1
2
3
4
5
6
7

The Honorable Ricardo S. Martinez

8

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11  WASHINGTON STATE ASSOCIATION OF
    HEAD START AND EARLY CHILDHOOD
12  ASSISTANCE AND EDUCATION PROGRAM,
    ILLINOIS HEAD START ASSOCIATION,
13  PENNSYLVANIA HEAD START
    ASSOCIATION, WISCONSIN HEAD START
14  ASSOCIATION, FAMILY FORWARD OREGON,
    and PARENT VOICES OAKLAND,
15                                    *Plaintiffs,*

16  v.

17  ROBERT F. KENNEDY, JR., in his official
    capacity as Secretary of Health and Human
18  Services; U.S. DEPARTMENT OF HEALTH
    AND HUMAN SERVICES; ANDREW
19  GRADISON, in his official capacity as Acting
    Assistant Secretary of the Administration for
20  Children and Families; ADMINISTRATION FOR
    CHILDREN AND FAMILIES; OFFICE OF
21  HEAD START; and TALA HOOBAN, in her
    official capacity as Acting Director of the Office of
22  Head Start,
                                    *Defendants.*
23

Case No. 2:25-cv-00781

**PLAINTIFFS' MOTION FOR
A PRELIMINARY
INJUNCTION**

NOTE ON MOTION CALENDAR:
JUNE 13, 2025

ORAL ARGUMENT
REQUESTED

24
25
26
27

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 1
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

## TABLE OF CONTENTS

INTRODUCTION ...............................................................................................................9

FACTUAL AND LEGAL BACKGROUND ...................................................................10

I.   Congress Created and Appropriated Funds for Head Start. .......................................11

II.  Defendants' DEIA Ban. ............................................................................................12

III. Defendants' Decimation of OHS. .............................................................................14

IV.  Irreparable Harms to Plaintiffs. ...............................................................................15

LEGAL STANDARD ......................................................................................................17

ARGUMENT ...................................................................................................................17

I.   Plaintiffs are Likely to Succeed on the Merits. .........................................................17

    A.  Defendants' DEIA Ban Violates the Constitution, APA, and Rehabilitation Act. .17

        1.  The DEIA Ban Violates the Fifth Amendment's Prohibition on Vagueness....17

        2.  The DEIA Ban Violates the First Amendment..............................................19

        3.  The DEIA Ban is Contrary to Separation of Powers & the Spending Clause. 21

        4.  The DEIA Ban Violates the APA and Section 504........................................22

            i.   The DEIA Ban is Contrary to Law and in Excess of Statutory Authority in
                 Violation of the APA. ..............................................................................22

            ii.  The DEIA Ban is Arbitrary and Capricious. .............................................24

    B.  OHS Decimation Through Mass Cuts Violates the Constitution and the APA......25

        1.  Defendants' Actions Violate the Separation of Powers. ...............................25

        2.  Defendants' Actions are Arbitrary and Capricious in Violation of the APA....26

II.  Defendants' Illegal Acts are Causing and Will Continue to Cause Plaintiffs Irreparable
     Harm. ......................................................................................................................28

    A.  The DEIA Ban Puts Agencies in an Impossible Double Bind. .............................28

    B.  Mass Cuts are Causing the Suspension and Degradation of Services. .................29

    C.  Parent Plaintiffs will be Irreparably Harmed by Defendants' Illegal Actions. ......30

III. The Balance of Equities & Public Interest Strongly Favor a Preliminary Injunction. 31

IV. Nationwide Relief is Appropriate. .................................................................32

CONCLUSION........................................................................................................33

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 3
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1

## <u>TABLE OF AUTHORITIES</u>

2

**Cases**

3

*Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*,
4
    570 U.S. 205 (2013) .................................................................................................. 19, 20

5

*Air Evac EMS, Inc. v. McVey*,
6
    37 F.4th 89 (4th Cir. 2022) ......................................................................................... 29

7

*Am. Fed'n of Gov't Emps. v. Trump*,
    No. 25-CV-03698-SI, 2025 WL 1358477 (N.D. Cal. May 9, 2025) .............................. 9, 29

8

*Am. Fed'n of Tchrs. v. Dep't of Educ.*,
9
    No. 25-cv-628-SAG, 2025 WL 1191844 (D. Md. Apr. 24, 2025)  ..................................... 9

10

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
11
    559 F.3d 1046 (9th Cir. 2009) ............................................................................... 28, 29

12

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) .................................................................................... 27

13

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife, Bureau of Land Mgmt.*,
14
    273 F.3d 1229 (9th Cir. 2001) .................................................................................... 26

15

*Ashton v. Kentucky*,
16
    384 U.S. 195 (1966) .................................................................................................. 18

17

*Backpage.com, LLC v. McKenna*,
    881 F. Supp. 2d 1262 (W.D. Wash. 2012) ................................................................... 18

18

*Bennett v. Spear*,
19
    520 U.S. 154 (1997) .................................................................................................. 22

20

*Boardman v. Pac. Seafood Grp.*,
21
    822 F.3d 1011 (9th Cir. 2016). .................................................................................... 31

22

*Bresgal v. Brock*,
    843 F.2d 1163 (9th Cir. 1987) .................................................................................... 32

23

*Chi. Women in Trades v. Trump*,
24
    No. 25 C 2005, 2025 WL 1114466 (N.D. Ill. Apr. 14, 2025) ................................. 9, 20, 22

25

*City & Cnty of San Francisco v. Trump*,
26
    No. 25-CV-01350-WHO, 2025 WL 1282637 (N.D. Cal. May 3, 2025) .............................. 9

27

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 4
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

*City of San Francisco v. Trump,*
   897 F.3d 1225 (9th Cir. 2018) ........................................................ 21

*Clinton v. City of New York,*
   524 U.S. 417 (1998) ..................................................................... 25

*Dep't of Homeland Sec. v. Regents of the Univ. of Ca.,*
   591 U.S. 1 (2020) ........................................................... 24, 25, 27

*Doe #1 v. Trump,*
   957 F.3d 1050 (9th Cir. 2020) ...................................................... 32

*E. Bay Sanctuary Covenant v. Biden,*
   993 F.3d 640 (9th Cir. 2021) ................................................. 28, 33

*Encino Motorcars, LLC v. Navarro,*
   579 U.S. 211 (2016) ..................................................................... 24

*FCC v. Fox Television Stations, Inc.,*
   556 U.S. 502 (2009) ..................................................................... 24

*FCC v. Fox Television Stations, Inc.,*
   567 U.S. 239 (2012) ................................................................ 17, 18

*Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ.,*
   82 F.4th 664 (9th Cir. 2023) ......................................................... 32

*Grayned v. City of Rockford,*
   408 U.S. 104 (1972) ................................................................ 19, 20

*HIAS, Inc. v. Trump,*
   985 F.3d 309 (4th Cir. 2021) ........................................................ 32

*Hunt v. City of Los Angeles,*
   638 F.3d 703 (9th Cir. 2011) ........................................................ 18

*In re Aiken Cnty.,*
   725 F.3d 255 (D.C. Cir. 2013) ...................................................... 21

*INS v. Chadha,*
   462 U.S. 919 (1983) ..................................................................... 25

*Isaacson v. Mayes,*
   84 F.4th 1089 (9th Cir. 2023) ....................................................... 28

*Jorgensen v. Cassiday,*
    320 F.3d 906 (9th Cir. 2003) ......................................................... 18

*King Cnty. v. Turner,*
    No. 2:25-CV-814, 2025 WL 1331488 (W.D. Wash. May 7, 2025) ...................................... 9

*Kolender v. Lawson,*
    461 U.S. 352 (1983).......................................................................... 18

*Loc. 2677, Am. Fed'n of Gov't Emps. v. Phillips,*
    358 F. Supp. 60 (D.D.C. 1973) ................................................. 26

*Melendres v. Arpaio,*
    695 F.3d 990 (9th Cir. 2012) ..................................................... 28

*Mingo Logan Coal Co. v. EPA,*
    829 F.3d 710 (D.C. Cir. 2016).................................................... 27

*Morales v. Trans World Airlines, Inc.,*
    504 U.S. 374 (1992) .................................................................... 29

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
    463 U.S. 29 (1983)................................................................ 26, 27

*Nat'l Educ. Ass'n v. U.S. Dep't of Educ.,*
    No. CIV.25-cv-091-LM, 2025 WL 1188160 (D.N.H. Apr. 24, 2025)........................... 9, 19

*Nat'l TPS All. v. Noem,*
    No. 25-cv-01766-EMC, 2025 WL 957677 (N.D. Cal. Mar. 31, 2025)....................... 17, 33

