# EXHIBIT 14

THE LEDE

# CAN HEAD START SURVIVE THE MAGA ERA?

*A sixty-year consensus on the War on Poverty program is at risk of finally coming undone.*

**By Jessica Winter**

May 10, 2025



Photograph by Rebecca Blackwell / AP



Save this story

Listen to this story



In early April, Head Start child-care centers began receiving an e-mail from the address <u>defendthespend@hhs.gov</u>. The message explained that, before providers could access their latest funding, they were required to supply the Department of Government Efficiency, or DOGE, with additional information and await its approval, and it signed off with "God bless America."

**The Lede**

*Reporting and commentary on what you need to know today.*

Head Start, a War on Poverty program established by an act of Congress in 1965, provides comprehensive child-care and preschool services to some eight hundred thousand children across the U.S., most of whom are at or below the federal poverty level. (For a family of four, that's an income of roughly thirty-two thousand dollars a year.) Individual Head Start programs aren't allowed to hold on to more than three days of their annual operating funds at a time, and they frequently log on to a payment system to cover day-to-day basics. To secure this flow of funds, providers must submit to a five-year grant-application process, a separate annual approval process, consistent monitoring of their spending, and fiscal audits. These providers are also in regular contact with regional Head Start program specialists who advise on their decision-making.

It was unclear why these many layers of approval and accountability did not meet the standards of Elon Musk's efficiency experts. "Defend the spend," for some providers, was a nightmare flashback to late January, shortly after Donald Trump's Inauguration, when a freeze on federal funding compelled dozens of Head Start centers to close down temporarily or, in a few cases, indefinitely. Although the freeze lifted within weeks, the continued slow-walking of funds has had an enormous cumulative effect. During the first quarter of 2025, Head Start received nearly a billion fewer dollars from its parent agency, the U.S. Department of Health and Human Services, than it did last year during the same time period—a drop of about thirty-seven per cent.

Get the News & Politics newsletter

The latest from Washington and beyond, covering current events, the economy, and more, from our columnists and correspondents.

Sign up

By signing up, you agree to our user agreement (including class action waiver and arbitration provisions), and acknowledge our privacy policy.

The provenance of "Defend the spend" was also murky. "Programs thought maybe it was a phishing e-mail," Lauri Morrison-Frichtl, the executive director of the Illinois Head Start Association, told me. (Frichtl's organization is one of fifty-one state-specific Head Start member groups.) Ordinarily, an Illinois provider in receipt of a shady-looking e-mail could call Head Start's Chicago regional office to get advice. But DOGE had just shut down the Chicago office, along with its counterparts in Boston, New York City, San Francisco, and Seattle, and had placed all of the program specialists from these offices on administrative leave. The closures left providers in twenty-two states—including the nation's three largest cities—without a Head Start point of contact. It escaped no one's attention that

the five regional offices that shut down were all in blue states, or that four of the five surviving offices were in red states. (As a program specialist on administrative leave in New York City told me, "Trump said he'd have revenge on the people who didn't vote for him. He did what he said he would do.")

Without a regional contact to turn to, providers instead reached out to H.H.S., which replied that the DOGE e-mail was indeed a phishing scam and warned not to click on the link enclosed in it. But then, a few hours later, the Office of Head Start, in Washington, D.C., confirmed that the message was legit, and that compliance was required. This added step meant that some centers waited an extra day or two for their money. Others waited longer.

"If it takes an extra week or two weeks to draw down funds because of these nonsense justification processes, it could result in a provider not making rent or payroll, even if the funds do eventually come through," Michelle Haimowitz, of the Massachusetts Head Start Association, said. The constant precarity, Haimowitz went on, "impacts our workforce, who are nervous about losing their jobs, and it impacts families and their belief in the stability of Head Start."

When a provider has to close down, even briefly, many families suffer immediate material harm. A program specialist who is now on administrative leave from a Head Start regional office in a swing state, whom I will call Michael, said, "We have a lot of parents in hourly, lower-paying jobs—cashier jobs, food service, some migrant and seasonal workers doing agricultural labor. Suddenly, all of these parents have to call out of work, and they lose those wages, and some of those parents have lost their jobs."

