The Honorable Ricardo S. Martinez

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF WASHINGTON
### AT SEATTLE

WASHINGTON STATE ASSOCIATION OF HEAD START AND EARLY CHILDHOOD ASSISTANCE AND EDUCATION PROGRAM, ILLINOIS HEAD START ASSOCIATION, PENNSYLVANIA HEAD START ASSOCIATION, WISCONSIN HEAD START ASSOCIATION, FAMILY FORWARD OREGON, and PARENT VOICES OAKLAND,

*Plaintiffs,*

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ANDREW GRADISON, in his official capacity as Acting Assistant Secretary of the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; OFFICE OF HEAD START; and TALA HOOBAN, in her official capacity as Acting Director of the Office of Head Start,

*Defendants.*

Case No. 2:25-cv-00781-RSM

**DECLARATION OF JOEL RYAN IN SUPPORT OF PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

NOTE ON MOTION CALENDAR:

JUNE 13, 2025

JOEL RYAN DECLARATION - 1
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

I, Joel Ryan, hereby declare and state:

1.      The information in this declaration is true and correct to the best of my knowledge and I am of majority age and competent to testify about the matters set forth herein.

**Experience and Professional Background**

2.      I am the Executive Director of the Washington State Association of Head Start and Early Childhood Education and Assistance Program ("Washington HAS"). I have served in this role since 2007.

3.      In my current role at Washington HSA, I oversee all operations of the organization, including WSA's funding and policy advocacy at the state and federal level and providing professional development for Head Start program members. This includes offering training for Head Start staff and program members on ways to tailor their curriculum to best serve their diverse children and families, and support member programs in making their programs more inclusive for children to best meet their obligations under the Head Start Act and related state laws.

4.      Most of my education and experience prior to being at Washington HSA has been focused on early childhood education and the Head Start program. While earning my bachelor's degree, I wrote my senior thesis on Head Start programming. After college, I served as an AmeriCorps volunteer providing literacy support for children at a Head Start school in Boston, MA. Thereafter, I received my law degree from American University, where I served as intern for Neighborhood Legal Services, the Coalition for the Homeless, and several child advocacy organizations.

5.      After receiving my law degree, I served as the Government Affairs Director of the National Head Start Association. In that role, I worked as the liaison between the Head Start community, Congress, and the White House. I have more than 20+ years of experience supporting Head Start programs, children, and families.

**The Guiding Principles of the Head Start Program**

6.      As discussed, I have been steeped in the intricacies of the Head Start program for the better part of my academic and professional life. For 60 years, the purpose and mission of Head Start has been to make sure that all children are ready for success in school regardless of their background, race, zip code, or income.

7.      The Head Start Act requires funding to be directed to the children and families that are the furthest away from opportunity. To identify those populations most in need of services, Head Start agencies are required under the Head Start Act to conduct community wide assessments that collect and analyze demographic data.

8.      Head Start agencies are multigenerational programs that provide services to children as well as their families. This is because parents are a child's first teacher and early child teachers and caregivers must work with parents as co-equals in their child's education. Head Start agencies provide services starting from the time when a mother is pregnant, and throughout a child's preschool age from 0-5 years old. Head Start agencies provide case management services for families to help them set up their children for success. Head Start services in this area include helping families find housing, helping parents set and meet goals to go to school or work, providing financial literacy education, and working with parents on nutrition and behavioral health so they can help their kids at home.

9.      Head Start is also an individual-focused program for children so that they can receive the best services based on their individual needs. Not all children are at the same starting point when they arrive at school. That is why Head Start agencies need to offer different services and resources based on need. Head Start is, at its heart, an equity program, which I understand to mean affording all children a fair chance to be ready for kindergarten and succeed by providing them resources tailored to their diverse circumstances.

10.     As required by the Head Start Act, Head Start serves children and families in need. That is why Head Start services are focused on some of the country's most

vulnerable communities. Head Start serves children furthest from opportunity. This means children who are very low income and children and families of color. For instance, the majority of children who are served by Head Start are low-income children of color. Up to two-thirds of all Head Start program attendees are Black or brown children. Head Start serves a high number of English language learners. Immigrants and refugees make up a large share of the population served by Head Start. Around 18% of the children served by Head Start are diagnosed with disabilities.

11.    Head Start teaching staff must have the background and knowledge to support the individual needs of the children and families they serve. This means that they must have relevant linguistic and cultural competency.

12.    To effectively provide services, Head Start agencies must consider the cultural norms of children and their families so that the agency can help the parents support their child's learning and development at home. Appropriate engagement with a Head Start family requires Head Start agencies to use culturally appropriate engagement. Head Start programs thus need their curriculum to be relevant to the populations they serve. As an example, its critical for parents that are non-English speakers to understand what their children learned during their day at Head Start. Head Start teachers will often send materials, books, and other activities for parents to work on with their child at home. It's critical that these be understandable to the family and, if necessary, translated so that parents can fully support their child's education. Ultimately, Head Start agencies want to create a welcoming environment for children and families.

**Washington HSA's Mission, Purpose and Alignment with the Head Start Program**

13.    Washington HSA's mission is like Head Start's mission: serving the children and families farthest from opportunity.

14.    Washington HSA is a statewide non-profit membership association founded in 1986 and is currently composed of 30 member agencies from early childhood care and education agencies that are funded by Head Start, Early Head Start, Migrant/Seasonal

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Head Start, Native American Head Start, and the Washington state Early Childhood Education and Assistance Program ("ECEAP"). As of 2025, Washington HSA members serve over 13,000 children and their families.

