The Honorable Ricardo S. Martinez

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

WASHINGTON STATE ASSOCIATION OF
HEAD START AND EARLY CHILDHOOD
ASSISTANCE AND EDUCATION
PROGRAM; ILLINOIS HEAD START
ASSOCIATION; PENNSYLVANIA HEAD
START ASSOCIATION; WISCONSIN HEAD
START ASSOCIATION; FAMILY
FORWARD OREGON; and PARENT
VOICES OAKLAND,

                    Plaintiffs,

      v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services; U.S. DEPARTMENT OF HEALTH
AND HUMAN SERVICES; ANDREW
GRADISON, in his official capacity as Acting
Assistant Secretary of the Administration for
Children and Families; ADMINISTRATION
FOR CHILDREN AND FAMILIES; OFFICE
OF HEAD START; and TALA HOOBAN, in
her official capacity as Acting Director of the
Office of Head Start,

                    Defendants.

Case No. 2:25-cv-00781-RSM

DEFENDANTS' OPPOSITION TO
PLAINTIFFS' MOTION FOR A
PRELIMINARY INJUNCTION

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

# BACKGROUND

## I.    The DEI Executive Orders, DEI Letter, and DEIA Certification

On January 20, 2025, the President issued Executive Order 14,151, 90 Fed. Reg. 8339, *Ending Radical and Wasteful Government DEI Program and Preferencing*. On January 21, 2025, the President issued Executive Order 14,173, 90 Fed. Reg. 8633, *Ending Illegal Discrimination and Restoring Merit-Based Opportunity*. The President's DEI Orders make clear that they must be "implemented consistent with applicable law." EO 14,151 § 4(b); EO 14,173 § 8(b).

On March 14, 2025, the Administration for Children and Families (ACF) issued a letter to all Head Start grant recipients informing them that the Office of Head Start (OHS) will not approve any use of federal funding for any expenditures that promote or take part in DEI initiatives. Dkt. 38, Ex. 5 (DEI Letter). As stated in the Letter, the guidance regarding funding expenditures is consistent with the non-discrimination provision in Section 654 of the Head Start Act which can be found at 42 U.S.C. § 9849. The Letter instructed grant recipients to examine future submissions to the OHS, including annual funding applications, budgets, training and technical assistance plans, to ensure those materials follow the March 14 guidance. The DEI Letter did not purport to terminate Head Start grant awards.

On April 16, 2025, HHS amended its Grants Policy Statement to include, among other things, a Civil Rights Assurance and certification that recipients will not operate programs that promote DEI, DEIA, or discrimination equity ideology in violation of Federal anti-discrimination laws. Dkt. 38, Ex. 7, pgs. 17-19 (DEIA Certification). The Grants Policy Statement is an HHS-wide document and not specific to Head Start. Although the DEIA Certification provision notes that HHS reserves the right to terminate financial assistance for violations of Federal anti-discrimination laws, that has always been true. Head Start grantees are subject to relevant Federal

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 2

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1  anti-discrimination laws. 45 C.F.R. § 1303.3; 42 U.S.C. § 9849. Moreover, as explained below,

2  there is a specific and extensive process in place to terminate Head Start grant awards which

3  provides notice, opportunity to correct, and ability to appeal to the Departmental Appeals Board

4  (DAB). A violation of the Grants Policy Statement by a Head Start grantee could not lead to a

5  termination without undergoing that process.

6      **II.    The Workforce Executive Order, OPM Memorandum, and HHS's ARRPs.**

7      On February 11, 2025, the President issued Executive Order 14210, 90 Fed. Reg. 9669,

8  entitled *Implementing the President's 'Department of Government Efficiency' Workforce*

9  *Optimization Initiative*. On February 26, 2025, OPM and OMB jointly issued a Memorandum to

10  agencies providing guidance for complying with the Order and on the Agency RIF and

11  Reorganization Plans ("ARRP") required to be submitted to OMB and OPM. The President's

12  Workforce Order and OPM's Memorandum make clear that they must be implemented consistent

13  with applicable law and statutory authority. EO 14210 §§ 3(b)(1); 3(c); 5(b); Memorandum §§ II;

14  IV(2).

15      HHS submitted Phase I and Phase II ARRPs in accordance with the Workforce Order and

16  Memorandum. Those ARRPs are in the process of review and refinement but have not yet been

17  finalized for public release and implementation. On March 27, 2025, as a step along the ARRP

18  process, Secretary Robert F. Kennedy, Jr. publicly announced the planned reorganization of certain

19  components of HHS. Dkt. 38, Exs. 8-9. The Secretary's announcement does not contemplate the

20  elimination of any statutorily mandated HHS programs or divisions. Instead, the focus of the

21  planned reorganization and consolidation is the reduction of wasteful spending, increased

22  efficiency, and increased responsiveness to the needs of the American people.

23  //

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 3

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Specifically, regarding the restructuring of programs and divisions, HHS plans to consolidate its existing 28 divisions; centralize shared services including information technology, external affairs, human resources, and procurement; create a new Administration for a Healthy America to coordinate chronic care and disease prevention programs and harmonize health resources to low-income Americans more efficiently; appoint a new Assistant Secretary for Enforcement to combat waste, fraud, and abuse in federal health programs; and consolidate ten regional offices into five. *Id.* The goal of the consolidation and streamlining of agency functions is to reduce redundancy and allow HHS to perform its core functions more efficiently. *Id.* As the announcement explained, HHS intends to accomplish its goals "without impacting critical services." *Id.*

As HHS has continued to develop its ARRPs, it is also working to ensure that statutorily mandated programs continue to function. As relevant here, certain employees at ACF and OHS were sent RIF notices and placed on administrative leave. However, critical functions including health and safety monitoring, centralized communication between OHS and grantees, grant funding, and application processing have continued, albeit in different forms and sometimes on different timelines than prior to the RIF.

## LEGAL STANDARDS

A "preliminary injunction is an extraordinary and drastic remedy." *Munaf v. Geren*, 553 U.S. 674, 689-90 (2008). A district court should enter a preliminary injunction only "upon a clear showing that the [movant] is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). To obtain a preliminary injunction, the moving party must demonstrate (1) that it is likely to succeed on the merits of its claims; (2) that it is likely to suffer an irreparable harm in the absence of injunctive relief; (3) that the balance of equities tips in its favor; and (4) that

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 4

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

the proposed injunction is in the public interest. *Id.* at 20. When "the Government is the opposing party," the assessment of "harm to the opposing party" and "the public interest" merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

# ARGUMENT

## I.  Plaintiffs have not shown a fair chance of establishing standing.

Article III's "case or controversy" requirement obligates federal courts to determine, as a preliminary matter, whether plaintiffs have standing to bring suit. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). A plaintiff establishes standing by showing: (1) that it suffered an injury in fact, meaning a concrete and particularized harm that is actual or imminent, rather than hypothetical; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (*Lujan*). "The second and third standing requirements—causation and redressability—are often 'flip sides of the same coin.'" *Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380-81 (2024) (quoting *Sprint Communications Co. v. APCC Servs., Inc.*, 554 U.S. 269, 288 (2008)). "If a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *Id.* at 381.

