1

2

3

4

5

6

7                                                                 The Honorable Ricardo S. Martinez

8               IN THE UNITED STATES DISTRICT COURT
            FOR THE WESTERN DISTRICT OF WASHINGTON
9                             AT SEATTLE

10  WASHINGTON STATE ASSOCIATION OF
    HEAD START AND EARLY CHILDHOOD
11  ASSISTANCE AND EDUCATION PROGRAM,
    ILLINOIS HEAD START ASSOCIATION,                Case No. 2:25-cv-00781-RSM
12  PENNSYLVANIA HEAD START
    ASSOCIATION, WISCONSIN HEAD START              **PLAINTIFFS' MOTION FOR**
13  ASSOCIATION, FAMILY FORWARD OREGON,            **TEMPORARY RESTRAINING**
    and PARENT VOICES OAKLAND,                      **ORDER/TO POSTPONE**
14                                                  **EFFECTIVE DATE OF AGENCY**
                                                    **ACTION**
15                                   *Plaintiffs,*

16  v.

17                                                  NOTE ON MOTION CALENDAR:
    ROBERT F. KENNEDY, JR., in his official         July 21, 2025
18  capacity as Secretary of Health and Human
    Services; U.S. DEPARTMENT OF HEALTH             ORAL ARGUMENT
19  AND HUMAN SERVICES; ANDREW                      REQUESTED
    GRADISON, in his official capacity as Acting
20  Assistant Secretary of the Administration for
    Children and Families; ADMINISTRATION FOR
21  CHILDREN AND FAMILIES; OFFICE OF
    HEAD START; and TALA HOOBAN, in her
22  official capacity as Acting Director of the Office of
    Head Start,
23
24                                   *Defendants.*

25

26

27

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................................................8

STATUTORY AND REGULATORY BACKGROUND ......................................................9

LEGAL STANDARD .........................................................................................................12

ARGUMENT ......................................................................................................................13

    I.  Plaintiffs Face Irreparable Harm Because of the Immigrant Exclusion Directive. .......... 13

        A.  Harms to Parent Plaintiffs' Members and Other Immigrant Families ........................ 13

        B.  HSA Plaintiffs: Harms to Head Start Programs ........................................................... 16

    II.  Plaintiffs are Likely to Succeed on the Merits Because the Directive Violates the

        APA. .................................................................................................................................... 18

        A.  Defendants' Directive Violates the APA because it is Contrary to Law and in Excess

            of Statutory Authority. ............................................................................................... 18

            1.  Head Start is a Non-Postsecondary Education Program for the Community, which

               is not within PRWORA's Definition of "Federal Public Benefit." ...................... 19

               i.  PRWORA Excludes Non-Postsecondary Education ....................................... 19

               ii.  PRWORA Also Excludes Programs Delivering Services at the

                    Community-Level. .......................................................................................... 21

               iii.  Contemporaneous, Consistent Agency Interpretations Further

                    Undermine Defendants' Interpretation ......................................................... 22

            2.  Head Start is Not Welfare or Anther Similar Benefit under PRWORA. ............. 23

            3.  The Directive Creates a Conflict with the Head Start Act. ................................. 25

        B.  Defendants' Directive Is Arbitrary and Capricious in Violation of the APA. ............. 26

        C.  Defendants Failed to Follow Procedures Required by Law. ......................................... 29

    III.  The Balance of Equities and Public Interest Strongly Favor Injunctive Relief and

        a Stay of the Agency Directive. ....................................................................................... 31

CONCLUSION ...................................................................................................................32

1

## TABLE OF AUTHORITIES

2

**Cases**

*Am. Trucking Ass'ns, Inc. v. City of Los Angeles*,
    559 F.3d 1046 (9th Cir. 2009) ................................................................ 17

*Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*,
    273 F.3d 1229 (9th Cir. 2001) ........................................................ 28, 29

*Ariz. Dream Act Coal. v. Brewer*,
    757 F.3d 1053 (9th Cir. 2014) ................................................................ 15

*Bruesewitz v. Wyeth LLC*,
    562 U.S. 223 (2011) ................................................................................ 19

*California v. Azar*,
    911 F.3d 558 (9th Cir. 2018) .................................................................. 30

*CC/Devas (Mauritius) Ltd. v. Antrix Corp.*,
    145 S. Ct. 1572 (2025) ............................................................................ 19

*City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*,
    408 F. Supp. 3d 1057 (N.D. Cal. 2019), aff'd 981 F.3d 742 (9th Cir. 2020) .......................... 27

*Clifton v. Pearson Educ., Inc.*,
    No. 5:11-cv-03640-EJD, 2012 WL 1565236 (N.D. Cal. May 2, 2012) ................................ 31

*Ctr. for Biological Diversity v. Bernhardt*,
    982 F.3d 723 (9th Cir. 2020) .................................................................. 27

*Doe v. Noem*,
    No. 2:25-cv-00633-DGE, 2025 WL 1141279 (W.D. Wash. Apr. 17, 2025) .......................... 14

*E. Bay Sanctuary Covenant v. Barr*,
    385 F. Supp. 3d 922 (N.D. Cal. 2019) ................................................... 30

*E. Bay Sanctuary Covenant v. Biden*,
    993 F.3d 640 (9th Cir. 2021) ............................................................ 13, 32

*E. Bay Sanctuary Covenant v. Trump*,
    909 F.3d 1219 (9th Cir. 2018) ........................................................ 30, 31

*Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*,
    653 F.3d 1 (D.C. Cir. 2011) .................................................................... 30

*Enyart v. Nat'l Conf. of Bar Examiners, Inc.*,
    630 F.3d 1153 (9th Cir. 2011) ................................................................ 15

*Gen. Motors Corp. v. Ruckelshaus*,
    742 F.2d 1561 (D.C. Cir. 1984) .............................................................. 30

*Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*,
    512 F.3d 1112 (9th Cir. 2008) ................................................................ 31

*Grondal v. Mill Bay Members Ass'n, Inc.*,
    471 F. Supp. 3d 1095 (E.D. Wash. 2020) aff'd, 21 F.4th 1140 (9th Cir. 2021) ................ 26

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 3
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

*Hellon & Assocs., Inc. v. Phoenix Resort Corp.*,
  958 F.2d 295 (9th Cir. 1992).................................................................. 25, 26

*Hoctor v. U.S. Dep't of Agric.*,
  82 F.3d 165 (7th Cir. 1996) (Posner, J.) ............................................. 30

*Immigrant Defs. Law Ctr. v. Noem*,
  No. 25-2581, 2025 WL 2017247 (9th Cir. July 18, 2025) ......... 13, 27

*J.L. v. Cissna*,
  341 F. Supp. 3d 1048 (N.D. Cal. 2018) ................................................ 15

*K Mart Corp. v. Cartier, Inc.*,
  486 U.S. 281 (1988) ............................................................................... 24

*Loper Bright Enters. v. Raimondo*,
  603 U.S. 369 (2024)......................................................................... 19, 22

*Lopez v. Heckler*,
  713 F.2d 1432 (9th Cir. 1983). ............................................................. 31

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................. 26

*Nat'l Lab. Rels. Bd. v. Aakash, Inc.*,
  58 F.4th 1099 (9th Cir. 2023) .............................................................. 23

*Nken v. Holder*,
  556 U.S. 418 (2009) ............................................................................... 31

*Nw. Forest Res. Council v. Glickman*,
  82 F.3d 825 (9th Cir. 1996) .................................................................. 22

*Or. Nat. Desert Ass'n v. U.S. Forest Serv.*,
  465 F.3d 977 (9th Cir. 2006) ............................................................... 18

*Org. of Pro. Aviculturists, Inc. v. U.S. Fish and Wildlife Serv.*,
  130 F.4th 1307 (11th Cir. 2025) .......................................................... 23

*RadLAX Gateway Hotel, LLC v. Amalgamated Bank*,
  566 U.S. 639 (2012) ............................................................................... 21

*Rodriguez v. Bostock*,
  No. 3:25-cv-05240-TMC, 2025 WL 1193850 (W.D. Wash., Apr. 24, 2025)......................... 23

*Bennett v. Spear*,
  520 U.S. 154 (1997) ............................................................................... 18

*Silvers v. Sony Pictures Ent., Inc.*,
  402 F.3d 881 (9th Cir. 2005) ................................................................ 19

*Tully v. Orr*,
  608 F. Supp. 1222 (E.D.N.Y. 1985) ..................................................... 14

*U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  591 U.S. 1 (2020)............................................................................... 26, 27

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 4
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

*U.S. Telecom Ass'n v. F.C.C.*,
    400 F.3d 29 (D.C. Cir. 2005) ............................................................. 30

*U.S. v. Valverde*,
    628 F.3d 1159 (9th Cir. 2010) ............................................................ 30

*United States v. Juvenile Male*,
    670 F.3d 999 (9th Cir. 2012) .............................................................. 26

*Washington v. Trump*,
    847 F.3d 1151 (9th Cir. 2017) ............................................................ 12

*Winter v. Nat'l Res. Def. Council, Inc.*,
    555 U.S. 7 (2008) ................................................................................ 13

