1
2
3
4
5
6
7                                                      The Honorable Ricardo S. Martinez
8
**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF WASHINGTON**
9                                   **AT SEATTLE**

10   WASHINGTON STATE ASSOCIATION OF HEAD
     START AND EARLY CHILDHOOD ASSISTANCE AND
11   EDUCATION PROGRAM, ILLINOIS HEAD START
     ASSOCIATION, PENNSYLVANIA HEAD START
12   ASSOCIATION, WISCONSIN HEAD START            Case No. 2:25-cv-00781-RSM
     ASSOCIATION, FAMILY FORWARD OREGON, and
13   PARENT VOICES OAKLAND,
14                                                 **DECLARATION OF**
                                                   **JENNIE (MAUER)**
15                           *Plaintiffs,*         **MAUNNAMALAI IN**
                                                   **SUPPORT OF PLAINTIFFS'**
16                                                 **MOTION FOR**
                                                   **TEMPORARY**
17   v.                                            **RESTRAINING ORDER/TO**
                                                   **POSTPONE EFFECTIVE**
18                                                 **DATE OF AGENCY**
                                                   **ACTION**
19
20   ROBERT F. KENNEDY, JR., in his official capacity as
     Secretary of Health and Human Services; U.S.
21   DEPARTMENT OF HEALTH AND HUMAN SERVICES;      NOTE ON MOTION
     ANDREW GRADISON, in his official capacity as Acting   CALENDAR: JULY 21, 2025
22   Assistant Secretary of the Administration for Children and
     Families; ADMINISTRATION FOR CHILDREN AND
23   FAMILIES; OFFICE OF HEAD START; and TALA
     HOOBAN, in her official capacity as Acting Director of
24   the Office of Head Start,
25
26                           *Defendants.*
27

JENNIE (MAUER) MAUNNAMALAI DECLARATION - 1        A.C.L.U. OF WASHINGTON
2:25-CV-00781-RSM                                 PO BOX 2728 SEATTLE, WA 98111-2728
                                                  (206) 624-2184

I, Jennie (Mauer) Maunnamalai, hereby attest as follows:

## I.     Background

1.     I am over eighteen years old, and I have personal knowledge of the facts set forth below. If called to testify about them, I could and would be able to do so competently. [1]

2.     I am the Executive Director of the Wisconsin Head Start Association (Wisconsin HSA). I have served as Executive Director of Wisconsin HSA since 2020. Prior to serving as Wisconsin HSA's Executive Director, for five years I was the Head Start Collaboration Director at the Wisconsin Department of Public Instruction, where I served as a key connection between grantees and state initiatives and services that also support Head Start families. I hold a Master's degree in Public Affairs from the La Follette School of Public Affairs at the University of Wisconsin-Madison and a Bachelor's degree in Legal Studies and French.

3.     Wisconsin HSA is a 501(c)(3) non-profit, non-partisan membership association of Wisconsin Head Start and Early Head Start grantees and delegate agencies that has been in existence for the last fifty years. Wisconsin HSA is made up of 39 grantee members who operate Head Start programs that provide early childhood education and support to families throughout Wisconsin. It serves all of Wisconsin's 72 counties, interacts with 424 school districts serving the state's children, and has approximately 280 center locations.

4.     Wisconsin HSA's mission is to support and strengthen Head Start and Early Head Start programs for the benefit of children, families, and communities through advocacy, professional development, and strategic alliances. Its membership is open to each federally recognized Wisconsin Head Start and Early Head Start grantee and delegate agency. Members pay annual dues determined by the Wisconsin HSA Board of Directors. Members have access to a network of support, including training events and workforce support, leadership development, representation on statewide collaborative projects, management of state

---

[1] I also incorporate into this declaration the information contained in the declaration I submitted in support of Plaintiffs' Motion for a Preliminary Injunction, filed on May 26, 2025. ECF No. 39.

supplemental Head Start grants, and advocacy work to assure the availability of comprehensive, top-quality services to families facing the struggles that living in poverty presents.

