1
2
3
4
5
6
7

The Honorable Ricardo S. Martinez

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WASHINGTON
AT SEATTLE**

WASHINGTON STATE ASSOCIATION OF HEAD
START AND EARLY CHILDHOOD ASSISTANCE AND
EDUCATION PROGRAM, ILLINOIS HEAD START
ASSOCIATION, PENNSYLVANIA HEAD START
ASSOCIATION, WISCONSIN HEAD START
ASSOCIATION, FAMILY FORWARD OREGON, and
PARENT VOICES OAKLAND,

Case No. 2:25-cv-00781-RSM

*Plaintiffs,*

**DECLARATION OF LAURI
MORRISON-FRICHTL IN
SUPPORT OF PLAINTIFFS'
MOTION FOR
TEMPORARY
RESTRAINING ORDER/TO
POSTPONE EFFECTIVE
DATE OF AGENCY
ACTION**

v.

ROBERT F. KENNEDY, JR., in his official capacity as
Secretary of Health and Human Services; U.S.
DEPARTMENT OF HEALTH AND HUMAN SERVICES;
ANDREW GRADISON, in his official capacity as Acting
Assistant Secretary of the Administration for Children and
Families; ADMINISTRATION FOR CHILDREN AND
FAMILIES; OFFICE OF HEAD START; and TALA
HOOBAN, in her official capacity as Acting Director of
the Office of Head Start,

NOTE ON MOTION
CALENDAR: JULY 21, 2025

*Defendants.*

LAURI MORRISON-FRICHTL DECLARATION - 1
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

I, Lauri Morrison-Frichtl, hereby attest as follows:

**I.    BACKGROUND**

1.    I am over eighteen years old, of sound mind, and fully competent to make this declaration. I have personal knowledge of the factual assertions set forth below.[1]

2.    I have served as the Executive Director of the Illinois Head Start Association (Illinois HSA) since 2006. As Executive Director, I am responsible for directing all operations of the Association, including planning and organization, communication, professional and leadership development, advocacy and partnership building, and financial management of the organization. Prior to joining Illinois HSA, I worked as a Training and Technical Assistance specialist at The Ohio State University and also served as Director of a Head Start program in Illinois. I earned a Bachelor's degree in Speech Pathology from Ball State University in 1986 and a Master's degree in Education from Western Michigan University in 1988.

3.    Illinois HSA is a 501(c)(3) non-profit, non-partisan association of federally recognized Illinois Head Start and Early Head Start grantee and delegate agencies in operation since 1978. Illinois HSA acts as the voice of Illinois Head Start and Early Head Start programs, staff, and parents, serving over 28,800 children and their families in all 102 counties in Illinois.

4.    Illinois HSA's mission is to provide guidance and support to Illinois Head Start and Early Head Start programs to ensure their ongoing viability and vitality to operate high impact, community driven services for Illinois' most vulnerable children and families. Illinois HSA advocates for its members at the federal, state, and local levels, offers professional development and training resources for Head Start agencies and their staff, and provides opportunities for parents and families to connect, share, and grow. Recently, this has included building awareness and leading advocacy efforts regarding Head Start and Early Head Start programs, leading collaboration and partnerships in the early childhood education space in

---

[1] I also incorporate into this declaration the information contained in the declaration I submitted in support of Plaintiffs' Motion for a Preliminary Injunction, filed on May 16, 2025.  ECF No. 41.

LAURI MORRISON-FRICHTL DECLARATION - 2
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1    Illinois, sponsoring professional and leadership development opportunities, and developing

2    supportive resources for our members. Illinois HSA maintains regular contact with its

3    members, including issuing a weekly newsletter; hosting a weekly "huddle" for members to

4    share information, raise questions, and provide feedback; leading monthly meetings with Head

5    Start program directors; and maintaining social media accounts to keep members informed and

6    offer informal networking opportunities.

