The Honorable Ricardo S. Martinez

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

WASHINGTON STATE ASSOCIATION OF HEAD START AND EARLY CHILDHOOD ASSISTANCE AND EDUCATION PROGRAM, ILLINOIS HEAD START ASSOCIATION, PENNSYLVANIA HEAD START ASSOCIATION, WISCONSIN HEAD START ASSOCIATION, FAMILY FORWARD OREGON, and PARENT VOICES OAKLAND,

*Plaintiffs,*

v.

ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ANDREW GRADISON, in his official capacity as Acting Assistant Secretary of the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; OFFICE OF HEAD START; and TALA HOOBAN, in her official capacity as Acting Director of the Office of Head Start,

*Defendants.*

Case No. 2:25-cv-00781-RSM

**DECLARATION OF JOEL RYAN IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER/TO POSTPONE EFFECTIVE DATE OF AGENCY ACTION**

NOTE ON MOTION CALENDAR: JULY 21, 2025

I, Joel Ryan, hereby declare and state:

1. The information in this declaration is true and correct to the best of my knowledge and I am of majority age and competent to testify about the matters set forth herein.

2. I incorporate all of the facts and allegations contained in my first declaration submitted in this case in support of Plaintiffs' Motion for a Preliminary Injunction.

**Experience and Professional Background**

3. I am the Executive Director of the Washington State Association of Head Start and Early Childhood Education and Assistance Program ("Washington HSA"). I have served in this role since 2007.

4. In my current role at Washington HSA, I oversee all operations of the organization, including WSA's funding and policy advocacy at the state and federal level and providing professional development for Head Start program members. This includes offering training for Head Start staff and program members on ways to tailor their curriculum to best serve their diverse children and families, and support member programs in making their programs more inclusive for children to best meet their obligations under the Head Start Act and related state laws.

5. Most of my education and experience prior to being at Washington HSA has been focused on early childhood education and the Head Start program. While earning my bachelor's degree, I wrote my senior thesis on Head Start programming. After college, I served as an AmeriCorps volunteer providing literacy support for children at a Head Start school in Boston, MA. Thereafter, I received my law degree from American University, where I served as intern for Neighborhood Legal Services, the Coalition for the Homeless, and several child advocacy organizations.

6. After receiving my law degree, I served as the Government Affairs Director of the National Head Start Association. In that role, I worked as the liaison between the Head Start community, Congress, and the White House. I have more than 20+ years of experience supporting Head Start programs, children, and families.

**The Guiding Principles of the Head Start Program**

7. As discussed, I have been steeped in the intricacies of the Head Start program for the better part of my academic and professional life. For 60 years, the purpose and mission of Head Start has been to make sure that all children are ready for success in school regardless of their background, race, zip code, or income.

8. The Head Start Act requires funding to be directed to approved agencies that focus on serving children and families that are the furthest away from opportunity. To identify those populations most in need of services, Head Start agencies are required under the Head Start Act to conduct community wide assessments that collect and analyze demographic data.

9. Head Start agencies are multigenerational programs that provide services to children as well as their families. This is because parents are a child's first teacher and early child teachers and caregivers must work with parents as co-equals in their child's education. Head Start agencies provide services starting from the time when a mother is pregnant, and throughout a child's preschool age from 0-5 years old. Head Start agencies provide case management services for families to help them set up their children for success. Head Start services in this area include helping families find housing, helping parents set and meet goals to go to school or work, providing financial literacy education, and working with parents on nutrition and behavioral health so they can help their kids at home.

10. Not all children are at the same starting point when they arrive at school. That is why Head Start agencies need to offer different services and resources based on need. Head Start is, at its heart, an equity program, which I understand to mean affording all children a fair chance to be ready for kindergarten and succeed by providing them resources tailored to their diverse circumstances.

