# EXHIBIT B

Notice: This HHS-approved document has been submitted to the Office of the Federal Register (OFR) for publication and has not yet been placed on public display or published in the Federal Register. The document may vary slightly from the published document if minor editorial changes are made during the OFR review process. The document published in the Federal Register is the official HHS-approved document.

**DEPARTMENT OF HEALTH AND HUMAN SERVICES**

**OFFICE OF THE SECRETARY**

**Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit"**

**AGENCY:** Office of the Secretary, HHS.

**ACTION:** Notice. 30-day comment period.

**RIN:** 0991-ZA57

**SUMMARY:** This notice sets forth the interpretation that the U.S. Department of Health and Human Services (HHS) uses for the term "Federal public benefit" as used in Title IV of the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA), Pub. L. 104–193, 8 U.S.C. § 1611. In doing so, this notice revises the interpretation of the term set forth in a prior notice, 63 FR 41658 (Aug. 4, 1998) ("the 1998 HHS PRWORA Notice" or "1998 Notice"). This notice also describes and preliminarily identifies the HHS programs that provide "Federal public benefits" within the scope of PRWORA, including HHS programs that were not listed in the 1998 HHS PRWORA Notice.

**DATES:** To be assured consideration, comments must be received no later than 11:59 p.m. Eastern Time (ET) on [INSERT DATE 30 DAYS AFTER PUBLICATION IN THE *FEDERAL REGISTER*]. HHS will not reply individually to responders but will consider all comments submitted by the deadline.

**ADDRESSES:** *Docket:* You may examine the notice docket at *regulations.gov* under Docket ID. AHRQ-2025-0002. The docket contains this notice, the Regulatory Impact Analysis, and all comments received to date. To submit a response, click the "Comment" button inside Docket: AHRQ-2025-0002 and follow all instructions.

**FOR FURTHER INFORMATION CONTACT:** Sean R. Keveney, Acting General Counsel, Office of the General Counsel, HHS. 200 Independence Avenue SW, Washington, DC 20201. 202-690-7741.

**SUPPLEMENTARY INFORMATION:**

## I.      Background

According to Section 401 of PRWORA, 8 U.S.C. § 1611(a), aliens who are not "qualified aliens" are not eligible for any "Federal public benefit" as defined in 8 U.S.C. § 1611(c). The prohibition set forth in § 1611(a) is subject to certain narrow exceptions explicitly set forth in § 1611(b).

The statutory text, § 1611(c), defines "Federal public benefit" as "(A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States" and "(B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1). This definition, too, is subject to certain narrow exceptions. *See id.* (c)(2) (setting forth certain narrow exceptions to the definition of "Federal public benefit").

In addition, under Section 432 of PRWORA, as amended, to the extent required by law, providers of a nonexempt "Federal public benefit" must verify that a person applying for the benefit is a qualified alien and is eligible to receive the benefit. 8 U.S.C. § 1642.

## II.   Interpretation

The statutory language is clear: if an HHS program falls into either § 1611(c)(1)(A) or (c)(1)(B), such benefits are not available to aliens, unless (i) that alien is a qualified alien, or (ii) some other exception applies to the HHS program, either under § 1611(b) or via the definitional limits on "Federal public benefit" set forth in subparagraph (c)(2). Thus, the task is simple: construe the plain language of § 1611(c)(1)(A) and (c)(1)(B). Those provisions state that "Federal public benefit" means:

> **(A)** any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

> **(B)** any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

If HHS "provide[s]" the (i) "grant, contract, loan, professional license, or commercial license," or if the "grant, contract, loan, professional license, or commercial license" is "provided by" "appropriated funds of the United States," then it is a "Federal public benefit." Similarly, if HHS "provide[s]" the "retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit," or such "benefit" is "provided by" "appropriated funds of the United States," then such benefit is a "Federal public benefit," as long as the benefit is "provided to" one of three types of recipients: (i) "an individual," (ii) a "household," or (iii) a "family eligibility unit."

The 1998 HHS PRWORA Notice artificially and impermissibly constrains these statutory definitions, and the scope of PRWORA's effect, in at least four main ways. <u>First</u>, it reads a limitation into § 1611(c)(1)(A) that "grant" refers to financial awards to individuals and thus does not include block grants to States and localities. That limitation does not appear in the statutory text. As explained further below, the limitation rests on the 1998 Notice's incorrect assertion that such limitation is required by the canon of *noscitur a sociis*. *See* 63 FR at 41659.

<u>Second</u>, the 1998 Notice convolutedly and incorrectly interprets § 1611(c)(1)(B)'s reference to "eligibility unit" to mean that subparagraph (c)(1)(B) does not actually reach benefits provided to individuals, households, or families. Rather, it erroneously reasons that "the individual, household, or family must, as a condition of receipt, meet specified criteria" beyond the fact that a given benefit is "targeted to communities or specified sectors of the population." 63 FR at 41659. As explained further below, this interpretation rests on an overreading of the phrase "eligibility unit" and arbitrary line-drawing about what is and is not an adequate "eligibility" criterion. Relatedly, to deal with the consequences of this arbitrary line-drawing, the 1998 Notice created another test—unmoored from the statutory language—that asked whether "a preponderance of a program's services" was "provided to communities or specified sectors of the population" versus "individual, household, or family eligibility units." *Id.* This test underscores that the 1998 Notice misinterpreted the statute.