*New York v. Trump,*
    133 F.4th 51 (1st Cir. 2025) ........................................................ 9

*New York v. Trump,*
    No. 25-CV-39-JJM-PAS, 2025 WL 715621 (D.R.I. Mar. 6, 2025) ............................ 26, 29

*Nken v. Holder,*
    556 U.S. 418 (2009)..................................................................... 31

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.,*
    465 F.3d 977 (9th Cir. 2006)........................................................ 22

*PFLAG, Inc. v. Trump,*
    No. CV 25-337-BAH, 2025 WL 685124 (D. Md. Mar. 4, 2025)........................................ 9

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 6
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

*Planned Parenthood Great Nw. v. Labrador*,
  122 F.4th 825 (9th Cir. 2024) .......................................................................... 17

*R.A.V. v. City of St. Paul*,
  505 U.S. 377 (1992) ........................................................................................ 21

*Rhode Island v. Trump*,
  1:25-CV-128-JJM-LDA, 2025 WL 1303868 (D.R.I. May 6, 2025) ..................................... 9

*S.F. Unified Sch. Dist. v. AmeriCorps (SFUSD)*,
  No. 25-CV-02425-EMC, 2025 WL 974298 (N.D. Cal. Mar. 31, 2025) .................. 9, 22, 29

*Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*,
  508 F. Supp. 3d 521 (N.D. Cal. 2020) .............................................................. 19

*South Dakota v. Dole*,
  483 U.S. 203 (1987) ........................................................................................ 21

*Tenn. Educ. Ass'n v. Reynolds*,
  732 F. Supp. 3d 783 (M.D. Tenn. 2024) ..................................................... 19, 27

*United States v. Williams*,
  553 U.S. 285 (2008) ........................................................................................ 18

*Washington v. DeVos*,
  481 F. Supp. 3d 1184 (W.D. Wash. 2020) .......................................................... 32

*Washington v. Trump*,
  2025 WL 659057 (W.D. Wash. Feb. 28, 2025) ............................................. 22, 28

*Washington v. Trump*,
  No. 2:25-CV-00244-LK, 2025 WL 1180290 (W.D. Wash. Apr. 23, 2025) .......................... 9

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ............................................................................................ 17

*Wiley v. Kennedy*,
  No. 2:25-CV-00227, 2025 WL 1384768 (S.D.W. Va. May 13, 2025) ............................... 9

*Youngstown Sheet & Tube Co. v. Sawyer*,
  343 U.S. 579 (1952) ........................................................................................ 21

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**Statutes**

29 U.S.C. § 794 ................................................................................................. 24

42 U.S.C. § 9833 ............................................................................................... 11

42 U.S.C. § 9835 ........................................................................................ *passim*

42 U.S.C. § 9836 ................................................................................... 11, 22, 23

42 U.S.C. § 9840a ............................................................................... 11, 12, 32

42 U.S.C. § 9843 ........................................................................... 12, 23, 24, 25

42 U.S.C. § 9844 ............................................................................................... 12

42 U.S.C. § 9839 ............................................................................................... 26

42 U.S.C. § 9836a ...................................................................................... 25, 26

5 U.S.C. § 704 .................................................................................................. 22

5 U.S.C. § 705 ........................................................................................... 17, 33

5 U.S.C. § 706 ........................................................................................ 22, 23, 24

Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, § 1101(a)139
   Stat. 9 (2025) ........................................................................................... 12, 22

Further Consol. Appropriations Act, 2024, PL 118-47, Mar. 23, 2024, 138 Stat 460 ........ 12, 22

**Regulations**

45 C.F.R. § 1302.11(b) ....................................................................................

45 C.F.R. § 1302.92 .........................................................................................

45 C.F.R. § 1304.13 .........................................................................................

56 Fed. Reg. 26866-01 (June 11, 1991) ..........................................................

88 Fed. Reg. 32227 (May 19, 2023) ...............................................................

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1 ............................................................................ 21

U.S. Const. art. I, § 9, cl. 7 ............................................................................ 21

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 8
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1

## **INTRODUCTION**

2

3      Head Start is a nationwide program created by Congress to deliver comprehensive early

4 learning, health, nutrition, and family support services to children who are living in poverty.

5 Congress directs Head Start providers (known also as "agencies") to meet the needs of these

6 diverse families, including through culturally relevant and linguistically appropriate services and

7 inclusion of children with disabilities.

8      Defendants' actions contravene these Congressional mandates. Days after President

9 Trump took office, the administration unlawfully froze federal funding, in an effort to effectuate

10 the President's "anti-DEI executive orders," forcing several agencies to immediately suspend

11 services and lay off staff. Defendants have since continued these attacks by taking a series of

12 unconstitutional and illegal actions that degrade and destabilize the Head Start program. First,

13 Defendants issued sweeping and impermissibly vague bans on activities that promote or advance

14 "diversity," "equity," "inclusion," and/or "accessibility" ("DEIA"), which effectively forbid

15 agencies from meeting their obligations under the Head Start Act and the Rehabilitation Act.

16 Second, Defendants eliminated half of the regional offices and 60 percent of the staff tasked with

17 satisfying the obligations of the Head Start Act, creating, in the words of the Acting Director of

18 the Office of Head Start, "major holes" in their ability to adequately administer grants, provide

19 training and technical support, and monitor agencies. Courts across the country have enjoined

20 these types of administrative action.[1]

---

21 [1] *Wiley v. Kennedy*, No. 2:25-CV-00227, 2025 WL 1384768, at *13 (S.D. W. Va. May 13, 2025) (reduction in force);
*Am. Fed'n of Gov't Emps. v. Trump (AFGE)*, No. 25-CV-03698-SI, 2025 WL 1358477, at *16 (N.D. Cal. May 9,

22 2025) (largescale overhaul of federal agencies); *King Cnty. v. Turner*, No. 2:25-CV-814, 2025 WL 1331488, at *2
(W.D. Wash. May 7, 2025) (funding conditions); *Rhode Island v. Trump*, No. 1:25-CV-128-JJM-LDA, 2025 WL

23 1303868, at *18 (D.R.I. May 6, 2025) (agency dismantling); *City of San Francisco v. Trump*, No. 25-CV-01350-
WHO, 2025 WL 1282637, at *27 (N.D. Cal. May 3, 2025) (funding conditions); *Nat'l Educ. Ass'n v. U.S. Dep't of

24 *Educ.*, No. CIV.25-cv-091-LM, 2025 WL 1188160, at *19 (D.N.H. Apr. 24, 2025) (anti-DEI letter and certification);
*Am. Fed'n of Tchrs. v. Dep't of Educ.*, No. 25-cv-628-SAG, 2025 WL 1191844, at *14 (D. Md. Apr. 24, 2025) (anti-

25 DEI letter); *Chi. Women in Trades v. Trump (CWIT)*, No. 25-C-2005, 2025 WL 1114466, at *11 (N.D. Ill. Apr. 14,
2025); *S.F. Unified Sch. Dist. v. AmeriCorps (SFUSD)*, No. 25-CV-02425-EMC, 2025 WL 974298, at *5 (N.D. Cal.

26 Mar. 31, 2025) (anti-DEI certification); *New York v. Trump*, 133 F.4th 51, 58 (1st Cir. 2025) (funding freeze to
enforce EOs); *PFLAG, Inc. v. Trump*, No. CV 25-337-BAH, 2025 WL 685124, at *14 (D. Md. Mar. 4, 2025)

27 (funding conditions); *Washington v. Trump*, No. 2:25-CV-00244-LK, 2025 WL 659057, at *12 (W.D. Wash. Feb. 28,
2025) (funding conditions).

---

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 9
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Defendants' actions have sowed chaos, confusion, and uncertainty. Some Head Start programs across the country have been forced to temporarily close, and many more have been only days away from shuttering. Agencies are changing their programs to try to comply with the DEIA ban but cannot do so with any certainty because the ban's scope is limitless—and would force agencies to violate their other statutory obligations. In the face of this uncertainty, agencies are unable to retain and hire staff, who themselves cannot afford to risk a missed paycheck.

Now, nearly 800,000 Head Start children and families across the country are poised to suffer most of all. For them, losing access to Head Start would mean loss of education, disability and other support services, food security, healthcare and well-being, and would force parents and caregivers to miss work, lose their jobs, drop out of school and vocational programs, and endure significant financial and mental hardship.

A preliminary injunction is warranted because Plaintiffs are likely to succeed on the merits of their claims and an injunction would prevent the degradation and termination of services vital to hundreds of thousands of families and effectuate the laws Congress enacted.