This vignette of administrative chaos exacerbated by mass layoffs will be familiar to any federal employee or contractor whose agency has been felled of late by <u>the whimsical machete of DOGE</u>. But the whiplash that Head Start has sustained in recent weeks has been perhaps especially severe. In late April, reports emerged that President Trump's 2026 budget could seek to abolish Head Start entirely, as

recommended in Project 2025, the policy blueprint for the second Trump term. But then, on May 2nd, the White House released its final budget proposal, which didn't mention Head Start at all.

Joel Ryan, of Washington State's Head Start association, told me that the Trump Administration may realize "that they'll have a hard time with a proposal just getting rid of Head Start," owing both to its congressional mandate and its popularity across party lines. What Trump is attempting instead, Ryan went on, is a "slow degradation of Head Start." This is the essential argument made in a complaint filed in federal court on April 28th, brought by the American Civil Liberties Union on behalf of a group of Head Start state associations and community nonprofits. "We see this series of attacks as part of a violation of separation of powers," Jennesa Calvo-Friedman, the lead counsel in the lawsuit, said. But, in the short term, she went on, "our fear is about what they're doing behind the scenes before we even get to have that fight, through the constant instability of the program."

Some Head Start providers, uncertain about their future, are feeling ambivalent about encouraging families to enroll for the upcoming school year. Parents have reason to wonder if their children's preschools will stay open. Teachers have been leaving for what they perceive as more secure jobs. Advocates worry, in short, that a toxic cloud of doubt and disarray is gathering around the program—and all despite the robust bipartisan consensus on Head Start that held for some sixty years, or so it seemed.

A few months after Richard Nixon yoinked the U.S. from the gold standard, and a few months before he presented Mao Zedong with a porcelain sculpture titled "Bird of Peace, Mute Swans," he vetoed the Comprehensive Child Development Act of 1971, which would have established a national child-care system. The bill, Nixon wrote in his veto message, was marked by "fiscal

irresponsibility, administrative unworkability, and family-weakening implications." (John Birch types used words such as "Sovietization" to describe the bill.)

Yet, in the same veto message, Nixon praised Head Start—which had begun under his predecessor, Lyndon Johnson—as "valuable" and "tried and tested." In fact, the Comprehensive Child Development Act aimed to expand a version of Head Start to the middle and working classes. Nixon's veto, the political scientist Kimberly Morgan has written, "slammed shut a window of opportunity for universal day-care legislation, effectively making public services a ghetto only for children from the poorest families."

This policy of containment has persisted ever since, whereby politicians of the right and center-right could at once embrace Head Start and reject the communist temptations of comprehensive child care—and also reject a more generous social safety net over all. Ronald Reagan slashed welfare funding at the same time that he supported indirect cash assistance to welfare recipients in the form of Head Start. Bill Clinton, who pledged during his 1992 Presidential campaign to "end welfare as we know it," presided over the expansion of Head Start to include infants and toddlers. Even during Trump's first term, Congress approved increases in Head Start's budgets, despite the President's decades-long hostility toward government aid to the needy.

But the first Trump Administration did not have a game plan in the form of Project 2025, which, in addition to recommending the termination of Head Start, supports deregulating the child-care sector, establishing more in-home day cares that operate with little oversight, and incentivizing more women to stay home with their children. Another key difference of Trump's first term is that the full-scale conservative <u>war on diversity, equity, and inclusion</u> had not yet launched. In an executive order issued on January 21st, Trump demanded that "all Government-wide processes, directives, and guidance" should remove "references to DEI and DEIA principles, under whatever name they may appear," and that

any programs related to "diversity," "equity," "advancing equity," and the like should be terminated.

The Trump Administration's enmity toward anything that smells of D.E.I. brings it into direct conflict with federal legislation, which obligates Head Start to "address disparities across racial and ethnic groups." And yet H.H.S. doubled down on the anti-D.E.I. fiat on April 16th, when it updated its policy guidelines to require grantees to pledge not to provide D.E.I.- or D.E.I.A.-related programs or services, under penalty of federal law. This puts Head Start providers in an impossible legal bind.

"At its core, Head Start is an equity-based program," Ryan, whose association is one of the plaintiffs in the A.C.L.U. litigation, told me. "The goal is to get these kids to the same starting line as their middle-class peers." He went on, "The majority of the kids we serve in Washington State are Black and brown. Thirteen per cent are experiencing homelessness, fourteen per cent are special-education students. We have a lot of foster-care kids, a lot of kids for whom English is a second language, and a lot of immigrant and refugee families."