15.    Washington HSA's purpose is to strengthen Head Start, Early Head Start, and ECEAP agencies for the benefit of children and families, through advocacy, education, and collaboration. Washington HSA strives to work in collaboration with children, families, and communities to advocate for antiracist and equitable early learning, education, and human services systems that provide opportunities for all children and families. Washington HSA is committed to supporting children and families of all races, genders, languages, abilities, sexual orientations, nationalities, immigration status, and socioeconomic status.

16.    Washington HSA supports its members through policy advocacy and by providing high quality professional development for members to maintain a high level of excellence in teaching, program governance, management, and family support services. Each year, we put together 6 to 8 professional development events and approximately 1,500 teachers, parents and staff attend. Washington HSA provides its members with peer-learning opportunities and assistance in navigating compliance with the Head Start Act and associated regulations and standards, including state licensing and achievement standards for early learning programs. Washington HSA organizes regular conferences and training for its membership. Washington HSA engages in advocacy and lobbying at both at the federal and state level on behalf of its members and for improving the early learning system overall.

17.    Washington HSA members provide critical services to people from some of Washington's most vulnerable and underserved communities.

    a.    Over 74% of the children served by Washington HSA members are children of color.

    b.    Nearly 42% of the children served by Washington HSA members speak a primary

language other than English at home with their family. Over half of the children served by Washington HSA members are dual language learners. For example, with a large population of low-income Mandarin-speaking immigrants from China in Seattle, WA, Head Start agencies tailor their programs and services to Mandarin Chinese-speaking students and families. It's common for this Head Start program to celebrate the Lunar New Year. In Yakima, WA, Washington HSA members serve migrant farm worker families and provide them culturally relevant curriculum and offerings in a family's home language of Spanish. And, in Skagit County, WA, Head Start agencies serve a larger number of Ukrainian refugees among others. These families are dealing with the trauma of coming from a war-torn country and the associated complex issues that can develop as a result.

    c. Around 14% of all children served by Washington HSA members are diagnosed with a disability and have an Individualized Education Plan.

    d. Almost 15% of the children served by Washington HSA members are involved in early family intervention services.

    e. Over 25% of families served by Washington HSA members have parents with less than a high school education. Nearly 13% of Washington HSA families served have one or more parents in a job training program.

    f. Most families served by Washington HSA members are well below the federal poverty level, and over 12% of families served by Washington HSA members experience homelessness every year.

    18.    Washington HSA operates with a budget of $1.2 million. Washington HSA is funded by membership dues, grants, and training and conferencing registration fees. Washington HSA has three full-time staff members.

**Washington HSA's Response to Attacks on the Head Start Program Since January 2025**

*January 20, 2025, Executive Orders Target the Core of the Head Start Program*

19.    In late January 2025, I became aware of Executive Orders 14151 "Ending Radical Government DEI Programs and Preferencing" and 14159 "Protecting the American People Against Invasion" ("EOs"), which were announced on January 20, 2025. At that time, I immediately began investigating what Washington HSA and its members should do to comply with the EOs.

20.    The intended scope and meaning of the EOs is unclear and confusing due to the language used and various terms being undefined. For example, the terms "illegal DEI activities," "'equity action plans,'" and "'equity' actions" are undefined and there is no additional guidance provided as to their intended meaning and scope.

21.    Even as a trained lawyer, interpreting the meaning and scope of the EOs is essentially impossible for me because the EOs are so vague. Even if interpreted narrowly, I believe the EOs would require fundamental changes from Washington HSA and its members that would completely upend our current practices and make it impossible for us to meet the requirements of the Head Start Act. This includes how Washington HSA and its members recruit students and families, conduct community outreach, hire, train and professionally develop staff, and the services we offer and how they are offered. However, I have no basis for understanding the intended scope and meaning of the language used.

22.    After learning of the EOs, Washington HSA members contacted me for guidance on how the EOs affected Head Start. I consulted with an attorney to analyze the EOs for their effect on Head Start and provide advice to Washington HSA members on how to comply with the EOs. The attorney met with Washington HSA members but was unable to offer effective counsel because the EOs are so vague and unclear.

*January 27, 2025, Funding Freeze Disrupts Head Start*

23.    On January 27, 2025, the Office of Budget Management ("OMB") instituted a federal funding freeze of all federal grants. When I learned of the freeze, it was unclear to

me from the order whether it would affect Heat Start grants.

24.     Washington HSA members were immediately affected by the funding freeze. They could not access funding through the Payment Management System (PMS). Not knowing if or when they would receive funding, members prepared to close their doors and shut down programming and services.

25.     The next day, OMB issued a clarification that Head Start grants were not intended to be affected by the funding freeze.

26.     However, Washington HSA members continued to be affected by issues with the PMS that prevented them from accessing funding. Some members received error messages when trying to draw down funds. Other members encountered repeated website errors when attempting to access the PMS online portal altogether.

27.     Requests for drawdowns from the PMS usually take only approximately 24-hours. This is because federal regulations require that federal grant funds be drawn solely to meet immediate needs and cannot be held for more than three days.

28.     Because of how the PMS and related regulations work, Washington HSA members were put into dire situations on account of the PMS draw down delays. Two Washington HSA members were forced to wait almost three weeks to draw down any funding and were imminently close to closing their agency, ceasing services, and laying off staff. These members were only two days away from having to shut down before they were finally able to access their funding through PMS.

### March 14 OHS Letter Banning DEI Programs

29.     On March 14, 2025, OHS issued guidance that informed all Head Start agencies that OHS "will not approve the use of federal funding for any training, technical assistance, or other program expenditures that promote or take part in diversity, equity, and inclusion (DEI) initiatives" ("March 14 DEI Letter"). The March 14 DEI Letter also instructs agencies to "carefully review their annual funding applications, including the budget and budget justification narrative, TTA plans, program goals, and any other

supplemental materials to ensure they are in accordance with this guidance."