Here, Plaintiffs have not shown that HHS's implementation of the Executive Orders threatens to cause them actual harm. At most, they allege a fear of what might happen down the line. Plaintiffs hypothesize about harms that may befall them if their members do, or do not, comply with the DEI Letter or DEIA Certification or if HHS is unable to provide a particular service or function because of its ARRPs. Plaintiffs rely on predictions of what "may" or is "likely" to happen to their programs, but they cite no proof that these alleged harms will materialize.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Alleging that their funding is "threatened" evinces little more than an apprehension about the future.

There is no basis for assuming that disruption of statutorily mandated programs will occur or that grant denials will materialize, or are imminent, especially given HHS's stated focus of avoiding disruption of critical services. Dkt. 38, Exs. 8-9. This is precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 409-10 (2013) (A threatened injury must be certainly impending to constitute injury in fact; allegations of possible future injury are not sufficient); *see also Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting standing based on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same); *United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023) (remote and speculative harms are not cognizable injuries-in-fact).

Allegations of some delay or disruption in a government service cannot justify sweeping relief halting an entire agency's implementation of the President's federal funding and enforcement priorities and reinstating hundreds of employees or freezing in place an entire restructuring effort. Were the rule otherwise, organizations could claim standing to second-guess nearly any federal funding or personnel decision on the theory that the decision may have a downstream effect on their resources.

Plaintiffs have also not shown redressability to establishing standing because they have not shown how an injunction would redress their fears that they may experience delays or disruptions to their funding or programs. Halting implementation of the DEI Letter and DEIA Certification will not automatically result in Plaintiffs becoming entitled to grants on the timeline they prefer. To the contrary, Plaintiffs ordinarily submit applications for grants, which must then be reviewed

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 6

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1  and approved. Without redressability, Plaintiffs cannot establish standing. *Lujan*, 504 U.S. at 560-
2  61.

3  **II.    Plaintiffs have not shown a fair chance of establishing ripeness.**

4  "Ripeness is one of the justiciability doctrines that we use to determine whether a case
5  presents a live case or controversy." *50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*,
6  129 F.4th 1186, 1188 (9th Cir. 2025) (quoting *Clark v. City of Seattle*, 899 F.3d 802, 808 (9th Cir.
7  2018)). "For a case to be ripe, it must present issues that are 'definite and concrete, not hypothetical
8  or abstract.'" *Id.* (quoting *Bishop Paiute Tribe v. Inyo County*, 863 F.3d 1144, 1153 (9th Cir. 2017)
9  (citation omitted)).

10  Instead of rushing into court, Plaintiffs must wait "until the scope of the controversy has
11  been reduced to more manageable proportions, and its factual components fleshed out, by some
12  concrete action applying the regulation to [their] situation in a fashion that harms or threatens to
13  harm [them]." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003)
14  (quoting *Lujan*, 497 U.S. at 891). To evaluate ripeness, courts look to (1) "the fitness of the issues
15  for judicial decision" and (2) "the hardship to the parties of withholding court consideration."
16  *National Park*, 538 U.S. at 808.

17  Here, both factors counsel against review. First, Plaintiffs present the kind of "abstract
18  disagreemen[t] over administrative policies" that are unfit for judicial resolution. *Id.* at 807.
19  Article III courts exist to resolve claims arising from concrete injuries arising in specific factual
20  settings, but Plaintiffs improperly seek preemptive judicial review of an agency's implementation
21  of the President's Executive Orders including grant funding and personnel decisions.

22  Second, denying review at this stage will not impose any legally cognizable hardship. If
23  HHS acts causing a Plaintiff a concrete injury for which they can seek redress, they can challenge

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 7

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1   that specific action in the normal course via the HHS Departmental Appeals Board (DAB), which

2   has jurisdiction over appeals of Head Start terminations, or at the Merit Systems Protection Board

3   (MSPB), which has jurisdiction over federal agency personnel actions. Plaintiffs' desire for earlier

4   judicial intervention than what regulations and Congress has provided for is not a cognizable

5   hardship justifying premature review.

6         Plaintiffs allege that HHS's implementation of the Orders *may* or *will* result in the non-

7   payment of grant funds. However, what Plaintiffs cannot claim is that any grant terminations have

8   occurred due to HHS's actions. Plaintiffs also fail to acknowledge that if a termination did occur,

9   it would happen only after a grantee was given significant process and a chance to appeal. Under

10  the Head Start Act and its implementing regulations, grant terminations follow a robust process

11  where OHS conducts a review, issues a monitoring report, gives grantees an opportunity to correct,

12  conducts a follow up review, and issues a termination notice with an opportunity to appeal. *See*

13  42 U.S.C. §§ 9836a(c) and (e) (prescribing monitoring process and corrective action opportunities)

14  and 9841(a)(3) (prohibiting termination or reduction of funding before reasonable notice and an

15  appeal); *see also* 45 C.F.R. § 1304.2 (outlining monitoring procedures) and 45 C.F.R. § 1304.5

16  (regulating the notice and appeals process). A Head Start grantee appealing a termination to the

17  DAB keeps its funding during the pendency of an appeal. 45 C.F.R. §§ 16.22; 1304.5(c)(2). This

18  process could take years to complete allowing for ample time to adjudicate this case before a

19  grantee faces loss of awarded grant funds.

20        **III.**    **Plaintiffs have not shown a fair chance of establishing jurisdiction over their**

21              **ARRP claims.**

22        In passing the Civil Service Reform Act (CSRA), Congress made the MSPB and the FLRA

23  the exclusive means for federal employees, labor unions, and other interested parties to raise

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 8

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    challenges to final, non-discrimination-related, adverse employment actions. *See United States v.*

2    *Fausto*, 484 U.S. 439, 455 (1988). Plaintiffs, who are not individual employees, nor labor unions

3    representing federal employees, but are non-profit organizations, cannot seek judicial review in

4    this Court. Just as Congress "intentionally foreclosed judicial review to" certain employees and

5    labor unions under the CSRA, it intentionally foreclosed judicial review by parties other than those

6    whom it specifically authorized to seek relief.

7         It would turn the CSRA's comprehensive structure "upside down" for Plaintiffs, who are

8    strangers to the federal government's employment relationships, to challenge HHS's employment

9    actions in federal district court, "free" from any of the restrictions that would apply if the claim

10   were brought by the HHS employees (or former HHS employees) themselves. *Id*. at 449-50. The

11   exclusion from the CSRA's review scheme reflects Congress's considered judgment limiting who

12   may challenge a personnel decision and on what grounds—rather than providing carte blanche for

13   those excluded to sue outside the CSRA's comprehensive scheme. *See Graham v. Ashcroft*,

14   358 F.3d 931, 935 (D.C. Cir. 2004).