**Statutes**

20 U.S.C. § 6312 .......................................................................................... 20

42 U.S.C. § 1314 .......................................................................................... 25

42 U.S.C. § 603 (1994) ................................................................................ 24

42 U.S.C. § 9831 .................................................................................... 20, 21

42 U.S.C. § 9833 .................................................................................... 19, 21

42 U.S.C. § 9835 .......................................................................................... 22

42 U.S.C. § 9836 .................................................................................... 21, 22

42 U.S.C. § 9836a .............................................................. 16, 20, 28, 29

42 U.S.C. § 9837 .................................................................................... 20, 22

42 U.S.C. § 9839 .......................................................................................... 29

42 U.S.C. § 9840 ........................................................................ 23, 25, 29

42 U.S.C. § 9843 .......................................................................................... 25

42 U.S.C. § 9843a ........................................................................................ 20

5 U.S.C. § 553 .............................................................................................. 30

5 U.S.C. § 704 .............................................................................................. 18

5 U.S.C. § 705 ........................................................................................ 13, 31

5 U.S.C. § 706 .............................................................................................. 29

8 U.S.C. § 1611 ..................................................................................... passim

8 U.S.C. § 1641 .............................................................................................. 9

8 U.S.C. § 1642 ............................................................................................ 10

Improving Head Start for School Readiness Act of 2007, Pub. L. No. 110-134, 121 Stat.
    1363 (2007) ................................................................................. 20, 25

Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA),
    Pub. L. No. 104-193, 110 Stat. 2105 (1996) ................................ 9, 24, 25

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 5
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Pub. L. No. 105-285, 112 Stat. 2702 (1998)........................................................... 25

Pub. L. No. 114-328, 130 Stat. 2000 (2016)........................................................... 26

Pub. L. No. 118-47, 138 Stat. 460 (2024).................................................... 24, 26

**Other Authorities**

153 Cong. Rec. S14375-02 (Nov. 14, 2007) (statement of Sen. Edward M. Kennedy)................ 21

ACF, ASPE, & HHS, *Report on Alternative Outcome Measures: Temporary Assistance for Needy Families (TANF) Block Gran*t (Nov. 30, 2000), https://aspe.hhs.gov/reports/report-alternative-outcome-measures-temporary-assistance-needy-families-tanf-block-grant .......................... 24

Dep't of Health & Hum. Servs., Admin. for Child. & Fams., Off. of Child Care, *Clarification of Interpretation of "Federal Public Benefit" Regarding Child Care and Development Fund (CCDF) Services* (Nov. 25, 1998) https://acf.gov/occ/policy-guidance/clarification-interpretation-federal-public-benefit-regarding-ccdf-services .......... 10

H.R. Rep. No. 104-725 (July 30, 1996) (Conf. Rep.)................................................. 22

*How to Advance Immigrant Women's Access to Childcare: Policy Brief*, Upwardly Global (Feb. 15, 2024), https://www.upwardlyglobal.org/news/news/how-to-advance-immigrant-womens-access-to-childcare-policy-brief/ ............................ 15

Jennifer M. Haley et al., *One in Five Adults in Immigrant Families with Children Reported Chilling Effects on Public Benefit Receipt in 2019*, Urban Institute (June 18, 2020), https://www.urban.org/research/publication/one-five-adults-immigrant-families-children-reported-chilling-effects-public-benefit-receipt-2019.............................. 14

Neeraj Kaushal & Robert Kaestner,*Welfare Reform and Health Insurance of Immigrants*, 40 HSR: Health Services Research 3, 697-722 (June 2005), https://pmc.ncbi.nlm.nih.gov/articles/PMC1361164/ ............................ 14

Randy Capps et al., *Anticipated "Chilling Effects" of the Public-Charge Rule Are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families*, Migration Policy Institute (Dec. 2020),  https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real ............................ 14

Statement by President George W. Bush Upon Signing, 2007 U.S.C.C.A.N. S17 (2007)........... 20

U.S. Dep't of Health & Hum. Servs., *Financial Assistance General Certifications and Representations*, https://www.hhs.gov/sites/default/files/financial-assistance-general-certification-representations.pdf (last visited July 20, 2025).................................... 17

U.S. Dep't of Health & Hum. Servs., *HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs* (July 10, 2025), https://www.hhs.gov/press-room/prwora-hhs-bans-illegal-aliens-accessing-taxpayer-funded-programs.html ............. 8, 14

**Rules**

Fed. R. Civ. P. 65............................................................................................. 12

**Regulations**

2 C.F.R. § 180.800 ........................................................................................... 17

45 C.F.R. § 1302 ................................................................................................. 29

45 C.F.R. § 1302.12 ........................................................................ 18, 24, 25, 28

45 C.F.R. § 1303.3 ............................................................................................. 17

45 C.F.R. § 1304.5 ............................................................................................. 17

45 C.F.R. § 75.213 ............................................................................................. 17

Dep't of Health & Hum. Servs., Child Care and Development Fund (CCDF) Program, 81
    Fed. Reg. 67438 (Sept. 30, 2016) ............................................................... 10

Dep't of Health & Hum. Servs., Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996 (PRWORA): Interpretation of "Federal Public Benefit,"
    63 Fed. Reg. 41658 (Aug. 4, 1998) ................................................... 10, 11, 23

Dep't of Just., *Interim Guidance on Verification of Citizenship, Qualified Alien Status and
    Eligibility Under Title IV of the Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996*, 62 Fed. Reg. 61344 (Nov. 17, 1997) ................. 11

Exec. Secretariat, Immediate Off. of the Sec'y, Dep't of Health & Hum. Servs., *Final
    Regulatory Impact Analysis*, Docket No. AHRQ-2025-0002 (2025) ....... 12, 13, 28

Program Integrity and Institutional Quality: Distance Education and Return of Title IV,
    HEA Funds, 90 Fed. Reg. 470 (2025) ............................................................. 11

U.S. Dep't of Health & Hum. Servs., Personal Responsibility and Work Opportunity
    Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit,"
    90 Fed. Reg. 31232 (July 14, 2025) ......................................................... passim

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 7
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**INTRODUCTION**

For the first time since Congress created Head Start in 1965, the Department of Health and Human Services ("HHS") seeks to exclude children based on immigration status from participation in this early childhood education program, depriving hundreds of thousands of young children with life-altering opportunity. On July 14, 2025, HHS issued a directive, effective immediately, that purports to reinterpret the phrase "federal public benefit" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) to include Head Start and thereby exclude all "non-qualified" immigrants ("Immigrant Exclusion Directive" or "Directive"). U.S. Dep't of Health & Hum. Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit," 90 Fed. Reg. 31232 (July 14, 2025). The Directive abruptly reverses the HHS interpretation of "federal public benefit" issued shortly after PRWORA's enactment and followed for the past 27 years.

Timed just as enrollment for most Head Start programs begins, the Directive inflicts maximal and immediate harm on Plaintiffs. Immigrant families, regardless of actual status, will predictably forgo participation in Head Start, leading to devastating harms for agencies and the children they serve. Agencies, which must certify compliance with all terms and conditions under the False Claims Act, currently face the risk of legal liability because the Directive went into effect "immediately."

The Directive continues Defendants' unlawful attempt to hobble the Head Start program. HHS's stated goal to "ensure enrollment in Head Start is reserved for American citizens"[1] cannot be reconciled with Congress's purpose in the Head Start Act to ensure school readiness for children from immigrant communities. PRWORA itself makes clear that restricted "federal public benefits" like "welfare" do not include early education programs like Head Start.

Defendants' sudden reinterpretation of PRWORA also violates the procedural

---

[1] U.S. Dep't of Health & Hum. Servs., *HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs* (July 10, 2025), https://www.hhs.gov/press-room/prwora-hhs-bans-illegal-aliens-accessing-taxpayer-funded-programs.html.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 8
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

requirements of the Head Start Act and the Administrative Procedures Act, is arbitrary, and willfully disregards the enormous, short- and long-term harms for families who will lose access to Head Start. Notably, HHS deprived the public of the right to comment on the impact of regulation before allowing the Directive to take effect. Such systematic indifference to the consequences for immigrant children, families, and communities is not only cruel, but illegal.

On July 15, 2025, Plaintiffs filed a motion to amend their First Amended Complaint to add additional claims arising from the July 14, 2025, Immigrant Exclusion Directive. While Plaintiffs' prior motion for a preliminary injunction seeking relief for Defendants' DEIA Ban and Mass Cuts to the Office of Head Start is currently pending, Plaintiffs now move for a Temporary Restraining Order solely based on and seeking emergency relief for these new claims. For the reasons below, Plaintiffs request that the Court grant their motion.[2]

## STATUTORY AND REGULATORY BACKGROUND

HHS's unprecedented redefinition of "federal public benefits" to include community-based early education programs like Head Start is contrary to the text and purpose of PRWORA as reflected in decades of consistent agency interpretation.