5.      Wisconsin HSA's purpose is to gather and disseminate information about Head Start for its members, provide assistance to state, regional, and national Head Start agencies and organizations, and to advocate for and carry out activities that support educational goals for Wisconsin's children and their families.

6.      Wisconsin HSA's Board is made up of directors, staff, and parents of Head Start, Early Head Start, Migrant and Seasonal Head Start, and Native American Early Head Start and Head Start programs in Wisconsin. Wisconsin HSA's Board maintains a comprehensive governance structure that ensures representation from all parts of its membership to ensure that Wisconsin HSA remains aligned with both the mission and priorities of its members and their broader communities, and responsive to their needs. The Board is both a fiduciary and a working Board, providing oversight on budget, collaborating with Association staff, and offering insight and oversight on advocacy and outreach efforts.

7.      In my role as Executive Director of Wisconsin HSA, I aim to promote the goals of the Association's members while maintaining fiduciary responsibilities to the Board. I am responsible for overseeing operations and organizational management, including accounting and fiscal management; organizing professional development and networking events; conducting outreach and engagement activities with collaborative partners; directing advocacy and policy work at the local, state, and federal levels; and managing the Association's contracts and grants.

8.      Consistent with Wisconsin HSA's mission, as well as the requirements of the Head Start Act and its implementing regulations, Wisconsin HSA is committed to serving and being responsive to the changing and developing needs of Wisconsin's children and families, including based on the needs identified in our members' annual Head Start mandated community assessments. Wisconsin HSA does this by offering a variety of services to

members, including regular opportunities for Head Start management level staff to participate in training and networking in several key services areas; an annual training conference dedicated to innovative practical initiatives, programs, and applied research; training and technical assistance to develop content for the broader early childhood and care community in Wisconsin, including topics such as Practice Based Coaching, Class Observation Training, and a New Director Series; assistance with grant-related troubleshooting; and liaising and advocating with the Office of Head Start (OHS) on behalf of members.

9.    Wisconsin HSA is in constant contact with its members in the following ways: hosting a weekly Zoom call for members, with guest speakers (e.g., representatives from the Regional Office) and opportunity for questions, feedback, and networking; regularly sending emails multiple times per week with updates on funding and policy issues; maintaining an active Facebook page for members to communicate with each other and Association staff; hosting an annual conference with professional development and networking opportunities; and providing regular virtual trainings on a variety of topics.

10.    Wisconsin HSA is funded by membership dues, event revenue, event registration, and a small number of philanthropic grants. It has a full-time staff of two personnel, including myself and an administrative assistant.

**II.    Composition of Wisconsin Head Start Association Members**

11.    Wisconsin HSA's members include Head Start grantees that operate several different kinds of early childhood education programs, including Head Start, Early Head Start, Migrant and Seasonal Head Start, and Native American Early Head Start and Head Start programs in Wisconsin. Six of our members operate programs in local school districts, and three are city or state government agencies.

12.    Through these programs, Wisconsin HSA's members provide comprehensive services for over 15,000 of Wisconsin's youngest and most vulnerable citizens, as well as their families. Wisconsin HSA members operate as independent non-profit organizations, within

1  State school districts, and as part of community action agencies, alongside American Indian
2  Tribes, and in partnership organizations serving migrant farmworker communities.

3          13.    In 2024, Wisconsin HSA members received approximately $168 million in
4  grants from the Administration of Children and Families, Office of Head Start within the U.S.
5  Department of Health and Human Services to operate their Head Start programs, including to
6  provide services to children and families and for continuing education, training and
7  professional development like that provided by Wisconsin HSA. None of Wisconsin HSA
8  members' grant funds go directly to any particular children or families.

9          14.    Of the approximately 15,000 children served by Wisconsin HSA members, over
10  70 percent are children of color, including significant numbers of Latine, African American,
11  American Indian, and refugee children. Wisconsin HSA members also serve over 1,797
12  children with disabilities, over 1,123 unhoused children, 512 foster children, and over 338
13  pregnant women.