7        5.    Illinois HSA's funding is comprised of membership dues, fees generated from

8    professional development opportunities offered to members, and contracts and grants from

9    outside entities. Illinois HSA has a staff of two full-time employees (myself and a Director of

10   Learning) and two part-time employees (a Director of Operations and a Director of Member

11   Engagement and Outreach).

12       6.    Illinois HSA is governed by a Board of Directors made up of the Directors of

13   Illinois Head Start agencies and other stakeholders in the early childhood education field,

14   including Head Start staff, parents, and community partners. The Board oversees the staff and

15   functions of the Illinois HSA, including setting the strategic direction and providing oversight

16   for the Association.

17       7.    Over the course of my tenure with the Illinois HSA, the focus and priorities of

18   the Association have changed over time to meet the needs of our members – for example,

19   providing additional supports to members serving immigrant and refugee populations; offering

20   resources for children with disabilities in response to increased diagnoses of autism and

21   developmental disabilities; developing supports for children and families involved with the

22   child welfare system; and adapting to changes during and after the COVID-19 pandemic to

23   support the behavioral and physical needs of children and families. Illinois HSA conducts a

24   comprehensive needs assessment twice each year to ensure that it is offering resources and

25   services targeted at the current needs of its members and the communities they serve.

26

27

## II.    MEMBERSHIP OF THE ILLINOIS HEAD START ASSOCIATION

8.    The membership of Illinois HSA includes 51 federally recognized Head Start agencies and 84 delegate agencies operating 513 program sites statewide. Four of the 51 agencies are operated by city or state government entities; three are housed within public universities; and five are run by local school districts.

9.    Illinois HSA members serve over 28,800 low-income children and their families in all 102 counties in Illinois. Of the total Illinois Head Start population, 14.3 percent are children with disabilities; 3.8 percent are children in foster care; and 7.9 percent are children experiencing homelessness. Nearly two-thirds are children of color, with 41 percent identifying as Black and 36 percent identifying as Hispanic. They live in communities ranging from Chicago, the third largest city in the country, to rural farming areas. To meet these widely and richly diverse needs, Illinois HSA members offer an equally wide array of services, including initiatives focusing on school-readiness for Black boys (which has recently been discontinued); English language learning and job placement resources for immigrant parents; on-site health clinics and food pantries; and regular staff training to reduce bias and improve equitable access to all Head Start services.

10.    Illinois HSA also has members who operate Migrant and Seasonal Head Start programs, who serve 360 children in Illinois via seven delegate agencies strategically located across the State. These programs adapt their calendar to the summer months to accommodate the unique schedule and needs of agricultural workers in Illinois's seed corn fields, before the children and their families traditionally move on to other locations.

11.    In 2024, Illinois HSA members received approximately $479 million in federal Head Start grants. Members use these funds to tailor programs to meet the needs of eligible children and families, as well as for continuing education, training, and professional development like that provided by Illinois HSA. The grant funds are not distributed directly to any individual child or family.

### III.  SERVICES PROVIDED BY ILLINOIS HEAD START ASSOCIATION MEMBERS

12.    I understand that Head Start agencies must recruit participants from all parts of their communities, including traditionally underserved populations, and they must also include families and community members in the development and implementation of local Head Start programs. This begins with the Community Assessment, described in the Head Start Performance Standards as the "community-wide strategic planning and needs assessment." It is an essential first step in designing a program that meets the needs of local children and families. Data from the Community Assessment is used to develop program-wide goals for the provision of responsive, high-quality services.

13.    Members of Illinois HSA serve significant populations of immigrant, refugee, and other limited English proficient families throughout the state; for example, we know based on the information gathered through their community assessments that approximately 33 percent of children are dual language learners. Consistent with the Head Start Performance Standards, to best serve these populations HSA members prioritize dual language services in the classroom; provide written recruitment materials in multiple languages to ensure all eligible families are aware of the services available; offer simultaneous translation services during parent meetings to support engagement; and provide referral resources for immigration matters.

14.    Illinois HSA members collaborate closely with families to understand their unique needs, values, and goals. They solicit parent input in program planning, policy-making, and continuous improvement efforts, ensuring that services are aligned with the real needs of the community. They host multicultural events and invite families to share their customs, languages, and experiences with the children and staff, and they provide books, literacy materials, and family communications in multiple languages reflective of enrolled families, including simultaneous translation services at parent meetings to help break down barriers to full family engagement for limited English speakers.