11. As required by the Head Start Act, Head Start serves children and families in need who are the furthest from opportunity. That is why Head Start services are focused on some of the children from the country's most vulnerable communities, including immigrants. This means children who are very low income and children and families of color, including a

significant number of immigrant families. The majority of children who are served by Head Start are low-income children of color. Up to two-thirds of all Head Start program attendees are Black or brown children. Head Start serves a high number of English language learners. Immigrants and refugees make up a large share of the population served by Head Start. Around 18% of the children served by Head Start are diagnosed with disabilities.

12.     Head Start teaching staff must have the background and knowledge to support the needs of the children and families they serve. Given the diversity of the populations they serve, this means that they must have relevant linguistic and cultural competency.

13.     To effectively provide services, Head Start agencies must consider the cultural norms of children and their families so that the agency can help the parents support their child's learning and development at home. Appropriate engagement with a Head Start family requires Head Start agencies to use culturally appropriate engagement. Head Start programs thus need their curriculum to be relevant to the populations they serve. As an example, it is critical for parents that are non-English speakers to understand what their children learned during their day at Head Start. Head Start teachers will often send materials, books, and other activities for parents to work on with their child at home. It is critical that these be understandable to the family and, if necessary, translated so that parents can fully support their child's education. Ultimately, Head Start agencies want to create a welcoming environment for children and families in order to carry out their obligations under the Head Start Act.

**Washington HSA's Mission, Purpose and Alignment with the Head Start Program**

14.     Washington HSA is a statewide non-profit membership association founded in 1986 and is currently composed of 30 member agencies from early childhood care and education agencies that are funded by Head Start, Early Head Start, Migrant/Seasonal Head Start, Native American Head Start, and the Washington state Early Childhood Education and Assistance Program ("ECEAP").

15.     Twelve member agencies are nonprofit charitable organizations, which account for 44.2% of Head Start program slots in our membership. Five grantees are nonprofit

community action agencies, which account for 11% of Head Start program slots.

16. Fourteen member agencies are local government-run programs, including schools, educational services districts, community colleges, and municipalities, which account for 44.8% of Head Start program slots.

17. Washington HSA's mission is aligned with Head Start's mission: serving the children and families farthest from opportunity.

18. Washington HSA's purpose is to strengthen Head Start, Early Head Start, and ECEAP agencies for the benefit of children and families, through advocacy, education, and collaboration. Washington HSA strives to work in collaboration with children, families, and communities to advocate for antiracist and equitable early learning, education, and human services systems that provide opportunities for all children and families. Washington HSA is committed to supporting children and families of all races, genders, languages, abilities, sexual orientations, nationalities, immigration status, and socioeconomic status.

19. As of 2025, Washington HSA members serve over 13,000 children and their families.

20. Washington HSA members provide critical services to people from some of Washington's most vulnerable and underserved communities.

  a. Over 74% of the children served by Washington HSA members are children of color.

  b. Nearly 42% of the children served by Washington HSA members speak a primary language other than English at home with their family. Over half of the children served by Washington HSA members are dual language learners. For example, with a large population of low-income Mandarin-speaking immigrants from China in Seattle, WA, Head Start agencies tailor their programs and services to Mandarin Chinese-speaking students and families. It is common for this Head Start program to celebrate the Lunar New Year. In Yakima, WA, Washington

HSA members serve migrant farm worker families and provide them culturally relevant curriculum and offerings in a family's home language of Spanish. And, in Skagit County, WA, Head Start agencies serve a larger number of Ukrainian refugees among others. These families are dealing with the trauma of coming from a war-torn country and the associated complex issues that can develop as a result.

c. In 2024, there are 1,956 children and four pregnant women enrolled in members' Migrant and Seasonal Head Start programs.

d. Around 14% of all children served by Washington HSA members are diagnosed with a disability and have an Individualized Education Plan.

e. Almost 15% of the children served by Washington HSA members are involved in early family intervention services.

f. Over 25% of families served by Washington HSA members have parents with less than a high school education. Nearly 13% of Washington HSA families served have one or more parents in a job training program.

g. Most families served by Washington HSA members are well below the federal poverty level, and over 12% of families served by Washington HSA members experience homelessness every year.