<u>Third</u>, the 1998 Notice advances an erroneously narrow interpretation of the elements of the list in § 1611(c)(1)(B) without due regard for the catch-all phrase "other similar benefit." For example, it declares that Head Start program would not be a "Federal public benefit" because one element of the list is "postsecondary education." 63 FR at 41659. As explained further below, this aspect of the 1998 Notice rests on a misapplication of canons of statutory interpretation.

Fourth, the 1998 Notice incorrectly asserts that the "exemption[s]" in § 1611(b)(1) "excludes some HHS programs from the definition of 'Federal public benefits.'" As detailed below, this aspect of the 1998 Notice is erroneous in certain respects.

### 1. "Any grant"

Section 1611(c)(1)(A) reaches "any grant, contract, loan, professional license, or commercial license" provided by HHS. HHS administers a multitude of grant programs, including those in which the grants go to institutions (such as research grants) and those in which the grants go to States (such as Title X services grants). Sometimes the activity supported by the grant is carried out by the "recipient"; sometimes the recipient uses an award to provide health professional training support for individuals; and sometimes the recipient acts as a "pass-through entity" "that provides a subaward to a subrecipient to carry out part of a Federal program," 45 C.F.R. § 75.2 (definitions for HHS's uniform grants regulation), under which the obligations and requirements on the recipient flow down to the subrecipient, *Id.* § 75.372.

PRWORA says "any grant" (emphasis added). "Read naturally, the word 'any' has an expansive meaning, that is, one or some indiscriminately of whatever kind." *Ali v. Fed. Bureau of Prisons*, 552 U.S. 214, 219 (2008) (cleaned up). The statutory text does not distinguish between grants "to individuals" and grants "provided to states or localities." *Contra* 63 FR at 41659. And so, HHS must apply the plain meaning of the statutory text. *E.g.*, *Pub. Serv. Elec. & Gas Co. v. F.E.R.C.*, 989 F.3d 10, 19 (D.C. Cir. 2021) ("[A] regulation can never trump the plain meaning of a statute.") (quotes omitted).

The 1998 Notice relied on the canon of *noscitur a sociis*—"words grouped in a list should be given related meaning," 63 FR at 41659 (quotes omitted)—in order to exclude "so-called 'block

grants' . . . provided to states or localities" from the sweep of subparagraph (c)(1)(A). But clearly the "related meaning" that ties together the elements of the list are that they are forms of a benefit that agencies (here, HHS) provide to the public. Obviously, the elements of the list will not match in every respect. A "license" will differ from a "loan" in some respects, and a "grant" will differ from all the other elements of the list in certain respects, too. In short, the 1998 Notice takes the canon of *noscitur a sociis* too far; it should be used "to avoid ascribing to one word a meaning so broad that it is <u>inconsistent</u> with its accompanying words." *See Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (emphasis added). No inconsistency arises from relying on the plain meaning of the term "any grant," including grants to individuals as well as grants to non-individuals. Even on its own terms, the 1998 Notice's reasoning fails: HHS <u>does</u> enter into "contract[s]" with non-individuals, including States.

Indeed, the reasoning of the 1998 Notice is incoherent when it comes to "grant[s]" in the context of HHS-administered benefit programs. Contrary to the 1998 Notice, "grants" are <u>not</u> "generally" "agreements between Federally funded programs and individuals." 63 FR at 41659. The one example cited in the notice, "research grants," does not fit the bill: those funds may eventually be given to a lab staffed with a group of individuals, but in most cases the grant recipient or subrecipient is an institution. It would be an error not to consider a grant to be a Federal public benefit because the initial recipient is a governmental or private entity. Indeed, that is rarely true for grants in the first place.

The conclusion that "any grant" means "any grant" is reinforced by the structure of the statute. While subparagraph (c)(1)(B) provides a definition of "Federal public benefit" that is tied to the nature of the recipient ("individual, household, or family eligibility unit"), subparagraph (c)(1)(A) does not include similar language. Especially because these are neighboring provisions,

the omission has to be assumed to be intentional. *Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion."). Thus, the 1998 Notice reads a limitation into subparagraph (c)(1)(A) that Congress intentionally left out.

  2. *"Eligibility unit"*

Section 1611(c)(1)(B) clearly prohibits aliens (who are not qualified aliens) from accessing a wide array of HHS-provided benefits "for which payments or assistance are provided to an individual, household, or family eligibility unit[.]" The question is the meaning and function of "eligibility unit" in this provision.