## FACTUAL AND LEGAL BACKGROUND

Plaintiffs—four State Head Start Associations ("HSA Plaintiffs") and two parent-led membership organizations ("Parent Plaintiffs")—share a commitment to the Head Start program created by Congress to serve the diverse needs of children and families across the country. HSA Plaintiffs are statewide, non-profit, and nonpartisan associations of 180 member agencies that provide Head Start services to nearly 100,000 children.[2] Each HSA Plaintiff provides an array of services to its member agencies to ensure comprehensive, top-quality programs. Parent Plaintiffs are non-profit organizations representing parents, caregivers, and teachers of children currently

---

[2] Citations to declarations in support of Plaintiffs' Motion are referenced throughout by citation to the last name of the declarant. For example, the Declaration of Joel Ryan is abbreviated as "Ryan." Ryan ¶14; Morrison-Frichtl ¶3; Maunnamalai ¶3; McFalls ¶¶4,6.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 10
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1  enrolled in Head Start.[3] Parent Plaintiffs advocate for high-quality, affordable, and culturally

2  competent childcare.[4]

3  **I.    Congress Created and Appropriated Funds for Head Start.**

4        Congress created Head Start to provide young children from low-income families with a

5  comprehensive education program that prepares them for school and life beyond.[5] Through the

6  Head Start Act, as amended by the Improving Head Start for School Readiness Act of 2007,

7  Congress tasked the Secretary of Health and Human Services ("HHS") with providing grant

8  administration, training and technical assistance ("TTA"), and monitoring support for local

9  programs.

10       Grant Administration: The Head Start Act directs the Secretary to designate agencies to

11  implement the Head Start program in a particular geographic area, 42 U.S.C. §§ 9833, 9840a, and

12  serve Native American and migrant/seasonal farmworker families through a national

13  administrative arrangement, *id.* § 9835(a). Agencies are "designated" for five-year periods, during

14  which federal funds cover at least 80 percent of the approved costs of the Head Start program. *Id.*

15  § 9835(b). Designated agencies receive a Notice of Award ("NOA"), which allows them to draw

16  down federal funds. HHS renews each agency's grant annually, a process referred to as a

17  "continuation grant" for "an amount equal to that agency's base grant for the prior fiscal year."

18  *Id.* § 9835(a)(2)(B). HHS does not permit agencies to hold funds for more than three working

19  days, requiring them to draw down funding on an "as needed basis."[6]

20       TTA and Monitoring: The Head Start Act directs the Secretary to enact "program

21  performance standards by regulation" that are "scientifically based and developmentally

22  appropriate," 42 U.S.C. § 9836(a); assure that "not less than 10 percent" of children enrolled are

23  children with disabilities, *id.* § 9835(d); and identify and prioritize "homeless children," *id.*

24  _____

25  [3] Vickers ¶4; Doutherd ¶4.

26  [4] *Id.*

    [5] Calvo-Friedman Ex. 1; Zaslow ¶¶6-12.

27  [6] Calvo-Friedman Ex. 2.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 11
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

§ 9835(m).[7] The Secretary must allocate funding to provide training, technical assistance, monitoring, and research to ensure compliance with program Performance Standards. *Id.* §§ 9835(a)(2)(C)-(E), 9840a(e)-(g), 9843, 9844.

By delegation, most of the Secretary's duties are performed by the Office of Head Start (OHS), with the majority of staff working out of Head Start regional offices. 88 Fed. Reg. 32227, 32229 (May 19, 2023). During FY2024, HHS operated 10 regional offices and employed approximately 250 staff. Garvin ¶20. OHS staff designate, fund, support, train, and monitor approximately 1,600 agencies serving 800,000 children and their families, and are critical to ensuring HSA Plaintiffs' members comply with program requirements.[8]

To enable Defendants to carry out these and other responsibilities, Congress appropriated $12,271,820,000 "for making payments under the Head Start Act," including $21,000,000 specifically for the "Federal administrative costs" of the Head Start Program in FY2024. Further Consol. Appropriations Act, 2024, Pub. L. 118-47, 138 Stat 460 (2024). Congress provided the same amount of funding for FY2025. Full-Year Continuing Appropriations and Extensions Act, 2025, Pub. L. 119-4, § 1101(a), 139 Stat. 9 (2025).

## II. Defendants' DEIA Ban.

Within the first week of his second administration, President Trump took steps to eliminate "diversity," "equity," "inclusion," and "accessibility," without defining any of these terms. *See* Am. Compl. ¶¶229-31.

Defendants have since implemented these anti-DEIA policies through two agency actions (collectively, the "DEIA Ban."). First, on March 14, 2025, the Administration for Children and Families within HHS issued a letter imposing funding consequences for agencies that "promote" or "take part" in any "diversity, equity, and inclusion (DEI) initiatives" (the "DEI Letter").[9] Second, on April 16, 2025, HHS amended its Grants Policy Statement, a document incorporated

---

[7] *See also* Calvo-Friedman Ex. 3.

[8] Garvin ¶¶11–24; Ryan ¶¶42–43; Morrison-Frichtl ¶44; Maunnamalai ¶53; Doe ¶34; Neas ¶¶13–15; McFalls ¶48.

[9] Calvo-Friedman Exs. 5, 6.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

into every new NOA, to require agencies to certify that they "do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" (the "DEIA Certification").[10] Neither the DEI Letter nor the DEIA Certification define any of the relevant terms.

The DEIA Ban has significant repercussions for Head Start agencies. If a funding recipient engages in "DEIA," consequences include a claw-back of grant funds and potential program termination, as well as civil and criminal liability under the False Claims Act. Rejecting the DEIA Certification means rejecting the NOA and the federal funds covering at least 80 percent of the costs of the agency's Head Start program, 42 U.S.C. § 9835(b), and losing its designation and the right to compete in the next funding cycle, 45 C.F.R. § 1304.13. Practically speaking, most Head Start programs would close within months or even days.[11]

Defendants have already begun enforcing the DEIA Ban through OHS's grant review process by, for example, requiring HSA Plaintiffs' members to amend program descriptions and, in some cases, change core components of their programs. OHS staff instructed HSA Plaintiffs' members to remove entire sections of their applications—such as an anti-bias training and a program goal aimed at addressing marginalization of underrepresented groups in the workplace.[12] Other agencies were directed to delete "non-English speaker" as a selection criterion,[13] and to remove planned training on the ADA.[14]

HSA Plaintiffs' members are considering discontinuing use of many standard educational methods, services, and tools they reasonably fear might contravene the DEIA Ban, but without any assurances that such actions are sufficient to comply with the Ban.[15] These include programs

---

[10] Calvo-Friedman Ex. 7 at 18-19.
[11] Ryan ¶50; Morrison-Frichtl ¶43.
[12] Morrison-Frichtl ¶¶34-35.
[13] Morrison-Frichtl ¶23.
[14] Ryan ¶78.
[15] Maunnamalai ¶¶33-50; McFalls ¶¶29-30; Morrison-Frichtl ¶¶25-28; Ryan ¶¶31-36.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 13
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

and activities core to HSA Plaintiffs' members abilities to meet Head Start Performance Standards, and that are critical to Parent Plaintiffs' members, [16] including linguistically appropriate services (e.g., support for dual language learners and their families),[17] cultural and language preservation of Native American Tribes,[18] specialized services for migrant/seasonal agricultural workers,[19] culturally appropriate engagement of families,[20] training on cultural competence,[21] culturally-relevant teaching materials that express diversity,[22] father-focused activities,[23] prioritization of children experiencing homelessness or in foster care,[24] and meeting the needs of children with disabilities through inclusion.[25] The conflict between the Head Start Act and the DEIA Ban puts HSA Plaintiffs' members in an impossible double-bind and degrades if not eliminates the services that are vital to Parent Plaintiffs' members.[26]

### III.    Defendants' Decimation of OHS.

On March 27, 2025, HHS issued a directive to remake its programs through mass layoffs and office closures, firing approximately a quarter of HHS's staff, with formal termination scheduled for June 2 ("mass cuts").[27] On April 1, 2025, HHS suddenly closed half of its regional offices, leaving Head Start agencies in 23 states without any program staff, and laying off

---

[16] Doutherd ¶¶18-24, 32-42; Vickers ¶¶6, 14-23, 31-44; Guerra ¶¶7-16; FFO Member A ¶¶6-17; FFO Member B ¶¶7-14, 17-22.

[17] Maunnamalai ¶¶17, 37-38; Morrison-Frichtl ¶¶25, 30; Ryan ¶¶12, 17(b), 31(a), (c), (i), (j), (k), (n); FFO Member A ¶¶10, 16; Doutherd ¶22, 34-38; Vickers ¶22, 40-42.