Now, Ryan told me, there's little clarity on whether Head Start can avowedly address these children's specific needs and challenges without running afoul of D.E.I. restrictions. The Administration "is using D.E.I. as a cudgel to get at the programs and potentially defund them. The programs will try to comply as best as they can, because they don't want to lose their grants. Is it possible that someone could get criminal sanctions? I don't think that's likely, but we just don't know," Ryan said.

"We had massive problems in January when DOGE first came in," Michael, the program specialist on leave, told me, over Zoom. "They said, 'We want everything D.E.I. shut down.' We were looking around at each other"—Michael rubbed his hands over his face in a world-weary manner—"like, 'I don't know what to say.'

We have a ten-per-cent disability requirement—ten per cent of the kids enrolled in our program have to qualify with a disability. Like, that's D.E.I."

Head Start programs are often the only option for families located in child-care deserts, which are defined as communities where kids outnumber available day-care or preschool slots in their age group by at least three to one. Half of all counties in Oregon, for example, qualify as child-care deserts for preschoolers, and thirty-five out of thirty-six counties in the state are child-care deserts for infants and toddlers, according to research out of Oregon State University. Candice Vickers, who is the executive director of Family Forward Oregon, another plaintiff in the A.C.L.U. lawsuit, told me that Oregon has some eighteen thousand families who use Head Start. "These are primarily rural moms, moms of color, moms who are trying to get out of cycles of generational poverty," Vickers, who is herself a Head Start alumna, said.

In spite of decades of funding increases and words of support from the Oval Office, Head Start has rarely—if ever—been sufficiently funded. Today, even in an expensive city such as Seattle or New York, a full-time Head Start teacher can expect to make a salary in the low forty thousands, Ryan said. "So it's, like, 'The kids in your classroom are super low-income, they speak multiple languages, and a lot of them have social-emotional challenges. We'll pay you twenty-two dollars an hour. You may or may not be furloughed. When do you want to start?' " He went on, "There are problems with Head Start, but these are not the problems that the Trump Administration is interested in fixing, and, in fact, they're trying to make those problems worse."

In my conversations with Head Start providers, advocates, and program specialists across seven states in the last few weeks, the mood has been a mix of anger, sadness, hope, and trepidation. "We always lose staff in the summer," Haimowitz, of the Massachusetts association, told me. "We're really nervous this year about how many of our staff will be looking for jobs in public schools, although that's

not our only competition. We also compete with Amazon and Target." Some families, she went on, "think their child's school might not be there tomorrow. They may be considering putting their children in less safe environments that may feel more stable, so that they can keep their jobs. Or they may be considering leaving the workforce altogether."

Michael, the program specialist, struck a surprising number of upbeat notes in our conversations, and appeared matter-of-fact in his confidence that he'd be back to work soon. The assault on Head Start has struck him as so top-down, so abstract; the enmity toward the program doesn't seem organic or informed to him, and he finds something reassuring in that. The Trump Administration, he said, "went in with a blitzkrieg approach, they unloaded on everybody, and nobody knew how to stop them. Now, with legal challenge after legal challenge, more and more people are getting hardened against this, and saying, 'This isn't O.K. You can't do this.'"

He is stunned that, in the months since the advent of DOGE, it still hasn't learned to move more deliberately. "They're, like, 'Well, if we make a mistake, we'll just undo it.' But you can't just turn it back on—you can't undo the damage you've done. It's catastrophic." The catastrophic damage that DOGE has done is also a great part of why Michael expects to get his job back. "They're going to need us more than before," he said.

He's packed a go-bag for when he gets the call: a leather satchel with his I.D.s and the work laptop that he's locked out of. ("They said, 'We'll send you a box with a shipping label to send the laptop back.' But they never did.") Poking out of the pen pouches on the satchel is a row of tiny state flags, representing each of the states that Michael's office covered. Until his time away from Head Start comes to an end, he's taking private coding courses and closely tracking state-level legislation related to early-childhood education. "Right now, I'm staying sharp," he said. "I'm still very optimistic." ♦