30.    Like the EOs, the March 14 DEI Letter does not define "DEI," "diversity," "equity," or "inclusion."

31.    That same day, Washington HSA members began to ask me for information on how to comply with the March 14 DEI Letter. Members communicated to me their confusion and fear about what the March 14 DEI Letter meant and how it was supposed to be implemented. Washington HSA members did not know—and still do not know—what is allowed under the guidance and what is not. For example:

a.    Washington HSA members are unsure if they are now allowed to translate program brochures and school curriculum materials into languages other than English.

b.    One Washington HSA member does not know if they are still allowed to provide professional development to assist LGBTQIA2S+ families.

c.    Members do not know if they needed to remove program materials in languages other than English, cease training staff in cultural sensitivity, change job titles of staff in their program, or stop collecting demographic data.

d.    Members are not sure if they are allowed to serve families culturally relevant food during program and family events.

e.    Members do not know if they can provide Black families with current information or trainings around Black maternal health and/or specific medical issues affecting their community.

f.    Members do not know if they can provide Head Start teachers and staff information about supporting Black and brown boys exhibiting challenging behaviors to avoid discipline disparities.

g.    Washington HSA members are confused as to whether they can spend Head Start funding on installing a wheelchair ramp at their program facility.

h.    Members are unsure if they are allowed to refer pregnant mothers to doulas who

offer culturally relevant services to improve maternal outcomes as shown by research.

i.  Washington HSA members do not know if they are allowed to provide language translation or interpretation services, or refer families to services that utilize those services when seeking legal aid, counseling, continuing education, etc.

j.  Washington HSA does not know whether Head Start agencies are allowed to support tribal language, customs, and cultural events at their programs.

k.  A Washington HSA member that retained a language coach to improve staff's Spanish-speaking for a monolingual Spanish-speaking program does not know if they can continue to provide programming in Spanish, let alone continue working with the coach.

l.  One Washington HSA member is unsure if they can continue to give a stipend to staff who perform additional work when teaching in a second language.

m.  Washington HSA members have pending and future grant applications that necessarily incorporate grants applications that were submitted before the March 14 DEI Letter. Those previously submitted applications contained the word "diversity," so members are unaware of whether those grant applications violate the March 14 DEI Letter.

n.  Washington HSA members are unsure whether they can conduct outreach to certain population of families that speak a language other than English, hire staff that best reflect families enrolled in the program, or provide additional selection criteria points to families that have children who are English language learners despite the research connecting school readiness and language development.

32.    Because the March 14 DEI Letter and EOs are vague and unclear, I do not know if some, all, or none of those things are now illegal.

33.    Because it is unclear what OHS considers a prohibited "DEI initiative," some Washington HSA members are relying on a recently published New York Times article

titled "These Words Are Disappearing in the New Trump Administration" to remove

words listed in the article from their program materials. *See*

https://www.nytimes.com/interactive/2025/03/07/us/trump-federal-agencies-websites-

words-dei.html.

34.    Washington HSA members are in constant fear that either their grant

applications will be denied, or their programs will be terminated if OHS finds them to be

in violation of the March 14 DEI Letter based on a vague standard that they do not

understand and have not had an opportunity to meet.

35.    Washington HSA members fear simply asking for assistance or clarification

from OHS on any of these matters in the event they might be unfairly targeted for grant

termination or other retaliation from the federal government.

36.    Because of the vagueness in both the March 14 DEI Letter and the EOs, I

cannot effectively advise Washington HSA members. There is widespread confusion

throughout the Head Start community about what the March 14 DEI Letter and EOs

mean.

37.    Washington HSA members also received inconsistent advice from Region 10

Office program specialists on how to comply with the March 14 DEI Letter and EOs. For

example:

a.    One Washington HSA member was advised by their program specialist to remove
       all references to "DEI" and related words from their grant application, but to
       continue using terms found in the Head Start Act, such as "disability."

b.    Other Washington HSA members were advised by their program specialist to
       swap the use of "disability" in their grant application to "developmental concern."

c.    One Washington HSA member was told by their program specialist that they
       could continue conducting training on DEI practices if they used funds other than
       those from Head Start.

d.    Other members were advised by their program specialist that they could not

conduct "DEI" related activities using other funding sources if the equipment used for those activities, such as computers and phones, was purchased with Head Start funds.

e. One member was advised by their program specialist to avoid "contemporary lingo" in their grant application.

38.     Because of the wide range of inconsistent guidance from the Region 10 Office program specialists, it is clear to me that they were also at a loss about the scope and meaning of the March 14 DEI Letter and EOs.

39.     Because of the uncertainty surrounding the March 14 DEI Ban and EOs, out of an abundance of caution to avoid running afoul of them and put our agencies at risk of losing their Head Start funding, Washington HSA decided that we could not offer any programming in what we broadly understood to be covered by this area at our upcoming Head Start teacher training conference at the end of June 2025.

**April 1, 2025, Mass OHS Staff Layoffs and Regional Office Closures Exacerbate the Crisis Facing Washington HSA Members**

40.     On April 1, 2025, the regional office of OHS for all Washington HSA members, the Region 10 Office—was closed by HHS without notice. Federal staff were locked out of the office and were only allowed to retrieve their personal items with the assistance of security

41.     No information was communicated to any Washington HSA member about the layoffs or who would be handling their requests for assistance and or processing their grants. There were still several Head Start grantees weeks later that have yet to be assigned a new Program Specialist to support them.