15        The CSRA's remedial scheme is both exclusive and preemptive because "permit[ting]

16   [other] claims to supplant the CSRA's remedial scheme" would defeat Congress' purpose of

17   creating "a single system of procedures and remedies, subject to judicial review." *Mangano v.*

18   *United States*, 529 F.3d 1243, 1246 (9th Cir. 2008) (quoting *Rivera v. United States*, 924 F.2d 948,

19   951 (9th Cir. 1991)). Accordingly, where Congress has provided a process for processing

20   prohibited personnel practices, other potential employee remedies are preempted. *Id.* (citing

21   *Fausto*, 484 U.S. at 455). In fact, a federal employee's personnel-related complaints are preempted

22   "even if no remedy [is] available ... under the CSRA." *Id.* (quoting *Collins v. Bender*, 195 F.3d

23

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 9

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1076, 1079 (9th Cir. 1999)) (citing *Bush v. Lucas*, 462 U.S. 367, 388; *Blankenship v. McDonald*, 176 F.3d 1192, 1195 (9th Cir. 1999)). [1]

Multiple courts addressing similar challenges to agencies' AARPs or restructuring decisions have declined jurisdiction on this ground. In *AFGE*, the D.C. Circuit held that the FLRA provided the exclusive avenue through which unions could bring claims pertaining to federal labor relations. *See AFGE v. Trump (AFGE)*, 929 F.3d 748, 754-61 (D.C. Cir. 2019); *see also Am. Fed. of Gov't Emps., AFL-CIO v. Ezell*, 2025 WL 470459, at *2 (D. Mass. Feb. 12, 2025) (finding the decision in *AFGE* "instructive" and dissolving a temporary restraining order and denying a preliminary injunction); *Nat'l Treasury Emps. Union v. Trump (NTEU)*, 2025 WL 561080, at *7 (D.D.C. Feb. 20, 2025) (upholding channeling requirement and denying request for emergency relief); *Carter v. U.S. Dep't of Education*, Case No. 1:25-cv-00744-PLF, ECF No. 68 (D.D.C. May 21, 2025) (denying motion for preliminary injunction).

The D.C. Circuit recently denied plaintiffs' motion for further injunctive relief over claims challenging an agency's ARRPs finding that the district court likely lacked jurisdiction over unions' claims under the FLRA, CSRA, and FSA. *American Foreign Service Association v. Trump*, 2025 WL 573762, at *8-10 (D.C. Cir. Feb. 21, 2025) (*AFSA*). And the Fourth Circuit also recently stayed a district court's injunction finding that the government is likely to show that the district court lacked jurisdiction where the government had argued, among other things, that the "[CSRA] provides the exclusive means for review of personnel actions taken against federal employees"—and observing that "[t]he Supreme Court has stayed a similar preliminary injunction

---

[1] *But see State of New York v. Linda McMahon*, Case No. 1:25-cv-10601-MJJ, ECF No. 128 (D. Mass. May 22, 2025) (granting motion for preliminary injunction and enjoining DOE from carrying out RIFs and AARPs) (Appeal 1st Cir. Case No 25-1495); *Am. Fed'n of Gov't Emps. v. Trump*, Ninth Cir. No. 25-3293, ECF No. 10 (denying motion to stay injunction) (Appeal Sup. Ct. 24A1106); *Widakuswara v. Lake*, 2025 WL 1521355, at *1-2 (D.C. Cir. May 28, 2025) (reversing initial order granting stay).

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 10

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

issued by the United States District Court for the Northern District of California." *See Maryland v. U.S. Dep't. of Agriculture (Maryland)*; 2025 WL 1073657, at \*1 (4th Cir. May 22, 2025).

### IV.    Plaintiffs have not shown a fair chance of establishing that their claims satisfy the APA's threshold requirements.

Plaintiffs have not identified a *discrete final* agency action under the APA. They allege the "mass OHS office closures and layoffs, the March 14 DEI Letter, and the April 16 DEIA Certification constitute final agency actions subject to judicial review." Dkt. 32, ¶¶ 344, 355, 365, 383. But Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (*Nat'l Wildlife Fed'n*). That final agency action must be "circumscribed [and] discrete." *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*).

The APA does not provide for "general judicial review of [an agency's] day-to-day operations." *Nat'l Wildlife Fed'n*, 497 U.S. at 899. On the contrary, it contains "a prohibition on programmatic challenges," meaning "challenges that seek 'wholesale improvement' of an agency's programs by court decree." *Alabama-Coushatta Tribe of Tex. v. United States*, 757 F.3d 484, 490 (5th Cir. 2014) (cleaned up); *see also SUWA*, 542 U.S. at 64. Plaintiffs must plead a final agency action that "mark[s] the 'consummation' of the agency's decisionmaking process[.]" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (citation omitted). It may not be a "preliminary, procedural, or intermediate agency action." 5 U.S.C. § 704.

HHS's ARRPs, which are currently paused, are in the process of review and refinement and are not final. HHS's operating divisions have worked diligently toward completing their ARRPs, as required by the President's Order and the OPM Memorandum, with the goal of implementation by the September 30, 2025, deadline. HHS's "decisionmaking process" is ongoing

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 11

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

and evolving. The Secretary's March 27 Press Release describes "specific contents of the restructuring plan that have been announced so far." Dkt. 38, Ex. 8. And the accompanying Fact Sheet notes that while "[n]o additional cuts are currently planned" beyond those described in the sheet, HHS "will continue to look for further ways to streamline its operations and agencies." *Id.* at Ex. 9. They describe aspects of what HHS "will" do going forward. *Id.* No one "action" is encompassed by the press release because the restructuring is still being planned, refined, and ultimately will be implemented. These statements underline the developing nature of HHS's actions - it is an unfolding reorganization plan that remains subject to changes based on circumstances, which is quintessentially non-final.

Thus, the actions taken so far reflect a decision by HHS leadership that agency functions need to be streamlined and reorganized. And HHS has begun taking steps to address that need. Those steps are "preliminary" in nature and "not directly reviewable." *See* 5 U.S.C. § 704.

Similarly, the DEI Letter is not a final agency action as no rights or obligations have been determined or legal consequences flow directly from the letter. It merely emphasizes to grant recipients that they must comply with the anti-discrimination provision of the Head Start Act. Dkt. 38, Ex. 5. The same is true for the DEIA Certification; it emphasizes the anti-discrimination requirements that all HHS grant recipients are already required to follow by having the recipient sign a certification. *Id.* at Ex. 7.