Enacted in 1996, PRWORA, Pub. L. No. 104-193, 110 Stat. 2105 (1996), limits eligibility for certain "federal public benefits" to "qualified" immigrants, 8 U.S.C. §§ 1611(a)-(c). "Qualified" immigrants are defined in *id.* § 1641 to include lawful permanent residents, refugees, asylees, and other enumerated immigrants. All non-citizens who do not fall within the definition—including many lawfully residing, including, for example, Special Immigrant Juveniles, U visa holders, students visa holders—are unqualified. PRWORA defines "federal public benefits" as:

(A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States;

---

[2] Plaintiffs respectfully request that the Court schedule a hearing as soon as possible and provide, at minimum, one day's notice for an in person hearing to enable counsel to travel from out of town.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 9
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

and (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

*Id.* § 1611(c)(1). Under the PRWORA, "nonprofit charitable organizations" are not required to determine or verify eligibility, even when they are providing federal public benefits. *Id.* § 1642(d).

*HHS's longstanding interpretation of "federal public benefits."* HHS issued an interpretation of "federal public benefit" in 1998, within two years of PRWORA's passage. This interpretation remained consistent for 27 years until Defendants' Directive. As HHS explained in its original interpretation:

Although the litany of categories in 401(c)(1)(B) is broad, it is not comprehensive and clearly excludes certain categories from the definition. For example, by explicitly identifying "postsecondary education" the statute excludes non-postsecondary education programs, such as Head Start and elementary and secondary education.

Dep't of Health & Hum. Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA): Interpretation of "Federal Public Benefit," 63 Fed. Reg. 41658 (Aug. 4, 1998); s*ee also* Dep't of Health & Hum. Servs., Admin. for Child. & Fams., Off. of Child Care, *Clarification of Interpretation of "Federal Public Benefit" Regarding Child Care and Development Fund (CCDF) Services* (Nov. 25, 1998), https://acf.gov/occ/policy-guidance/clarification-interpretation-federal-public-benefit-regarding-ccdf-services ("Head Start and Early Head Start have been determined not to provide "Federal public benefits" because non-post secondary education benefits were expressly omitted from the statutory definition in title IV of [PRWORA]. Therefore, Head Start providers are not required to implement PRWORAs verification requirements."); Child Care and Development Fund (CCDF) Program, 81 Fed. Reg. 67438, 67461 (Sept. 30, 2016) ("when a child receives Early Head Start or Head Start services

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 10
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

that are supported by CCDF funds and subject to the Head Start Performance Standards, the PRWORA verification requirements do not apply."); *see also* Program Integrity and Institutional Quality: Distance Education and Return of Title IV, HEA Funds, 90 Fed. Reg. 470, 491 (2025) (reaffirming position that "programs that provide non-postsecondary services from the requirements of PRWORA, such as Head Start and elementary and secondary education" are not subject to restrictions under PRWORA).

Additionally, HHS and DOJ have consistently interpreted "federal public benefit" to exclude "benefits that are generally targeted to communities[.]" PRWORA; Interpretation of "Federal Public Benefit", 63 Fed. Reg. 41658, 41659 (Aug. 4, 1998); Dep't of Just., *Interim Guidance on Verification of Citizenship, Qualified Alien Status and Eligibility Under Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996*, 62 Fed. Reg. 61344, 61361 (Nov. 17, 1997) (explaining even when a "community organization" receives a federal public benefit, if it uses the funds to provide a benefit to the community, "the prohibition would not apply.").

*The Immigrant Exclusion Directive.* On July 14, 2025, HHS issued the Immigrant Exclusion Directive reinterpreting the phrase "federal public benefit" in PRWORA to exclude "unqualified" immigrants from Head Start programs for the first time, effective immediately. 90 Fed. Reg. at 31232, 31236.

Despite HHS's previous explanation that PRWORA's explicit inclusion of "postsecondary education" in the list of "federal public benefits" means that the statute excluded non-postsecondary education programs like Head Start, its new Directive declares Head Start a "similar benefit" to "welfare," such that it falls within PRWORA's definition of "federal public benefit" and requires exclusion of "unqualified" immigrants. *Id.* at 31236. The Directive does not specify whether this new exclusion is based on the immigration status of the child, parents, guardians, or family and/or household members.

Further, while the Directive purports not to "formally revise" PRWORA's "verification requirements," which exempt nonprofit charitable organizations, the Directive also extensively

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 11
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

references President Trump's January 20 and February 19 Anti-Immigration Executive Orders, and states that it is "the policy of this country that persons' access to public benefits should turn on those persons' immigration status." 90 Fed. Reg. at 31237. The Directive instructs entities, including HSA Plaintiffs' members, to "pay heed to the clear expressions of national policy," with no explanation of the nature or extent of this obligation, how entities are expected to implement the policy, or the consequences of noncompliance. *Id.*

The Directive acknowledges that it will have a significant economic impact and is subject to the requirements of Executive Orders 12866 and 13563, which direct agencies "to assess all benefits and costs of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits." 90 Fed. Reg. at 31238. To meet these requirements HHS issued a Regulatory Impact Analysis. *See* Exec. Secretariat, Immediate Off. of the Sec'y, Dep't of Health & Hum. Servs., *Final Regulatory Impact Analysis*, Docket No. AHRQ-2025-0002 (2025) [hereinafter *RIA*].

The RIA describes "full compliance with the notice" as one in which immigration status relating to every Head Start participant is verified such that no "unqualified" child is enrolled. *Id.* at 8, 14. Notably, although the Directive does not specify whose immigration status must be verified, the RIA refers to immigration status for both children and parents. *Id.* at 7-8. Defendants "anticipate that approximately 115,000 Head Start children and families could be impacted, or about 16% of total cumulative enrollment in Head Start programs in FY 2024[,]" and that approximately 500,000 children would no longer be eligible to attend Head Start. *Id.* at 7-8.

Head Start agencies, which are required to certify their full compliance under the threat of False Claims Act penalties, currently face real legal jeopardy if they do not change their procedures because the Directive went into effect "immediately."

## **LEGAL STANDARD**

The temporary restraining order standard is "substantially identical" to the preliminary injunction standard. *Washington v. Trump*, 847 F.3d 1151, 1159 n.3 (9th Cir. 2017); *see also* Fed. R. Civ. P. 65(b). The APA also authorizes courts to "preserve status or rights pending conclusion

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 12
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

of the review proceedings," 5 U.S.C. § 705, under the same standard as a preliminary injunction, *Immigrant Defs. Law Ctr. v. Noem*, No. 25-2581, 2025 WL 2017247, at *1 (9th Cir. July 18, 2025). Plaintiffs satisfy these requirements because the Directive changes the status quo in a way that will cause them irreparable injury, they are "likely to succeed on the merits," "the balance of equities tips in [their] favor," and "an injunction is in the public interest." *Winter v. Nat'l Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).

## **ARGUMENT**

### I.    **Plaintiffs Face Irreparable Harm Because of the Immigrant Exclusion Directive.**

The Directive seeks to bar over 500,000 children from Head Start programs, resulting in imminent and irreparable injuries to Head Start children, families, agencies and the organizations that support them. Children and families, including Parent Plaintiffs' members, will suffer irreparable harm through deprivation of access to early education with attendant economic, social, and public health consequences for parents, families, and communities. In addition, Head Start agencies, including HSA Plaintiffs and their members, will suffer drops in enrollment, resulting in funding cuts, layoffs, and even program closures, and the threat of civil and criminal penalties if they fail to comply with the vague Directive. Such irreparable injuries necessitate emergency relief. *See E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677-79 (9th Cir. 2021).

### A.    **Harms to Parent Plaintiffs' Members and Other Immigrant Families**

The Directive will cause Head Start children and families, including Parent Plaintiffs' members to suffer loss of access to early childhood education and care.[3] Defendants' own analysis estimates the Directive's effect as excluding hundreds of thousands of children from Head Start.[4] Those estimates do not account for the predictable and intended broader chilling effect on even "qualified" immigrant families. Defendants' public statements about the Directive, including that

---

[3] Douther ¶¶26-31; Maunnamali ¶¶38-42; McFalls ¶¶24-36; Morrison-Frichtl ¶¶32-36; Ryan ¶¶26-34, 54-56; Williams ¶¶33-39.
[4] *RIA* at 7-8.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 13
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

"Head Start is reserved for American citizens from now on,"[5] communicates that immigrants are not permitted in Head Start programs. The Directive will thus chill participation in Head Start even by "qualified" immigrant families both because of confusion about eligibility and fear that continued participation will subject them to increased scrutiny, adverse immigration consequences, and even civil and criminal penalties.[6] This same chilling effect has been well documented in other federal programs.[7]

For Parent Plaintiffs' members, loss of access to Head Start means sudden and major disruptions to their children's early childhood education, including critical dual language instruction, disability-related supports, and a safe and stable learning environment.[8] *See Doe v. Noem*, No. 2:25-cv-00633-DGE, 2025 WL 1141279, at *8 (W.D. Wash. Apr. 17, 2025) (disruption of educational programs or progress constitutes irreparable harm); *see also Tully v. Orr*, 608 F. Supp. 1222, 1225–26 (E.D.N.Y. 1985) (same). Such disruptions at a young age will have severe immediate and long-term harms to children's development, physical and mental health, self-esteem, sense of stability, and overall well-being.[9] These harms are especially devastating for children who have disabilities, are experiencing developmental delays, or are

---

[5] U.S. Dep't of Health & Hum. Servs., *HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs* (July 10, 2025), https://www.hhs.gov/press-room/prwora-hhs-bans-illegal-aliens-accessing-taxpayer-funded-programs.html ("Head Start is among the programs included in the updated and expanded list of classified 'Federal public benefits' under PRWORA to *ensure enrollment in Head Start is reserved for American citizens from now on*.") (emphasis added).