14          15.    We have one Wisconsin HSA member who operates a Migrant and Seasonal
15  Head Start (MSHS) program, serving over 300 children and their families. Many of these
16  families work in and around Wisconsin's dairy farms and other agricultural facilities, with a
17  modified program calendar accommodating the unique needs of agricultural work. MSHS also
18  provides continuity of services for children and families if and when they relocate between
19  states over the course of an agricultural season.

20          16.    Wisconsin HSA also has nine members who operate Tribal Head Start programs
21  that serve over 1,000 children and their families. These programs serve descendants of the 11
22  federally recognized Indian Tribes in Wisconsin. Consistent with the Head Start Performance
23  Standards, these members expend considerable resources on programs focused on cultural and
24  language preservation, including language immersion classes.

25
26
27

**III.    The Importance of Head Start for Wisconsin Communities**

17.    Over 70 percent of Head Start families have at least one parent working full-time, in job training, or pursuing their education, and they rely on Head Start to provide quality childcare as they seek to improve their financial stability. Head Start programs are particularly important in Wisconsin's rural and agricultural areas, including Western Wisconsin where the dairy farms are staffed by large numbers of Latino migrant and immigrant populations who are predominantly Spanish-speaking, and Northern Wisconsin which draws immigrant families for seasonal employment in agriculture and tourism. Head Start programs in these areas are often the only childcare facilities available to these populations and are essential to allowing parents – particularly mothers – to work reliable hours to support their families.

18.    In many communities, Head Start may be the only (or only no-cost) early childcare option available to poor families. While the State offers some Supplemental Head Start grants, they could not replace the existing, federally funded Head Start program, and the supplemental grants only serve to expand the number of children that can be enrolled at these programs, or to improve the quality of services offered. The total amount of state funding available is a small fraction of federal Head Start funding for these programs, and many programs use the state supplement to support salaries and other program costs rather than to fund additional slots.

19.    In addition to serving children and families, Head Start is a significant part of Wisconsin's thriving workforce. Some Head Start parents participate in the program as volunteers at first, then later find employment in Head Start classrooms. Head Start grants support a workforce in Wisconsin of 4,424 employees, 419 contract staff, and 9,537 volunteers, of whom 7,757 are Head Start parents.

20.    Head Start programs also support local economies by purchasing food, classroom materials, and other goods from local businesses.

21.    Wisconsin HSA members serve a significant number of migrant, immigrant and refugee children and families, and provide a variety of services to support their needs. The

most prevalent need is for bilingual Spanish-speaking teachers and staff, and those with understanding of tribal cultures, customs and languages of the 11 federally recognized American Indian nations and tribal communities in the state. As such, and consistent with Head Start Performance Standards, the services they provide these communities include not only dual language curriculum for children, but they also spend considerable resources to provide dual language resources to families. Those resources include interpretation services during parent and family conferences, home visits, and parent engagement events; translated books and literacy take-home materials in multiple languages to strengthen the connection between home and school, and to support early language development in both English and the child's home language.

22.    Wisconsin HSA members also support their diverse families through community engagement, resources and referral. In 2024, Wisconsin HSA members served over 14,000 families, including families with two parents, single fathers, pregnant women, foster parents, and grandparents. They offer services including English as a second language training; education on fetal development, prenatal/postpartum healthcare, and benefits of breastfeeding; help enrolling in education or job training programs; assistance to families with incarcerated individuals; parenting curriculum; and asset building services. In 2024, approximately 4,500 Head Start families received emergency or crisis intervention services, such as meeting immediate needs for food, clothing, or shelter. The same year, approximately 1,400 families also received housing assistance such as subsidies, utilities and repairs.

**IV.    Immigration Status has Never Been Required for Head Start Eligibility**

23.    As far as I know, the Head Start Act has never included immigration status as one of the eligibility criteria, and Wisconsin HSA members do not screen applicants' immigration status for purposes of enrollment or any other reason.  Wisconsin HSA has come to rely on this practice, and requiring them to change it would be incredibly burdensome, and diminish enrollment for the reasons discussed here.