## IV.    IMMIGRATION STATUS HAS NEVER BEEN INCLUDED IN HEAD START ELIGIBILITY CRITERIA

15.    I understand that since the Head Start Act was originally enacted, immigration status has never been included among the eligibility criteria, and Illinois HSA members do not screen applicants for eligibility based on immigration status.  Illinois HSA members have come to rely on this practice, and requiring them to do so now would be incredibly burdensome, and would likely discourage enrollment for the reasons discussed here.

16.    Our members do not have infrastructure in place to verify immigration status for individual applicants and families.  Head Start agencies already collect a substantial amount of personal information regarding the children and families participating in their programs including, for example: dates of birth, race and ethnicity, primary and secondary language, parent and guardian employment and education information, 12 months of income documentation, housing status, household member information, SNAP/TANF/SSI status, health and medical history, and more.

17.    For families experiencing homelessness, however, the McKinney-Vento Act instructs states and school districts to remove barriers to identifying and enrolling eligible children, which means that when these families are unable to provide the typical documentation, they are not required to do so.

18.    Requiring Head Start agencies to verify immigration status, on top of the already burdensome application process, would require significant financial, personnel, and time from Illinois HSA members. For example, several members anticipate they would need to hire or reassign additional administrative staff to manage the increased workload in order to meet application and enrollment deadlines for the 2025-2026 school year. Staff will also require training about the types and definitions of various immigration statuses, which statuses qualify for eligibility, and the types of documentation sufficient to prove statuses. Agencies may also need additional recordkeeping or IT resources to verify the validity of the documentation submitted and store this sensitive information securely. Moreover, because

families themselves may not know how to accurately articulate their immigration status, this would compound the burden on our members.

## IV.    THE IMMIGRANT EXCLUSION DIRECTIVE IS VAGUE AND AMBIGUOUS, AND ILLINOIS HSA MEMBERS ARE UNCERTAIN HOW TO COMPLY

19.    I am aware that on July 14, 2025, the Department of Health and Human Services published a Notice of Interpretation (the "Immigrant Exclusion Directive") of the term "federal public benefit" as used in the Personal Responsibility and Work Opportunity Reconciliation Act ("PWRORA"). The Immigrant Exclusion Directive provides no guidance to Illinois HSA members on how to comply with its terms under existing law.

20.    For example, I understand that under PRWORA, "nonprofit charitable organizations" are exempt from any requirement to verify the immigration status of applicants. But the Immigrant Exclusion Directive highlights that nothing in the statute prohibits nonprofits from conducting verification, and it warns that "all entities . . . should pay heed to the clear expression of national policy described above." Faced with this thinly veiled threat, Illinois HSA nonprofits are caught between relying on the statutory exemption or facing the uncertainty of potential False Claims Act liability or other penalties if they do not voluntarily comply with this "policy."

21.    The Immigrant Exclusion Directive does not specify whether eligibility will be determined based on the immigration status of the child, the parent or other family member, or both. For example, based on my general understanding of the composition of the immigrant population in the state, Illinois HSA members are likely serving many U.S. citizen children whose parents are undocumented or present in the United States with temporary protected status or student or other temporary visas. And programs traditionally collect information related to the parents or household – e.g., income verification – to determine the eligibility of the child. Further, Early Head Start programs also provide services to pregnant women. Are those programs expected to consider the immigration status of the pregnant mother or the

unborn child? The policy does not address this key issue of whose immigration status must be determined to qualify for enrollment.

22.    The Immigrant Exclusion Directive also does not specify whether programs are expected to verify the immigration status of children who are already enrolled – and if so, when and how often. Under the Head Start Act, once a currently enrolled child has been determined to meet the eligibility criteria, that child is considered to meet the criteria through the end of the succeeding program year. The Immigrant Exclusion Directive states that it is effective immediately, but it does not indicate whether programs are expected to re-evaluate already enrolled children to screen for immigration status immediately, or on some other timeframe.