21. Like other Head Start agencies, Washington HSA members receive Head Start grants from the federal government. Members use those grants to fund their Head Start programs that provide services that are tailored to the needs of eligible children and families, as well as for continuing education, training and professional development like that provided by Washington HSA. Grant funds do not go directly to any child or family.

22. Washington HSA members have discretion as to who enrolls in their programs. Even if they meet the eligibility criteria stated in the Head Start Act, specific children or

families are not entitled to enrollment in Head Start programs or services provided through Head Start grants.

23. Washington HSA operates with a budget of $1.2 million. Washington HSA is funded by membership dues, grants, and training and conference registration fees. Washington HSA has three full-time staff members.

**<u>Immigration Status Has Never Been Part of Head Start Eligibility Criteria and Requiring Agencies to Verify Status Will Subject Members to Significant Harms</u>**

24. I am aware that the Department of Health and Human Services (HHS) has submitted a new Directive that reinterprets the meaning of "federal public benefit" under the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA). My understanding is that this Directive interprets the services provided by the Head Start program to be a federal public benefit and thus requires Head Start agencies, including Washington HSA members, to verify that children and families enrolled in Head Start are eligible "qualified aliens."

25. Since the formation of Head Start, program eligibility has never depended on immigration status.

26. Making enrollment dependent on immigration status will have a massive chilling effect on children and families enrolling in Head Start.

27. If Washington HSA members are required to verify immigration status and exclude certain classes of immigrants from their programs, they expect to experience significant decreases in enrollment and retention. While Washington HSA members did not record the legal immigration status of the children and families in their programs before the new HHS Directive was put forth, they expect that significant numbers of enrolled children and families will no longer be considered eligible for Head Start and be forced to disenroll.

28. Given the demographic background of the children and families served by Washington HSA's members, I anticipate that enrollment could decline by 15 to 25% as a conservative estimate.

29. The chilling effect will extend beyond immigrant families. Because Head Start eligibility has always been irrespective of immigration status, Washington HSA members have been able to maintain trust with immigrant communities and other communities of vulnerable people, allowing them to build successful Head Start programs. Requiring members to verify immigration status means that Head Start teachers and staff will need to question applicants and/or enrolled children and families about their immigration status. This invasive questioning carries a heightened level of fear at this time due to the federal administration's actions against immigrants. It will sever the trust that member agencies have built, not just with immigrant communities, but with the community at large as Head Start agencies will now be seen as unwelcoming and potentially dangerous.

30. Washington HSA members serve communities for which fear and distrust of government systems are significant concerns. Families—particularly those who are immigrants, refugees, or limited English speakers—often feel unsafe due to increased scrutiny, racial profiling, or language-based discrimination. A critical part of the success Washington HSA members have with their Head Start programs is the trust they have been able to form with immigrants.

31. Even if the intent of this new HHS Directive is to exclude certain classes of immigrants and not others, it will likely discourage enrollment of otherwise eligible children based on the fear that seeking or receiving Head Start services would affect parental immigration status, such as resulting in the child being deemed a "public charge" and affecting the ability of the parents to adjust their immigration status. Washington HSA members are of the understanding that parents who are not citizens will be too scared to apply their children to Head Start programs, even if it is true that their citizen child is eligible for Head Start.

32. Even when families could have the legal right to access services, the perception of risk may lead them to withdraw from the Head Start program or avoid enrollment altogether. This Directive will create barriers for children who would benefit most from early learning services, further widening the opportunity gaps in already underserved communities.

33. The chilling effect negatively impacting Washington HSA members will not be limited to just Head Start enrollment. I expect that HHS' Directive will negatively impact members' program enrollment in state funded early childhood education programs—many of which also receive Head Start funding—as families feel unwelcome and/or unsafe in the program generally because the program is screening for immigration status.

34. The chilling effect of HHS' Directive targeting immigrants is especially harmful at this time because Washington HSA members are currently engaged in the enrollment process for filling their programs that start in the fall.