To start, "eligibility unit" does not modify all items of the list. Rather, the term "family eligibility unit" is used in parallel to "household" elsewhere in the statute. *See* 8 U.S.C. 1631 (f)(1), (2) (discussing instances in which an abuser "resid[es] in the same household as the alien" and then stating that benefits are not available "for an alien during any period in which the individual responsible for such battery or cruelty resides in the same household or family eligibility unit as the individual*"); see* 8 U.S.C. 1641(c) (similar). This leads to a straightforward reading of the statute: benefits are subject to PRWORA if they go to an individual, a household, or a "family eligibility unit."

Even just looking to the phrase "eligibility unit" itself, in the benefits context, "family eligibility unit" just means the "unit" by which "eligibility" is assessed. *Cf. Mitchell v. Lipscomb*, 851 F.2d 734 (4th Cir. 1988) (discussing "filing unit" in context of Medicaid eligibility determination). Subparagraph (c)(1)(B) does not otherwise dictate what criteria must enter into the "eligibility" assessment in order for the "payments or assistance" to be within the definition of

"Federal public benefit." Under a plain-meaning approach, "eligibility" simply means "the quality or state of being eligible: fitness or suitability to be chosen, selected, or allowed to do something."[1] Depending on the program, eligibility can turn on the income level or age of the relevant "unit." *See* 63 FR at 41659. But it can also turn on the fact that the "unit" has a "particular physical condition[]" or is a certain "gender." *Contra id.*

Thus, the Department believes the proper interpretation of subparagraph (c)(1)(B) is as follows: the listed benefits, including "other similar benefit[s]," are "Federal public benefit[s]" as long as they are provided on either a per-individual, per-household, or per-"family eligibility unit" basis.

The 1998 Notice gave greater significance to "eligibility unit" than that text can bear. The notice interpreted subparagraph (c)(1)(B) to include only "benefits that are (1) provided to an individual, household, or family, *and* (2) the individual, household, or family must, as a condition of receipt, meet specified criteria (e.g., a specified income level or residency) in order to be conferred the benefit[.]" 63 FR at 41659 (emphasis added). As to the second criterion, the 1998 Notice added: "in order for a program to be determined to provide benefits to 'eligibility units' the authorizing statute must be interpreted to mandate ineligibility for individuals, households, or families that do not meet certain criteria, such as a specified income level or a specified age." *Id.*

The first flaw of the 1998 Notice is that it assumes that "eligibility unit" modifies "individual" and "household." It is not clear whether the phrase "eligibility unit" applies to all three items in the list ("individual," "household," and "family") or to just "family." At a minimum,

---

[1] *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/eligibility. (Accessed 15 Apr. 2025). This is also consistent with HHS regulations: e.g. CFR § 431.804 "*Eligibility* means meeting the State's categorical and financial criteria for receipt of benefits under the Medicaid or CHIP programs." *See also:* 2 CFR § 200.203, "The statutory, regulatory or other eligibility factors or considerations that determine the applicant's qualification for Federal awards under the program (e.g., type of non-Federal entity)."

it strains the English language to conceive of an "individual[ ]eligibility unit." That notion would commonly be expressed as "eligible individual," but Congress did not say "eligible individual" in subparagraph (c)(1)(B). As explained above, recognizing that "family eligibility unit" is a discrete phrase (parallel to "individual" and "household") avoids having to resolve the textual question of the difference between "individual" and "individual eligibility unit." The Department is unaware of any statute or HHS program that uses the term "individual eligibility unit" in this sense. The Department seeks comment on the application of "eligibility unit" in other federal programs at HHS or similar contexts. In the interpretation that the Department now sets forth, the question is largely academic as to whether "eligibility unit" applies to "individual" and "household." But under the 1998 Notice's approach, the question becomes much more important, because "eligibility unit" bears significant weight in the analysis. Yet, the 1998 Notice elides this question, simply assuming without explanation that "eligibility unit" applies across the list despite its likely inapplicability to the term "individual."

Even if the phrase does apply to all three items, it is not clear whether the word "eligibility" supplies any significant constraint in this context. Of course, the Department is mindful of the canon against superfluity. *See Microsoft v. i4i Ltd*, 564 U.S. 91, 106 (2011). But as explained above, in the context of benefit programs, a reference to "eligibility unit" can simply mean the categorization of discrete end-recipients of the "payments or assistance"—that is, the statute recognizes that some benefits are allocated on an individual basis, some on a household basis, and some on a family basis, and "eligibility" is assessed vis-à-vis those "unit[s]." The statute does not otherwise place special weight on the word "eligib[le]." *See also* Dep't of Justice, "Verification of Eligibility for Public Benefits," 63 FR 41662, 41664-65 ("if an agency provides an unemployment benefit to an individual using federally appropriated funds, the definition is satisfied"; no

discussion of "eligibility unit" or additional "eligibility" criteria). This understanding makes particular sense in the PRWORA context. One purpose of PRWORA is to limit aliens' access to public benefits, and if the end-recipient of the benefit is something larger than a household or family (for example, the multi-unit buildings referenced in the 1998 Notice, 63 FR at 41660), it makes little sense to talk about an assessment of immigration status.