[18] Maunnamalai ¶¶17, 19, 41.

[19] Maunnamalai ¶18; Morrison-Frichtl ¶¶10, 13.

[20] Maunnamalai ¶40; Morrison-Frichtl ¶¶29-31; Ryan ¶¶12, 31(d), (h).

[21] Morrison-Frichtl ¶33; Maunnamalai ¶¶21, 42; Ryan ¶31(c).

[22] Ryan ¶79(f); Guerra ¶12; Williams ¶14.

[23] Ryan ¶79(j); McFalls ¶29(i-j).

[24] Maunnamalai ¶¶48-50, Morrison-Frichtl ¶27; Zaslow ¶¶16-17; FFO Member B ¶¶12-14; Doutherd ¶¶24, 41-42.

[25] Maunnamalai ¶¶44-47; Morrison-Frichtl ¶26; Ryan ¶31(g), 79(d), (i), (l); Doe ¶31; Doutherd ¶¶23, 39-40; Vickers ¶¶23, 43-44; Zaslow ¶17; Neas ¶¶14, 20; FFO Member B ¶¶5, 7-8; McFalls ¶29(e-f); Williams ¶¶7-8.

[26] Maunnamalai ¶¶35, 39, 43, 50; Morrison-Frichtl ¶¶28, 36-38; Ryan ¶¶21, 75, 77; Doe ¶¶23-28; Neas ¶20; Doutherd ¶¶18-24, 32-42; Vickers ¶¶6, 14-23, 31-44; FFO Member A ¶¶6-17; FFO Member B ¶¶5, 7-14; Guerra ¶¶7-16; McFalls ¶32, 34; Williams ¶¶6-8, 12-16; *see generally* Calvo-Friedman Ex. 39.

[27] Calvo-Friedman Ex. 8, 9.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 14
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

additional OHS Staff at the regional offices that remained open.[28] So far, Defendants have purged 60 percent of OHS staff, making it "virtually impossible" for those who remain to meet the obligation to administer Head Start.[29] Secretary Kennedy acknowledged that HHS did not perform a detailed "line by line" review of the responsibilities of each fired employee, and that about 20 percent of the layoffs could be "mistakes" requiring reinstatement.[30] On or about April 10, 2025, OMB notified HHS that "[t]he [President's] Budget does not fund Head Start" and directed HHS to work with OMB "to ensure to the extent allowable FY 2025 funds are made available to *close out the program*" and to "achieve" staff reductions consistent with the FY2026 Budget, i.e., the elimination of Head Start entirely.[31]

After the mass cuts, HSA Plaintiffs' members have struggled to make contact with program administrators,[32] experienced extreme delays in necessary funding approvals,[33] and have lost training and technical assistance support[34] provided by OHS staff. As a result, one of the HSA Plaintiffs' members has already had to suspend services.[35] Many more have been days or weeks away from having to close.[36] On May 1, 2025, the OHS Acting Director acknowledged in a webinar that there were "major holes" in coverage because of the loss of "subject-matter experts" with decades of experience who would never be able to be replaced.[37]

## IV. Irreparable Harms to Plaintiffs.

Each HSA Plaintiff has members subject to the DEI Letter, and subject or soon subject to the DEIA Certification. The DEIA Ban places HSA Plaintiffs' members in an impossible double

---

[28] *Id.* Ex.10; McFalls ¶¶46-49; Ryan ¶40-42.

[29] Garvin ¶21.

[30] Calvo-Friedman Ex. 11.

[31] *Id.* Ex. 12 at 46-47, 60 (emphasis added).

[32] Maunnamalai ¶¶55, 57-58; Morrison-Frichtl ¶47; Ryan ¶¶41-44, 46,58; Doe ¶¶21, 35-40.

[33] Morrison-Frichtl ¶¶49-51; Maunnamalai ¶¶57, 59; McFalls ¶¶49, 52; Ryan ¶¶50, 63-64; Doe ¶41.

[34] Maunnamalai ¶58; McFalls ¶50; Ryan ¶49; Doe ¶16(a); Neas ¶¶15-16.

[35] Ryan ¶¶51-54.

[36] McFalls ¶¶21-22, 40, 51-54; Morrison-Frichtl ¶¶49-50; Ryan ¶¶50, 59-62; Doe ¶37.

[37] Ryan ¶67; Morrison-Frichtl ¶48; Maunnamalai ¶56.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 15
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

bind: they can refuse to comply with the DEIA Ban and lose federal designation and funding for the program on which their communities rely, or they can attempt to comply with the DEIA Ban, which makes it impossible to fulfill their statutory obligations to provide culturally, linguistically, and developmentally appropriate education and services. Worse still, this "choice" is illusory, as HSA Plaintiffs' members have no way to know the scope of the DEIA Ban and thus face arbitrary enforcement at any time. Moreover, under the Certification, agencies that engage in "DEIA" activities—even those required by statute or outside the Head Start program—may be subjected to ruinous penalties and criminal investigation under the False Claims Act.[38]

Plaintiffs are also irreparably harmed by OHS cuts. Since the sudden elimination of five regional offices and staff on April 1, HSA Plaintiffs' members and Head Start agencies across the country have struggled to access grant funds and experienced severe delays in receiving notice about future funding that, if left unresolved, could require HSA Plaintiffs' members to close their doors as soon as June 1. Agencies that were working with now-terminated OHS staff to resolve technical errors in grant documents have been left in the lurch.[39] Agencies with annual renewal periods ending May 31 are still waiting for NOAs.[40]

Defendants are interfering with the continued operation of Head Start programs across the country by hamstringing their ability to comply with the evidence-based Performance Standards,[41] to plan ahead,[42] and to recruit and retain staff.[43] Parent Plaintiffs' members fear the sudden closure of programs as a result of Defendants' actions, which would immediately harm their children and impede their own ability to attend work or school.[44]

---

[38] Maunnamalai ¶63; Morrison-Frichtl ¶¶36-38.

[39] *See* Ryan ¶¶68-71; Morrison-Frichtl ¶¶54-55.

[40] Morrison-Frichtl ¶51.

[41] Ryan ¶78; Morrison-Frichtl ¶¶23, 34-35.

[42] Morrison-Frichtl ¶56; McFalls ¶49; Ryan ¶62; Doe ¶32.

[43] Maunnamalai ¶59; McFalls ¶¶54-56; Morrison-Frichtl ¶57; Ryan ¶96; FFO Member B ¶¶17, 19-20.

[44] Morrison-Frichtl ¶58; Maunnamalai ¶¶23-24, 64; McFalls ¶65; Ryan ¶¶53, 99-100, 107; Doe ¶¶16(a), 16(f), 44-46; Doutherd ¶¶18-24, 32-42; Vickers ¶¶22-23, 31-44; FFO Member A ¶¶6-18; FFO Member B ¶¶17-20, 22, 24; Guerra ¶¶6-16; Zaslow ¶¶58-60; Neas ¶20; Williams ¶¶12-13, 15-16.

---

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 16
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1

## LEGAL STANDARD

Plaintiffs meet the requirements for a preliminary injunction. They are "likely to succeed on the merits" and are "likely to suffer irreparable harm in the absence of preliminary relief,…the balance of equities tips in [their] favor, and [] an injunction is in the public interest." *Planned Parenthood Great Nw. v. Labrador*, 122 F.4th 825, 843 (9th Cir. 2024) (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). The APA also authorizes courts to "preserve status or rights pending conclusion of review proceedings," 5 U.S.C. § 705, under the same standard as that for a preliminary injunction. *See Nat'l TPS All. v. Noem*, No. 25-cv-01766-EMC, 2025 WL 957677, at *20 (N.D. Cal. Mar. 31, 2025).

## ARGUMENT

### I.    Plaintiffs are Likely to Succeed on the Merits.

Plaintiffs are likely to succeed on the merits of their claims that (A) the DEIA Ban violates the Constitution, the APA, and the Rehabilitation Act, and (B) the mass cuts violate the Constitution and the APA.

### A.  Defendants' DEIA Ban Violates the Constitution, APA, and Rehabilitation Act.

The DEIA Ban is an impermissibly vague directive that suppresses speech and fundamentally threatens the core of the Head Start program in contravention of Congressional mandate. Indeed, administration officials have described Head Start as a program with a "radical curriculum" that includes "diversity, equity, and inclusion programming."[45] Defendants now unlawfully seek to interfere with the program's longstanding goals and continued operation. Multiple courts have found similar actions likely unlawful under the Constitution and the APA. *See supra* n.1.