42.     This left Washington HSA members without the support provided by the regional office and its program specialists. This would be a debilitating loss even without the chaos sown by the March 14 DEI Letter and PMS draw down disruptions. Head Start regional offices are critical in helping agencies comply with Performance Standards and

other program requirements when applying for grants and implementing programs. Program specialists act as intermediaries between OHS and Head Start grantees and associations. Program specialists distribute information from the OHS, including updates in technical operations and program administration, training on how to provide childhood services based on new developments in the field, and analysis of trends in Head Start populations across the region. Head Start agencies communicate concerns about Head Start implementation to the regional offices, which in turn communicate those concerns to OHS.

43.    Program specialists and Regional Office staff act as lifelines between Head Start agencies and HHS. Head Start agencies are heavily dependent on their support. Without it, they are in an extremely difficult position to maintain effective operations and fulfill the requirements of Head Start agencies.

44.    Without the support provided by the regional office and program specialists, many Washington HSA members have been left in the dark as to whether they are adequately complying with the March 14 DEI Letter and/or the EOs. Washington HSA members have attempted to contact OHS directly via email and phone for guidance, but many have not received adequate, if any, response in many instances.

45.    After the closure of the Region 10 office and other Regional office closures, Washington HSA members now fall under one of the remaining regional offices that are handling a vastly increased workload.

46.    Some Washington HSA members have still not been assigned to a new program specialist and are thus without direct program support from OHS.

47.    Head Start is a high stakes program. Agencies must comply with complicated regulations and laws to maintain their Head Start designation status. Program Specialists and OHS representatives are invaluable lifelines for guidance in meeting program requirements. Because funding is dependent on grant awards and funding drawdowns must be for immediate needs, agencies rely on close communication with their Program

Specialist and other OHS representatives to know the status of their funding. Agencies cannot effectively run their programs without this support.

48.     The lack of staff and support from OHS is also seriously affecting Washington HSA members' day-to-day operations involving actions that require OHS approval. For example, the appointment of certain staff positions at Head Start agencies require OHS approval. One Washington HSA member submitted for approval of a new program director and did not hear back from OHS for one week. This left the member in limbo without a director, which negatively affected its operations. Before the mass layoffs and closures, it would have been typical to hear back from an OHS representative in one day.

49.     The layoffs, office closures, and the anti-DEIA orders have also severely affected training and technical assistance (TTA) for Washington HSA members. Due to layoffs, there are now only two contracted TTA specialists left to try to support the 65 Head Start agencies that were formerly within the Region 10 office. Moreover, the TTA contractors have been told not to provide any DEIA support or training even if its need to comply with the Head Start program performance standards.

50.     At the beginning of April, several Washington HSA members were expecting OHS approval for grants funding their programs from April 2025 to October 2025. These members need this grant funding to operate. Without it, some of those members would be forced to close their agency in days, and others would be forced to close their agency within two weeks.

***One Washington HSA Member Was Forced to Close its Program Because of Extreme Delays in Payment Processing***

51.     One Washington HSA member did not receive grant approval or any information about the status of its grant by mid-April. Without a program specialist to contact, this member was unable to confirm it would be able to cover payroll and other essential agency expenditures.

52.     No one at OHS was able to provide this member with information on when

their grant would be approved, or if it would be approved at all.

53.     On April 11, 2025, this member was forced to close its program and lay-off more than 70 staff, terminating services for more than 400 children. These services included, but were not limited to child care, meals for children, healthcare and medical services, early child learning classrooms, parent coaching, home visit programming, parent advisory classes, fatherhood classes, language access resources, and therapeutic classrooms for children who are healing from trauma. Working parents were left without child care. Many of the parents work in the fields picking crops including fruit and in warehouses in the Yakima Valley. These parents were left scrambling to find alternative arrangements and because of the lack of flexibility with their employment they risk losing their jobs.

54.     This Washington HSA member eventually received notice of their award the on April 18, 2025, and re-opened. However, the lack of information from OHS that forced the abrupt closure harmed children and their families by interrupting their continuity of services, and agency staff lost employment for that period.

***Many Other Washington HSA Members Experience Continued Delays to Payment Processing and Related Disruptions***

55.     Washington HSA members have been subject to serious and ongoing delays and related disruptions in accessing funding that they have already been awarded, or renewal awards. One of my members whose Head Start program is part of a college, had its grant returned for revisions because the Vice President of Equity, Inclusion, and Belonging for the college serves on one of the Head Start program's governing bodies.

56.     On April 7, 2025, the Department of Government Efficiency ("DOGE") began requiring Washington HSA members to submit additional justifications for routine PMS draw downs. Stating that the reason for the draw down was "payroll" was deemed insufficient. This directive from DOGE came from an unknown email address: defendthespend@hhs.gov.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

57.     Agencies contacted HHS for clarification of this directive and to find out if it was legitimate. HHS representatives initially responded that the emails were "phishing emails" and were not real. Hours later, agencies were contacted by OHS and told that the emails were indeed legitimate and that they must comply with the directive to draw down the money they have already been awarded.

58.     In the weeks since the layoffs and regional office closure, many Washington HSA members who attempted to contact OHS about their anticipated Notice of Awards received no assistance. Instead, they were told that OHS is still working to assign tasks following the regional office closures, and that "at this time I do not have an answer for you about how the recent changes in the Region will affect grant application processing and approval timelines."

59.     Six Washington HSA members experienced extreme delays in receiving the second half of their funding from their 5-year grant. These members did not receive information about their funding until mere days before their funding ran out, or experienced unprecedented delays in accessing their funding through PMS. These members typically would have received their funding by the beginning of April, but did not receive it until right before May 1.

60.     These delays to PMS drawdowns have caused Washington HSA members to be late in payroll payments to staff.

61.     If these members did not receive this funding, they would have been forced to close or cut their services severely. These members serve over 2,700 children in addition to their families.