Therefore, Plaintiffs' requested injunction presents exactly the type of wholesale challenge that the APA forbids. They do not seek judicial review of a final discrete agency action. Rather, they seek comprehensive judicial review of HHS's initial and preliminary actions to begin implementing the President's Executive Orders, and their requested preliminary relief would freeze that decisionmaking process and implementation in its tracks. Addressing this type of claim

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 12

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

would require the Court to supervise HHS's activities and determine how it should accomplish its

statutorily-mandated functions going forward—an even more extreme kind of supervisory claim

than the one rejected in *Nat'l Wildlife Fed'n*. *See* 497 U.S. at 892-93.

### V.     Plaintiffs have not shown a fair chance of prevailing on their APA claims on the merits.

#### 1.     Plaintiffs are unlikely to succeed on their claim to compel agency action unlawfully withheld.

Plaintiffs have not identified an agency action unlawfully withheld that this Court can

compel under 5 U.S.C. § 706(1). They allege that some members have experienced *delays* in

receiving decisions on their applications for renewal and annual funding. Dkt. 32, ¶¶ 373-80. But

they do not allege a mandatory duty unlawfully delayed or withheld.

"The only agency action that can be compelled under the APA is action legally required."

*SUWA*, 542 U.S. at 63. Plaintiffs do not identify any "specific, unequivocal command" to which

HHS is subject such that the Court could "order[] . . . a precise, definite act." *SUWA*, 542 U.S. at

63 (citations omitted).

Here, there is no statutorily required timeline for making designation and funding decisions

for Head Start grants. Thus, Plaintiffs' allegations of delay do not support a mandamus-like claim

under Section 706.

#### 2.     Plaintiffs are unlikely to succeed on their arbitrary and capricious claim.

Plaintiffs have not identified an agency decision that is outside "the zone of

reasonableness." They allege that HHS failed to consider the impact that the DEI Letter, DEIA

Certification, and the ARRPs would have on Head Start agencies and the potential harms that

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1   Plaintiffs predict will befall them. Dkt. 32, ¶¶ 355-61. But Plaintiffs' dissatisfaction with the degree

2   of analysis does not support their APA claim.

3       "Judicial review under [the arbitrary and capricious] standard is deferential, and a court

4   may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio*

5   *Project*, 592 U.S. 414, 423 (2021). "As the Supreme Court has 'repeated time and again, an agency

6   has broad discretion to choose how best to marshal its limited resources and personnel to carry out

7   its delegated responsibilities.'" *Scarborough Citizens Protecting Resources v. U.S. Fish and*

8   *Wildlife Service*, 674 F.3d 97, 101 (1st Cir. 2012) (quoting *Massachusetts v. EPA*, 549 U.S. 497,

9   527 (2007)). Thus, this Court must review only to ensure "that the agency has acted within a zone

10  of reasonableness[.]" *Prometheus*, 592 U.S. at 423; *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993)

11  (noting that, absent a statutory directive to the contrary, an agency has unreviewable "capacity to

12  adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most

13  effective or desirable way.").

14      HHS's actions satisfy this deferential review. Plaintiffs overlook the cost-saving value of

15  actions like consolidating redundant departments. And they overstate the alleged harms that may

16  follow finalization of the ARRPs—harms that, as discussed earlier, are largely speculative. And

17  any other programmatic decisions regarding HHS's handling of its statutorily required duties or

18  responsibilities are likewise committed to agency discretion. *Nat'l Wildlife Fed'n*, 497 U.S. at 891;

19  *SUWA*, 542 U.S. at 62. To override these principles and enjoin agency leadership from exercising

20  control over their own funding, staffing, and organizational issues would be an extraordinary

21  violation of the separation of powers.

22      Indeed, ARRPs are exactly the type of action that is "committed to agency discretion by

23  law." *See* 5 U.S.C. § 701(a)(2); *Markland v. OPM*, 140 F.3d 1031, 1033 (Fed. Cir. 1998) (stating

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 14

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1   that "[w]e accord an agency wide discretion in conducting a reduction-in-force" (cleaned up)).

2   Staffing decisions fit neatly among those "categories of administrative decisions that courts

3   traditionally have regarded as 'committed to agency discretion.'" *Lincoln*, 508 U.S. at 191-92

4   (citation omitted). After all, the point of HHS's ARRPs is to improve efficiency, which allows the

5   Agency to "meet its statutory responsibilities in what [the new administration] sees as the most

6   effective or desirable way." Dkt. 38, Exs. 8-9.

7       Even if this Court were to conclude that HHS's analysis was insufficient to justify actions

8   taken so far, such a conclusion would not justify a preliminary injunction. Rather, "the proper

9   course" would be "to remand to the [Department] for additional . . . explanation." *Fla. Power &*

10  *Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). If the Court finds HHS's reasoning arbitrary or

11  capricious in any way, it should take that course.

12      **3.      Plaintiffs are unlikely to succeed on their rule making claim.**

13      Plaintiffs allege that the DEI Letter and the DEIA Certification constitute "rules" that must

14  be published in the Federal Register. Dkt. 31, ¶¶ 365-370. This is not true. Plaintiffs cite a provision

15  in the Head Start Act at Section 644(d) that requires HHS to publish all rules, regulations and

16  application forms in the Federal Register 30 days prior to their effective date. Dkt. 31, ¶¶ 366-70.

17  This language in Section 644(d) is taken out of context and only applies to a specific sub-set of

18  rules or regulations related to administrative requirements in subsections (a) and (f) of Section 644.

19      The OHS regularly publishes guidance documents on its website, often called Program

20  Instructions or Information Memorandum, that the grant recipient community relies on to help run

21  their program. These are not considered rules or published in the Federal Register. A simple letter

22  reminding recipients of the requirements under statutory anti-discrimination provisions is not a

23  rule, but more akin to a program instruction or information memorandum. The DEIA Certification

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 15

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

is an agency-wide policy document, not specific to Head Start. Even if Section 644(d) of the Head Start Act applied to a departmental policy document, which it does not, it would not be considered a rule or regulation.

**VI.    Plaintiffs have not shown a fair chance of prevailing on their Constitutional claims on the merits.**

**1.    Plaintiffs' Fifth Amendment Due Process claims fail.**

This Court should reject Plaintiffs' Due Process claims. Plaintiffs asserts their Due Process challenges to the DEI Letter (alleging a potential loss of grants) and the DEIA Certification (alleging potential enforcement action). Both sets of claims fail.

Plaintiffs' challenge to the DEI Letter fails at the threshold because they fail to identify a property or liberty interest that is protected by the Fifth Amendment in the first place. With respect to the DEI Letter, Plaintiffs fail to establish that their purported grants are protected by the Due Process Clause. "The procedural component of the Due Process Clause does not protect everything that might be described as a 'benefit': 'To have a property interest in a benefit, a person clearly must have more than an abstract need or desire'" and "more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Town of Castle Rock v. Gonzalez*, 545 U.S. 748, 756 (2005) (citation omitted).