[6] Doutherd ¶¶27-28; Maunnamalai ¶¶31-35, 38, 41-42; McFalls ¶¶33-36; Morrison-Frichtl ¶¶23-29; Ryan ¶¶26-34; Williams ¶¶34-36.

[7] Randy Capps et al., *Anticipated "Chilling Effects" of the Public-Charge Rule Are Real: Census Data Reflect Steep Decline in Benefits Use by Immigrant Families*, Migration Policy Institute (Dec. 2020), https://www.migrationpolicy.org/news/anticipated-chilling-effects-public-charge-rule-are-real; Jennifer M. Haley et al., *One in Five Adults in Immigrant Families with Children Reported Chilling Effects on Public Benefit Receipt in 2019*, Urban Institute (June 18, 2020), https://www.urban.org/research/publication/one-five-adults-immigrant-families-children-reported-chilling-effects-public-benefit-receipt-2019; Neeraj Kaushal & Robert Kaestner, *Welfare Reform and Health Insurance of Immigrants*, 40 HSR: Health Services Research 3, 697-722 (June 2005), https://pmc.ncbi.nlm.nih.gov/articles/PMC1361164/.

[8] Doutherd ¶29; Maunnamalai ¶¶38-40; McFalls ¶¶26-29; Morrison-Frichtl ¶¶13, 33; Ryan ¶¶54-56; Williams ¶37.

[9] Doutherd ¶¶29-30; Maunnamalai ¶¶38-40; McFalls ¶¶26-29; Morrison-Frichtl ¶¶32-34; Ryan ¶¶54-56; Williams ¶¶37-38.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 14
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

otherwise vulnerable, because their families especially rely on Head Start programs for education-related supports and interventions.[10]

Without access to Head Start's early education and care, many of Parent Plaintiffs' members from immigrant families will be forced to miss work, risking losing their jobs, and drop out of school and training programs, which, in turn, jeopardizes their ability to pay rent and utilities, buy groceries, cover medical costs, and otherwise support their families.[11] *See Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014) (loss of opportunity to pursue professional opportunities constitutes irreparable harm) (quoting *Enyart v. Nat'l Conf. of Bar Examiners, Inc.*, 630 F.3d 1153, 1165 (9th Cir. 2011)); *J.L. v. Cissna*, 341 F. Supp. 3d 1048, 1069 (N.D. Cal. 2018) (same). These impacts are especially severe for immigrant mothers and families, who already face increased barriers to accessing early education programs that are affordable and/or linguistically and culturally appropriate.[12] The sudden disruption of these programs may even lead to housing insecurity and homelessness for some of Parent Plaintiffs' members.[13] These harms also will extend beyond impacted children and families, with collateral economic, social, and public health costs for employers, educational and vocational programs, and communities.[14]

For Parent Plaintiffs, the Immigrant Exclusion Directive further frustrates their mission to increase access to early education and care, forces them to divert limited time and resources toward rapid response efforts related to the Directive's impacts, and directly interferes with their ability to carry out core activities by impairing members' ability to attend and participate in programming due to lack of childcare.[15] Indeed, Parent Plaintiffs have already experienced

---

[10] *Id.*

[11] *Id.*

[12] *How to Advance Immigrant Women's Access to Childcare: Policy Brief*, Upwardly Global (Feb. 15, 2024), https://www.upwardlyglobal.org/news/news/how-to-advance-immigrant-womens-access-to-childcare-policy-brief/; *see also* Williams ¶¶20-21.

[13] Doutherd ¶30; Williams ¶38.

[14] Zaslow Decl. ISO Pls. Mot. Preliminary Injunction, Doc. 51 ¶¶58–61; *see also* McFalls ¶29.

[15] Doutherd ¶¶32-37; Williams ¶¶40-46.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 15
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

increased outreach from members, partners, and stakeholders regarding the Directive and its impacts in their communities.[16]

### B.  HSA Plaintiffs: Harms to Head Start Programs

HSA Plaintiffs and their members will also suffer irreparable harms because of the Immigrant Exclusion Directive.

The sudden reversal of Head Start's longstanding policy not to screen based on immigration status will immediately impact many of HSA Plaintiffs' members who are currently in the process of enrolling children and families for the upcoming school year.[17] A significant proportion of current enrollees are from immigrant families and communities to whom HSA Plaintiffs' members have devoted significant resources in a decades-long outreach and recruitment effort, including building community trust in Head Start as a safe and inclusive learning environment for their children.[18] HSA Plaintiffs' members anticipate that the Directive will result in drops in enrollment as high as 30 percent.[19] Indeed, HSA Plaintiffs and their members are already experiencing an increase in concerns and questions from families about the impact of the Directive.[20]

Because enrollment numbers are the source of Head Start funds, HSA Plaintiffs and their members face loss of funding as enrollment and attendance fall.[21] *See* 42 U.S.C. 9836a(h) (requiring monthly reporting on "actual enrollment"). As a result, thousands of Head Start teachers and staff are at risk of losing their jobs, and HSA Plaintiffs' members could be forced to close altogether.[22] Head Start programs that remain operational will face significant challenges recruiting and retaining students and staff, as they will be unable to recruit from the same

---

[16] Doutherd ¶33; Williams ¶¶43-44.

[17] Maunnamalai ¶¶36-37; Morrison-Frichtl ¶¶18, 23; Ryan ¶34.

[18] Maunnamalai ¶¶17, 21, 31, 33, 34-35, 37, 44; McFalls ¶¶6, 35; Morrison-Frichtl ¶¶13-14, 24-25, 31-36; Ryan ¶¶29-30.

[19]  Maunnamalai ¶¶34-35, 45; McFalls ¶¶25-27; Morrison-Frichtl ¶¶23, 26-29, 32; Ryan ¶28.

[20] Maunnamalai ¶¶31, 44; McFalls ¶51; Ryan ¶¶35-36, 58; Morrison-Frichtl ¶27.

[21] Maunnamalai ¶36, McFalls ¶¶25-32, 41, 47-48; Morrison-Frichtl ¶30; Ryan ¶¶38-39, 41-44.

[22] *Id.*

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 16
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

communities or to maintain stable budgets for staff and programming.[23] Indeed, even an enrollment decrease of just a few children could result in the loss of a Head Start teacher.[24] Thus, *all* Head Start children and families—not only those excluded by the Directive—will suffer as a result of programs' loss of funding and related consequences, particularly in communities where Head Start is the only available option for early childhood education and care.[25]

HSA Plaintiffs and their members also face significant harms because of the Directive's failure to provide clear guidance and standards on how to implement its restrictions, including whether eligibility determinations are based on the immigration status of the child, parents and/or guardians, or household and family members, and the Directive's warning that even agencies otherwise exempt from verification requirements must "heed" the new "national policy" of immigrant exclusion.[26] The Directive's failure to provide clear enforcement standards leaves HSA Plaintiffs' members unjustly vulnerable to legal consequences,[27] including civil and criminal liability under the False Claims Act. *See Am. Trucking Ass'ns, Inc. v. City of Los Angeles*, 559 F.3d 1046, 1058 (9th Cir. 2009) (finding irreparable harm where Plaintiffs were forced to choose between complying with a potentially unconstitutional concession agreement and losing professional opportunities).

The Directive further harms HSA Plaintiffs and their members by frustrating their mission and mandate to support and provide early childhood education and care to low-income children and families in their communities.[28]  In addition to the potential reduction of funding for HSA

---

[23] Morrison-Frichtl ¶31; Ryan ¶¶40, 42; Maunnamalai ¶33; McFalls ¶¶35, 37, 40, 49.

[24] Maunnamalai ¶43.

[25] Morrison-Frichtl ¶30; Maunnamalai ¶¶17-18, 36; McFalls ¶¶45, 49; Ryan ¶¶38, 44.

[26] Maunnamalai ¶¶27-30; Morrison-Frichtl ¶¶19-22; Ryan ¶¶51-53; McFalls ¶¶20-23

[27] *See* 45 C.F.R. § 1303.3 (enumerating "HHS regulations that apply to all grants made under the Act"); 45 C.F.R. § 75.213 (subject to debarment); 2 C.F.R. § 180.800 (causes for debarment); *see also* 45 C.F.R. § 1304.5(a)(2)(iv) ("fail[ure] to comply with eligibility requirements" is grounds for terminate financial assistance to a Head Start agency); U.S. Dep't of Health & Hum. Servs., *Financial Assistance General Certifications and Representations*, https://www.hhs.gov/sites/default/files/financial-assistance-general-certification-representations.pdf (last visited July 20, 2025) (requiring compliance with "all applicable requirements of all other federal laws, executive orders, regulations, and public policies governing financial assistance awards").