JENNIE (MAUER) MAUNNAMALAI DECLARATION- 7
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

24.    Our members do not have the resources to verify immigration status for families. They are already burdened with various data collection obligations, including personal information of prospective enrollees and their families, for example: dates of birth, race and ethnicity, primary and secondary language, parent and guardian employment and education information, 12 months of income documentation, housing status, household member information, welfare benefits they may be receiving, health and medical history, etc..

25.    The burden of collecting information for families experiencing homelessness is even greater.  It is my understanding that federal law requires schools to remove barriers to enrollment, including dispensing with collection of documentation families do not readily have. And for children who are in foster care, Head Start providers often have no way of verifying immigration status based on the information available, given the lack of contact with their biological parents. Nevertheless, these children are wards of the state who are court-ordered to enroll in an early childhood program.

26.    If Wisconsin HSA members were required to track and verify immigration status, the burden on the organization would be substantial and multifaceted, involving significant changes to staff, operations, data systems, and compliance protocols. Staff would need training to understand and accurately interpret a wide range of immigration documentation, which is highly complex and typically outside the scope of their expertise.  The intake and enrollment process would become more time-consuming, potentially delaying services to children and families.  Agencies would likely need to hire additional administrative or compliance personnel, including legal counsel, to ensure accurate classification and avoid unintentional violation of federal civil rights laws. From an IT standpoint, current systems would require upgrades or modifications to securely collect, verify, and store sensitive immigration data. These systems would also need to be compliant with federal data privacy standards, and capable of producing audit trails for federal oversight, which would involve additional costs and technical capacity.

**V.    The Immigrant Exclusion Directive is Vague and Ambiguous**

27.    I am aware that on July 14, 2025, the Department of Health and Human Services published a Notice of Interpretation (the "Immigrant Exclusion Directive") of the term "federal public benefit" as used in the Personal Responsibility and Work Opportunity Reconciliation Act ("PWRORA"). I am unaware of any guidance I can provide to Wisconsin HSA members to help them comply with the terms of the Immigrant Exclusion Directive.

28.    For example, I understand that under PRWORA, "nonprofit charitable organizations" do not have to verify the immigration status of applicants. However, other provisions of the Immigrant Exclusion Directive appear to conflict with this understanding. The Directive appears to emphasize that because PRWORA does not prohibit nonprofits from verifying immigration status, and appears to say agencies should do so in any event, *e.g.* warn that "all entities . . . should pay heed to the clear expression of national policy described above" - namely that certain immigrants should not have access to resources like Head Start. These confusing and ambiguous statements leave Wisconsin HSA nonprofits to decide at their potential peril whether to rely on the statutory exemption or face potential False Claims Act liability or other penalties if they do not voluntarily comply with the Directive.

29.    Another ambiguity with the Immigrant Exclusion Directive is whether eligibility is based on the immigration status of the child, the parent or other family member, or both. This is a significant concern because, based on my understanding of the makeup of immigrant communities in the state, many are comprised of what is known as "mixed status" families, or those in which one or more family members may be undocumented or hold a temporary status, but the others are not. The information Wisconsin HSA members must already collect includes information that relates to the parents or household – e.g., income verification – to determine the eligibility of the child. It is unclear whether this information should still be collected, if simply having one undocumented income earner would itself be disqualifying.

30.     The timing of when immigration status screening must occur is also left ambiguous in the Immigrant Exclusion Directive.  It says that the screening requirement is effective immediately, but it does not make clear if, when, and how often programs are required to start verifying the immigration status of children who are already enrolled.  Currently, the Head Start Act only requires screening for eligibility once at the beginning of each program year, with that determination remaining valid for the succeeding program year.  It is unclear whether the Directive requires additional screening for already enrolled children, which could pose serious challenges in advance of the upcoming school year.