## V.    HARM TO ILLINOIS HSA MEMBERS FROM IMMIGRANT EXCLUSION DIRECTIVE

23.    Since this Administration issued its Executive Orders directing agencies, including HHS, to stop providing services to "illegal aliens," Illinois HSA members have seen declines in attendance and enrollment among immigrant families – regardless of their legal status – due to concerns of immigration consequences. They anticipate that the Immigrant Exclusion Directive will exacerbate this trend, particularly now as Illinois HSA members are currently "knee deep" with enrolling children and getting ready to start a new school year. Most of the programs have completed their recruitment efforts and are now working with families to get the child's developmental screening completed, along with all the health screenings (lead, TB, immunizations, etc.)

24.    I understand that the Head Start Act instructs agencies to prioritize enrollment of limited English proficient students, many of whom may no longer be eligible under the new policy. Further, requiring Head Start agencies to identify and "weed out" applicants based on immigration status would create a chilling effect on participants who remain eligible. This policy would likely discourage enrollment of otherwise eligible children due to the fear that participation could negatively impact their parents' immigration status—for example, by deeming them a "public charge" and limiting their ability to adjust their immigration status.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

25.     Maintaining eligibility for Head Start services regardless of immigration status allows families to participate without fear of these repercussions, and it allows agency staff to maintain trust with the local community—an important consideration for recruitment, retention, and overall quality of the services provided.

26.     Though Illinois HSA members do not maintain routine records on immigration status, based on their familiarity with the children, families, and communities served, some members anticipate their enrollment could decline by 20% or more – including both children who are no longer eligible and otherwise eligible families who are deterred from participating due to this new policy.

27.     For example, one Illinois HSA member operates a program in a lower income neighborhood that is 80% Latino. Though this member does not collect information on immigration status, they are aware that undocumented residents make up a significant portion of the local community, and by extension they likely comprise a good number of the families they serve. In recent months, even before the Immigrant Exclusion Directive was published, families have raised concerns about immigration-related consequences of remaining in the program, and this member has seen significant attendance issues since January of this year. Similarly, two other Illinois HSA members estimate that about 45% of the children they serve belong to immigrant families, at least some significant proportion of whom include family members who are undocumented. Both organizations have noted a consistent decrease in attendance compared with enrollment since January of this year.

28.     For one government agency member in a community with a significant refugee population, the chilling effect is particularly noticeable in the Early Head Start home visiting program, in which staff members provide home-based services for children age zero to three and their families. This program typically experiences high turnover, and reluctance by local families to participate will only exacerbate enrollment concerns, because they will feel vulnerable with sharing information about where they live for fear of it being shared with federal immigration enforcement agencies

LAURI MORRISON-FRICHTL DECLARATION - 9
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

29.     Another Illinois HSA member serves a significant number of children whose parents attend the local university on student visas. Based on the definition of "qualified alien" under PWRORA, it is this member's understanding that those children and families would no longer be eligible, which will impact their overall enrollment. Whether this member's understanding is correct or not, I cannot say, but it highlights the problem of potentially eligible families not accessing Head Start because of confusion about whether or not they are eligible.

30.     Decreased enrollment will in turn impact the ability of Illinois HSA members to comply with the terms of their grants. At the same time, the Office of Head Start has increased enforcement of its full enrollment initiative. In recent weeks, at least two large programs in the Chicago area have received letters notifying them that OHS will be recapturing funding due to under-enrollment. This loss of funding forces programs to lay off staff – including staff with linguistic and cultural competency to serve the diverse needs of their communities – and diminishes the overall quality of services that the program is able to provide for the children who remain enrolled.

31.     Moreover, requiring Head Start program staff to inquire into and screen for immigration status diverts from the core operation of their programs. Several Illinois HSA members note concerns from their staff that they will be forced to participate in immigration enforcement efforts that are inconsistent with the mission of their programs – to serve the most vulnerable children and families in their communities. These members also raise concerns that they may lose staff if they are required to comply with this new policy.