35. Even before HHS' Directive, Washington HSA member agencies were already experiencing negative impacts to enrollment and retention due to the Executive Orders targeting "DEIA" and "illegal aliens" and HHS' policies to execute those Orders.

36. Multiple Washington HSA members have experienced decreases in attendance from immigrant children and families since the Executive Orders and HHS policies. Multiple members also report that immigrant parents have expressed fear of going to work and taking their children to the Head Start program because of the Executive Orders and HHS policies.

37. Consequently, this massive chilling effect due to HHS' immigration Directive will have a deleterious impact on Washington HSA members' ability to meet enrollment requirements under the Head Start Act. The resulting decline in enrollment and retention due to HHS' Directive will make it more likely that member agencies will be underenrolled and thus exposed to the penalties for under enrollment in the Head Start Act.

38. If members are unable to fully enroll their programs, they are at serious risk of having to close their classrooms and facilities, which would deprive all of the children and families in their care of the critical resources received through their Head Start program.

39. In recent weeks, the Office of Head Start has increased enforcement of its Full Enrollment Initiative, making HHS' immigration Directive even more dangerous for members. Some Washington HSA members are already working through the Full Enrollment Initiative and this new Directive will serve to increase the risk that they will lose funding.

40. Washington HSA members will have to drastically change their outreach and recruiting programs at great effort and cost.

41. The resulting drop in attendance and enrollment will have severe financial consequences for members. Loss of enrollment leads to a decrease in program size, which leads to a loss of Head Start grant money. Members will also lose funding from state funding streams with this drop in enrollment and retention. This bears additional costs to the many members that "braid" their funding sources as discussed in paragraph 87 of my first declaration filed in this case. These members would likely need to shut down their entire program, even if they receive funding outside of Head Start, because of their fund braiding.

42. These funding decreases will require members to lay off staff, and they may no longer be able to afford appropriate training and technical assistance from their remaining staff, including from sources like Washington HSA. Both of these will diminish the overall quality of the early educational services they provide.

43. Members will likely be placed in the Designation Renewal System as a result of the HHS Directive, which threatens their ability to receive Head Start grants.

44. Finally, members will be at risk of having their Head Start grants terminated and closing their program, leading to loss of employment for staff and loss of critical early education resources that will be catastrophic for entire communities.

45. This new Directive also puts members in the untenable position of deciding between violating the new Directive and violating parts of the Head Start Act. For example, the Head Start Act requires agencies to prioritize Limited English Proficiency students, many of whom will likely no longer be eligible for Head Start under the new HHS immigration guidance and thus will need to be excluded from enrollment by Washington HSA members.

46. Verifying immigration status would also likely result in these members running afoul of state law. Washington state law requires public schools, including Head Start agencies, to adopt local policies in alignment with model policies from the Washington Attorney General's Office to ensure public schools remain safe and accessible to all Washington

residents, regardless of immigration or citizenship status. See RCW 43.10.310. The model policies prohibit public school staff from "inquir[ing] about, request[ing], or collect[ing] any information about the immigration or citizenship status or place of birth of any person." *See* Washington State Office of the Attorney General Bob Ferguson, *Keep Washington Working Act Guidance, Model Policies, and Best Practices for Public Schools*, at 8 (May 2020), https://agportal-s3bucket.s3.amazonaws.com/uploadedfiles/Home/Office_Initiatives/KWW/KWW%20Schools%20Model%20Guidance.pdf. Public school staff are also prohibited from seeking or requiring information regarding the parent or guardian's citizenship or immigration status. *See id.* Even if member agencies that are public schools are required to collect information related to national origin to satisfy federal reporting requirements, they are required under these policies to take measures toward protecting the child and family, including "collecting this information separately from the school enrollment process" to "mitigate deterring school enrollment of immigrants or their children." *Id.*

47. Verifying immigration status and excluding immigrants from programming will also put members at risk of violating the state licensing requirements for early education as discussed in paragraph 84 of my first declaration filed in this case.