In addition, the 1998 Notice's approach is unmoored from the statutory text and invites arbitrary application. Assume for the sake of discussion that "eligibility unit" modifies the entire list. And assume further that the term "eligibility" means a "Federal public benefit" must employ some sort of criteria that excludes certain individuals, household, or families, but not others. The 1998 Notice goes further: those criteria must be in "the authorizing statute" of the benefit program and those criteria must be of some special type. It is not enough if the entire benefit program is structured "to meet the needs of certain populations"; rather, the criteria must be such that "providers use variations in individual characteristics as a basis for determining eligibility, on a case-by-case basis." 63 FR at 41659-60.

None of the Notice's line-drawing about the right type of criteria is grounded in the statutory text. That is enough to reject it. And the 1998 Notice's own example demonstrates the fallacy of its reasoning. The Notice points to a grant for "children or pregnant women." *Id.* Obviously, a man is not an eligible individual for a grant program that provides benefits to pregnant women. Put another way, "as a condition of receipt" of the benefit, he must "meet specified criteria," and he fails to do so. *Id.* at 41659. So, the situation would seem to meet the test articulated by the 1998 Notice. But the notice convolutedly reasons that the "Maternal and Child Health program" is not a Federal public benefit because <u>this</u> criterion (being a pregnant woman, not a

man) is somehow different from other criteria ("such as a specified income level or a specified age").

The 1998 Notice also points to the definition of "Federal benefit" in Section 561 of the Illegal Immigration Reform and Immigrant Responsibility Act of 1996 (IIRIRA). 63 FR at 41659. The caption of that section is "Increased maximum criminal penalties for forging or counterfeiting seal of a federal department or agency to facilitate benefit fraud by an unlawful alien." That is, the entire statutory provision, 18 U.S.C. § 506, is about criminal liability for a person who commits certain acts of forgery (or related acts). In defining "Federal benefit" in that context, there is no need to refer to "eligibility unit"—the statute contemplates a person committing a criminal act to "facilitate[e] an alien's application for, or receipt of, a Federal benefit." 18 U.S.C. § 506(b). Any inference that might be drawn for supporting a narrow interpretation of PRWORA is insufficient to overcome the plain meaning of the text of 8 U.S.C. § 1611, especially in light of the explicit purpose of PRWORA set forth in § 1601.

By eliminating this arbitrary line-drawing around what constitutes an appropriate "eligibility" criterion, HHS's new interpretation will no longer raise a question about what to do with programs that, as the 1998 Notice describes, "provide a mixture of services, some of which are provided to . . . communities or specified sectors of the population." 63 FR at 41660. That question was a consequence of the 1998 Notice's convoluted approach to subparagraph (c)(1)(B), in which certain eligibility criteria (such as income limits) counted, but others did not (such as geographic limits). And it led to yet more analysis that was far removed from the statutory text. *See id.* (creating a "preponderance" test to determine whether an HHS program is a "Federal public benefit"). Now, if an HHS program provides a benefit that falls within the categories set forth in the first half of subparagraph (c)(1)(B), and it does so on a per-individual, per-household, or per-

family basis, it will be a "Federal public benefit." That is true whether the "eligibility" of the relevant "unit" turns on being part of a specific "communit[y]," part of a "specified sector of the population," having a "specified income level," being a "specified age," etc. *See* 63 FR at 41659-60.

Further, the 1998 Notice imposes a requirement that the limits on eligibility to individuals, household, or family be in the statutory text. There is no statutory basis for requiring that the description of eligibility be in statute. At least one court has found the 1998 Notice misinterprets the statute. "HHS's reasoning is not persuasive . . . Not only did HHS fail to explain why a benefit program's status should turn on whether Congress explicitly laid out the eligibility criteria in the statutory text, but HHS's approach would result in a large number of benefit programs falling outside PRWORA's reach, which would run counter to Congress's intent in enacting PRWORA." *Poder in Action v. City of Phoenix*, 481 F. Supp. 3d 962, 974 (D. Ariz. 2020). That court found that the program at issue in that case (the Coronavirus Relief Fund) was likely a "Federal public benefit" because it "provide[d] benefits on a household basis." *Id.* at 974.

The straightforward reasoning applied by that court, supported by the plain meaning of the statutory text, is consistent with the approach the HHS will take in determining whether an HHS program is a "Federal public benefit" and applying the prohibition in § 1611(a).