#### 1.  The DEIA Ban Violates the Fifth Amendment's Prohibition on Vagueness.

"[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). A

---

[45] Calvo-Friedman Ex. 13.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 17
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

regulation is "void for vagueness when it either (1) fails to give a 'person of ordinary intelligence a reasonable opportunity to know what is prohibited;' (2) 'impermissibly delegates basic policy matters…for resolution on an ad hoc and subjective basis…or (3) 'abut(s) upon sensitive areas of basic First Amendment freedoms, [] operat[ing] to inhibit the exercise of (those) freedoms.'" *Hunt v. City of Los Angeles*, 638 F.3d 703, 712 (9th Cir. 2011) (quoting *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972)). "Vague laws in any area suffer a constitutional infirmity," *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966), but the Supreme Court has especially cautioned that, "[w]hen speech is involved, rigorous adherence" to the requirement of clarity "is necessary to ensure that ambiguity does not chill protected speech." *Fox*, 567 U.S. at 253-54; *see, e.g., Backpage.com, LLC v. McKenna*, 881 F. Supp. 2d 1262, 1279 (W.D. Wash. 2012).

Defendants' DEIA Ban, comprised of the DEI Letter and the DEIA Certification, prohibits programs or initiatives that "promote" or "advance" "diversity," "equity," "inclusion," "DEI," "accessibility," or "DEIA." By proscribing conduct and speech based on terms with "such amorphous meanings that it makes it difficult, if not impossible, for an individual to determine whether his conduct is proscribed," *Hunt*, 638 F.3d at 711, Defendants deprive HSA Plaintiffs of their due process right to "know what is required of them so they may act accordingly," *Fox*, 567 U.S. at 253. And because the Ban has no ascertainable standard, enforcement necessarily turns on subjective evaluation, "with the attendant dangers of arbitrary and discriminatory application." *Grayned*, 408 U.S. at 109; *see also Kolender v. Lawson*, 461 U.S. 352, 361 (1983) (use of subjective criteria "encourages arbitrary enforcement"). This amorphous prohibition leaves complete discretion in the hands of regulators to determine whether an agency will be subjected to ruinous penalties and even criminal investigation.

The DEIA Ban contains no "definitions, narrowing context, or settled legal meanings," *United States v. Williams*, 553 U.S. 285, 306 (2008), nor any "limiting examples to illustrate" the meaning of the terms, *Hunt*, 638 F.3d at 711. As one court recently explained, "DEI as a concept is broad: one can imagine a wide range of viewpoints on what the values of diversity, equity, and inclusion mean when describing a program or practice. It is no surprise that several courts—

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 18
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

including this one—have struck down similar laws as void for vagueness." *Nat'l Educ. Ass'n*, 2025 WL 1188160, at \*19; *see also Tenn. Educ. Ass'n v. Reynolds*, 732 F. Supp. 3d 783, 807 (M.D. Tenn. 2024) (law "built around unrestrained appeals to abstract principles with contestable moral and political content" was unconstitutionally vague); *Santa Cruz Lesbian & Gay Cmty. Ctr. v. Trump*, 508 F. Supp. 3d 521, 543 (N.D. Cal. 2020) (restriction "so vague that it is impossible for Plaintiffs to determine what conduct is prohibited" violates due process); *see Williams*, 553 U.S. at 294 (word "promote" is "susceptible of multiple and wide-ranging meanings.").

Under these vague and imprecise standards, it is virtually impossible for HSA Plaintiffs' members to avoid using language or engaging in activities that a regulator could perceive as promoting diversity, equity, inclusion, or accessibility.[46] Not even the people charged with enforcing the DEIA Ban know what it means, as evidenced by their inconsistent explanations.[47] When the DEIA Ban was announced, a former program specialist explained that "[w]e were looking around at each other like, 'I don't know what to say.' We have a ten-percent disability requirement—ten percent of the kids enrolled in our program have to qualify with a disability. Like, that's D.E.I."[48]

Further, because the DEIA Ban applies to all of an agency's programs—including those outside the federally funded Head Start program—it "abut(s) upon sensitive areas of basic First Amendment freedoms" and "operates to inhibit the exercise of (those) freedoms," *Grayned*, 408 U.S. at 109, as described below.

### 2. *Defendants' DEIA Ban Violates the First Amendment.*

The government may not leverage funding to "regulate speech outside the contours of the federal program." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc. (AFID)*, 570 U.S. 205, 214-15 (2013). The DEIA Certification applies to "any programs" of the grant recipient, and the Department of Justice has conceded that the Certification Provision in the Executive Order—the

---

[46] Maunnamalai ¶¶ 30, 3-34; McFalls ¶13; Morrison-Frichtl ¶¶20-22; Ryan ¶¶14-16, 24-25, 56; Doe ¶¶18-19, 23, 33.
[47] McFalls ¶¶13,15; Morrison-Frichtl ¶23; Ryan ¶30.
[48] Calvo-Friedman Ex. 14.; *See also* McFalls ¶32; Ryan ¶38; Doe ¶20.

basis for the DEI Certification required here—"attempts to regulate grantees' speech outside of their federally-funded programs." *CWIT*, 2025 WL 1114466, at *11 (quoting government's statement at hearing: "[W]e're not arguing that the Certification Provision doesn't apply outside of the grants or contracts. It does. It plainly does.").

As a result, HSA Plaintiffs and their members are impermissibly chilled in their speech based on viewpoint and required to suppress expressions and support for activities that could be construed as "promot[ing]" "DEIA," including outside of the contours of federally funded programming. HSA Plaintiffs' members are prohibited from allowing staff—even those not funded by Head Start—to attend trainings or engage in speaking opportunities, if any of the topics covered could be construed as "DEIA" related.[49] HSA Plaintiffs have stopped offering previously popular trainings on topics such as enhancing inclusionary practices and evidence-based culturally responsive education because most of their members provide Head Start services, and are afraid to attend.[50] And HSA Plaintiffs' members are removing language or concepts that could be considered "DEIA" related from the descriptions of their organizations, restricting their ability to authentically communicate with the populations they serve.[51] Indeed, one of Plaintiff HSAs' members, whose Head Start program is part of a college, had its grant returned for revisions because the Vice President of Equity, Inclusion, and Belonging for the college serves on one of the Head Start program's governing bodies.[52] The government violates the First Amendment when it uses government funding to impede HSA Plaintiffs' expressions of support for equity and inclusion—such as attending or offering trainings, participating in speaking events, and choosing how to describe themselves publicly, outside of the contours of the Head Start program. *See AFID*, 570 U.S. at 214-16.

---

[49] Maunnamalai ¶51; Morrison-Frichtl ¶¶36-39; McFalls ¶¶58-60.
[50] Ryan ¶¶82-83.
[51] Maunnamalai ¶52.
[52] Ryan ¶55.

Additionally, the DEIA Certification's purported limitation to DEIA that violates federal anti-discrimination law fails to save it. Even were it so limited, Defendants nevertheless engage in impermissible viewpoint-based discrimination because the DEIA Ban singles out speech for adverse action "because of disapproval of the ideas expressed." *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382, 293 (1992) (striking ordinance that prohibits fighting words that contain messages of "bias-motivated" hatred for violating First Amendment). The DEIA Ban does exactly what the First Amendment proscribes: it prohibits only speech that expresses messages and perspectives that the government does not like.

### 3. The DEIA Ban is Contrary to Separation of Powers and the Spending Clause.

By issuing the DEIA Ban and attempting to fundamentally alter the core of the Head Start program, Defendants unlawfully arrogated to the Executive Branch power that belongs exclusively to Congress. The Constitution "exclusively grants the power of the purse to Congress, not the President," through the Appropriations Clause, U.S. Const. art. I, § 9, cl. 7, and the Spending Clause, U.S. Const. art. I, § 8, cl. 1. *City of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018). Only Congress is authorized to direct how appropriated funds should be spent through federal grants. *Id.*; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987) (Spending Clause allows Congress, not the Executive Branch, to "attach conditions on the receipt of federal funds…to further broad policy objectives."). Accordingly, Defendants may not impose conditions on federal funding unless Congress has explicitly delegated such authority. *San Francisco*, 897 F.3d at 1235 (executive order withholding funds from "sanctuary cities" violated Separation of Powers "[b]ecause Congress did not authorize withholding of funds"); *see also In re Aiken Cty.*, 725 F.3d 255, 259 (D.C. Cir. 2013) (Kavanaugh, J.) ("[T]he President may not decline to follow a statutory mandate or prohibition simply because of policy objections."); *see generally Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 637-38 (1952) (Jackson, J., concurring).