62.     Washington HSA members who are due to receive a notice of award by June 1 are still waiting for notice. They typically would have received notice well beforehand and would be able to plan their operations in advance. Because of these unprecedented delays, members are having to prepare closure of program notices to families and staff as they await funding that might not arrive.

63.     One Washington HSA member has been waiting for more than two months for approval of a PMS draw down to repair a playground at the agency that is out of compliance with state child care licensing requirements. This delay is extraordinary and puts this member in jeopardy of losing its license. In this instance it also deprives children of access to outdoor play and learning.

64.     Another Washington HSA member in Eastern Washington has been waiting more than 3 months for approval to purchase a new vision screening machine

65.     Many members are still expressing alarm and concerns that this will be an ongoing pattern of issues caused by OHS, especially with the Administration's goal to dismantle Head Start. I fear that another round of federal reductions in force will only leave OHS even more understaffed and Washington HSA members with even less support, leading to increasingly severe disruptions to operations and negative outcomes for children and families in need.

66.     After the closure of the Region 10 Office, federal funding freezes, and Washington HSA members experiencing delays in receiving money from the PMS, Washington HSA has diverted most of its focus to assisting its members facing these issues with Head Start.

67.     On May 1, 2025, in a webinar titled "Office of Head Start Operations Update," Acting Director Hooban explained that because of the loss of "so many of our amazing colleagues"—colleagues she had described as "subject matter experts" with ten to twenty years of experience who would never be able to be replaced—the staff that remain are "working really hard to fill major holes."

68.     Most recently, a Washington HSA member was working with OHS to resolve a funding mis-categorization issue in which the agency drew down funds for the incorrect funding year. After raising this issue with OHS, the agency received approval from OHS to roll those funds over to the next fiscal year after returning the funds. The member was working with an OHS representative on this issue for months. That OHS representative

was laid off in the mass Reduction in Force. Now, the member does not have direct support from an OHS representative in completing this process. The member is currently without any information on when this funding will be accessible.

69.     Because of this delay, the member is in a budget deficit of around $400,000, and they will not be able to make payroll for their staff for the month of June unless they receive the overdue funding. The member is preparing notice of program closures for parents and guardians and layoff notices for staff.

70.     Typically, this member would have been able to resolve this issue within two to three-months at the very most with the direct support of an OHS representative. Because there is no longer available direct support from OHS, the issue has lingered for almost six-months and the program is in serious danger of closing. Moreover, they are in the process of going through a federal monitoring review and this unresolved issue could put this program in jeopardy.

71.     This member program serves almost 400 families, many of whom are particularly vulnerable and heavily reliant on the member's services: 30 families served by the member are experiencing homelessness, five families are receiving domestic violence support services, and ten children are receiving intensive case management services because they are either in foster care or are involved in child protective services. These children and families will be stripped of critical supports and services if this member does not receive funding.

**April 16, 2025, HHS Amendment to Its Grants Policy Statement Creates a New Liability**

**For Agencies Trying to Comply With the Head Start Act**

72.     On April 16, 2025, HHS amended its Grants Policy Statement to include a "Grant award certification" that states that The provision provides that "by accepting [HHS's] grant award, recipients are certifying that . . . they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote

DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The April 16 DEIA Certification also states that "HHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any program in violation of Federal anti-discriminatory laws." The Policy Statement further cautions that "recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act.]"

73.     This April 16 DEIA Certification does not define "diversity," "equity," "inclusion," or accessibility" Like with the March 14 DEI Letter, I do not know how to properly interpret the meaning and scope of the Certification, and I cannot advise my members. My members are also confused, and they are without the benefit of the Region 10 office and its staff for guidance.

74.     I understand that if an agency certifies under this statement and then is found to have been in violation of it, they can have their grant funds clawed back, and they can even be held criminally or civilly liable under the False Claims Act. Our Head Start programs are just starting to become aware of this, causing serious concerns and fear.

75.     Washington HSA members are in the impossible position of having to certify under these terms to receive funding but also meet their obligations under the Head Start Act that directly contradict the certification that they will not "advance or promote DEI, DEIA, or discriminatory equity ideology."

**The DEIA Ban Likely Contradicts Head Start Legal Requirements**

76.     The Head Start Program has many legal requirements that likely conflict with the March 14 DEI Letter and April 16 DEIA Certification (collectively, "DEIA Ban"). Agencies cannot comply with those requirements and the DEIA Ban simultaneously. The following are just a few examples of the provisions of the Head Start Act that I believe may conflict with the DEIA Ban:

a. "Diversity" Provisions: Agencies are directed to tailor their programs "to meet the diverse needs of the population served" 42 U.S.C. § 9836. Agencies must "create welcoming program environments that incorporate the unique cultural, ethnic, and linguistic backgrounds of families in the program and community." 45 C.F.R. § 1302.50. They must also "[c]onduct family engagement services in the family's preferred language, or through an interpreter, to the extent possible, and ensure families have the opportunity to share personal information in an environment in which they feel safe" 45 C.F.R. § 1302.50.

b. "Equity" Provisions: Head Start agencies must implement policies and practices that support the unique learning needs of children with limited English proficiency and dual language learners. *See e.g.,* 45 C.F.R. §§ 1302.30, 1302.90. Educational performance standards in this area also require that grantees "ensure equitable, inclusive, and accessible service[s]" that reflect the "needs and diversity of the community." 45 C.F.R. § 1302.11.