Applying these principles, the Supreme Court has identified a narrow set of government benefits—so-called "new property"—that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). But the protections afforded to this narrow set have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 16

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

(S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev*., 421 F.3d 1, 10 (1st Cir. 2005) ("We have held with a regularity bordering on the echolalic that a simple breach of contract does not amount to an unconstitutional deprivation of property."); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014) ("The Supreme Court has never held that government contracts for goods and services create property interests protected by due process." (citation omitted)).

Here, Plaintiffs have not shown that they have any constitutionally protected entitlement-like grants that will be subject to termination. Indeed, no entity is entitled to a Head Start grant. *See Ohio Head Start Ass'n, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 873 F. Supp. 2d 335 (D.D.C. 2012), *aff'd*, 510 F. App'x 1 (D.C. Cir. 2013) ("Ultimately, Plaintiffs failed to identify any protected liberty or property interest triggering due process protections" in the automatic renewal of their Head Start grant award).

Similar to the plaintiffs in *National Urban League v. Trump*, Plaintiffs here fail to identify a constitutionally protected interest because the grants they worry about are not the kind that create a "legitimate claim of entitlement" to the benefit—i.e., not the kind that provide a protected property interest. *See National Urban League v. Trump (NUL)*, 2025 WL 1275613, at *17 (D.D.C. May 2, 2025). As the *NUL* court held, the plaintiffs offered no reason to think that their contracts and grants—which are "[o]utside of the employment context"—are different from the "millions of government contracts in effect at any point in time" to which courts seldom apply "due-process principles." *Id.* at *18 (*citing New Vision Photography*, 54 F. Supp. 3d at 29 (citation omitted). And "'ordinary' or 'routine' government contracts do not, by themselves, give rise to ... an interest" that due process protects. *Id.* (*citing Gizzo*, 44 F. Supp. 3d at 385).

//

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

But in any event, even if Plaintiffs had identified a constitutionally protected property interest, their vagueness argument would still fail. Plaintiffs argue that the DEI Letter is unconstitutionally vague because it purports to limit government funding based on criteria that are undefined. In scrutinizing this text, Plaintiffs urge this Court to employ a rigorous vagueness test. Dkt. 37, pg. 18. But in *National Endowment for the Arts v. Finley*, the Supreme Court rejected application of any such demanding vagueness standard to government funding decisions. 524 U.S. 569, 589 (1998).

In *Finley*, the plaintiffs brought vagueness challenges under the First and Fifth Amendments to a funding provision that required the National Endowment for the Arts to "take[] into consideration general standards of decency and respect for the diverse beliefs and values of the American public." *Id.* at 572 (quoting 20 U.S.C. § 954(d)(1)). The Supreme Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns." *Id.* at 588. But, the Court reasoned, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe." *Id.* at 589; *see also id.* (cautioning that "[t]o accept [plaintiffs'] vagueness argument would be to call into question the constitutionality of . . . valuable Government programs and countless others like them" that "award[] scholarships and grants on the basis of subjective criteria such as 'excellence'").

This Court should similarly reject Plaintiffs' invitation to impose a demanding vagueness standard on the government when it "is acting as patron rather than as sovereign." *Id.*; *see also Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) ("There is substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." (citation omitted)); *NUL*, 2025 WL 1275613, at *19 (Indeed, "when

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 18

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

the Government is acting as patron rather than as sovereign," the effects "of imprecision are not constitutionally severe." (citation omitted); *Chicago Women in Trades v. Trump (CWIT)*, 2025 WL 1114466, at *14 (N.D. Ill. Apr. 14, 2025) (Because the Termination Provision of EO 14,151 simply involves the government engaging in funding, as opposed to regulating, the vagueness concerns fall away as well).

Plaintiffs' challenge to the DEIA Certification also fails. The Due Process Clause requires that laws "give the person of ordinary intelligence a reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). While this doctrine demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, the DEIA Certification does no such thing. "Instead, the so-called 'Certification' … provision[] appl[ies] only to conduct that violates *existing* federal anti-discrimination law." *Cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump (Diversity Officers)*, No. 25-1189, ECF No. 29 at 7 (4th Cir. Mar. 14, 2025) (emphasis added); (analyzing the Certification Provision from EO 14,173). The DEIA Certification here does not penalize any new conduct; it merely prioritizes the enforcement of existing antidiscrimination laws, which Plaintiffs do not challenge as unconstitutionally vague. Thus, Plaintiffs have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108.

Arguing otherwise, Plaintiffs maintain that these federal-law qualifiers are not helpful because the government has not specified which DEI programs *it* considers illegal. Dkt. 37, pgs. 18-19. Once again, Plaintiffs' argument erroneously assumes that the DEIA Certification purports to penalize conduct *beyond* those prohibited by existing antidiscrimination laws. It does not. As such, all Plaintiffs must do is comply with federal law itself—longstanding federal statutes

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 19

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

that are not challenged here on vagueness or any other grounds. Moreover, any lack of clarity over when DEI runs afoul of those statutes is not attributable to the DEIA Certification Provision and would not be remedied by its invalidation. And in any future enforcement, Plaintiffs are free to defend themselves by maintaining that their conduct is lawful. But none of that is remotely ripe, let alone a sound basis for preemptively enjoining the government from enforcing antidiscrimination laws.

Accordingly, even if the Court were inclined to demand more specificity than the DEIA Certification provides, any injunction on due process grounds would be premature in this pre-enforcement posture where courts must not "assume that the [government] will take no further steps to minimize the dangers of arbitrary enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 504 (1982). To the contrary, courts must consider the possibility that, prior to enforcement, the government "will sufficiently narrow potentially vague or arbitrary interpretations of the [directives]." *Id.*

Indeed, on March 19, 2025, the U.S. Department of Justice (DOJ) and the U.S. Equal Employment Opportunity Commission (EEOC) provided additional guidance on the types of DEI activities that could violate Title VII. *See* Declaration of Kristin B. Johnson, Ex. A. This Court should reject Plaintiffs' invitation to enjoin the government before it has had the opportunity to further "narrow potentially vague or arbitrary interpretations of the [directives]," prior to enforcement. *Vill. of Hoffman Ests.*, 455 U.S. at 504.

### 2.    Plaintiffs' First Amendment claims fail.

Plaintiffs' First Amendment challenge is also unavailing. For starters, Plaintiffs do not explicitly challenge the DEI Letter under the First Amendment—rightly so.

//

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 20

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

It is well established that government spending is not subject to traditional First-Amendment scrutiny. The Supreme Court has long been clear that First Amendment concerns are far less pronounced when the government acts as patron to subsidize speech, as opposed to when it acts as sovereign to regulate it. "The Government can, without violating the Constitution, selectively fund a program to encourage certain activities it believes to be in the public interest . . . In so doing, the Government has not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 214 (2013) (collecting cases).