[28] Maunnamalai ¶¶36-37, 43-48; McFalls ¶¶37-51; Morrison-Frichtl ¶¶31, 37-42; Ryan ¶¶57-59.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 17
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Plaintiffs' members as a result of decreased enrollment and attendance,[29] HSA Plaintiffs and their members will be forced to divert resources to developing and implementing new policies and procedures for screening and verifying immigration status, as well as providing relevant training to all personnel.[30] Such increased costs, on top of the loss of funding and staff, will result in financial hardship to programs, forcing them to reduce services or close.[31]

## II.    Plaintiffs are Likely to Succeed on the Merits Because the Directive Violates the APA.

Plaintiffs will succeed on the merits of their claims that the Immigrant Exclusion Directive violates the APA because it is contrary to law, arbitrary and capricious, and fails to follow procedures required by law.

The Directive is a "final agency action[,]" 5 U.S.C. § 704, because it is a formal directive that reflects a consummation of decision-making and from which legal obligations and consequences will flow. *See Bennett v. Spear*, 520 U.S. 154, 177–78 (1997); *see also Or. Nat. Desert Ass'n v. U.S. Forest Serv.*, 465 F.3d 977, 982-83 (9th Cir. 2006).

### A.  Defendants' Directive Violates the APA because it is Contrary to Law and in Excess of Statutory Authority.

The Directive violates the APA because it conflicts with the text of PRWORA and Head Start Act. HHS claims that Head Start is a "federal public benefit" because it falls within the meaning of "welfare" or a "similar benefit." 90 Fed. Reg. at 31236. But this interpretation is impermissible for several reasons: (1) it conflicts with the clear text of PRWORA "definition of federal public benefit," which excludes early and elementary education and programs that provide services at the community, not individual, level; (2) the text and context of PRWORA make clear that "welfare" has a narrow meaning that encompasses only individualized cash benefits; and (3) the Directive's exclusion of "unqualified" immigrant children adds eligibility criteria inconsistent

---

[29] Maunnamalai ¶¶23-26, 30-33; McFalls ¶¶33-36, 40-41, 47-49; Morrison-Frichtl ¶¶15-18, 22-25; Ryan ¶¶40-41; 59.

[30] Maunnamalai ¶¶26, 45-46; Morrison-Frichtl ¶¶18, 38-40; McFalls ¶38; Ryan ¶¶48-49; *see also* 45 C.F.R. § 1302.12(l)-(m).

[31] Ryan ¶44; Maunnamalai ¶¶47-48; Morrison-Frichtl ¶¶41-42; McFalls ¶¶31, 38.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 18
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1  with those in the Head Start Act, reauthorized almost a decade after PRWORA. "[A]pplying all

2  relevant interpretive tools," the Directive's interpretation of PRWORA's definition of federal

3  public benefit "is not the best" so "it is not permissible." *See Loper Bright Enters. v. Raimondo*,

4  603 U.S. 369, 400 (2024).

5          1.  Head Start is a Non-Postsecondary Education Program for the Community,

6              which is not within PRWORA's Definition of "Federal Public Benefit."

7          PRWORA's definition of "federal public benefit" limits its scope (1) to enumerated

8  categories of benefits and (2) whether those benefits are "provided to an individual, household,

9  or family eligibility unit." 8 U.S.C. § 1611(c)(1)(B). Both textual limitations independently

10  exclude Head Start.[32]

11                  *i.  PRWORA Excludes Non-Postsecondary Education.*

12         PRWORA's explicit listing of "postsecondary education" means that non-postsecondary

13  education, including Head Start, is excluded. "The doctrine of *expressio unius est exclusio alterius*

14  as applied to statutory interpretation creates a presumption that when a statute designates certain

15  persons, things, or manners of operation, all omissions should be understood as exclusions."

16  *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005) (en banc) (internal citation

17  omitted). If Congress intended to include non-postsecondary education in the definition, it "would

18  have been much easier (and much more natural)" to use the word "education," instead of the more

19  specific, "postsecondary education." *See Bruesewitz v. Wyeth LLC*, 562 U.S. 223, 232 (2011). The

20  use of the narrower postsecondary term is a "deliberate choice, not inadvertence*." Id.* at 233

21  (quoting *Barnhart v. Peabody Coal Co.*, 537 U.S. 149, 168 (2003). The Directive impermissibly

22  substitutes a term Congress did not choose to use in its legislative text. *See CC/Devas (Mauritius)*

23  *Ltd. v. Antrix Corp.*, 145 S. Ct. 1572, 1581 (2025).

24

25

26  [32] The Directive does not argue that Head Start is a "federal public benefit" under subsection (A), *id.* § 1611(c)(1)(A), nor could they. Head Start rants are provided to agencies. 42 U.S.C. § 9833, and thus not to any "alien who is not a qualified alien."8 U.S.C. § 1611(a).

27

Defendants admit that Head Start is a non-postsecondary education program. *See* 90 Fed. Reg. at 31236 ("an HHS program that deals with non-postsecondary education (such as Head Start)"). As Congress wrote in its reauthorization of Head Start through the "Improving Head Start *for School Readiness Act* of 2007," Pub. L. No. 110-134, § 2, 121 Stat. 1363, 1363 (2007) (emphasis added), "[i]t is *the* purpose of this subchapter to promote the school readiness of low-income children[.]" 42 U.S.C. § 9831 (emphasis added); *see also* Statement by President George W. Bush Upon Signing, 2007 U.S.C.C.A.N. S17 (2007) ("Stronger educational performance standards and an emphasis on research-based curricula and classroom practices will increase children's preparedness for school.") The Head Start Act's many provisions aimed at school readiness further confirm that Head Start is an education program. Like other education programs, Head Start agencies use evidence-based curriculum and instruction,[33] align with educational standards,[34] employ qualified educators who meet licensure requirements[35] and receive ongoing professional development,[36] and engage in ongoing assessment.[37] Because Head Start is an education program, Congress requires that if federal education funds are spent on early childhood education, the program must comply with the performance standards established by the Head Start Act, 20 U.S.C. § 6312(c)(7).

From the beginning, Head Start reflected its creators' insight that to successfully "prepare our neediest children for kindergarten and first grade," preschool was the "centerpiece" but it must be accompanied by health care and parent involvement in order to provide "children with

---

[33] 42 U.S.C. § 9837(f)(3) (requiring "research-based early childhood curriculum" that "promotes young children's school readiness"); *id.* § 9836a(a)(1)(B) (requiring that children develop and demonstrate language, literacy, mathematics, science, cognitive abilities, social problem solving, among others).

[34] *Id.* § 9837(f)(3)(E) (requiring curriculum to be "aligned with the Head Start Child Outcomes Framework … and, as appropriate, State early learning standards"); § 9836a(a)(1)(B) (same); *see also id* § 9837a (requiring agencies "coordinate with the local educational agency serving the community").

[35] *Id.* §§ 9843a(a)-(b) (professional and degree requirements for classroom teachers, education coordinators and "mentor teachers").

[36] *Id.* § 9843a(a)(5) (requiring "classroom-focused" professional development every year); *see also* § 9832(21)(G).

[37] *Id.* § 9837(f)(3)(C) (requiring curriculum be "linked to ongoing assessment, with developmental and learning goals and measurable objectives"); *id.* § 9837(f)(5) (requiring "use research-based assessment methods" to "support the educational instruction and school readiness"); *see also id.* § 9836a(b)(3)(A)(i) *id.* § 9836a(c)(2)(F).

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 20
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

the building blocks they need to enter school ready to learn." 153 Cong. Rec. S14375-02 (Nov. 14, 2007) (statement of Sen. Edward M. Kennedy). Thus, the "provision to low-income children and their families of health, educational, nutritional, social, and other services that are determined, based on family needs assessments, to be necessary" is in support of the school readiness purpose, just as "a learning environment that supports children's growth in language, literacy, mathematics, science, social and emotional functioning, creative arts, physical skills, and approaches to learning" supports the educational purpose of Head Start. 42 U.S.C. § 9831; *contra* 90 Fed. Reg. at 31236 (taking quote out of context); *see also* 42 U.S.C. § 9833 (authorizing Secretary to provide financial assistance to Head Start programs that "will provide such comprehensive health, education, parental involvement, nutritional, social, and other services *as will enable* the children to attain their full potential and *attain school readiness*" (emphasis added)).

Head Start also does not fall into the general "catch-all" provision of "federal public benefit." Because Congress specifically excluded non-postsecondary education from the definition of "federal public benefit," the inclusion of catch-all language cannot override this more specific textual exclusion. *See RadLAX Gateway Hotel, LLC v. Amalgamated Bank*, 566 U.S. 639, 645 (2012). Under the "well established canon of statutory interpretation…the specific governs the general." *Id*. (internal quotation marks and citation omitted).