**VI.     Wisconsin HSA Members Will be Harmed by the Immigrant Exclusion Directive**

31.     Wisconsin HSA members have reported declines in attendance among both Spanish-speaking and immigrant families, which they attribute to this Administration's Executive Orders directing agencies like HHS to deny "illegal aliens" access to federal resources, who fear immigration consequences if they continue participating in Head Start programs. Staff at Wisconsin HSA members have reported increased hesitation among some families about enrolling their children, attending parent meetings, or providing personal information. Some families have withdrawn or chosen not to re-enroll, citing concerns about government scrutiny or fear that their information could be used against them. Wisconsin HSA members anticipate that the Immigrant Exclusion Directive will intensify this trend, particularly now as they begin enrolling for the new school year.

32.     The Directive also appears to be in conflict with the Head Start Act's mandate to prioritize enrollment of limited English proficient students, many of whom are likely the very students slated for exclusion by the Directive. Along the same lines, requiring program staff to inquire about and reject applicants based on their immigrant status will scare off even those participants who remain eligible. Families with eligible children will hesitate to enroll out of fear that participation will have consequences for the parents' or other family members' immigration status – for example, putting them at risk of being declared a "public charge" and impacting their ability to apply for permanent residency or citizenship.

33.    HHS' prior practice of not requiring agencies to verify the immigration status of enrollees had the important benefit of allowing families to access these crucial early childhood services without fear of unintended consequences. It also allowed the program staff to maintain trusting relationships with the families and communities they serve, which has been a key driver of recruiting and retaining enrollees, and working with families to ensure high quality and needs-based educational services.

34.    Because Wisconsin HSA members have never verified immigration status, it is difficult to say with precision how many children and families will be impacted by the Immigrant Exclusion Directive. However, based on their understanding of the demographics of their locales, some Wisconsin HSA members anticipate their enrollment could decline by 30% or more – comprised of both undocumented families and those who may still be eligible but decide not to participate in Head Start for fear of negative consequences. One Wisconsin HSA member has already experienced a drop in attendance due to fear of immigration enforcement raids. This member runs a program that is designed to be neighborhood based and offers bus transportation. Because immigrant families often live in the same communities, this program anticipates that several of their sites would lose much of their enrollment. This creates a logistical problem, as they cannot easily transport children from other areas, while sites in other neighborhoods are already at maximum capacity and cannot absorb additional children.

35.    Another Wisconsin HSA member estimates that at two of their sites, about 80% of the children belong to immigrant families, many of which may have members who are undocumented. They have observed increased stress and heightened levels of anxiety among their families in recent months, including families who were afraid to send their kids to Head Start. One of these program sites is located inside a local school, and requiring the program to verify immigration status – which is contrary to the school district's policy and practice – will impact their ability to collaborate effectively. Another Wisconsin HSA member that runs a school district-based program has had multiple families ask how the school will protect their children from ICE, and whether the school would release the children to ICE during a raid.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

This program has spent countless hours attempting to reassure parents that their children are safe, to preserve the trust and community relationships necessary to continue their work.

36. The Immigrant Exclusion Directive's negative impact on enrollment is particularly concerning given the Office of Head Start's recent announcement that it will be enforcing its "full enrollment initiative." The two together will make it difficult for Wisconsin HSA members to comply with the terms of their grants. If programs have their funds "recaptured" due to under-enrollment, they risk being forced to lay off staff, which will diminish the overall quality of services for all children the agency serves, particularly where the departing staff brought a needed linguistic or cultural competency. Under-enrollment by even just a few students could lead to the loss of an entire teaching position.

37. Moreover, Wisconsin HSA members have expressed concern that the Immigrant Exclusion Directive will require them to divert resources from their core mission of providing quality early childhood education to the most needy children, as they will be forced to divert time on mission-related work to further immigration screening efforts. Head Start program staff are not immigration officers; they are educators, family advocates, and child development specialists who work every day to ensure children are safe, healthy, and ready to learn. Being forced to engage in immigration screening has also raised valid concerns among Wisconsin HSA members that they may lose staff who would not be willing to compromise their relationships with families.

## VII. The Immigrant Exclusion Directive Will Harm Children and Families

38. As discussed above, Wisconsin HSA members estimate that enrollment may decline by 30% or more due to this new policy. Taking into account the report that HHS estimates that about 16% of currently enrolled children will lose access to Head Start as a result of the Directive, this translates to at least 2,400 children and their families losing high quality early childhood education statewide.