## VI.     HARM TO CHILDREN AND FAMILIES FROM THE IMMIGRANT EXCLUSION DIRECTIVE

32.     As discussed above, Illinois HSA members estimate that enrollment may decline by 20% or more due to this new policy. I understand that HHS itself estimates that about 16% of currently enrolled children will be impacted. Relying on the Department's figure, this translates to at least 4,608 children and their families statewide who will lose access to high quality early childhood education services in Illinois.

LAURI MORRISON-FRICHTL DECLARATION - 10
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

33.     If children from immigrant families are no longer eligible to participate in Head Start, or are deterred from attending due to fears of immigration or other consequences, they will not only lose access to quality early childhood and educational readiness for primary and secondary education relative to their peers, but they will also lose out on the supplemental services Head Start affords them to support their health and development, including access to routine developmental screenings, physical and mental health services, nutritious meals, and supports for children with disabilities, such as speech, occupational, and physical therapy.

34.     Immigrant parents and families will either be unable to work and go to school to support their children, or they may be forced to leave their children in unsafe environments to continue providing for their families. They will also be deprived of the resources Head Start programs offer to parents and caregivers, such as parenting classes, housing assistance, and job placement services.

35.     The uncertainty about how this policy will be implemented and enforced puts immigrant families in an impossible position. For example, families participating in a Head Start program run by a nonprofit organization may not be asked about their immigration status, if that program decides to rely on the screening exemption provided by PWRORA. If parents enroll their child, assuming they are eligible, but later learn they don't qualify, they could face immigration consequences or other penalties.

36.     Even non-citizen families who remain eligible as "qualified aliens" may be reluctant to enroll their children for fear that participation will be used to declare them a "public charge" and prevent them from applying for permanent residency, citizenship, or otherwise adjusting their status.

## VII.    HARM TO ASSOCIATION FROM THE IMMIGRANT EXCLUSION DIRECTIVE

37.     The new policy will also directly harm the Illinois HSA, including by impairing its ability to fully engage in its core work of training, technical assistance and advocacy that it carries out for its members.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

38.     Illinois HSA's small staff and limited resources will be burdened by the need to respond to the Immigrant Exclusion Directive, including to address the justified fear and understandable confusion from members and the families they serve, given the significant impact on their lives.

39.     Illinois HSA will have to divert staff time and resources away from its core activities to educating its members on how to navigate compliance with the new policy, including counseling the communities on how to avoid running afoul of the new policy.

40.     This will mean Illinois HSA staff have less time and fewer resources to work on other critical issues, such as state-level policy and systems work related to Illinois's current efforts to consolidate all early childhood services under a new Department of Early Childhood.

41.     The Immigrant Exclusion Directive will also likely cause Illinois HSA to lose members, because the decline in enrollment may mean their grants will be terminated or because they cannot otherwise afford or justify the expense of Illinois HSA's membership dues.

42.     This could force Illinois HSA to reduce staff, or shutter altogether, as the majority of the Association's funding comes from dues paid by its members.

## VIII.   BENEFIT OF ENJOING THE IMMIGRANT EXCLUSION DIRECTIVE

43.     Enjoining the Immigrant Exclusion Directive would protect Illinois HSA and its members from distractions and diversion of resources necessary to address the harms, panic, and misinformation it will cause if it goes into effect.

44.     A Temporary Restraining Order would allow Illinois HSA and its members to focus on critical longer-term projects to ensure members meet the obligations of the Head Start Act, including providing essential quality early childhood education for the State's most disadvantaged children.

45.     A Temporary Restraining Order would protect children and families from unintended consequences caused by the new policy, in particular the ambiguities that remain about which children remain eligible for Head Start services and how programs are expected

1  to comply with these new requirements – ambiguities that could result not only in eligible

2  children being denied services, but in negative immigration consequences to those children

3  and their families.

4      46.    A Temporary Restraining Order will also help to prevent the chilling effect of

5  this new policy which, if it is allowed to go into effect, will prompt otherwise eligible families

6  to withdraw their children due to fear about the consequences of continuing to participate.

7

8      Pursuant to 28 U.S.C. § 1786, I declare under penalty of perjury that the foregoing is

9  true and correct.

10

11  Dated: July 21, 2025                          _____

12                                                     Lauri Morrison-Frichtl

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184