48. If Washington HSA members are required to verify immigration status, they do not have the infrastructure necessary to verify immigration status. Members will need to create and develop a recordkeeping system and protocol for gathering and holding this data. They will need to train staff in this new system and potentially hire new staff. A member agency for which 50% of its students have a home language other than English—and thus expects that a large share of its students are immigrants or are from immigrant families—reports that this requirement will be very costly because: (1) it has no process in place to support the collection of immigration status data, (2) its online systems do not support housing this data, (3) its current applications do not have space for this level of detail, and (4) it will need to complete an impact analysis to determine what process it will need to create, budget, and fund.

49. Screening for immigration status will divert resources from the core operation of programs. These members will bear the cost of this requirement, which will only be exacerbated by the funding and staffing issues they are already facing because of the actions of this administration seeking to dismantle Head Start.

50. Members face potential False Claims Act liability in connection with any reporting obligations they have regarding compliance with the Directive. In addition to the potential civil and criminal legal penalties, this liability also poses an existential threat to members' programs.

**The HSS Immigration Directive is Vague and Ambiguous**

51. From the text of the HSS Directive, Washington HSA and its members do not know if nonprofit organizations are subject to it, and if so, how to account for PRWORA's nonprofit exemption from the verification requirement.

52. It is also unclear as to whether Washington HSA members will need to verify the immigration status of children who are already enrolled in their programs, and if so, when, and at what intervals.

53. It is also unclear whether Washington HSA members are now mandated to inquire into the immigration status of parents, only their children, or both.

**The HSS Immigration Directive Will Severely Harm Immigrant Children and Families**

54. Because of HSS' immigration Directive, immigrant children will lose access to quality early childhood care and educational readiness for primary and secondary education. They will fall behind in school readiness relative to their peers and be deprived of the supplemental services Head Start affords their families to support the health, welfare and development of their children, including access to health and developmental screenings, physical and mental health services, nutritious meals, home visits and support for infant and toddler health and development, and supports for children with disabilities, such as speech, occupational, and physical therapy.

55.     Immigrant parents and families also will lose their ability to work and go to school to support their children without having reliable childcare through Head Start. It is my understanding that local farmers are already concerned that they will not have enough workers for the rest of this fruit-picking season because immigrant workers will not be able to take their children to Head Start programs. This will result in significant financial hardship for families that are already dealing with poverty. They will also be deprived of other resources Head Start offers to strengthen their families, including access to parenting classes and other resources to better their psychological well-being and foster economic self-sufficiency.

56.     Washington HSA and its members expect that this Directive will have severe impacts on community well-being and stability, as children fall behind in their development and their opportunities for future success become more limited without the resources of Head Start. Entire classrooms could close due to the impacts of this Directive, impacting both immigrant and nonimmigrant children alike, as well as the entire community.

**The HHS Immigration Directive Will Harm Washington HSA**

57.     This Directive will also directly harm Washington HSA by diminishing its ability to fully engage in its core work of training, professional development, and advocacy that it provides for members. Instead of concentrating on its primary responsibilities, Washington HSA will have to devote the significant part of its resources towards guiding members in applying the vague and ambiguous Directive and navigating the existential threats to their programs.

58.     Washington HSA's small staff and limited resources will be severely burdened by the need to respond to the new HHS Directive. Members are already raising considerable fear and confusion, from both themselves and the families they serve, as they are faced with this new Directive that poses a significant impact on their lives.

59.     The HHS Directive is also likely to cause Washington HSA to lose members, as member agencies experience declines in enrollment that result in grant termination, or

funding decreases that make Washington HSA membership financially unfeasible. This could force Washington HSA to lose staff, consolidate operations, or shut down completely.

60.    Enjoining the new HHS Directive would protect Washington HSA, its members, and most importantly, the vulnerable children and families served by members, from the harms described above.

Executed this 21st day of July 2025.

I declare under penalty of perjury under the laws of the United States and the State of Washington that the foregoing is true and correct to the best of my knowledge.

By: _____

Joel Ryan