   3.  *"Any other similar benefit"*

Subparagraph (c)(1)(B) lists a wide range of benefits that fall within the definition of "Federal public benefit," and supplements those specific examples with a catch-all phrase: "any other similar benefit." HHS programs may provide an "other similar benefit" even if they do not directly fall within the enumerated, specific items of the list. Indeed, that is the point of a catch-all phrase. *Republic of Iraq v. Beaty*, 556 U.S. 848, 860 (2009) ("[T]he whole value of a generally

phrased residual clause, like the one used in the second proviso, is that it serves as a catchall for matters not specifically contemplated—known unknowns[.]"); *Cf. Uriostegui v. Ala. Crime Victims Compensation Comm'n*, 2010 WL 11613802, at *15 (N.D. Ala. Nov. 16, 2010) (rejecting attempts to distinguish crime victim compensation program from the other benefits listed in (c)(1)(B): "The categories of benefits listed in § 1611(c)(1)(B) are quite broad in their variety[.]"), *report and recommendation adopted*, 2011 WL 13285298 (N.D. Ala. Jan. 12, 2011).

The 1998 Notice acknowledged that "the litany of categories in 401(c)(1)(B) is broad." But the notice only engaged with this statutory language apophatically, providing a single example of what is <u>not</u> included in the specific terms, while ignoring the catch-all phrase. *See* 63 FR at 41659. It is true that an HHS program that deals with non-postsecondary education (such as Head Start) would not fall within the statutory term "postsecondary education . . . benefit." *Id.* But such program <u>would</u> fall within the statutory term if it is "similar" to another "benefit" explicitly listed in the statutory text. At the very least, the 1998 Notice wholly fails to explain why a program like Head Start would not fall within the term "other similar benefit."  HHS believes Head Start is similar to a welfare benefit and will explain further below.

The Department announces that it will interpret the phrase "any other similar benefit" in line with plain meaning: any other benefit that is "alike in substance or essentials" to or that "[has] characteristics in common"[2] with "retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, [or] unemployment benefit[s]." 8 U.S.C. § 1611(c)(1)(B). *See also United States v. Raynor*, 302 U.S. 540, 547 (1938) ("Similarity is not identity, but resemblance between different things."). This approach is fully consistent with the canon of *ejusdem generis*: "Where general words follow specific words in a statutory enumeration,

---

[2] *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/similar. (Accessed 13 Apr. 2025).

the general words are usually construed to embrace" "objects <u>similar in nature</u> to those objects enumerated by the preceding specific words." *Yates v. United States*, 574 U.S. 528, 545 (2015) (alterations omitted, emphasis added).

The application of this interpretation to specific HHS programs is informed by PRWORA's statement of purpose, which emphasizes that Congress intended to reach a broad range of benefit programs in order to ensure that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations" and to ensure that "the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601(2). HHS's interpretation of subparagraph (c)(1)(B) will also be informed by the recognition that Congress enacted this provision to apply across the multifarious operations of the federal government—that is, HHS will not overread into the fact that Congress provided certain examples to underscore the breadth of subparagraph (c)(1)(B) in order to improperly exclude programs that properly fall within the plain meaning of subparagraph (c)(1)(B).

Based on this interpretation, the Department believes that Head Start is a "similar benefit" to a welfare benefit. While the term "welfare" is not defined in PRWORA, it can be given a fair reading in its plain meaning and agency usage. The broad sweep of "welfare" described in the preamble in section 400 of PRWORA, (8 USC 1601) supports a broad reading of "welfare" and any "similar benefit", as do other laws enacted around the same time. The Welfare Indicators Act of 1994 (Pub. L. 103-432) directs the HHS Secretary to publish an annual report on welfare dependency. The law states it should "include analysis of families and individuals receiving assistance under means-tested benefit programs, including the program of aid to families with dependent children under

part A of title IV of the Social Security Act (42 U.S.C. 601 et seq.), the food stamp program under the Food Stamp Act of 1977 (7 U.S.C. 2011 et seq.), and the Supplemental Security Income program under title XVI of the Social Security Act (42 U.S.C. 1381 et seq.), or as general assistance under programs administered by State and local governments."[3] The purpose of this report is to address questions concerning the extent to which American families depend on income from welfare programs. The Administration for Children and Families also defines "welfare" specifically in the context of services that help children: "Child welfare is a continuum of services designed to ensure that children are safe and that families have the necessary support to care for their children successfully." [4] The Head Start Program is, at minimum, a similar program to the aforementioned welfare programs, which also provide means-tested assistance to families and individuals.

While Head Start provides for school readiness, it also provides low-income children and their families with "health, educational, nutritional, and social and other services, that are determined based on family needs assessment, to be necessary."[5] Further, it may serve as child care for parents of young children. These benefits provided by the Head Start program are "similar" to "welfare" benefits.

To the extent HHS has issued regulatory statements or guidance that suggest the Head Start program is not a "Federal public benefit" under subparagraph (c)(1)(B), those statements cannot stand in light of the plain meaning of PRWORA. This principle, of course, applies beyond the determination of whether the Head Start program is a "Federal public benefit"; it applies to the

---

[3] 42 U.S. Code § 1314a
[4] "Child Welfare," Administration for Children and Families, accessed on July 7, 2025, https://acf.gov/acf_issues/child_welfare.
[5] 42 U.S.C. § 9831. *See also* 42 U.S.C. § 9833

evaluation of any other program "provided by" by the Department or administered by the Department "by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(A), (B).