Congress has exercised its authority to create and fund the Head Start program at its current capacity, most recently through the Further Consolidated Appropriations Act of 2024 and

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 21
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

FY2025 Continuing Resolution. 138 Stat. 460 (Mar. 23, 2024); 139 Stat. 9 (2025). The appropriated funds contain no conditions prohibiting "promot[ing]" "diversity," "equity," "inclusion," and/or "accessibility," nor has Congress delegated such authority to the Executive Branch. Rather, such conditions conflict with the plain language of the Head Start Act, which requires agencies to meet the "diverse needs of the population served," 42 U.S.C. § 9836(d)(2)(L); *see* Calvo-Freidman Ex. 39; *Washington v. Trump*, 2025 WL 659057, at *12 ("anti-DEI" conditions likely violates the Separation of Powers because "none of the funds received by medical institutions in the Plaintiff States have a congressionally authorized condition requiring them to refrain from the provision of gender-affirming care."); *CWIT*, 2025 WL 1114466, at *22 (enjoining termination of an "equity-related" grant issued under a statute authorizing technical assistance supporting women). Defendants' DEIA Ban further violates the Spending Clause because the conditions on the receipt of federal funds are ambiguous as set forth above. *SFUSD*, 2025 WL 974298, at *6-7 (granting temporary restraining order to prevent implementation of AmeriCorp's version of the DEIA Certification).

### 4.  *The DEIA Ban Violates the APA and Section 504.*

The DEI Letter and DEIA Certification are "final agency actions." 5 U.S.C. § 704. Each are formal directives that reflect a consummation of decision-making and from which legal obligations and consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177-78 (1997). Both directives have already changed the way that agencies operate. *See Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982-83 (9th Cir. 2006).

### i.  The DEIA Ban is Contrary to Law and in Excess of Statutory Authority in Violation of the APA.

The DEIA Ban violates the APA because it is "contrary to constitutional right[s]," *see* Sections A.1-A.3, *supra*, conflicts with numerous mandates set forth in the Head Start Act and its implementing regulations, and Section 504 of the Rehabilitation Act, and is therefore "not in accordance with law." 5 U.S.C. §§ 706(2)(A), (B). Because the DEIA Ban is contrary to law,

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 22
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Defendants have acted in excess of their statutory authority in violation of 5 U.S.C. § 706(2)(C). Therefore, the Ban must be "set aside." *Id.* § 706(2).

The DEIA Ban's prohibition on promoting diversity, equity, inclusion, and accessibility conflicts with the legal obligations of Head Start agencies and Defendants' own obligations in administering the program in at least three ways. First, the Head Start Act and its implementing regulations require agencies to consider and take action based on diversity, equity, and inclusion principles. For example, agencies must meet the "diverse needs of the populations served," 42 U.S.C. § 9836(d)(2)(L), and conduct an annual review that considers "how the program addresses equity, accessibility, and inclusiveness in its provision of services," 45 C.F.R. § 1302.11(b); *see also* Am. Compl. ¶¶79-82 (describing requirements to meet needs of local community), ¶¶89-92 (describing requirements to provide "linguistically and culturally appropriate" services and education, "create learning environments that support children's diversity," and meet the "unique needs of children and families of bilingual and multicultural backgrounds"). To qualify for federal designation and funding, HSA Plaintiffs' members must have programs and initiatives that meet these standards. *See generally* Calvo-Friedman Ex. 39.

Second, the Head Start Act, its implementing regulations, and Section 504, require agencies to ensure that children with disabilities have "access to and can fully participate in the full range of activities and services," including through reasonable accommodations. 45 C.F.R. § 1302.61(a); Am. Compl. ¶¶99-103 (requirements to enroll and provide equal access to children with disabilities, including making "necessary accommodations"); ¶387 (requirements under Section 504); Neas ¶¶12-14; Neas Ex. A ("Inclusion in early childhood programs," including Head Start, refers to "including children with disabilities in early childhood programs together with their peers without disabilities."). Agencies must reserve at least 10 percent of a program's enrollment for children with disabilities. Neas ¶13; 42 U.S.C. § 9835(d). Agencies are affirmatively required to provide training for staff who work with children with disabilities. Am. Compl. ¶123 (citing 45 C.F.R. § 1302.92 and 42 U.S.C. § 9843). To qualify for federal funding, HSA Plaintiffs' members must have programs and initiatives that meet these requirements. These

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 23
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

requirements are in plain conflict with the Ban on activities "promot[ing]" "inclusion" and "accessibility."

Third, the DEIA Ban contravenes Defendants' obligations under the Head Start Act and Section 504. Under the Act, the "Secretary shall develop and implement a program of outreach to recruit and train professionals from diverse backgrounds to become Head Start teachers in order to reflect the communities in which Head Start children live and to increase the provision of quality services and instruction to children with diverse backgrounds." 42 U.S.C. § 9843(c). In training and technical assistance, the Secretary is required to prioritize "instruction for providing services to children with disabilities." *Id.* § 9843(a)(3)(A)(iii). Additionally, under Section 504, HHS must not "subject[] to discrimination" any "otherwise qualified individual with a disability" under any "program or activity" it conducts. 29 U.S.C. § 794(a); Am. Compl. ¶392 (implementing regulations). These obligations necessarily involve the "advancement" of "diversity," "inclusion," and/or "accessibility."

Because the DEIA Ban is contrary to law, Defendants have acted in "excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(C).

> ii.    The DEIA Ban is Arbitrary and Capricious.

The APA further "requires agencies to engage in 'reasoned decisionmaking.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Ca.*, 591 U.S. 1, 16 (2020) (citation omitted). Defendants' DEIA Ban is arbitrary and capricious for two reasons.

First, the DEIA Ban abandons decades of policy. When an agency changes an existing policy, it must "display awareness that it is changing its position," *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), and "be cognizant that longstanding policies may have 'engendered serious reliance interests that must be taken into account," *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 212-22 (2016) (citation omitted). For decades, Defendants have consistently required Head Start agencies to "address issues of cultural relevance and diversity,"

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 24
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Calvo-Friedman Ex. 15, and serve children with disabilities in inclusive settings, *see, e.g.*, 56 Fed. Reg. 26866-01 (June 11, 1991). The DEIA Ban forces HSA Plaintiffs to abruptly change course.

Second, Defendants' failure to consider how the DEIA Ban's vague prohibitions conflict with the Head Start Act, implementing regulations, and state and local laws have weakened the ability of HSA Plaintiffs' members to effectively run their programs.[53] Defendants have failed to meet their obligations to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Regents of the Univ. of Cal.*, 591 U.S. at 33.

For the foregoing reasons, Plaintiffs are likely to succeed on their claims that the DEIA Ban violates the Constitution, the APA, and Section 504.

**B. OHS Decimation Through Mass Cuts Violates the Constitution and the APA.**

*1. Defendants' Actions Violate the Separation of Powers.*

Defendants usurped Congress's lawmaking power through mass cuts because these actions prevent the Head Start program from operating in compliance with the Head Start Act. The Executive Branch lacks the power "to enact, to amend, or to repeal statutes." *Clinton v. City of New York*, 524 U.S. 417, 438 (1998) (citing *INS v. Chadha*, 462 U.S. 919, 954 (1983)). Nor has Congress authorized HHS to withhold or terminate funds allocated to Head Start, including funds to employ personnel necessary to operate the program at current capacity. But that is just what these mass cuts do.

Under the Head Start Act, the Secretary "shall," through funds appropriated by Congress, "allocate such sums in accordance" with the statute to Head Start agencies, 42 U.S.C. § 9835(a); monitor Head Start agencies and programs, *id.* § 9836a; "provide…technical assistance and training for Head Start programs for the purposes of improving program quality and helping prepare children to succeed in school," *id.* § 9843(a); and administer operations, such as

---

[53] *See* Morrison-Frichtl ¶¶20-38; Ryan ¶¶7, 12, 20-39.

1    "adjust[ing] as necessary the requirements relating to funded enrollment" and approving waivers

2    and capital investment payments, *id.* §§ 9836a, 9835, 9839.

3        Defendants violated the direction of Congress when HHS closed half of Head Start

4    regional offices and laid off 60 percent of the OHS staff—leaving *just 100 people total* to provide

5    core administration, oversight, monitoring, training, and technical assistance to 1,600 agencies

6    across the country. Twenty-three states have lost their OHS regional office. And Defendants took

7    these actions with no alternative plan for administering Head Start, leaving the program in

8    shambles. As a recent OHS Director explains, it is "virtually impossible" for the remaining OHS

9    staff to meet the obligation to administer Head Start.[54] Unless Congress itself terminates a

10   program, "historical precedent, logic, and the text of the Constitution itself obligate the defendant

11   to continue to operate the…programs as was intended by the Congress…." *Loc. 2677, Am. Fed'n*

12   *of Gov't Emps. v. Phillips*, 358 F. Supp. 60, 76 (D.D.C. 1973).