c. "Inclusion" Provisions: Agencies must conduct community assessments to identify "populations most in need of services including prevalent social or economic factors, challenges, and barriers experienced by families and children" when determining services, *Id.* §§ 1302.11(b)(1)(i)-(ii), (v), and participants, § 1302.14. Agencies are "required to use data from the community assessment to identify the population of eligible children and families and potential barriers to enrollment and attendance, including using data to understand access to transportation for the highest need families. Agencies must use this data to inform ongoing program improvement efforts" and "to promote enrolling the children most in need of program services." *Id.* § 1302.14. Agencies "must include specific efforts to actively locate and recruit children with disabilities and other children in need, including children experiencing homelessness and children in foster care." *Id.* § 1302.13.

d. "Accessibility" Provisions: Head Start agencies must create inclusive and accessible classrooms for children with disabilities. Agencies must provide individualized assessments, resources, and services (including accessible transportation) for children with disabilities. Id. §§ 1302.61, 1303.75(a). In particular, "[t]he equipment, materials and supplies [that agencies use] must include any necessary accommodations and the space must be accessible to children with disabilities. Agencies must change materials intentionally and periodically to support children's interests, development, and learning." Id. §1302.31(d

77. Washington HSA members are facing an impossible choice between whether to violate pre-existing Head Start legal requirements or the DEIA Ban.

78. For example, the Americans with Disabilities Act ("ADA") requires most Head Start agencies to provide training on the ADA. However, the DEIA Ban seems to prohibit that training because it inherently involves accessibility, inclusivity, and equity. One Washington HSA member was told by a representative from OHS that they were no longer allowed to train on the ADA, and their application which included funding for an ADA training would be rejected.

**Washington HSA Members Meet Head Start Requirements Through Activities and Programs that Members Have Long Understood to be Lawful, but Would Seem to Violate the DEIA Ban**

79. Washington HSA members meet the above statutory and regulatory obligations through a wide array of activities that may be implicated by the DEIA Ban. For example:

a. Washington HSA members selection criteria to determine which children and families to accept, because they receive more program applicants than they can accept due to the level of need in Washington communities. The selection criteria

are in line with Head Start enrollment standards, and include income-level, status in experiencing homelessness, disability or developmental delay diagnosis, level of English language skill, whether the child or family member has attended an Indian Boarding School, and tribal membership.

b. Washington HSA members conduct targeted recruitment to hire staff who have multi-lingual skills and diverse backgrounds.

c. Washington HSA members conduct targeted recruitment to hire staff who have multi-lingual skills and diverse backgrounds.

d. Washington HSA members develop individualized learning plans to meet the unique needs of children.

e. Washington HSA members provide staff with rigorous equity and anti-bias training so that they can uphold related Head Start Program requirements.

f. Washington HSA members use culturally relevant teaching materials that express diversity, such as books and dolls.

g. Washington HSA members choose the geographic placement of their programs based on community assessment data so that they can allocate services to the populations most in need.

h. Washington HSA members conduct focused outreach and recruitment of children and families to participate in the program in specific communities or locations, so that services can reach immigrants, refuges, and people experiencing homelessness.

i. Washington HSA members train their staff and teachers in providing inclusive learning in the classroom for children with disabilities. This is imperative because of the increase in developmental delays seen post-COVID-19 pandemic, with some Washington HSA members reporting that 25-50% of their children served are experiencing delays.

j. Washington HSA members organize "father affinity groups that provide Head

Start fathers with supportive community with their peers, and "father engagement nights" that provide family-activities for fathers to engage with their children for positive relationship building, such as carnival games or sports activities.

k.  Washington HSA members use intensive case management models to support children and families who are experiencing destabilizing issues that can affect school-readiness, connecting them with housing, food resources, drug treatment, behavioral therapy, job training, and financial literacy trainings.

l.  A Washington HSA member offers "blended" inclusion classes in partnership with a special education preschool. These classes provide a learning environment where children on Individualized Education Plans are in the same classroom with neuro-typically developing peers.

80.     These activities allow members to maximize their enrollment and design the best quality programming for the children and families they serve to meet their legal and regulatory requirements as Head Start agencies.

81.     These activities may be considered DEIA-related activities that are now prohibited by the DEIA Ban. If they are, I do not know how Washington HSA members will be able to remove all these activities and still meet the requirements of the Head Start Program.

82.     To support members in meeting their legal obligations, Washington HSA provides training and conferencing opportunities that are focused on these requirement areas to its members. For example, these are some of the trainings and conferences Washington HSA provided in the last four years:

a.  Supporting the Gap and Bridging the Gap: Administered with the Region 10 Office, this training focused on how to provide individualized support to children experiencing gaps in development that have increased since the COVID-19 pandemic, and how teachers can respond to these development gaps with trauma-informed practices.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

b. Meeting the Needs of All Children - Pyramid Model, Behavior Supports, and Inclusion: A 3-day training examining practices around preventing challenging behavior, supporting new skill development, and enhancing inclusionary practices.

c. Culture in the Classroom: Serving diverse populations and building an anti-biased environment for children: A one-week conference teaching evidence-based practices for providing culturally responsive assessment, care, education, and community engagement.

83.     Even though these activities have long been understood to be prescribed by the Head Start performance requirements, Washington HSA agencies are operating in constant fear that continuing to engage in them will result in cuts to their funding. This fear is exacerbated by the fact that their activities are subject to monitoring by OHS, which has caused some agencies to self-sensor and stop engaging in lawful activities they believe would run afoul of the DEI Ban.