Indeed, other courts have already rejected First Amendment challenges in similar contexts. *See Diversity Officers*, No. 25-1189, ECF No. 29, at 7 (Harris, J., concurring) (the Termination Provision in EO 14151 does not "authorize the termination of grants based on a grantee's speech or activities outside the scope of the funded activities"); *NUL*, 2025 WL 1275613, at *19 (Plaintiffs fail to show likely to succeed on their First Amendment challenge to DEI provisions because they do not on their face restrict speech outside the scope of the federal funds or contract or require plaintiffs to profess a specific belief or disclose anything); *CWIT*, 2025 WL 1114466, at *11-14 (Plaintiff is unlikely to succeed on its contention that the Termination Provision in EO 14151 violates its First Amendment rights).

For similar reasons, Plaintiffs have no meaningful argument that the DEI Letter is vague and therefore imposes a "chilling" effect on protected speech because any such argument has been foreclosed by the Supreme Court's decision in *Finley*. As the Court explained in *Finley*, no First

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 21

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the . . . decisionmaking criteria in order to acquire funding." *Finley*, 524 U.S. at 589. At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.*; *see also id.* at 599 (Scalia, J., concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs."); *see also*; *CWIT*, 2025 WL 1114466, at *11-14 (the Termination Provision in EO 14151 reflects a funding decision not an impermissible attempt to regulate speech); *NUL*, 2025 WL 1275613, at *21-22 (the DEI Provisions do not on their face restrict speech outside the scope of the federal funds or contract and do not run afoul of the First Amendment).

Plaintiffs instead focus their First Amendment challenge on the DEIA Certification. But their challenge suffers from a fatal flaw: Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place. The DEIA Certification merely requires grant recipients/applicants to certify their compliance with existing legal obligations under the "applicable" federal civil rights laws. Dkt. 38, Ex. 7. As such, the Certification Provision is "distinctly limited scope." *Diversity Officers*, No. 25-1189, ECF No. 29, at 7.

There is nothing unlawful about requiring recipients of federal contracts or grants to affirm that any DEI programs that they operate comply with antidiscrimination laws and further requiring recipients to acknowledge that the government considers compliance with such laws material to its payment decisions. Importantly, this provision imposes no new requirements on primary conduct. It neither adopts any new construction of antidiscrimination law nor declares all DEI to be illegal. Rather, it simply requires recipients to certify their compliance with existing legal

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 22

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    obligations under the "applicable" federal civil rights laws such as Title VI of the Civil Rights Act

2    of 1964, which apply to all recipients of federal assistance, 42 U.S.C. § 2000d-1—laws that are

3    binding independent of any certification requirement. There is no First Amendment problem with

4    requiring certification that these existing legal obligations are being honored.

5         That is not novel. It has been true for decades that "[e]very application for Federal financial

6    assistance must, 'as a *condition* to its approval and the extension of any Federal financial

7    assistance,' contain assurances that the program will comply with Title VI *and* with all

8    requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians*

9    *Ass'n v. Civ. Serv. Comm'n of City of N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983). These

10   "assurance[s]" of compliance are "given in consideration of" federal aid, "and the federal

11   government extends assistance in reliance on the assurance of compliance"—but the obligations

12   of Title VI apply regardless of any certification. *Id.* at 630 (citation omitted).

13        The requirement here is no different: while the provision addresses unlawful DEI programs

14   specifically—a subset of the potential ways in which federal funding recipients might violate

15   antidiscrimination law—that limitation merely renders it narrower than scores of certifications

16   signed by recipients of federal assistance attesting that they are complying with Title VI in every

17   respect. Plaintiffs neither argue that these longstanding requirements are unconstitutional nor

18   explain why their breadth is constitutionally required. At bottom, the DEIA Certification "does not

19   place upon a recipient [any] unanticipated burdens because any recipient must anticipate having

20   to comply with the law." *Id.*

21        For similar reasons, requiring recipients to sign this Certification Provision for purposes of

22   the False Claims Act does not raise First Amendment concerns. As the D.C. Circuit has explained,

23   the False Claims Act "does not reach an innocent, good-faith mistake about the meaning of an

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 23

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). That provides ample protection against the sort of unfair liability that may worry Plaintiffs.

Plaintiffs complain that the clause concerning Federal anti-discrimination laws does not limit the provision's scope because they fear that acts could be construed as promoting DEI by the government putting them at risk of losing designation, funding, or exposing them to additional penalties. Dkt. 31, ¶ 336. This argument fails. For starters, recipients will be asked to certify compliance with the anti-discrimination laws, not with the government's interpretation of them. And as discussed above, good-faith errors on this subject would not give rise to False Claims Act liability.

Plaintiffs' reliance on *AID* to argue that the Certification provision amounts to an unconstitutional condition is similarly unpersuasive. Dkt. 31 ¶¶ 333-39; Dkt. 37, pgs. 19-21. In *AID*, under the relevant policy requirement, "[a] recipient [could not] avow the belief dictated by the Policy Requirement when spending [federal] funds, and then turn around and assert a contrary belief, or claim neutrality, when participating in activities on its own time and dime." 570 U.S. at 218.

Here, unlike in *AID*, the DEIA Certification does not limit Plaintiffs' free speech by compelling or restricting their speech. Plaintiffs remain free to engage in protected speech that espouses any viewpoint they want, including advocating for whatever DEI activities they prefer. The provision simply restricts the recipient's ability to engage in illegal discrimination while also securing federal funding—discrimination that would be illegal even without federal funding.

The *NUL* decision is instructive. There, the court found that the DEI provisions in the EOs tell agencies what to do with federal funds and contracts and do not reach beyond the scope of the

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 24

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

grant or fund at issue. *See NUL*, 2025 WL 1275613, at \*21. The directives do not tell agencies to cancel contracts with entities doing equity-related work outside their contracts or to ensure that federal funds do not support grantees promoting gender ideology with non-federal funds. *Id.* In this way, the provisions do not "prohibit[ ] the recipient from engaging in the protected conduct outside the scope of the federally funded program" or contract. *Id.* (quoting *AID*, 570 U.S. at 217 (quoting *Rust*, 500 U.S. at 197)). The provisions, in other words, are part of a government effort "to fund one activity to the exclusion of another"—or to contract for certain purposes to the exclusion of others—which does not amount to "discriminat[ion] on the basis of viewpoint." *Rust*, 500 U.S. at 193. Thus, the court found that the provisions do not on their face restrict speech outside the scope of the federal funds or contract, they do "not run afoul of the First Amendment." *NUL*, 2025 WL 1275613, at \*22 (*quoting AID*, 570 U.S. at 217).

### 3.    Plaintiffs' separation-of-powers challenges fail.

***DEI Letter.*** With respect to the DEI Letter, Plaintiffs argue that conditioning federal grants amounts to enacting, amending, or repealing statutes. Dkt. 37, pg. 21, 25. This argument is intertwined with their APA claim that HHS's actions are not in accordance with law and are in excess of statutory authority. 5 U.S.C. § 706(2). This argument fails.