> ii.   *PRWORA Also Excludes Programs Delivering Services at the Community-Level.*

Head Start is also outside PRWORA's limitation to those programs "for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(B). In Head Start, the "payments or assistance" provided by HHS and federally appropriated funds goes to organizations and local governments to deliver programs to communities within designated geographic areas, rather than individuals, households, or families. 42 U.S.C. § 9833 (financial assistance provided to designated agencies); *id.* § 9836 (agency must be "within a community" to be designated); *id.* § 9836(h) ("Community" defined as a particular geographic area "that provides

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 21
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

a suitable organizational base and possesses the commonality of interest needed to operate a Head Start program."); *id.* § 9836(d) (Secretary required to designate another agency to deliver the Head Start program in a community if original provider is not delivering a high-quality program); *id.* § 9837(c)(2)(D)(i) (Head Start agencies must be "responsive to community…needs"); *id.* § 9835(f) (agencies "develop locally designed or specialized service delivery models to address local community needs"); *id.* §§ 9837(b), (c), (e) (requiring community residents be involved in the design and implementation of the program and governance). Therefore, Head Start is excluded from the definition of "federal public benefit" on the independent basis that neither HHS nor appropriated funds of the United States provide payments or assistance directly to individuals, households, or family eligibility units.

This is confirmed by the Congressional Conference Report, which states that non-postsecondary education programs are not included in the definition of federal public benefit because the benefit is not provided to an individual, household, or family eligibility unit. *See* H.R. Rep. No. 104-725, at 380 (July 30, 1996) (Conf. Rep.) ("The intent of the conferees is that title I, part A of the Elementary and Secondary Education Act [20 U.S.C. 6311, et seq.] would not be affected by section 401 [8 U.S.C. 1611(a)] because the benefit is not provided to an individual, household, or family eligibility unit."); *see also Nw. Forest Res. Council v. Glickman*, 82 F.3d 825, 835 (9th Cir. 1996) ("[A] congressional conference report is recognized as the most reliable evidence of congressional intent because it represents the final statement of the terms agreed to by both houses." (internal quotation omitted)).

### iii. Contemporaneous, Consistent Agency Interpretations Further Undermine Defendants' Interpretation.

"[I]nterpretations issued contemporaneously with the statute at issue, and which have remained consistent over time," "may be especially useful in determining the statute's meaning," and further support the conclusion that PRWORA's "federal public benefits" do not include Head Start. *Loper Bright Enters.*, 603 U.S. at 394 (citation omitted). HHS and DOJ interpreted "federal public benefit" just two years after PRWORA's passage to exclude Head Start and that remained

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 22
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

consistent for 27 years until Defendants' issued this Directive. *See* 63 Fed. Reg. 41658; 90 Fed. Reg. 31232; *see also Rodriguez v. Bostock*, No. 3:25-cv-05240-TMC, 2025 WL 1193850, at *15 (W.D. Wash., Apr. 24, 2025) (finding contemporaneous agency interpretation and unchanged practice persuasive); *Org. of Pro. Aviculturists, Inc. v. U.S. Fish and Wildlife Serv.*, 130 F.4th 1307, 1319 (11th Cir. 2025) (finding agency interpretation issued two years after passage of statute and consistently applied for thirty years persuasive).

### 2.   Head Start is Not Welfare or Anther Similar Benefit under PRWORA.

The Directive states that Head Start falls within PRWORA's definition of "federal public benefit" because it is "welfare…or other similar benefit" as it provides "health, educational, nutritional, and social and other services" or "child care" and is means tested. 90 Fed. Reg. at 31236. Defendants' interpretation is wrong. As used in PROWRA, the term "welfare" refers to reoccurring cash payments to low-income families with children, a benefit that Head Start does not provide.

Defendants' interpretation violates the rule against surplusage because the express inclusion of "health," "postsecondary education," and "food assistance" would be entirely unnecessary if "welfare…or other similar benefit" broadly encompassed all "health, educational, nutritional, and social and other services." 90 Fed. Reg. at 31236; *see also Nat'l Lab. Rels. Bd. v. Aakash, Inc.*, 58 F.4th 1099, 1105 (9th Cir. 2023) ("We generally interpret a statute to avoid making a part of it unnecessary") (citation omitted). The title of PRWORA that created 8 U.S.C. § 1611, "Restricting *Welfare and* Public Benefits for Aliens" (emphasis added), demonstrates that "welfare" has a separate meaning and is not the same as a "public benefit."

Defendants are also wrong that Head Start as "a similar program" to welfare because it "also provide[s] means-tested assistance to families and individuals." 90 Fed. Reg. at 31236. While being low-income is one eligibility criterion for Head Start, other criteria do not depend on family income. *See* 42 U.S.C. § 9840(a)(1)(B) (children residing in low-income communities, including children with disabilities); *id.* § 9840(a)(2) (rural communities); Pub. L. No. 118-47,

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 23
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Div. D, Title II, § 238, 138 Stat. 460, 681 (2024) (operated by an Indian tribe); *id.* § 239 (Migrant and Seasonal Head Start); 45 C.F.R. § 1302.12(c)(iv) (2016) (child is in foster care).

The text, context, and structure of PRWORA also support the conclusion that "welfare" refers specifically to Aid to Families with Dependent Children (AFDC), and its replacement, Temporary Assistance to Needy Families (TANF). *See K Mart Corp. v. Cartier, Inc.,* 486 U.S. 281, 291 (1988) ("In ascertaining the plain meaning of the statute, the court must look to the particular statutory language at issue, as well as the language and design of the statute as a whole.") (citation omitted). PRWORA uses the term "welfare" in several provisions, and each time it does so to refer to reoccurring cash payments for low-income families with children. *See* Pub. L. No. 104-193, § 114, 110 Stat. 2105, 2180 (1996) (defining "welfare reform effective date" to mean "the effective date, with respect to a State, of title I of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996," which is "Block Grants for Temporary Assistances for Needy Families."); *id.* § 403 (defining "welfare spending" by referencing the "total amount required to be paid to the State under former section 403 (as in effect during fiscal year 1994)"—that is, the payments to states under AFDC, 42 U.S.C. § 603 (1994); *id.* § 413(d)(1) (using the term "overall welfare caseload" to refer to "recipients of assistance under the State program" funded by TANF); *id.* § 101(8)(A) (Congressional findings that the longer a woman remains "on welfare," the higher the total AFDC costs). HHS has also long demonstrated its understanding of "welfare" as used in PRWORA to refer to its cash aid to families program. *Compare id.* § 107 (directing HHS to "study and analyze outcomes measures for evaluating the success of the States in moving individuals out of the *welfare* system through employment") (emphasis added) *with* ACF, ASPE, & HHS, *Report on Alternative Outcome Measures: Temporary Assistance for Needy Families (TANF) Block Gran*t (Nov. 30, 2000), https://aspe.hhs.gov/reports/report-alternative-outcome-measures-temporary-assistance-needy-families-tanf-block-grant (noting report is "submitted pursuant to section 107" of PRWORA and explaining that states show they have "moved families off welfare" by showing a decline in TANF caseloads).

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 24
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

The two sources Defendants cited in the Directive undermine rather than support the conclusion that Head Start is "welfare" or similar to it. The Welfare Indicators Act, which requires the Secretary of HHS to prepare an annual report "on welfare receipt in the United States[,]" 42 U.S.C. § 1314a(d)(1), does *not* classify Head Start as a "welfare" program. *Id.* § 1314a(d)(2). The Welfare Indicators Act also undercuts Defendants' claim that "child care" is similar to "welfare." The statute begins with a statement of "Congressional policy" that juxtaposes dependence on welfare programs, which the federal government should "reduce," *id.* § 1314a(a)(1), with "education" and "child care," which the federal government should support to assist families in achieving financial independence, *id.* § 1314a(a)(3).

Nor is Head Start "child welfare," *see* 90 Fed. Reg. at 31236, which refers to the programs that focus on preventing child abuse and neglect. *See* § 429A, 110 Stat. at 2277 (requiring study of "child welfare" meaning children at risk of or determined to have experienced abuse or neglect); *see also* 42 U.S.C. § 9843(b)(2) (Head Start Act provision requiring Secretary to "support training for personnel…providing services to children determined to be abused or neglected or children referred by or receiving child welfare services").

### 3.  The Directive Creates a Conflict with the Head Start Act.

Defendants' Directive is also contrary to law because it creates a conflict between the text of PRWORA and the text of the Head Start Act, which establishes "criteria for eligibility," including children who "shall" be eligible, without regard to immigration status. 42 U.S.C. § 9840(a)(1)(B); *see also* 45 C.F.R. § 1302.12(c), (d).  Defendants' re-interpretation of "federal public benefit" flatly contradicts Congress's direction that certain children "shall" be eligible for Head Start, and thus violates a cardinal rule of statutory interpretation: "to the extent that statutes can be harmonized, they should be[.]" *Hellon & Assocs., Inc. v. Phoenix Resort Corp.*, 958 F.2d 295, 297 (9th Cir. 1992). These two statutes have been read harmoniously for the last 27 years, during which time Congress amended the Head Start Act's provision on "criteria for eligibility" several times, and never added immigration status. *See* Pub. L. No. 105-285, Title I, § 112, 112 Stat. 2702, 2718-19 (1998); Pub. L. No. 110-134, § 14, 121 Stat. 1363, 1415 (2007); Pub. L. No.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 25
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

114-328, Div. A, Title VI, § 618(j), 130 Stat. 2000, 2161 (2016); *see* Pub. L. No. 118-47, §§ 238-39, 138 Stat. 460, 681 (2024). Congress's modification of Head Start's eligibility criteria without adding restrictions based on immigration status demonstrates Congress's approval of HHS's prior construction of "federal public benefit" to exclude Head Start. *See e.g. Grondal v. Mill Bay Members Ass'n, Inc.*, 471 F. Supp. 3d 1095, 1121 (E.D. Wash. 2020) *aff'd*, 21 F.4th 1140 (9th Cir. 2021) ("Congress ratifies an agency's interpretation or practice when it is aware of that interpretation or practice, legislates in an area covered by that interpretation or practice, and does not refer to or change that interpretation or practice.") (internal citation omitted).