39. In addition to loss of educational services, these immigrant children and families will also lose out on Head Start's important wrap around services, like developmental

screenings, physical and mental health services, nutritious meals, and supports for children with disabilities, such as speech, occupational, and physical therapy.

40.     Without a safe place to take their children during the workday, immigrant parents and families will be forced to miss work or school, or risk placing their children in unsafe environments so they can earn a livelihood for them.  They will also be deprived of other Head Start resources directed at parents and caregivers as added support for the family unit, such as housing assistance, employment referrals, and parenting classes.

41.     The absence of guidance and clarity about how the Directive will be implemented is completely untenable for immigrant families. For example, suppose a Head Start program does not screen for immigration status, or it does and incorrectly determines that a child is eligible.  If the parents enroll their child, but later learn they don't qualify for services, will they still face immigration or other penalties?

42.     Moreover, the Directive will also likely have the effect of scaring away even families that are "qualified aliens," because they fear participating in Head Start programs could later work against them, i.e. if they are deemed a "public charge," which could jeopardize their chances of being able to adjust to longer term immigration status.

## VIII.   The Immigrant Exclusion Directive Will Harm the Wisconsin HSA

43.     The Directive will force the Wisconsin HSA to divert its focus away from its mission of providing continuing education, training, technical assistance, and advocacy related to core issues like the quality of curriculum and instruction on behalf of its members.

44.     Wisconsin HSA's small staff and limited resources will be – and already have been – burdened by responding to the Immigrant Exclusion Directive, including attempting to address the understandable confusion and panic from members and the families they serve.

45.     Wisconsin HSA will have to divert staff time and resources away from its usual core activities to instead advise its members on how to manage compliance with the new policy, including counseling their families and communities on what is now expected of them and what they must do to comply.

46.     This will mean Wisconsin HSA staff have less time and fewer resources to work on other critical issues, such as ongoing state-level advocacy, developing new projects and professional development opportunities, and pursuing funding opportunities.

47.     Based on the reaction and information shared from Wisconsin HSA members so far, I anticipate that the Immigrant Exclusion Directive will also likely cause Wisconsin HSA to lose members, because the decline in enrollment may cause them to lose their grants, or because they are forced to reevaluate their budgets and eliminate Wisconsin HSA membership dues going forward.

48.     For these reasons, there is a real possibility that Wisconsin HSA would have to reduce staff and drastically curtail the services it offers its members, or even cease operation, as the majority of its funding is paid for through dues from its members.

**IX.     Benefit of Enjoining the Immigrant Exclusion Directive**

49.     Enjoining the Immigrant Exclusion Directive would protect Wisconsin HSA and its members from expending significant time, money, and effort to address the confusion, panic, and misinformation it will cause to its immigrant families if the policy goes into effect.

50.     A Temporary Restraining Order would allow Wisconsin HSA and its members to continue to serve the significant number of immigrant children and families in their respective locales, which they understand to be part of their mandate under the Head Start Act. They also will not need to experience loss of enrollment of these immigrant communities and thereby grant funds, or run afoul of the Directive and triggering False Claim Act liability.

51.     A Temporary Restraining Order would protect children and families from the harms associated with the vague and ambiguous nature of the policy, which will likely result in many immigrant children and families being denied educational and wrap around services, even if they are "qualified" for them, because of misinformation about or misinterpretation of their particular immigration status, and whether or not they remain eligible for Head Start.

52.     A Temporary Restraining Order will also counter the significant fear immigrant communities in Wisconsin are facing in response to the Directive, which is likely going to

result in potentially "qualified" families disenrolling their children out of an abundance of caution so as not to face negative immigration consequences of continuing participation in Head Start.

Pursuant to 28 U.S.C. § 1786, I declare under penalty of perjury that the foregoing is true and correct.

Dated: July 21, 2025

_____

Jennie (Mauer) Maunnamalai

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184