    *4. Exemptions*

Section IV of the 1998 Notice, entitled "Exemptions," asserts that § 1611(b)(1) "excludes some HHS programs from the definition of 'Federal public benefits.'" 63 FR at 41660.

While it is true that § 1611(b)(1) excludes certain HHS programs from the ambit of § 1611(a), it is false that those programs are excluded from the definition of "Federal public benefit." In fact, the statute clearly says the opposite. Paragraph (b)(1) says "Subsection (a) shall not apply with respect to the following <u>Federal public benefits</u> . . . " (emphasis added). Thus, "Public health assistance . . . for immunizations with respect to immunizable diseases and for testing and treatment of symptoms of communicable diseases whether or not such symptoms are caused by a communicable disease," 8 U.S.C. § 1611(b)(1)(C), very much is a "Federal public benefit." *Contra* 63 FR at 41660. Whether it is subject to § 1611(a) is a separate question conceptually.

## III.    HHS Programs

Having set forth the correct interpretation of the definition of "Federal public benefit,", HHS has determined that the list of HHS programs set forth in the 1998 HHS PRWORA Notice is incomplete and needs to be updated.

The 1998 Notice, 63 FR at 41660, identified the following HHS programs as providing "Federal public benefit[s]" and were not "otherwise excepted" from § 1611(a): (1) Adoption Assistance; (2) Administration on Developmental Disabilities (ADD)—State Developmental Disabilities Councils (direct services only); (3) ADD—Special Projects (direct services only); (4) ADD— University Affiliated Programs (clinical disability assessment services only); (5) Adult

Programs/Payments to Territories; (6) Agency for Health Care Policy and Research Dissertation Grants; (7) Child Care and Development Fund; (8) Clinical Training Grant for Faculty Development in Alcohol & Drug Abuse; (9) Foster Care; (10) Health Profession Education and Training Assistance; (11) Independent Living Program; (12) Job Opportunities for Low Income Individuals (JOLI); (13) Low Income Home Energy Assistance Program (LIHEAP); (14) Medicare; (15) Medicaid (except assistance for an emergency medical condition); (16) Mental Health Clinical Training Grants; (17) Native Hawaiian Loan Program; (18) Refugee Cash Assistance; (19) Refugee Medical Assistance; (20) Refugee Preventive Health Services Program; (21) Refugee Social Services Formula Program; (22) Refugee Social Services Discretionary Program; (23) Refugee Targeted Assistance Formula Program; (24) Refugee Targeted Assistance Discretionary Program; (25) Refugee Unaccompanied Minors Program; (26) Refugee Voluntary Agency Matching Grant Program; (27) Repatriation Program; (28) Residential Energy Assistance Challenge Option (REACH); (29) Social Services Block Grant (SSBG); (30) State Child Health Insurance Program (CHIP); (31) Temporary Assistance for Needy Families (TANF).

Based on the interpretation of PRWORA set forth above, and based on intervening developments since the promulgation of the 1998 Notice, HHS now identifies the following additional HHS programs as providing "Federal public benefit[s]": (32) Title X Family Planning Program; (33) Head Start; (34) Title IV-E Educational and Training Voucher Program; (35) Community Services Block Grant (CSBG); (36) Health Center Program; (37) Substance Use Prevention, Treatment, and Recovery Services Block Grant; (38) Community Mental Health Services Block Grant; (39) Projects for Assistance in Transition from Homelessness Grant Program; (40) Certified Community Behavioral Health Clinics; (41) Mental Health and Substance Use Disorder Treatment, Prevention, and Recovery Support Services Programs administered by

the Substance Abuse and Mental Health Services Administration not otherwise covered under (37)-(40), above (42) Title IV-E Prevention Services Program; (43) Title IV-E Kinship Guardianship Assistance Program; (44) Health Workforce Programs not otherwise covered under "(10) Health Profession Education and Training Assistance", as described above (including grants, loans, scholarships, payments, and loan repayments).[6]

To be clear, the above list is not exhaustive. Any programs not listed in this notice or established after the date of this notice may still fall under the definition of Federal public benefit. Any additional programs determined to be Federal public benefits will be announced in program specific guidance.

## IV.    Verification

The 1998 Notice, at various points, touched on the immigration-status verification requirements that PRWORA, as amended, attached to HHS programs. While verification requirements are related to a practical effectuation of the prohibition set forth in § 1611(a), they are conceptually distinct from a proper definition of "Federal public benefit." Thus, the Department is not formally revising the aspects of the 1998 Notice that touch on PROWRA's verification requirements at this time.