13            *2.  Defendants' Actions are Arbitrary and Capricious in Violation of the APA.*

14       Defendants implemented mass cuts without sufficient reasoning or justification, plainly

15   falling short of their duty to "articulate a satisfactory explanation for its action." *Motor Vehicle*

16   *Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). HHS provided no factual

17   findings or bases for its decisions, making it impossible to "articulate[] a rational connection

18   between the facts found and the choices made." *See Ariz. Cattle Growers' Ass'n v. U.S. Fish &*

19   *Wildlife, Bureau of Land Mgmt.*, 273 F.3d 1229, 1243 (9th Cir. 2001); *see also New York v. Trump*,

20   No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *8 (D.R.I. Mar. 6, 2025) (agencies' funding freezes

21   pursuant to executive order are arbitrary and capricious because the record "does not suggest that

22   agencies made individualized assessments…before making the determination to blankety

23   pause…funds.").

24       Defendants' actions are arbitrary and capricious for three reasons. First, they have failed

25   to consider "important aspect[s] of the problem" created by mass cuts, *Motor Vehicle Mfrs. Ass'n*,

26

27   _____
     [54] Garvin ¶21.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 26
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

463 U.S. at 43, including how federal OHS staff will fulfill their statutory obligation to monitor and support agencies.[55] Defendants have not addressed how they will continue to (1) ensure that agencies understand and have necessary guidance to comply with Performance Standards; (2) monitor agencies for compliance with the Performance Standards; and (3) provide other necessary support for agencies' day-to-day operations, including, crucially, administering grant funds and providing information about the status of funding.[56]

Second, the sudden mass cuts have significant costs and burdens that Defendants have failed to acknowledge or consider. *See Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 732-33 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act."); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017). Defendants have caused predictable confusion, instability, and stress for Head Start agencies and the families they serve, with immediate impacts, including on agencies' ability to recruit and retain staff amidst already "severe workforce challenges."[57]

Finally, Defendants failed to meet their obligation to assess reliance interests. *See Regents of the Univ. of Cal.*, 591 U.S. at 33. HHS has given no indication it has considered the reliance of HSA Plaintiffs' members on the regional offices and staff. HHS has not told agencies who to turn to for guidance in place of their previously assigned program specialists, and agencies' inability to reach OHS staff has already caused the temporary termination of a program serving 400 children and employing 70 workers. *See* Am. Compl. ¶¶185-97.

For the foregoing reasons, Defendants' mass cuts violate the Constitution and the APA.

---

[55] Garvin ¶¶20–24.
[56] Garvin ¶¶5, 11–19.
[57] Ryan ¶¶69, 95; McFalls ¶¶22, 51-54; Calvo-Friedman Ex. 4 at 124.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 27
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

## II. Defendants' Illegal Acts are Causing and Will Continue to Cause Plaintiffs Irreparable Harm.

Plaintiffs are experiencing ongoing harm, including violations of their constitutional rights, and face imminent injury for which there is no adequate legal remedy. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) ("[W]here parties cannot typically recover monetary damages flowing from their injury—as is often the case in APA cases—economic harm can be considered irreparable.") (citations omitted); *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("[T]he deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'" (citation omitted)).

### A. The DEIA Ban Puts Agencies in an Impossible Double Bind.

Defendants' DEIA Ban forces HSA Plaintiffs' members to face a "Hobson's choice," which will result in "a very real penalty" regardless of how they proceed, which "is an imminent harm." *Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009); *see also SFUSD*, 2025 WL 974298, at *4.

On the one hand, HSA Plaintiffs' members can refuse to accept the DEIA Certification or comply with the DEI Letter, which will foreseeably lead to the loss of federal designation, funding, and almost immediate closure of their Head Start programs. *See Washington v. Trump*, 2025 WL 659057, at *5 ("The fact that the loss of funds may have not yet materialized or that enforcement of the Order has not yet occurred does not mean that no injury is imminent…."). On the other hand, if HSA Plaintiffs' members attempt to comply with the DEIA Ban, they will run afoul of the Head Start Act's requirements, Section 504, and state laws governing early childhood programs, which also creates an existential threat to their status as Head Start providers.[58]

The DEIA Ban thus poses an imminent threat to liberty and property without due process, which "is a cognizable injury." *Isaacson v. Mayes*, 84 F.4th 1089, 1099 (9th Cir. 2023). Further, "the prospect of an unconstitutional enforcement 'supplies the necessary irreparable injury.'" *Air*

---

[58] *See* Ryan ¶¶76-81, 83-90; Morrison-Frichtl ¶¶20-21, 36-38; Maunnamalai ¶¶32-35; Neas ¶13; McFalls ¶¶34-35.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 28
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

*Evac EMS, Inc. v. McVey*, 37 F.4th 89, 103 (4th Cir. 2022) (quoting *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381-82 (1992)). HSA Plaintiffs have already suffered irreparable harm from the substantive programmatic changes they have had to make to their programs, and have had their speech unconstitutionally restricted. *See SFUSD*, 2025 WL 974298, at *3 (changes to AmeriCorps' programs to comply with its version of the DEIA Certification are irreparable harm).

The programmatic changes required to comply with the DEIA Ban reduce and degrade services to children, which will lead HSA Plaintiffs' members to lose enrollment and, in turn, face the loss of designation status and ultimately closure. *See Am. Trucking Ass'ns, Inc.*, 559 F.3d at 1058 (irreparable harm where one of two options would "disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone."). Even if agencies make certain programmatic changes, however, they are still subject to arbitrary enforcement of the DEIA Ban and continue to face loss of designation status, funding, and closure.

**B.  Mass Cuts are Causing the Suspension and Degradation of Services.**

As another federal court has already found, irreparable injury exists when Head Start agencies are forced to "consider[] layoffs, reductions in service, and even closures." *New York v. Trump*, 2025 WL 715621, at *13; *see also AFGE*, 2025 WL 1358477, at *2 (finding irreparable injury because Head Start "federal employees have now all been laid off and their San Francisco office closed," leading agencies to fear loss of funding and notify more than 100 workers that they might lose their jobs on July 1, 2025).

Here, the lack of communication and delays in program administration are causing agencies irreparable harm by preventing HSA Plaintiffs' members from accessing funds, responding to monitoring reports, making necessary modifications, and accessing technical assistance. The delay and lost technical assistance mean that programs will not have timely advice and information.[59] Members have been forced to delay hiring for key leadership positions that

---

[59] Ryan ¶49; McFalls ¶50.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 29
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

require approvals.[60] And delays in approvals for construction expenditures mean that repairs to agency facilities are taking at least twice as long.[61]

At least one of HSA Plaintiffs' members had to suspend its Head Start services—leaving 400 children without programming, their parents without childcare, and 70 staff without jobs.[62] Many more have been forced to the brink of closure.[63] Many of HSA Plaintiffs' members are losing staff, who leave for more stable jobs, unable to afford being furloughed or terminated on short notice.[64]

The loss of federal responsiveness and support affects the quality of agencies' programs and harms the children and families that the program was designed to support and empower.[65]

**C. Parent Plaintiffs will be Irreparably Harmed by Defendants' Illegal Actions.**

The DEIA Ban and mass cuts prevent agencies from operating effectively and jeopardize their ability to stay open at all. As a result, children and families who rely on Head Start, including Parent Plaintiffs' members, have lost and will continue to lose access to early education, childcare, and other critical services.

Children face losing access to formative early education designed to ease their transition to elementary school and increase their chances of success.[66] They will also lose access to health and developmental screenings, physical and mental health services, nutritious meals, and supports for children with disabilities, such as speech, occupational, and physical therapy.[67] Without Head Start, participating children will be deprived of necessary services at a critical time in their

---

[60] Ryan ¶48.

[61] Ryan ¶63.

[62] Ryan ¶¶51-53.

[63] McFalls ¶22; Ryan ¶¶28, 54; Morrison-Frichtl ¶49.

[64] McFalls ¶¶17-18, 40; Ryan ¶¶28,69; Maunnamalai ¶64; Morrison-Frichtl ¶57.

[65] Zaslow ¶¶42-51; Neas ¶¶15-19.

[66] Doutherd ¶¶18, 31-42; Vickers ¶¶31-44; FFO Member A ¶¶4, 6-12, 16; FFO Member B ¶¶5, 7-8, 10-15, 20; Guerra ¶¶6-12, 16-17; Maunnamalai ¶24, Williams ¶¶7-10, 11, 15.