**The DEIA Ban Likely Conflicts with Washington State Law and Licensing Requirements**

84.     Washington HSA members are subject to a wide range of legal requirements under state law that conflict with the March 14 DEI Letter. For example:

a. State law requires that a Head Start agency serve as a representative on Washington's early learning advisory council, which is tasked with monitoring and ensuring that state funds for early childcare and education are invested to "[a]dvance racial equity and strengthen families by recognizing and responding to the growing diversity [of Washington's] population" while "[m]aintain[ing] a focus on racial equity and inclusion in order to dismantle systemic racism at its core and contribute to statewide efforts to break the cycle of intergenerational poverty." Revised Code of Washington (RCW) 43.216.075.

b. Head Start agencies in Washington are required by state law to meet data

reporting requirements focused on improving services and access for "early learning providers and children from diverse racial, ethnic, and cultural backgrounds and from low-income neighborhoods and communities" to comply with Washington's mandatory rating and monitoring program for early childcare and education. RCW 43.216.089(5).

c. Washington Head Start agencies commonly receive concurrent funding from Washington's state-level early childhood education and assistance program. Under state law, grantees under that state program must consider racial diversity and equity in providing services. *See, e.g.,* RCW 43.216.567(2).

d. To receive and maintain early learning program licensing in Washington, Head Start agencies are subject to numerous requirements to meet the diverse needs of the children and families they serve. They must "provide culturally and racially diverse learning opportunities," including "curriculum, activities, and materials that represent all children, families, and staff...and do not reinforce stereotypes. Washington Administrative Code (WAC) 110-300-0160.

e. Agencies are further required to discuss "family beliefs, culture, language, [and] child rearing practices" with children's families and to "[g]ive families opportunities to share their language and culture in [their program]." WAC 110-300-0085.

f. Agencies are mandated to have a written curriculum philosophy that is informed by the Washington state early learning and development guidelines, which are themselves intended to "[a]cknowledge, honor and embrace the tremendous diversity and variation that exists for children and families" and "[i]ncorporate current and culturally inclusive research on child development and best practices." *See Washington State Early Learning and Development Guidelines Birth through 3rd Grade*, DCYF, https://dcyf.wa.gov/sites/default/files/pubs/EL_0015.pdf.

g.  Head Start agencies in Washington are required to "maintain a climate for healthy, culturally responsive child development," with a mandate to "represent[] the diversity found in the early learning program and society, including gender, age, language, and abilities while being respectful of cultural traditions, values, religion and beliefs of enrolled families." WAC 110-300-0325.

h.  Licensing requirements further mandate that Head Start agencies "be aware of and responsive to children's developmental, linguistic, cultural, and academic needs," "work to maximize children's... engagement with developmentally and culturally responsive activities" and offer such activities, adapt their program environment to a child's "strengths, developmental level, abilities, culture, community" and relate to the child's behavior. WAC110-300-0315(1); 110-300-0320; 110-300-0330.

i.  Agencies are required to have and follow written policies for staff that include "religious, equity and cultural responsiveness" and daily schedules "designed to meet enrolled children's developmental, cultural, and special needs." WAC 110-300-0110(2); 110-300-0360(2). To further comply with licensing requirements, Washington Head Start agencies must provide each child in their care with a written food plan that accommodates religious or cultural preferences, and they are required to be "respectful of each child's cultural food practices." WAC 110-300-00190; 110-300-0195.

j.  Washington Head Start agencies are also required to facilitate the toilet training process for children by encouraging the child with "[c]ulturally sensitive methods." WAC110-300-0220.

85.  The above examples are just some of the state requirements that appear to be in direct conflict with the March 14 DEI Letter and EOs.

86.  It is entirely unclear to me how Washington HSA members can comply with the March 14 DEI Letter and EOs and still meet their requirements under Washington

1    state law.

2        87.    There is also a logistical impediment that would not allow many Washington

3    HSA members to even attempt to remove "illegal DEI activities" from their

4    programming, even if they knew what that means. Many Washington HSA members

5    "braid" their funding sources, so that Head Start funds are used in conjunction with funds

6    from state-level sources, like ECEAP. The braiding of funds has been historically

7    encouraged by both HHS and Washington state. When funds are braided, staff may be

8    funded by the braided funds from both Head Start and ECEAP. ECEAP was established

9    in the 1980's as the state's early child care and learning program to supplement Head

10   Start and is a complementary program. Nearly ¾ of Region 10 Head Start grantees also

11   run ECEAP programs. It is common for ECEAP and Head Start children to be served in

12   the same building, for the staff and teachers to share in training, and for both programs to

13   collaborate closely. And in some instances, Head Start and ECEAP children might be

14   served in the same classroom. Additionally, Head Start programs often receive working

15   connections child care subsidies to provide children with extended care for parents who

16   are working.

17       88.    Under the DEIA restrictions, there appears to be a real possibility that Head

18   Start programs would no longer be eligible to receive grants from the Equity Fund

19   established by the Fair Start for Kids Act passed by Washington legislature during the

20   pandemic. These important funds pay for activities including culturally responsive and

21   linguistic training on how to incorporate inclusive practices and preventing racial

22   disparities in disciplinary action.

23       89.    I fear that Washington HSA members will lose their state licenses or be

24   subject to fines if they change their programs and their activities to attempt to comply

25   with the DEIA Ban.

26       90.    However, I understand some programs have already begun to scale back their

27   compliance with State standards, out of fear it will run afoul of the DEI Ban.

**Washington HSA Members are in Fear of Funding Termination, Agency Closure, and Criminal and Civil Liability Because of the DEIA Ban and Unprecedented Disruption**

91.     The unprecedented level of disruption and uncertainty with grant funding, OHS regional support and technical and training assistance, and the DEIA Ban have left Washington HSA in fear of agency funding termination, agency closure, and criminal and/or civil liability.