To begin with, Head Start grants are ultimately funded through appropriations – after all, no federal funds can be paid without appropriations. *See Seila L. LLC v. Consumer Fin. Prot. Bureau*, 591 U.S. 197, 207 (2020) (noting that most agencies rely on the annual appropriations process for funding). But Plaintiffs have brought a facial challenge; as such, they cannot invoke specific applications of the provisions, while ignoring others. Instead, they must show that each provision is unconstitutional "in all of its applications." *Vill. of Hoffman Ests.*, 455 U.S. at 495. The Executive may terminate grants in some instances without seeking congressional approval.

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 25

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    45 C.F.R. § 75.372. As such, Plaintiffs cannot establish—as they must in a facial posture—that

2    every termination of a government grant/contract would violate separation of powers.

3         Plaintiffs' reliance on *City & County of San Francisco v. Trump* to support their argument

4    is unavailing. 897 F.3d 1225 (9th Cir. 2018). There, the court struck down what it found to be a

5    condition on the *recipients*. According to the court, the Executive Order purported to withhold *all*

6    funding from recipients—including congressionally appropriated funds *outside* the scope of the

7    relevant activity (i.e. immigration enforcement). In the DEI Letter, the Government is simply

8    making an *allocation* choice about *what* the funding should be spent on. Such allocation choices

9    are routinely made without explicit congressional approval. *Lincoln*, 508 U.S. at 192 ("the

10   allocation of funds from a lump-sum appropriation is another administrative decision traditionally

11   regarded as committed to agency discretion.").

12        Plaintiffs' separation-of-powers challenge under the Head Start Act is also futile. For

13   starters, this challenge is not a "separation-of-powers" challenge or a "Spending Clause" challenge

14   at all. Plaintiffs confuse a *statutory* challenge with a constitutional one. The Supreme Court has

15   long held that not "every action by the President, or by another executive official, in excess of his

16   statutory authority is *ipso facto* in violation of the Constitution." *Dalton v. Specter*, 511 U.S. 462,

17   472 (1994). Simply put, a claim that the Executive is exercising authority in a manner that violates

18   a statute is merely a claim that an official has acted in excess of his statutory authority—it is not

19   elevated to a "constitutional" claim merely because it identifies a conflict between a congressional

20   statute and Executive action. *See Harmon v. Brucker,* 355 U.S. 579, 581 (1958).

21        But in any event, Plaintiffs' challenge under the Head Start Act fails on the merits.

22   Plaintiffs claim that the DEI letter and DEIA Certification are at odds with the Head Start Act and

23   they are forced to make a choice between compliance with the Head Start Act and regulations or

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 26

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

the Letter and Certification. This is not true. The Letter and Certification serve only to highlight and emphasize the existing statutory anti-discrimination provisions and other civil rights laws. The Letter and Certification do not prevent Head Start agencies from serving and recruiting from diverse populations, offering services to children with diverse backgrounds, or meeting the diverse needs of the population served. Rather, they remind Head Start agencies that they need to comply with the provisions of the Head Start Act without illegal discrimination.

Likewise, Plaintiff's arguments that the DEI communications conflict with the Head Start appropriation falls flat. The Further Consolidated Appropriations Act appropriates funds in a general manner, "for making payments under the Head Start Act" and then specifies four areas where a specific and relatively small amount of funds should be spent. *See* The Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024). The appropriation does not explicitly allocate federal money to Head Start to recruit and train professionals from diverse backgrounds or to serve and deploy resources to children with diverse backgrounds as Plaintiffs contend. In a recent decision from the N.D. Illinois, the court declined to broaden a preliminary injunction to another federal program when that program's appropriation used permissive language, not mandatory language for the funding of a grant program. *See CWIT*, 2025 WL 1114466, at *1. In this case, HHS continues to use its appropriation for making payments under the Head Start Act and operates the program in accordance with the Head Start Act. It has not terminated or clawed back any funding. In no way is HHS thwarting Congress' funding requirements.

**DEIA Certification.** Plaintiffs' argument with respect to the Certification Provision is similarly unavailing. While "*new* conditions on federal funds" may implicate separation of powers, *see Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (emphasis added),

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 27

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

no such concern arises when the Executive merely reinforces preexisting legal obligations. As explained above, the requirement that federal funding recipients follow the law is not new. For decades, federal agencies have required recipients to certify their compliance with federal laws, including antidiscrimination laws. The Certification Provision requires recipients to certify that they are honoring their preexisting obligation to follow the law with respect to DEI programs in particular. That limitation merely renders it narrower than routine compliance-with-law certifications, which Plaintiffs do not challenge as unconstitutional.

Plaintiffs have also not established that HHS's actions are "not in accordance with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2). First and foremost, the Executive Orders require that they be implemented consistent with applicable law and statutory authority. EO 14,151 § 4(b); EO 14,173 § 8(b); EO 14210 §§ 3(b)(1); 3(c); 5(b); Memorandum §§ II; IV(2). Plaintiffs' fear that the Orders will not be carried out in such a way is speculation and they have failed to show that HHS is violating (or will imminently violate) a specific statutory requirement. Plaintiffs' separation-of powers theory therefore fails.

Plaintiffs generally argue that HHS will be unable to comply with its statutory obligations because of its implementation of the Orders. But that is simply incorrect. Plaintiffs have not identified any statutory obligations with which HHS is unable or unwilling to comply. To reiterate, HHS's ARRPs were in progress. They are currently enjoined, but if and when that injunction is modified or lifted, HHS will continue developing and implementing them. That some regional offices are being closed, or that services may be provided by a different division or unit after the reorganization, does not mean that they will cease being provided. The fact that funding decisions will be guided by the Administration's priority to enforce federal antidiscrimination laws against

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 28

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

unlawful DEI and DEIA programs does not mean that Head Start grants will not be awarded consistent with law.

Plaintiffs also argue that HHS's actions violate the law because the Executive Branch must spend appropriated funds. Again, however, this anticipated problem does not meet the high bar required to justify a preliminary injunction. HHS has not refused to spend appropriated funds on statutorily mandated programs. And saving taxpayer money by consolidating functions and reducing personnel redundancy is not inherently inconsistent with spending appropriated funds. Furthermore, the time that has elapsed is not, in the context of this case, enough time to diagnose a failure to spend prescribed money.

That Congress often chooses to appropriate funds without attempting to control the manner of their use underlines a key point: absent explicit statutory direction, funding decisions are generally committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2). The appropriations bills provide no standards "against which to judge the agency's exercise of discretion" in making the many choices the agency must make concerning how to spend those funds. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985). HHS's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831-32).

Plaintiffs' Rehabilitation Act claim also fails. Plaintiffs argue that the DEI Letter and DEIA Certification discriminate on their face and in their application against children with disabilities. Dkt. 31, ¶ 393. But they do the opposite. The DEI Letter states that it is consistent with the nondiscrimination provision in the Head Start Act, which includes application of Section 504 of

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 29

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

the Rehabilitation Act to all Head Start grants. And the DEIA Certification requires compliance with applicable antidiscrimination laws, which for Head Start would include Section 504 of the Rehabilitation Act.