Moreover, "[w]here two statutes conflict, the later-enacted, more specific provision generally governs." *United States v. Juvenile Male*, 670 F.3d 999, 1007–8 (9th Cir. 2012) (rejecting argument statutes "do not conflict because they each operate on different classes of individuals and agencies."); *see also Hellon*, 958 F.2d at 297. In reauthorizing the Head Start Act, Congress specifically proscribed who would be eligible for the particular program over a decade after more general proscription in PRWORA. This later, more specific eligibility criteria governs.

### B. Defendants' Directive Is Arbitrary and Capricious in Violation of the APA.

The Immigrant Exclusion Directive is arbitrary and capricious because Defendants relied on improper factors, failed to consider important aspects of the issue, offered an explanation counter to the evidence, and based their decision on implausible reasoning. *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

First, the Directive abandons decades of existing policy without meaningfully considering "important aspects of the problem," including the significant reliance interests of Head Start agencies, Parent Plaintiffs, and Head Start children and families. *See id.* at 43. Because HHS "was not writing on a blank slate [and] *was* required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns"—even where the asserted basis for the agency's action is to correct purported legal defects. *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020) (internal quotation marks and citation omitted).

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 26
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Because Defendants have made clear for decades that Head Start is not a "federal public benefit" under PRWORA, HSA Plaintiffs and their members have never screened participants based on immigration status, allowing staff to build the community trust necessary for program recruitment and retention.[38] Similarly, Parent Plaintiffs' members have relied on this policy to enroll their children in Head Start without fear of increased scrutiny of their immigration status or other negative repercussions.[39] The Directive now forces HSA Plaintiffs to abruptly change course in program implementation,[40] while disrupting critical access to early education and care for Parent Plaintiffs' members and their children.[41] Such disruptions have severe and lasting harms, especially for children with disabilities or who are otherwise vulnerable.[42] Because Defendants failed to weigh any of these significant reliance interests against competing policy concerns, the Directive is arbitrary and capricious. *Regents*, 591 U.S. at 33. *See also Immigrant Defs. Law Ctr.,* 2025 WL 2017247, at *11 ("Merely saying something was considered is not enough to show reasoned analysis.") (quotation omitted).

Moreover, despite acknowledging that the Directive will have a significant economic impact, 90 Fed. Reg. at 31238, Defendants have not meaningfully considered the significant costs and burdens that this Directive imposes on Head Start agencies, including tribes and school districts, that operate Head Start programs, and failed entirely to quantify or even acknowledge the economic, social, and health costs for impacted children and families. *See City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.,* 408 F. Supp. 3d 1057, 1106 (N.D. Cal. 2019), *aff'd* 981 F.3d 742 (9th Cir. 2020) (failure to consider costs of disenrollment from benefits programs of Public Charge Rule was likely unlawful under APA); *see also Ctr. for Biological Diversity v. Bernhardt*, 982 F.3d 723, 750 (9th Cir. 2020) (finding agency action was arbitrary and

---

[38] Doutherd ¶23; Maunnamalai ¶33; Morrison-Frichtl ¶25; Williams ¶28; Ryan ¶¶29-30; McFalls ¶35.

[39] Doutherd ¶¶18-23; Williams ¶¶24-28.

[40] Maunnamalai ¶¶24-26; Morrison-Frichtl ¶¶16-18; Ryan ¶40; McFalls ¶40.

[41] Doutherd ¶¶26-31; Williams ¶¶33-39.

[42] Doutherd ¶¶29, 31; Williams ¶37; Ryan ¶54; McFalls ¶¶28, 45.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 27
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

capricious where agency failed to quantify impacts or to explain why it could not quantify impacts). The Directive will cut off access to early education for many of Parent Plaintiffs' members' children, which, as explained above, will inflict significant costs and hardships on parents, local businesses, schools, and beyond.[43] Yet, Defendants' RIA is devoid of any discussion or analysis of these cost. *RIA* at 14.

Defendants also failed to quantify or acknowledge the severe financial and programmatic impacts to Head Start agencies caused by sudden drops in attendance and enrollment,[44] the significant resources required to develop and implement new enrollment policies and procedures,[45] and diversion of limited staff and financial resources toward ensuring compliance with the Directive's requirements.[46] And while Defendants provide an estimate of the costs of collecting and reviewing documentation to verify eligibility, *RIA* at 12–14, these estimates do not account for the complexity involved in determining whether non-citizen participant is "qualified" under PRWORA, particularly for providers who have never been required to ask about or screen based on immigration status.

Additionally, because the Directive imposes restrictions on participation in Head Start programs without providing any guidance on how to comply with the requirements[47]—it leaves Head Start agencies, including HSA Plaintiffs' members, without standards for determining whether they are in compliance. *See Ariz. Cattle Growers' Ass'n v. U.S. Fish & Wildlife*, 273 F.3d 1229, 1233 (9th Cir. 2001) (holding agency action was arbitrary and capricious because it "issue[d] terms and conditions so vague as to preclude compliance therewith"). The lack of clear guidance, coupled with the Directive's threat to "pay heed to the clear expressions of national

---

[43] *Id.;* Doutherd ¶¶26-31; Williams ¶¶33-39; *see also* Zaslow Decl. ISO Pls. Mot. Preliminary Injunction, Doc. 51 ¶¶58–61.

[44] Maunnamalai ¶¶31-37; Morrison-Frichtl ¶¶23-31; McFalls ¶¶31, 41, 47-48; Ryan ¶¶38-44, 49, 59; *see also* 42 U.S.C. § 9836a(h) ("Reduction of grants and redistribution of funds in case of underenrollment.").

[45] Maunnamalai ¶26; Morrison-Frichtl ¶18; Ryan ¶¶48-49; McFalls ¶¶38, 42; *see also* 45 C.F.R. § 1302.12.

[46] Maunnamalai ¶¶26, 37; Morrison-Frichtl ¶¶18, 31; Ryan ¶¶48-49; McFalls ¶¶ 38-39, 50.

[47] Maunnamalai ¶¶27-30; Morrison-Frichtl ¶¶19-22; McFalls ¶¶20-22; 50; Ryan ¶¶51-53.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 28
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

policy,"[48] leave HSA Plaintiffs' members at "unfettered discretion" of HHS, with "no method by which the [programs] can gauge their performance" or compliance. *Ariz. Cattle Growers'*, 273 F.3d at 1250.

Accordingly, Plaintiffs are likely to succeed on their claim that the Immigrant Exclusion Directive is arbitrary and capricious in violation of the APA.

### C. Defendants Failed to Follow Procedures Required by Law.

HHS's issuance of the Directive, which took immediate effect, violates the procedural requirements of the Head Start Act and the APA. Each deficiency is sufficient to establish that HHS failed to observe necessary procedures required by law and must be set aside. 5 U.S.C. § 706(2)(D).

*Head Start Act*. The Head Start Act requires HHS to "prescribe eligibility for the participation of persons in Head Start programs" "by regulation." 42 U.S.C. § 9840(a)(1)(A). Such regulations must be published in the Federal Register at least 30 days before they take effect. *Id.* § 9839(d). Because current regulations governing eligibility for Head Start do not include requirements related to immigration status, *see* 45 C.F.R. § 1302 *et seq.*, HHS cannot radically alter the eligibility criteria without providing the public an opportunity to explain the devastating impacts of such a change.

Furthermore, before HHS may make "any" modifications to Head Start program "performance standards," including any "administrative" standards, the Secretary must consult a range of stakeholders (including experts in early childhood education and AIAN programs), assess the educational impacts based on enumerated considerations,  and ensure that "revisions in the standards will not result in the elimination of or any reduction in quality, scope, or types" of Head Start services. 42 U.S.C. §§ 9836a(a)(1)-(2). The Directive fails to establish that any of these prerequisites have been met.

---

[48] 90 Fed. Reg. at 31237.