However, the Department notes important considerations for stakeholders to keep in mind. The American people, acting through their elected representatives in Congress and the President

___

[6] Some programs have citizenship or immigration requirements independent of, or more extensive than, PRWORA. For example, The National Health Service Corps (NHSC) programs require beneficiaries to be U.S. citizens or nationals of the United States. See 42 USC 254l(b)(2) (requiring NHSC scholars to be "be eligible for, or hold, an appointment as a commissioned officer in the Regular or Reserve Corps of the Service or be eligible for selection for civilian service in the Corps." Also see 42 CFR 62.3(a)(3)-(4). The same requirements apply to the NHSC Loan Repayment Program. See 42 USC 254l-1(b)(2); 42 CFR 62.24(a)(2). In general, under 5 CFR § 7.3(a), civilian employees of the United States appointed through the competitive process are required to be a "citizen or national of the United States," and Comm. Corps officers are required to be U.S. citizens under 42 USC 204(a)(2) ("All commissioned officers shall be citizens of the United States . . . .")

that they have elected to lead the Executive Branch, has made it clear that it is the policy of this country that persons' access to public benefits should turn on those persons' immigration status. In enacting PRWORA, "Congress ma[de] the following statements concerning national policy with respect to welfare and immigration": "It continues to be the immigration policy of the United States" that "aliens within the Nation's borders not depend on public resources to meet their needs, but rather rely on their own capabilities and the resources of their families, their sponsors, and private organizations," and that "the availability of public benefits not constitute an incentive for immigration to the United States." 8 U.S.C. § 1601.

President Trump has similarly issued numerous Presidential actions that reflect the will of the American people that aliens should not burden our public benefits system and that our public benefits system should not serve as a magnet for illegal immigration. This Administration recognizes that it is "it is national policy that 'aliens within the Nation's borders not depend on public resources to meet their needs,' and that 'it is a compelling government interest to remove the incentive for illegal immigration provided by the availability of public benefits.'" Executive Order 14218, §1, 90 FR 10581 (quoting PRWORA, alterations omitted). Thus, President Trump has emphasized that his Administration "will uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need, including individuals with disabilities and veterans." *Id.* As President Trump has ordered, "The American people deserve a Federal Government that puts their interests first and a Government that understands its sacred obligation to prioritize the safety, security, and financial and economic well-being of Americans." Executive Order 14159, § 1, 90 FR 8443.

Even if PRWORA and related regulatory activity do not mandate an entity to conduct verification of the immigration status of a person applying for benefits, nothing in the statute

prohibits such an entity from conducting verification. *See* 8 U.S.C. § 1642. Pending further regulation and/or guidance on the situations in which verification is required, all entities that are part of HHS's administration of public benefits should pay heed to the clear expressions of national policy described above.

V.      **Change in Position**

To be clear, the Department hereby explicitly "display[s] awareness that it is changing position." *F.C.C. v. Fox Television Stations*, 556 U.S. 502, 515 (2009) (emphasis omitted). As explained above, the change in position from the 1998 Notice is necessary because the 1998 Notice incorrectly interprets PRWORA's plain meaning of the statute's text in multiple ways. The Department's new position is consistent with the plain meaning of the statute's text.

Some may argue that there are reliance interests that are affected by the Department's change in position. Some may argue that the Department's new position will negatively impact public health. However strong these hypothetical policy arguments may be, the Department has no power to override Congress's will, expressed in the clear statutory text of PROWRA. *See Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 400 (2024) ("In the business of statutory interpretation, if [an agency's interpretation of a statute] is not the best, it is not permissible."). The Department anticipates that numerous unqualified aliens will no longer receive benefits under Federally funded programs due to this notice. This is a necessary result of the Department's obligation to comply with the law. It is also necessary to remedy the corresponding harm of the denial of limited benefits to those U.S. citizens and qualified aliens who otherwise would receive benefits to which they are entitled, but for them being provided to unqualified aliens. In addition, HHS is concerned that the provision of Federal public benefits to unqualified aliens incentivizes increased illegal immigration, compounding the problem over time, of unqualified aliens increasingly unlawfully drawing down and crowding out benefits reserved for U.S. citizens and qualified aliens.

## V.    Comment Period and Effective Date

Although HHS is soliciting public comment on this interpretation, it is necessary to apply this interpretation to HHS programs immediately, prior to receipt and consideration of any comments. Any delay would be contrary to the public interest and fail to address the ongoing emergency at the Southern Border of the United States.

During the prior administration, the numbers of illegal aliens who entered the United States reached dangerous levels, threatened the safety and wellbeing of the American people, and strained Federal and State resources.[7] On January 20, 2025, President Trump declared a national emergency at the Southern Border of the United States. Additional delay to correct the deficiencies of the 1998 Notice would fail to remove incentives to illegal immigration that are exacerbating the invasion at the Southern Border.