[67] *Id.*; *see also* Zaslow ¶¶8-12.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 30
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

development, resulting in immediate and lasting harms to their ability to survive and thrive in educational environments and beyond.[68]

Parents and families will lose access to reliable childcare, which is necessary to facilitate work and schooling outside the home, as well as to Head Start services aimed at strengthening parenting, health practices, parent psychological well-being, and economic self-sufficiency.[69] The disruption of these services causes hardship and distress to families who must scramble for alternative short-term care, move their children to a different provider that promises greater stability, or lose access to childcare entirely.[70] In contrast, participation in Head Start has been found to promote children's health and cognitive development and improve parenting practices and family functioning, as well as family economic self-sufficiency.[71]

The Court should not wait until more children have lost educational and other services and parents are unable to go to work or school before granting relief. *See Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023 (9th Cir. 2016).

### III.    The Balance of Equities and Public Interest Strongly Favor a Preliminary Injunction.

The balance of equities and public interest weigh in Plaintiffs' favor because Defendants will suffer no harm if the Court grants the requested relief, and the public interest is served when courts protect constitutional rights. Courts consider these factors jointly when a plaintiff seeks emergency relief against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

First, absent injunctive relief, Plaintiffs and their members will suffer immediate and irreparable harm. *See supra* II. In stark contrast, Defendants will not suffer any harm, much less irreparable harm, from fulfilling their constitutional, statutory, and regulatory obligations.

---

[68] *Id.*; *see also* Zaslow ¶¶7, 58-60; Neas ¶¶19-20.

[69] Doutherd ¶¶18-20, 22-24, 35-43; Vickers ¶¶14-17, 23, 31-38, 41-42; FFO Member A ¶¶11, 14-15, 17-18; FFO Member B ¶¶12-14, 17, 20-22; Guerra ¶¶7, 9, 13-17; Williams ¶¶12-13, 16; Zaslow ¶¶13-16.

[70] *Id.*; *see also* Zaslow ¶58; Neas ¶20.

[71] Zaslow ¶¶18-25, 59-60.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 31
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Second, the public interest favors enjoining enforcement of unlawful administrative and executive actions that inflict grave harm on Plaintiffs and their constituents. A preliminary injunction would serve the public interest by ensuring Defendants' compliance with the law. It is well established that the public has an important interest in "prevent[ing] the violation of a party's constitutional rights," *Fellowship of Christian Athletes v. San Jose Unified Sch. Dist. Bd. of Educ*., 82 F.4th 664, 695 (9th Cir. 2023) (citation omitted), and "in having governmental agencies abide by the federal laws that govern their existence and operations," *Washington v. DeVos*, 481 F. Supp. 3d 1184, 1197 (W.D. Wash. 2020) (citation omitted).

Thus, the balance of equities and the public interest weigh decisively in Plaintiffs' favor.

## IV.    Nationwide Relief is Appropriate.

"The scope of an injunction is 'dependent as much on the equities of a given case as the substance of the legal issues it presents,' and courts must tailor the scope 'to meet the exigencies of the particular case.'" *Doe #1 v. Trump*, 957 F.3d 1050, 1069 (9th Cir. 2020) (citation omitted). Here, nationwide relief is appropriate for at least two reasons. First, it is necessary to provide relief to the named parties. *Bresgal v. Brock*, 843 F.2d 1163, 1170-71 (9th Cir. 1987). There is no way to craft a remedy to the harm imposed on Plaintiffs by the mass cuts that is limited to particular states because OHS does not have state-specific offices.

Second, limiting an injunction to only the states where Plaintiffs reside would cause inequitable treatment of the children and families that Congress designed Head Start to benefit, and undermine Congress's clear intent that the program be administered equitably nationwide. *See, e.g.*, 42 U.S.C. § 9835(e) (requiring equitable distribution of benefits); *id.* § 9840a (same). *See HIAS, Inc. v. Trump*, 985 F.3d 309, 327 (4th Cir. 2021) (nationwide injunction appropriate where more limited injunction "would cause inequitable treatment" and "undermine" statute). Agencies implement the Head Start program under uniform statutory and regulatory standards. Defendants' actions undermine Head Start agencies' ability to meet these standards, with dire consequences for children and families nationwide who depend on a program Congress created

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 32
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

to meet their needs.[72] Limiting relief would be especially inequitable because HSA Plaintiffs attest the primary reason other associations are not participating directly as parties is because of fear of retaliation by Defendants.[73]

Separately, Plaintiffs also seek a stay of agency action pending judicial review under the APA. 5 U.S.C. § 705. "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed." *E. Bay Sanctuary Covenant*, 993 F.3d at 681 (citation omitted). *See Nat'l TPS All.*, 2025 WL 957677, at *45 ("[W]here agency action is challenged as a violation of the APA, nationwide relief is commonplace.").

Finally, under Federal Rule of Civil Procedure 65(c) the Court should either waive entirely or set a nominal bond of zero because "there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Jorgensen v. Cassiday*, 320 F.3d 906, 919 (9th Cir. 2003).

## CONCLUSION

Plaintiffs respectfully request that the Court hold a hearing as soon as practicable and grant their motion for a preliminary injunction.

***

---

[72] *See* Zaslow ¶¶61 (loss or reduction of Head Start programming would be felt by early care and education programs nationwide); Calvo-Friedman Ex. 17-38 (documenting problems faced by Head Start agencies in Alaska, Arizona, California, Connecticut, Florida, Massachusetts, Michigan, Minnesota, New Jersey, New York, Nevada, Ohio, Rhode Island, Vermont).

[73] Maunnamalai ¶62; McFalls ¶¶61-62; Morrison-Frichtl ¶¶40-42; Ryan ¶¶104-106.

PLAINTIFFS' MOTION FOR
PRELIMINARY INJUNCTION - 33
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

The undersigned certifies that this motion contains 8,310 words, in compliance with the

Local Civil Rules.

| Dated: May 16, 2025 | Respectfully submitted, |
|---|---|
| Ming-Qi Chu (*pro hac vice*)<br>Jennesa Calvo-Friedman (*pro hac vice*)<br>Linda S. Morris* (*pro hac vice*)<br>*admitted in State of Maryland*<br>Sania Chandrani<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel: (212) 549-2500<br>mchu@aclu.org | By:    /s/   La Rond Baker<br>La Rond Baker (WSBA No. 43610)<br>Brent Low (WSBA No. 61795)<br>David Montes (WSBA No. 45205)<br>AMERICAN CIVIL LIBERTIES<br>    UNION OF WASHINGTON<br>P.O. BOX 2728<br>Seattle, Washington 98111-2728<br>Tel: (206) 624-2184<br>baker@aclu-wa.org |
| Michelle Fraling (*pro hac vice*)<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>915 15th Street NW, 6th Floor<br>Washington DC, 20005<br>Tel: (917) 710-3245<br>michelle.fraling@aclu.org | Kevin M. Fee (*pro hac vice*)<br>Allison Siebeneck (*pro hac vice*)<br>ROGER BALDWIN FOUNDATION OF<br>    ACLU, INC.<br>150 N. Michigan Ave, Suite 600<br>Chicago, IL 60601<br>Tel: (312) 201-9740<br>kfee@aclu-il.org |
| Laboni A. Hoq (*pro hac vice*)<br>HOQ LAW APC<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>    (Cooperating Attorney)<br>P.O. Box 753<br>South Pasadena, CA 91030<br>Tel: (213) 977-9004<br>laboni@hoqlaw.com | Lindsay Nako (*pro hac vice*)<br>Lori Rifkin (*pro hac vice*)<br>Fawn Rajbhandari-Korr (*pro hac vice*)<br>Meredith Dixon (*pro hac vice*)<br>Megan Flynn (*pro hac vice*)<br>IMPACT FUND<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704<br>Tel: (510) 845-3473<br>lrifkin@impactfund.org |
| S. Starling Marshall (*pro hac vice* forthcoming)<br>CROWELL & MORING LLP<br>Two Manhattan West<br>375 Ninth Avenue<br>New York, NY 10001<br>Tel: (212)223-4000<br>SMarshall@crowell.com | Edward T. Waters (*pro hac vice* forthcoming)<br>FELDESMAN LEIFER LLP<br>1129 20th Street NW, 4th Floor<br>Washington, DC 20036<br>Tel: (202) 466-8960<br>ewaters@feldesman.com |

1
2
3
4
5
6
7

Skye Mathieson (*pro hac vice forthcoming*)
Lucy Hendrix (*pro hac vice forthcoming*)
Emily P. Golchini (*pro hac vice forthcoming*)
CROWELL & MORING LLP
1001 Pennsylvania Ave NW
Washington, DC 20004
Tel: (202)624-2500
SMatheison@crowell.com

8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184