92.     Most Washington HSA members will need to close their programs if they lose their Head Start funding or if it is delayed past when they need to make payroll or cover expenses. This is still the case for Washington HSA members who receive concurrent state funding as they would not be able to stay in business if they could only rely entirely upon state ECEAP dollars. Some Washington HSA members are already struggling with funding due to cuts to state funding and other federal funding sources. As an example, the final state budget passed this month by our state legislature reduces the number of ECEAP slots by 3,000, delays a subsidy rate increase for working connections child care, and makes other reductions to early learning services and programming.

93.     Washington HSA members are fearful about retaliation from the federal government despite doing their best to comply with the DEIA Ban.

94.     Washington HSA members cannot effectively provide service and fulfill their obligations under the Head Start Act and other laws when they do not know how to interpret the DEIA Ban if or when their programs will be forced to close.

95.     Washington HSA members who are up for grant renewals by June 1 and July 1 legitimately and seriously fear that either their grants will not be processed in time to avoid agency closure, or delays with PMS will force agency closure. It has already happened to one of our members and it feels like it can happen again to any agency without justification.

96.     It is my understanding that eight Washington HSA member program directors are considering quitting their jobs because of the uncertainty clouding Head Start's

future. One Washington HSA member who is waiting notice of award by July 1 has had five staff, including teachers and classroom assistants, resign from their jobs due to the Head Start funding delays and uncertainty. This member expects many more resignations in the coming weeks due to the continued funding uncertainty. This member has serious concerns about the increased likelihood of child safety incidents due to inadequate staff to child ratios caused by staff being unable to rely on their jobs being available due to the uncertainty with Head Start.

**Washington HSA Member Programs are Integral to the Community**

97.    Washington HSA member agencies are critical to ensuring that children are kindergarten-ready and have the support they need to get out of poverty and provide a stable home environment. The importance of Washington HSA members is borne out in Washington state surveys of kindergarten-readiness across demographic categories. According to a report that tracked outcomes for children who received ECEAP services—effectively the state's Head Start program—children who receive early child care and learning are more ready for kindergarten than their peers of low-income who do not receive such services. *See* https://erdc.wa.gov/publications-and-reports/early-learning-feedback-report. This was found across a broad swath of categories for kindergarten readiness, including cognitive readiness, language readiness, literacy readiness, math readiness, social/emotional readiness, and physical readiness. These benefits applied to Head Start children across race and ethnicity, disability status, and whether they were a dual language learner. *See id.*

98.    These results are consistent with the results for Head Start generally. Head Start is an incredibly successful program. Research shows that early education and care from Head Start greatly improves the likelihood of obtaining financial self-sufficiency in adulthood. *See* https://anderson-review.ucla.edu/head-start-the-public-preschool-program-more-than-pays-for-itself/; https://www.nber.org/papers/w28268 . Children in Head Start graduate from high school and college at higher rates than children who don't

participate in Head Start, with the college completion rate being 39% higher for Head Start children. *See id*. Head Start reduces the incidence of adult poverty by 32% and the receipt of public assistance income by 27%. *See id*. These effects mean that funding Head Start generates revenue, rather than costs, for the federal government. It is estimated that the government makes 5.4% to 9.1% per year for at least 30 years for every child it puts through Head Start due to savings on public assistance and the increase in tax revenue from higher wages earned by Head Start participants. *See id*.

99.     The data is clear: Washington HSA Head Start programs work. Taking away services tailored to the needs of communities and to those who need them most will deprive children and their families of the benefits of Head Start. Vulnerable children will fall behind their peers in and out of the classroom. Parents will lose work because they don't have childcare, housing, and food resources. The negative effects of this loss will continue throughout the life of the child if they are not provided with the opportunity for a more-equitable start to their life.

**Head Start Agencies Need Relief**

100.     The DEIA Ban is not in the interest of children who need help. It is against the very heart and spirit of Head Start, let alone the requirements of the Head Start Act.

101.     From my vantage point this is a concerted effort to dismantle Head Start by trying to paralyze government programs.

102.     I am aware that a leaked copy of the 2026 HHS budget "pass back" called for the elimination of Head Start. I believe that coupled with the disruptions to Head Start this reveals the true intentions of Defendants to dismantle the program despite their recent public reversal.

103.     Harm is being done by the ongoing threat of agency closure due to the lack of resources and support and funding uncertainty and delays. Slowly eroding the quality of service and the ability to provide service depletes the ability of agencies to care for children and makes it so that they cannot meet their legal obligations to do so.

104.    I understand that Head Start agencies in other states are facing similar challenges as are Washington HSA member agencies concerning Defendants' DEIA Ban and the regional Head Start office closures and layoffs on their Head Start programming. I have personal knowledge that multiple agencies in states other than those participating directly in this lawsuit have made efforts to remove certain words from their websites and curricula, change their recruitment and advertising of staff positions, and cease certain trainings and professional development, in order to try to not run afoul of the DEIA Ban.

105.    I have personal knowledge of multiple agencies in states other than those participating directly in this lawsuit who have faced similar concerns with not having predictable and timely access to funding and have had to consider whether to suspend or terminate programs as a result.

106.    I also have personal knowledge that leadership of multiple other Head Start agencies and associations in states other than those participating directly in this lawsuit decided not to participate primarily or in large part because of concerns that they would face retaliation from Defendants. I understand that they were concerned that their programs would be targeted for enforcement of the DEIA Ban and thereby denied funding; denied funding in another manner; and/or that the Executive Defendants would target other (non-Head Start) federally funded services and programs in their states for investigation and/or de-funding in retaliation for their participation in this case.

107.    We cannot wait for more program closures for relief. By then, it will be too late because children and families will lose access to critical resources, staff will lose their jobs, and parents will not be able to work without child care. If these abuses of power are allowed to stand, it will be catastrophic for Washington children and their families.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct to the best of my knowledge.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Executed this 14th day of May 2025

_____
Joel Ryan