Finally, Plaintiffs' ultra vires claim is just a repackaging of their Constitutional and APA claims. "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949) (footnote omitted). The exception to sovereign immunity is based on the principle that such ultra vires action by a federal officer "is beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here, Plaintiffs set forth no ultra vires claim that is conceptually distinct from their Constitutional and APA claims.

### VII. Plaintiffs have not shown that they will face irreparable harm absent a preliminary injunction.

A plaintiff must demonstrate they are likely to suffer irreparable harm in the absence of a preliminary injunction. *See Winter*, 555 U.S. at 20. The Ninth Circuit has cautioned that "[s]peculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction." *Caribbean Marine Servs. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988).

First, Plaintiffs' alleged injuries for anticipated harms are not sufficiently concrete or imminent to establish standing or ripeness, let alone irreparable harm.

Second, even if Plaintiffs could show that they suffered an injury to a legally protected interest in the lack of funding or services previously provided by HHS, that does not establish a need for preliminary relief because these injuries are readily measurable in monetary terms and compensable upon final judgment after the comprehensive monitoring, correction, and appeals

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 30

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    process required for Head Start grant terminations.

2        Third, the relief Plaintiffs request—completely halting implementation of the Executive

3    Orders because of a fear of what might happen—sweeps far beyond what might arguably be

4    necessary to protect their interests. *See American Assoc. of People with Disabilities v. Dudek*, Case

5    No. 25-cv-00977, ECF No. 34 (D.D.C. May 6, 2025) (denying motion for preliminary injunction

6    challenging RIFs at SSA because the plaintiffs had not established irreparable harm or based on

7    their fears or concerns over SSA continuing to be able to provide services).

8        Finally, Plaintiffs' argument for irreparable harm is also diminished here by the length of

9    time since they learned of HHS's implementation of the Executive Orders, which began in March

10   2025. Plaintiffs waited until April 28, 2025, to initiate this lawsuit and until May 16, 2025 to seek

11   injunctive relief. Dkts. 1, 37. That delay further undermines their claims that they are suffering

12   irreparable harm.

13   **VIII.    The equities and public interest weigh against relief.**

14       The third and fourth requirements for issuance of a preliminary injunction—the balance of

15   harms and whether the requested injunction will disserve the public interest—"merge when the

16   Government is the opposing party." *Nken*, 556 U.S. at 435. These factors tilt decisively against

17   granting a preliminary injunction here. Granting a preliminary injunction would disrupt HHS's

18   efforts to comply with the Executive Orders and accompanying Memorandums, which are duly

19   promulgated directives of the Executive Branch, and which the American people have entrusted

20   with the power to direct the activities of Executive Departments.

21       The public has an interest in seeing that power carried out effectively. It also has an interest

22   in permitting the Secretary to decisively implement policy priorities for HHS. Entering any sort of

23   preliminary relief would displace and frustrate the Secretary's decision about how to best address

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 31

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

issues. *See Heckler*, 470 U.S. at 831-32. And as discussed above, Plaintiffs will not suffer any irreparable harm from the denial of their request for preliminary relief. Their side of the equities scale is far outweighed by HHS's here.

Plaintiffs argue that HHS will not be harmed by an injunction against an unlawful practice and that the public interest favors carrying out statutory functions. Dkt. 37, pgs. 31-32. But, as explained above, HHS intends on continuing to perform its statutory duties. And the relief Plaintiffs seek goes beyond merely ensuring statutory functions are carried out. Agencies are permitted to weigh "many variables involved in the proper ordering of [agency] priorities" without judicial overview of their discretionary decisions. Yet Plaintiffs' requested relief would hamstring HHS and force it to operate as if a new administration was never elected. Not only would this deprive HHS of its flexibility on how to execute its broad statutory mandates; it would also compel work that is otherwise discretionary and may not be consistent with Administration priorities.

In sum, Plaintiffs' proposed relief would inflict severe constitutional harms on the Executive branch and run contrary to the public interest. It would frustrate the public interest in having the Executive Branch effectuate the President's policy priorities—including to enforce federal antidiscrimination laws against unlawful DEI and DEIA programs and reduce the federal government's operational footprint—through lawful direction. The equities and the public interest disfavor such sweeping and intrusive relief. That is doubly true given Plaintiffs' delay in moving for that relief.

## IX.  Any preliminary injunction should be limited, accompanied by security, and be stayed.

If the Court concludes that Plaintiffs are entitled to an injunction, the relief granted "should be no more burdensome to the defendant than necessary to provide complete relief to the

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 32

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994) (citation omitted). The expansive relief Plaintiffs seek flouts these well-established principles and should be significantly narrowed, if awarded at all. Any preliminary injunction should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff that the Court finds to have established such harm. Extending relief that is broader either in substance or scope (for example, wholesale reinstatement of staffing at, or reversal of already-commenced reorganization of, Department agencies) would violate the foundational Article III principle that judicial remedies "must be tailored to redress the plaintiff's particular injury." *Gill v. Whitford*, 585 U.S. 48, 73 (2018). The Court should order only relief sufficient to address any funding or services to which it determines Plaintiffs have established an entitlement.

Any preliminary injunction should also require Plaintiffs to post security. The Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined." Fed. R. Civ. P. 65(c). The Court should require Plaintiffs to post an appropriate bond commensurate with the scope of any injunction issued. The bond amount should consider that the relief Plaintiffs request will hinder Defendants' ability to process funding requests and reorganize HHS in a manner consistent with the President's policies. If Plaintiffs fail to comply with Rule 65(c), the Court should deny or dissolve the requested injunctive relief.

Finally, to the extent the Court issues any injunctive relief, Defendants request that such relief be stayed pending any appeal, or at a minimum that such relief be administratively stayed for a period of seven days to allow Defendants to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

//

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 33

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    DATED this 6th day of June, 2025.

2                                  Respectfully submitted,

3                                  TEAL LUTHY MILLER
                                   Acting United States Attorney
4

5                                  s/ Kristin B. Johnson
                                   KRISTIN B. JOHNSON, WSBA #28189
6                                  Assistant United States Attorney
                                   United States Attorney's Office
7                                  700 Stewart Street, Suite 5220
                                   Seattle, Washington 98101-1271
8                                  Telephone No. (206) 553-7970
                                   Fax No. (206) 553-4073
9                                  Email: kristin.b.johnson@usdoj.gov

10                                 Attorneys for Defendants

11                                 I certify that this memorandum contains 9,898 words,
                                   in compliance with the Local Civil Rules.
12

13

14

15

16

17

18

19

20

21

22

23

24

DEFENDANTS' OPPOSITION TO PLAINTIFFS'
MOTION FOR A PRELIMINARY INJUNCTION
[2:25-cv-00781-RSM] - 34

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970