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 29
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

*APA Notice and Comment Requirement.* Under the APA, agencies must publish proposed rules and allow the public an opportunity to comment. 5 U.S.C. § 553(c). "The greater the public interest in a rule, the greater reason to allow the public to participate in its formation." *E. Bay Sanctuary Covenant v. Barr*, 385 F. Supp. 3d 922, 947-48 (N.D. Cal. 2019) (quoting *Hoctor v. U.S. Dep't of Agric.*, 82 F.3d 165, 171 (7th Cir. 1996) (Posner, J.)). Because the Directive creates new "rights [and] duties" for Head Start participants by imposing a categorical bar to eligibility for any "unqualified" immigrant it is "properly considered to be a legislative rule" subject to the APA's notice and comment requirement. *Gen. Motors Corp. v. Ruckelshaus*, 742 F.2d 1561, 1565 (D.C. Cir. 1984); *see also Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6-7 (D.C. Cir. 2011) (a legislative rule "effects 'a substantive regulatory change' to the statutory or regulatory regime") (quoting *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 34–40 (D.C. Cir. 2005)).

HHS effectively concedes that the Directive requires notice and comment but argues that the Directive must take effect before the 30-day comment period concludes because "any delay would be contrary to the public interest," and therefore good cause exists for the rule to take immediate effect. 90 Fed. Reg. at 31238. But HHS does not meet the standard for invoking the "good cause" exception. *U.S. v. Valverde*, 628 F.3d 1159, 1164 (9th Cir. 2010) (an agency "must overcome a high bar if it seeks to invoke the good cause exception to bypass the notice and comment requirement."). The exception is an "emergency procedure" that must be "narrowly construed and only reluctantly countenanced." *E. Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1253 (9th Cir. 2018) (*E. Bay* II) (internal quotation marks and citation omitted). The Ninth Circuit has recognized that good cause exists only "where [an] agency cannot 'both follow [notice and comment requirements] and execute its statutory duties'" or where 'delay would do real harm' to life, property, or public safety.' *California v. Azar*, 911 F.3d 558, 576 (9th Cir. 2018) (internal citations omitted).

HHS does not meet this narrow standard. The Directive states that "additional delay to correct the deficiencies of the 1998 Notice would fail to remove incentives to illegal immigration that are exacerbating the invasion at the Southern Border," and references one "report" that

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 30
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

addresses immigration trends generally from 2020 to 2024. 90 Fed. Reg. at 31238. But HHS cites no evidence *linking* participation in early education programs like Head Start to increased immigration of any form, lawful or unlawful. Its claim that these programs are an incentive for immigration and that a 30-day delay in the effective date will "exacerbate the invasion" are far too "speculative" to support a finding of good cause. *E. Bay II*, 909 F.3d at 1253 (government failed to establish good cause where there was no evidence that delay in effective date would "would give aliens a reason to 'surge' across the southern border in numbers greater than is currently the case").

## III.    The Balance of Equities and Public Interest Strongly Favor Injunctive Relief and a Stay of the Agency Directive.

The balance of equities and public interest heavily favor Plaintiffs. *See Nken v. Holder*, 556 U.S. 418, 435 (2009) (courts consider these factors jointly when plaintiffs seek emergency relief against the government).

In stark contrast to the irreparable and severe harm to Plaintiffs, *see supra* I, Defendants will suffer no harm, much less irreparable harm, from Head Start continuing under the rules that have been in effect for nearly three decades. Any alleged harm to Defendants pales in comparison to the magnitude of "preventable human suffering" that would result if this Court permits the Directive to remain in effect. *Golden Gate Rest. Ass'n v. City & Cty. of San Francisco*, 512 F.3d 1112, 1126 (9th Cir. 2008) (internal quotation marks and citation omitted).

Granting a TRO and/or stay under 5 U.S.C. § 705 while litigation is pending will serve the public interest by ensuring Defendants' compliance with the law and preventing harm to the immigrant communities targeted by the Directive and all present and future participants of Head Start. "Our society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges." *Lopez v. Heckler*, 713 F.2d 1432, 1437 (9th Cir. 1983). Conversely, continuing the education of young people has a clear benefit to the public. *Clifton v. Pearson Educ., Inc.*, No. 5:11-cv-03640-EJD, 2012 WL 1565236, at *11 (N.D. Cal. May 2, 2012) (recognizing an "overwhelming public interest in education."). *E. Bay Sanctuary*

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 31
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1  *Covenant*, 993 F.3d at 681 (citation omitted) ("[W]hen a reviewing court determines that agency
2  regulations are unlawful, the ordinary result is that the rules are vacated.")).

3        Thus, the balance of equities and the public interest weigh decisively in Plaintiffs' favor.

### <u>CONCLUSION</u>

5        The Court should grant the motion and postpone the effective date of the Directive and/or
6  temporarily enjoin Defendants from enforcing it until the Court can further consider the merits.
7  The Court should exercise its discretion to waive or set a nominal bond.

8                                                 ***

The undersigned certifies that this motion contains 8,392 words, in compliance with the

Local Civil Rules.

| Dated: July 21, 2025 | Respectfully submitted, |
|---|---|
| Ming-Qi Chu (*pro hac vice*)<br>Jennesa Calvo-Friedman (*pro hac vice*)<br>Linda S. Morris* (*pro hac vice*)<br>*admitted in State of Maryland*<br>Sania Chandrani<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel: (212) 549-2500<br>mchu@aclu.org | By:    /s/   La Rond Baker<br>La Rond Baker (WSBA No. 43610)<br>Brent Low (WSBA No. 61795)<br>David Montes (WSBA No. 45205)<br>AMERICAN CIVIL LIBERTIES<br>    UNION OF WASHINGTON<br>P.O. BOX 2728<br>Seattle, Washington 98111-2728<br>Tel: (206) 624-2184<br>baker@aclu-wa.org |
| Michelle Fraling (*pro hac vice*)<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>915 15th Street NW, 6th Floor<br>Washington DC, 20005<br>Tel: (917) 710-3245<br>michelle.fraling@aclu.org | Kevin M. Fee (*pro hac vice*)<br>Allison Siebeneck (*pro hac vice*)<br>ROGER BALDWIN FOUNDATION OF<br>    ACLU, INC.<br>150 N. Michigan Ave, Suite 600<br>Chicago, IL 60601<br>Tel: (312) 201-9740<br>kfee@aclu-il.org |
| Laboni A. Hoq (*pro hac vice*)<br>HOQ LAW APC<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>    (Cooperating Attorney)<br>P.O. Box 753<br>South Pasadena, CA 91030<br>Tel: (213) 977-9004<br>laboni@hoqlaw.com | Lindsay Nako (*pro hac vice*)<br>Lori Rifkin (*pro hac vice*)<br>Fawn Rajbhandari-Korr (*pro hac vice*)<br>Meredith Dixon (*pro hac vice*)<br>Megan Flynn (*pro hac vice*)<br>IMPACT FUND<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704<br>Tel: (510) 845-3473<br>lrifkin@impactfund.org |
| S. Starling Marshall (*pro hac vice*)<br>CROWELL & MORING LLP<br>Two Manhattan West<br>375 Ninth Avenue<br>New York, NY 10001<br>Tel: (212)223-4000<br>SMarshall@crowell.com<br>Skye Mathieson (*pro hac vice*) | Edward T. Waters (*pro hac vice*)<br>FELDESMAN LEIFER LLP<br>1129 20th Street NW, 4th Floor<br>Washington, DC 20036<br>Tel: (202) 466-8960<br>ewaters@feldesman.com |

Lucy Hendrix (*pro hac vice* forthcoming)
Emily P. Golchini (*pro hac vice*)
CROWELL & MORING LLP
1001 Pennsylvania Ave NW
Washington, DC 20004
Tel: (202)624-2500
SMatheison@crowell.com

PLAINTIFFS' MOTION FOR
TEMPORARY RESTRAINING ORDER - 34
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON

WASHINGTON STATE ASSOCIATION OF
HEAD START AND EARLY CHILDHOOD
ASSISTANCE AND EDUCATION
PROGRAM, et al.

　　　　　　　　　　Plaintiff(s),

　　v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services, et al.

　　　　　　　　　　Defendant(s).

CASE NO. 2:25-cv-00781-RSM

CERTIFICATE OF SERVICE

　　　　I hereby certify that on ___July 21, 2025___, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

　　　　KRISTIN B. JOHNSON, WSBA #28189
　　　　Assistant United States Attorney
　　　　United States Attorney's Office
　　　　700 Stewart Street, Suite 5220
　　　　Seattle, Washington 98101-1271
　　　　Telephone No. (206) 553-7970
　　　　Fax No. (206) 553-4073
　　　　Email: kristin.b.johnson@usdoj.gov

And I hereby certify that I have mailed by United States Postal Service the document to the following non CM/ECF participants: N/A

Dated: July 21, 2025　　　　　　　　　/s/ La Rond Baker
　　　　　　　　　　　　　　　　　　　_____

　　　　　　　　　　　　　　　　　　La Rond Baker
　　　　　　　　　　　　　　　　　　American Civil Liberties Union of
　　　　　　　　　　　　　　　　　　Washington P.O. Box 2728
　　　　　　　　　　　　　　　　　　Seattle, Washington 98111-2728
　　　　　　　　　　　　　　　　　　Tel: (206) 624-2184
　　　　　　　　　　　　　　　　　　baker@aclu-wa.org