Additional delay will also cause unnecessary or incorrect administrative actions by agencies or entities that administer our programs, resulting ultimately in the denial of critical benefits and services to U.S. citizens and qualified aliens who, according to the interpretation in this notice, are otherwise eligible. In sum, although we are providing a 30-day period for public comment, as indicated at the beginning of this notice, this interpretation is effective immediately. Post-promulgation notice-and-comment and immediate effectiveness are consistent with the Administrative Procedure Act, pursuant to 5 U.S.C. 553(b)(A) and (d)(2).

## VI.    Economic Impact

1. <u>Introduction</u>

---

[7] "Crisis by Design," A Comprehensive Look at the Biden-Harris Administration's Unprecedented Border Crisis, House Committee on Homeland Security Majority Report, September 18, 2024, homeland.house.gov/wp-content/uploads/2024/09/September-2024-Border-Report.pdf.

We have examined the impacts of the notice under Executive Order 12866, Executive Order 13563, Executive Order 14192, the Regulatory Flexibility Act (5 U.S.C. 601-612), the Congressional Review Act/Small Business Regulatory Enforcement Fairness Act of 1996 (5 U.S.C. 801, Pub. L. 104-121), and the Unfunded Mandates Reform Act of 1995 (Pub. L. 104-4).

Executive Orders 12866 and 13563 direct us to assess all benefits and costs of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits. Regulatory actions are "economically significant" under section 3(f)(1) Executive Order 12866 if they "have an annual effect on the economy of $100 million or more; or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, local, or tribal governments or communities." Executive Order 14192 requires that any new incremental costs associated with significant new regulations "shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least ten prior regulations." This notice addresses alien eligibility for public benefits, and thus is expressly exempt from the requirements of Executive Order 14192 as a regulatory action related to an immigration-related function of the United States. The analysis indicates, and the Office of Information and Regulatory Affairs (OIRA) has determined, that this notice is an economically significant regulatory action under section 3(f)(1) Executive Order 12866.

Because this notice may result in an annual effect on the economy of $100 million or more or meet other criteria specified in the Congressional Review Act/Small Business Regulatory Enforcement Fairness Act of 1996, OIRA has determined that this notice falls within the scope of 5 U.S.C. 804(2).

The Regulatory Flexibility Act requires Agencies to analyze regulatory options that would minimize any significant impact of a rule on small entities. Because the incremental costs of verification are about 0.1% of the average annual expenditures per enrollee, we certify that the notice will not have a significant economic impact on a substantial number of small entities. This analysis, as well as other sections in this document and the notice, serves as the Final Regulatory Flexibility Analysis, as required under the Regulatory Flexibility Act.

The Unfunded Mandates Reform Act of 1995 (UMRA) generally requires that each agency conduct a cost-benefit analysis; identify and consider a reasonable number of regulatory alternatives; and select the least costly, most cost-effective, or least burdensome alternative that achieves the objectives of the rule before promulgating any proposed or final rule that includes a Federal mandate that may result in expenditures of more than $100 million (adjusted for inflation) in at least one year by State, local, and tribal governments, in the aggregate, or by the private sector. Each agency issuing a rule with relevant effects over that threshold must also seek input from State, local, and tribal governments. The current threshold after adjustment for inflation using the Implicit Price Deflator for the Gross Domestic Product is $187 million, reported in 2024 dollars. UMRA only applies in situations where an agency engages in notice-and-comment rulemaking. It does not apply to this notice.

A.  Overview of Economic Impacts

This notice updates and corrects our interpretation of the term "Federal public benefit." We anticipate that the notice will lead to a reduction in improper expenditures of taxpayer resources on Federal public benefits for unqualified aliens and a corresponding increase in benefits for U.S. citizens and qualified aliens. We present a partial benefit-cost analysis of the notice—for some effects, focusing on the impacts of one program as an illustrative case of the full potential

economic impacts. For the Head Start program, we report a primary estimate of $374 million in annual effects representing incremental expenditures on U.S. citizens and qualified aliens. We report a full range of estimated expenditure effects between $184 million and $1,881 million, capturing uncertainty in the baseline share of program beneficiaries who are U.S. citizens and qualified aliens. We anticipate that these expenditure effects will result in improved services and access for U.S. citizens and qualified aliens. For these effects to occur, we estimate corresponding annual costs of $21 million in the opportunity cost of time spent by individuals seeking benefits to document eligibility and time spent by individuals reviewing program eligibility, and additional transition costs for the Head Start program associated with revising standard operating procedures. A broader scope of analysis would report additional expenditure effects and costs associated with other programs covered by the notice. In a supplementary analysis, we estimate a range of potential upfront transition costs associated with revising standard operating procedures (not limited to Head Start) between $115 million to $175 million. We request comment on our estimates of benefits, costs, and transfers of this notice. We have developed a Final Economic Analysis of Impacts that assesses the impacts of this notice. The full final analysis of economic impacts is available in the docket at *regulations.gov* under Docket ID. AHRQ-2025-0002.

**Robert F. Kennedy, Jr.**,
*Secretary,*
*Department of Health and Human Services*.