The Honorable Ricardo S. Martinez

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF WASHINGTON
# AT SEATTLE

| | |
|---|---|
| WASHINGTON STATE ASSOCIATION OF HEAD START AND EARLY CHILDHOOD ASSISTANCE AND EDUCATION PROGRAM, ILLINOIS HEAD START ASSOCIATION, PENNSYLVANIA HEAD START ASSOCIATION, WISCONSIN HEAD START ASSOCIATION, FAMILY FORWARD OREGON, and PARENT VOICES OAKLAND, | Case No. 2:25-cv-00781-RSM **SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** JURY DEMAND |
| *Plaintiffs*, | |
| v. | |
| ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services; U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ANDREW GRADISON, in his official capacity as Acting Assistant Secretary of the Administration for Children and Families; ADMINISTRATION FOR CHILDREN AND FAMILIES; OFFICE OF HEAD START; and TALA HOOBAN, in her official capacity as Acting Director of the Office of Head Start, | |
| *Defendants*. | |

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

# SECOND AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

INTRODUCTION. ................................................................................................ 4

JURISDICTION AND VENUE ........................................................................ 10

PARTIES........................................................................................................... 10

FACTUAL ALLEGATIONS ............................................................................ 14

I.   Prior Congressional actions require HHS to continue to administer the Head Start program, including by maintaining funding and staffing levels. ........................................... 17

    A.  Congress has directed HHS to maintain the Head Start program at current capacity. ................................................................................................. 17

    B.  HHS must maintain sufficient staff to perform the guidance, oversight, monitoring, and grant administration functions mandated by Congress in the Head Start Act. .................................................................................... 18

II.  Congress directed HHS to administer the Head Start program in a manner that accounts for and effectively serves the wide range of children and families across the country........... 21

    A.  Head Start programs must be designed to meet the needs of the local community.................................................................................................. 24

    B.  Agencies must provide linguistically and culturally appropriate services.................. 27

    C.  Agencies do not and cannot deny enrollment based on immigration status. .............. 30

    D.  Agencies must provide inclusive and accessible services for children with disabilities. .......................................................................................... 32

    E.  Agencies must provide services to children experiencing homelessness and children in foster care........................................................................ 34

    F.  Agencies must consider diversity in development of staff. ......................................... 36

    G.  Agencies must conduct outreach to diverse families in the community and involve parents in the design and implementation of their programs........................ 38

III. Head Start's community-based model improves outcomes for children, families, and their communities.............................................................................. 41

    A.  Educational outcomes ................................................................................ 42

    B.  Health outcomes ............................................................................... 44

    C.  Economic outcomes ......................................................................... 46

IV. Defendants' actions conflict with the legal requirements established by Congress to maintain Head Start programming across the country. ......................................... 50

    A.  Contrary to Congressional mandate, Defendants are implementing a policy to dismantle the Head Start program .............................................. 53

        i.  HHS carries out unauthorized mass office closures and layoffs. ......................... 53

        ii.  Unlawful office closures cause and compound the chaos of extreme delays in funding and access to PMS. ......................................... 55

        iii.  Defendants systematically delay decision-making on designation renewals. ......................................................................... 60

    B.  HHS's unlawful ban on diversity, equity, inclusion, and accessibility sows confusion, compromises the quality of Head Start programming, and is inconsistent with the Head Start Act and the Rehabilitation Act. .............................. 61

        i.  OMB funding freeze implementing Anti-DEI, Gender Ideology, and Anti-Immigration Executive Orders. ............................................. 62

        ii.  The March 14 DEI Letter and the April 16 DEIA Certification. ......................... 64

V.  HHS Issuance of New Directive to Exclude Immigrants from Head Start ............................ 75

VI. Defendants' actions have caused, are causing, and will continue to cause irreparable harm to Plaintiffs. ......................................................................... 78

    A.  Defendants' actions will imminently result in reduction, suspension, or termination of Head Start programs across the country. .............................. 78

    B.  Loss of access to affordable childcare will have catastrophic and cascading impacts. ......................................................................... 82

CAUSES OF ACTION ..................................................................... 1186

REQUEST FOR RELIEF ................................................................... 118

JURY DEMAND ......................................................................... 121

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**INTRODUCTION**

1.      In 1965—as an outgrowth of the Civil Rights Movement, Congress created Head Start to provide high quality and comprehensive early education and childcare services for families the most in need. Head Start prepares children for success at school by providing services that "enhance cognitive, social, and emotional development." Over the past 60 years, this visionary program has transformed the lives of countless families by providing free early childhood education and childcare to 40 million children in every community in every state across the country. Head Start's educational programming has generated documented improvements in the health, educational outcomes, and financial prospects of participating children and families. For parents and caregivers—especially mothers, who carry a disproportionate share of childcare responsibilities, access to Head Start enables them to provide for their families. Without Head Start, many women, and especially women of color, would not be able to work or go to school.

2.      Defendants are now dismantling this crucial program in defiance of Congress—a goal specifically identified in "Project 2025: A Mandate for Leadership." A recent version of President Trump's budget proposes the complete elimination of Head Start by September 30, 2025, the end of Fiscal Year 2025.[1] Between January 20, 2025 and April 16, 2025, the Department of Health and Human Services ("HHS") has disbursed nearly $1 billion less in spending for Head Start compared to the same period in the previous year.[2] On April 25, 2025, news sources reported that budget-related materials describe Head Start as a program that "uses a 'radical' curriculum and gives preference to illegal immigrants" and "criticizes it for

---

[1] Alan Rappeport & Tony Romm, *Trump Budget to Take Ax to 'Radical' Safety Net Programs*, N.Y. Times (Apr. 25, 2025), https://www.nytimes.com/2025/04/25/us/politics/trump-budget-cuts.html.
[2] *NEW: Trump Admin Withholding Nearly $1 Billion in Funding for Head Start—Crunching Centers Nationwide and Forcing Devastating Closures*, U.S. Senate Comm. On Appropriations (Apr. 16, 202, https://www.appropriations.senate.gov/news/minority/new-trump-admin-withholding-nearly-1-billion-in-funding-for-head-startcrunching-centers-nationwide-and-forcing-devastating-closures.

SECOND AMENDED COMPLAINT - 4
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

diversity, equity and inclusion programming and the use of resources that encourage toddlers to welcome children and families with different sexual orientations."[3]

3.      In accordance with Project 2025's blueprint, Defendants have launched an offensive on Head Start providers and families in a series of unrelenting attacks. On January 20, 2025, President Trump issued his first Executive Orders banning "diversity, equity, inclusion, and accessibility," the "indoctrination of gender ideology," and the "supporting or providing services, either directly or indirectly, to removable or illegal aliens."

4.      On January 27, 2025, implementing these Day 1 Executive Orders, the Office of Management and Budget ("OMB") froze all funds for federal funding recipients, including for Head Start providers. The freeze created profound confusion and, within hours, forced several providers to close indefinitely. Even after the freeze was lifted following multiple court injunctions, programs faced looming uncertainty.

5.      On March 14, 2025, the Administration for Children and Families ("ACF") within HHS issued a letter implementing the President's ban on "DEI." The letter threatened funding consequences for agencies that "promote" or "take part" in any "diversity, equity, and inclusion (DEI) initiatives" (the "March 14 DEI Letter").

6.      On April 16, 2025, HHS then amended its Grants Policy Statement, which is incorporated into every new grant award, to add a certification requirement stating that agencies that accept grant awards "are certifying that . . . they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws" (the "April 16 DEIA Certification"). In the event that a funding recipient engages in impermissible

---

[3] *See supra* n. 1.

SECOND AMENDED COMPLAINT - 5
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

"DEIA," consequences include a claw-back of grant funds as well as civil and criminal liability for misrepresentation under the False Claims Act.

7.     Head Start providers (also known as Head Start "agencies") were not provided any official guidance as to what was considered a "diversity, equity, and inclusion (DEI) initiative," an activity "advancing" or "promoting" "DEIA," or "discriminatory equity ideology" per the above-referenced Executive Orders. Nor were they instructed how to reconcile these bans with their conflicting obligations under the Head Start Act to serve the "diverse needs" of their communities, including by providing "linguistically and culturally appropriate" services and supports for children with disabilities. Defendants have placed agencies in constant fear that they are in violation of the March 14 DEI Letter and the April 16 DEIA Certification and in jeopardy of losing their funding or their designation as Head Start providers, having funds clawed back, or being subject to investigation and liability under the False Claims Act.

8.     On April 1, 2025, Defendants also abruptly shuttered half of the Office of Head Start ("OHS") locations across the country and laid off the entirety of their staff. Defendants' mass closures and layoffs stripped Head Start agencies in 23 states overnight of the essential support, resources, and guidance of their regional Head Start offices. Head Start agencies ("Agencies"), including members of Plaintiffs Washington State Association of Head Start and Early Head Start Association ("Washington HSA"), Illinois Head Start Association ("Illinois HSA"), and Wisconsin Head Start Association ("Wisconsin HSA"), faced unprecedented confusion that threatened their ability to operate and, indeed, their very existence. Agencies struggled to get any information about the status of their funding and their designation as Head Start providers, without which they would not be able to continue services. Agencies' budgets are currently so precarious that many are not able to adequately plan to pay leases and staff.

SECOND AMENDED COMPLAINT - 6
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

9.    One member agency of Plaintiff Washington HSA, located in Sunnyside, Washington—after weeks of receiving no confirmation or updates from OHS about the status of its impending funding renewal deadline—was forced to suspend services. The sudden closure left 400 children without care and over 70 staff members without jobs. More closures and attendant harm will follow absent relief from this Court.

10.    Indeed, on April 10, OMB issued a memorandum (the "April 10 OMB Memo") reiterating that "[t]he [President's] Budget does not fund Head Start" and that "HHS/ACF should work with OMB to ensure to the extent allowable FY 2025 funds are made available to close out the program. This elimination is consistent with the Administration's goals of returning education to the States and increasing parental choice. The Federal government should not be in the business of mandating curriculum, locations and performance standards for any form of education."

11.    On May 19, 2025, the Department of Justice established a Civil Rights Fraud Initiative, which will engage with the Criminal Division and HHS to coordinate enforcement actions against DEIA policies, programs, and activities, as well as "strongly encourage" private parties to file their own False Claims Act lawsuits. *See* Memorandum from Todd Blanche, Deputy Attorney General, U.S. Dep't of Justice (May 19, 2025), https://perma.cc/N9WX-VQY7.

12.    In May 2025, Defendant HHS released its Fiscal Year 2026 Budget in Brief, reiterating their commitment to "remove DEI" from Head Start. *See* Fiscal Year 2026, Budget in Brief, U.S. Dep't of Health & Human Services (May 2025), https://www.hhs.gov/sites/default/files/fy-2026-budget-in-brief.pdf.

13.    In June 2025, Defendant ACF submitted its FY 2026 budget to Congress. The budget includes funding for Head Start but anticipates decreasing the total funded slots by nearly 50,000. *See* Fiscal Year 2026: Justification of Estimates for Appropriations Committees

SECOND AMENDED COMPLAINT - 7
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

at 51, Administration for Children, Families, and Communities, Dep't of Health & Human Services, (June 2025), https://acf.gov/sites/default/files/documents/olab/ACF-FY-2026-CJ-for-web.pdf.

14. On July 14, 2025, HHS issued a directive that purports to reinterpret the phrase "federal public benefit" in the Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA) in order to exclude "non-qualified" immigrants from Head Start for the first time in the program's history. *See* U.S. Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit," 90 Fed. Reg. 31232 (July 14, 2025) (the "July 14 Immigrant Exclusion Directive"). The July 14 Immigrant Exclusion Directive is "effective immediately." *Id.* at 31238.

15. The July 14 Immigrant Exclusion Directive contradicts HHS's 1998 notice stating that Head Start is not a "federal public benefit" that requires the exclusion of "non-qualified aliens." *See* U.S. Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA): Interpretation of "Federal Public Benefit," 63 Fed. Reg. 41658 (Aug. 4, 1998).

16. In the 1998 notice, HHS explained that Congress' explicit inclusion of "postsecondary education" in the list defining "federal public benefits" means that non-postsecondary education programs, such as Head Start, are not "federal public benefits" for the purposes of PRWORA. In the new Immigrant Exclusion Directive, HHS now declares Head Start a "similar benefit" to "welfare," such that it falls within PRWORA's definition of "federal public benefit" and requires the exclusion of "non-qualified" immigrants.

17. HHS stated that it made this change to "ensure enrollment in Head Start is reserved for American citizens from now on." Press Release, U.S. Dep't of Health and Human Services, *HHS Bans Illegal Aliens from Accessing its Taxpayer-Funded Programs* (July 10,

2025),    https://www.hhs.gov/press-room/prwora-hhs-bans-illegal-aliens-accessing-taxpayer-funded-programs.html.

18.    Both the July 14 Immigrant Exclusion Directive and HHS's accompanying Regulatory Impact Analysis focus exclusively on Head Start in analyzing the effects of its new interpretation of "federal public benefit." *See* 90 Fed. Reg. at 31236 (addressing only Head Start in its discussion of "[t]he application of this interpretation to specific HHS programs"); U.S. Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit"; Final Regulatory Impact Analysis, Final Regulatory Flexibility Analysis, Unfunded Mandates Reform Act Analysis, Docket No. AHRQ-2025-002 at 5 ("Specifically, in assessing expenditure changes and ongoing costs of checking eligibility, we adopt a scope of analysis that covers the Head Start program, administered by the Office of Head Start within the Administration for Children and Families.").

19.    Defendants' unyielding stream of attacks are unlawful acts in service of an unlawful goal: to eliminate Head Start in blatant contravention of Congressional directives. They violate the core principles of Separation of Powers and the Spending Clause under the Constitution. Defendants' March 14 DEI Letter and the April 16 DEIA Certification are also unconstitutionally vague and impermissibly suppress protected speech.

20.    Defendants' actions are additionally unlawful under the Administrative Procedure Act because they are contrary to the Constitution and federal statutes, including the Head Start Act and the Rehabilitation Act; *ultra vires*, and arbitrary and capricious.

21.    Defendants' actions cause significant and irreparable harm to Plaintiff Head Start Associations, whose members do not know whether they will be suddenly forced to close in a day, a week, or a month. Defendants' actions also have caused and will continue to cause significant harms to Head Start parents and caregivers across the country, including members

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

of Plaintiffs Family Forward Oregon and Parent Voices Oakland ("Parent Plaintiffs"). Loss of access to Head Start would result in significant disruptions to their children's education, disability and other support services, food security, and health and well-being, and would force parent and caregiver members to miss work, lose their jobs, drop out of school and vocational training programs, and endure significant financial and mental stress and hardship.

22.    Relief from this Court is necessary to prevent the imminent termination of critical services for hundreds of thousands of families currently enrolled, as well as to preserve the program for the millions of families of future generations.

### JURISDICTION AND VENUE

23.    This Court has jurisdiction under 28 U.S.C. §§ 1331 (federal question), 1346 (civil actions against the United States), and 5 U.S.C. § 702 (final agency action).

24.    Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(2) and 1391(e)(1). Defendants are government agencies and government officers who are sued in their official capacities. Plaintiff Washington HSA is headquartered in this District. A substantial part of the events or omissions giving rise to this Complaint occurred in this District.

25.    This Court is authorized to issue declaratory and injunctive relief under 28 U.S.C. §§ 2201–02, 5 U.S.C. §§ 705–06, Rules 57 and 65 of the Federal Rules of Civil Procedure, and by the inherent general equitable powers of this Court.

### PARTIES

**Plaintiffs**

26.    The **Washington State Association of Head Start and Early Childhood Education and Assistance Program ("Washington HSA")** is a statewide, non-profit organization with 32 agency members that provide Head Start, Early Head Start, Migrant and Seasonal Head Start, and Tribal Head Start services. Washington HSA members serve over 14,300 children and families, most of whom come from underserved communities.

SECOND AMENDED COMPLAINT - 10
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

27.     The mission of Washington HSA is to work in collaboration with children, families, and communities to advocate for antiracist and equitable early learning, education, and human services systems that provide opportunities for all children and families, regardless of race, gender, language, ability, sexual orientation, nationality, immigration status, or socioeconomic status. Washington HSA supports its members through policy advocacy and by providing high quality professional development for members to help them maintain a high level of excellence in teaching, program governance, management, and family support services.

28.     The **Wisconsin Head Start Association ("Wisconsin HSA")** is a statewide, non-profit organization made up of 39 agency members who provide Head Start and Early Head Start services to families throughout Wisconsin for the last 50 years. It serves all of Wisconsin's 72 counties and interacts with 424 school districts serving the state's children and provides comprehensive services for over 15,000 of Wisconsin's youngest and most vulnerable citizens.

29.     Wisconsin HSA's mission is to support and strengthen Head Start and Early Head Start programs for the benefit of children, families, and communities through advocacy, professional development, and strategic alliances. Its membership is open to each federally recognized Wisconsin Head Start and Early Head Start agency and delegate agency. Members pay annual dues determined by the Wisconsin HSA Board of Directors. Members have access to a network of support, including training events and workforce support, leadership development, representation on statewide collaborative projects, management of State Supplemental Head Start Grants, and advocacy work to assure the availability of comprehensive, top-quality services to families facing the struggles that living in poverty presents.

SECOND AMENDED COMPLAINT - 11
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

30.     The **Illinois Head Start Association (the "Illinois HSA")** is a statewide, non-profit, nonpartisan association of 51 member agencies and 84 delegate agencies serving over 28,800 children and their families.

31.     Illinois HSA's mission is to provide guidance and support to Illinois Head Start and Early Head Start programs to ensure their ongoing viability and vitality to operate high impact, community driven services for Illinois' most vulnerable children and families. Illinois HSA advocates for its members at the federal, state, and local levels, offers professional development and training resources for Head Start agencies and their staff, and provides opportunities for parents and families to connect, share, and grow.

32.     The **Pennsylvania Head Start Association ("Pennsylvania HSA")** is a statewide, non-profit, non-partisan organization dedicated to improving the future for children, families, and communities who are economically challenged. As a responsive and collaborative organization, it embraces diversity, promotes comprehensive services, and unifies the early childhood community in Pennsylvania by offering professional development and training for its member Head Start agencies, providing networking and information-sharing opportunities, and advocating at the federal, state, and local levels on behalf of its members. Pennsylvania HSA's 60 member agencies serve over 32,300 children and 30,000 families, providing comprehensive services to ensure all children in Pennsylvania reach their full potential.

33.     **Family Forward Oregon ("FFO")** is a statewide, non-profit organization led by and comprised of Oregon mothers and caregivers fighting for gender, economic, and racial justice and for access to high-quality, affordable, and culturally relevant childcare. Its membership includes Oregon mothers and caregivers across intersecting identities of race, class, sexuality, gender identity, and disability, including parents and family members of

SECOND AMENDED COMPLAINT - 12
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

children currently enrolled in Head Start. FFO's membership also includes Oregon childcare providers, including current Head Start teachers and staff members.

34.     The mission of FFO is to work collectively with Oregon mothers and caregivers to organize, educate, and advocate for care systems that ensure that families obtain economic stability and power, and where the labor of caregiving is seen and valued. To achieve these goals, FFO builds on the collective power of Oregon mothers and caregivers through community organizing, leadership development, civic engagement, education, and advocacy. FFO offers many opportunities for training, development, and participation to its members, including, but not limited to, monthly action team meetings; direct actions, including a Day Without Child Care to draw attention to the statewide childcare crisis; care summits; and a statewide parent cohort, comprised of parent members from communities most impacted by the childcare crisis in Oregon.

35.     **Parent Voices Oakland ("PVO")** is a parent-led non-profit organization that organizes, educates, and advocates for affordable, accessible, quality childcare in Oakland and the surrounding Bay Area in California. Its multi-racial, multi-lingual, and multi-generational membership includes parents and caregivers in Oakland and the surrounding Bay Area, including parents and caregivers of children currently enrolled in Head Start. PVO is one chapter of a statewide network of 17 chapters serving children and families across California.

36.     The mission of PVO is to make quality, accessible, and affordable childcare available to all families, and to organize, support, and empower parents and caregivers in becoming life-long advocates for their children. PVO's programs are developed to expand local, state, and federal resources for a childcare delivery system that is comprehensive, community driven, and provides support for children and families universally. Through community organizing, parent education and leadership development, coalition building, and

SECOND AMENDED COMPLAINT - 13
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

civic engagement, PVO elevates the visibility of low-wage workers who cannot afford the full cost of childcare.

**Defendants**

37.    Defendants are officials of the United States government and United States governmental agencies responsible for promulgating or implementing the Head Start Act. 42 U.S.C. § 105 *et seq*.

38.    Defendant **Robert F. Kennedy Jr.** is the Secretary of Health and Human Services. He oversees, among other things, the Administration for Children and Families and the OHS. He is sued in his official capacity.

39.    Defendant **United States Department of Health and Human Services ("HHS")** is an executive department of the United States government headquartered in Washington, D.C., and responsible for the Head Start program.

40.    Defendant **Andrew Gradison** is the Acting Assistant Secretary for the Administration for Children and Families. He is sued in his official capacity.

41.    Defendant **Administration for Children and Families** ("ACF") is a division within the United States HHS that is headquartered in Washington, D.C., and administers the Head Start program.

42.    Defendant the **Office of Head Start** ("OHS") is an office within the Administration for Children and Families, and is headquartered in Washington, D.C., and administers the Head Start program.

43.    Defendant **Tala Hooban** is the acting director of the OHS. She is sued in her official capacity.

## FACTUAL ALLEGATIONS

44.    Head Start is a Congressionally-established federal program that provides young children of low-income families "a comprehensive program to meet their emotional,

SECOND AMENDED COMPLAINT - 14
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

social, health, nutritional and psychological needs."[4] The purpose of the program is to prepare children for school and life beyond school in "(1) a learning environment that supports children's growth in language, literacy, mathematics, science, social and emotional functioning, creative arts, physical skills, and approaches to learning; and (2) through the provision to low-income children and their families of health, educational, nutritional, social, and other services that are determined, based on family needs assessments, to be necessary." 42 U.S.C. § 9831.

45.   Congress established Head Start in the Economic Opportunity Act ("EOA") of 1964, which authorized financial and technical assistance for "Urban and Rural Community Action Agencies" through which "[c]ommunities will be encouraged and helped to develop individual agencies" for low-income families. Senate Report from the Committee on the Labor and Public Welfare, July 21, 1964, p 18. Under the Act, each community must be given "as much flexibility as possible" to develop their own agencies. *Id.* Since its founding, Head Start has served 40 million children.

46.   Launched in the summer of 1965, Head Start was an outgrowth of the Civil Rights Movement and its promise of racial and economic justice, particularly for Black women and children in the United States.[5] Head Start provided Black children, in particular,

---

[4] *Head Start History*, Admin. For Child & Fams., U.S. Dep't of Health & Hum. Servs. (Jan. 31, 2025), https://headstart.gov/about-us/article/head-start-history.
[5] Crystal R. Sanders, *A Chance for Change: Head Start and Mississippi's Black Freedom Struggle* 4–8 (Univ. of N.C. Press, 2016) (noting that Black women "perceived Head Start, with its access to social services and its stated commitment to their maximum participation, as the logical way to continue their struggle for political and socioeconomic justice," and that Head Start programming "readied [B]lack children to live in an equal and integrated society rather than teaching them to survive white supremacy"); *see also* Crystal R. Sanders, *The 1966 Preschool March on Washington*, Univ. of N.C. Press Blog (Feb. 11, 2016), https://uncpressblog.com/2016/02/11/the-1966-preschool-march-on-washington/ ("[T]he Head Start program provided [B]lack youth with an educational experience void of notions of [B]lack inferiority.").

SECOND AMENDED COMPLAINT - 15
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

with critical "access to professional healthcare, nutritious meals, and an education that celebrated[,] rather than condemned[,] their [B]lackness."[6]

47. The program is funded by OHS under ACF within HHS. Head Start services are available at no cost to families that fall below the poverty line.

48. ACF awards Head Start grants directly to local Head Start agencies, which are typically organizations that provide childcare and early learning services. This unique "federal to local" funding structure ensures that each Head Start program is tailored to the needs of the community.[7]

49. Early Head Start serves infants as young as six weeks old, and children remain eligible for Head Start until they reach the age for public school where the program is located.[8]

50. As set forth in detail below, Congress requires HHS to administer and maintain Head Start across the country in a manner consistent with the requirements and standards set forth in the Head Start Act. For decades, Head Start has resulted in proven benefits for the wide range of children, families, and communities it serves nationwide.

51. In the past several months, however, Defendants' actions have impeded the ability of Head Start agencies to provide services and pose a substantial risk of irreparable and ongoing harm to the hundreds of thousands of children and families served by Head Start each year.

---

[6] Keisha N. Blain, *Head Start and Mississippi's Black Freedom Struggle: An Interview with Crystal R. Sanders*, Black Perspectives (July 18, 2016), https://www.aaihs.org/head-start-and-mississippis-black-freedom-struggle/.
[7] *Head Start Program Facts: Fiscal year 2023*, Admin. For Child & Fams., U.S. Dep't of Health & Hum. Servs. (Feb. 27, 2025), https://headstart.gov/program-data/article/head-start-program-facts-fiscal-year-2023
[8] *Head Start Program Facts: Fiscal year 2023*, Admin. For Child & Fams., U.S. Dep't of Health & Hum. Servs. (Feb. 27, 2025), https://headstart.gov/program-data/article/head-start-program-facts-fiscal-year-2023

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

I.    **Prior Congressional actions require HHS to continue to administer the Head Start program, including by maintaining funding and staffing levels.**

A.  **Congress has directed HHS to maintain the Head Start program at current capacity.**

52.    The Head Start Act, as amended by the Improving Head Start for School Readiness Act of 2007, requires the Secretary of HHS to allocate funds to agencies in each state, in an amount no less than the funds allocated in the previous fiscal year. 42 U.S.C. § 9835 (2007). The Secretary must also allocate funds for training and technical assistance activities and for research.

53.    Congress most recently funded Head Start in the Fiscal Year 2024 Appropriations Bill. The bill "[p]rovided, [t]hat $12,271,820,000 shall be for making payments under the Head Start Act, including for Early Head Start-Child Care Partnerships." Further Consolidated Appropriations Act, H.R. 2882, 118th Cong. (2024), https://www.congress.gov/bill/118th-congress/house-bill/2882. In lieu of passing a Fiscal Year 2025 budget, Congress instead passed a series of Continuing Resolutions to extend funding at current levels, through September 30, 2025, the end of the fiscal year. Making Further Continuing Appropriations and Other Extensions for the Fiscal Year Ending September 30, 2025, and for Other Purposes, Pub. L. No. 119-4, 139 Stat. 9 (2025) (extending funding through September 30, 2025).

54.    Under the operative Continuing Resolution, HHS must disburse funds that have been appropriated to agencies that provide Head Start services.

55.    The Secretary designates Head Start agencies based on their ability to deliver a "high-quality and comprehensive Head Start program that meets the educational, health, nutritional, and social needs of the children and families it serves, and meets program and financial management requirements and standards." 42 U.S.C. § 9836(c)(1). Each agency's

SECOND AMENDED COMPLAINT - 17
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Head Start program is "designat[ed] . . . for a period of [five] years for the planning, conduct, administration, and evaluation of a Head Start program." 42 U.S.C. § 9833.

56.     Each agency designated a Head Start agency can receive federal funds that cover at least 80 percent of the approved costs of the agency's Head Start program. 42 U.S.C. § 9835(b).

57.     During this five-year period, HHS renews each agency's grant annually. This annual renewal is referred to as a "continuation grant" or "refunding." As discussed *infra* Section I.B, agencies receive consistent updates and communication about the status of their grants from staff who are "Program Specialists" at the OHS. HHS must disburse continuation grants to agencies unless OHS has identified a performance issue that would justify termination. Agencies' grant renewal deadlines are staggered in different months over the course of the year.

58.     After a five-year designation period, agencies that maintain high performance are entitled to another five-year designation. Agencies that trigger performance-related criteria during their five-year designation are placed in the Designation Renewal System ("DRS") and must compete with other agencies at the end of their designation period for another five-year designation.

59.     If a previously designated Head Start agency does not qualify for a designation renewal, the Secretary must either designate a new agency or an interim agency to fill the gap in services. 42 U.S.C. § 9836(d), (f).

### B.   HHS must maintain sufficient staff to perform the guidance, oversight, monitoring, and grant administration functions mandated by Congress in the Head Start Act.

60.     Through the Head Start Act, Congress provided specific instructions for monitoring the performance of Head Start agencies to determine whether they qualify for

SECOND AMENDED COMPLAINT - 18
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

federal funding. Congress delegated specific responsibilities to the Secretary of HHS and the OHS. OHS staff are critical to maintaining the quality and ensuring continued operation of Head Start programs.

61.    OHS staff conduct regular performance evaluations of Head Start programs, including a full review of each agency at least once every three years; a review of each newly designated Head Start agency immediately after completion of its first year; and follow-up reviews for agencies with specific deficiencies or broader areas of noncompliance. 42 U.S.C. § 9836a(c)(1).

62.    If OHS determines that a Head Start agency fails to meet the performance standards, the Head Start Act sets out a detailed corrective action plan, including deadlines for correcting the deficiency—*i.e.*, immediately, if the deficiency threatens the health or safety of program staff or participants or "poses a threat to the integrity of Federal funds," or else within 90 days or longer, per the Secretary's discretion depending upon the nature of the deficiency and whether it requires development of a quality improvement plan. 42 U.S.C. § 9836a(e)(1). Head Start agencies are constantly monitored by Defendants, most receiving monthly contact about compliance.

63.    The administration of Head Start has been divided into twelve regions for more than four decades. Ten regions are geographic, with each regional office responsible for managing programs in its respective group of states. Regional offices are staffed in large part by "Program Specialists," who are the primary and sometimes only points of contact for agencies to OHS. Two special program Regions are located in the OHS central office and support American Indian and Alaska Native Head Start, and Migrant and Seasonal Head Start---which serves the families of farmworkers. *See, e.g.*, ACF, Proposed Information Collection Activity: Objective Work Plan/On-Going Progress Report, 88 Fed. Reg. 32227, 32229 (May 19, 2023); 49 Fed. Reg. 28512-01 (July 12, 1984) (explaining Head Start was administered

through the ten HHS regional offices and the American Indian and Migrant Programs Branches (now called American Indian and Alaska Native Head Start and Migrant and Seasonal Head Start)). "Head Start Regional Offices are responsible for administering funding, ongoing oversight and monitoring, and training and technical assistance to the grant recipient agencies that provide services to Head Start children and families; providing ongoing management of Regional Head Start program operations, including State Collaboration grants, and liaising within each Region to the Office of Child Care and the Office of Grants Management." ACF, Proposed Information Collection Activity: Objective Work Plan/On-Going Progress Report, 88 Fed. Reg. 32227, 32229 (May 19, 2023).

64.     Communication and transparency about funding are particularly crucial due to restraints on HHS's Payment Management System ("PMS"), which provides that "[F]ederal cash must be drawn solely to accommodate your immediate needs on an 'As Needed Basis Only' and must not be held *in excess of three (3) working days*.'"[9] Because of this Three-Day Rule, agencies have limited cash reserves and need certainty that they will be able to continue to withdraw funds to make payroll, pay rent, and meet other financial obligations.

65.     Regional offices act as important intermediaries between OHS and agencies and Head Start Associations in other respects. Program specialists distribute information from OHS, including updates in technical operations and program administration, trainings on how to provide childhood services based on new developments in the field, and analysis of trends in populations across the region. Head Start agencies communicate concerns about Head Start implementation to the Regional Offices, which in turn communicate those concerns to OHS.

66.     Additionally, Program Specialists are an agency's lifeline throughout an agency's initial set-up process. Program Specialists assist with leasing and licensing

---

[9] *Payment Request*, Program Mgmt. Servs., U.S. Dep't of Health & Hum. Servs., https://pms.psc.gov/grant-recipients/funding-request-formula.html/.

SECOND AMENDED COMPLAINT - 20
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

requirements; help manage timelines and other logistics; recruit parents to participate in programming; and numerous other responsibilities that help an agency's program come to fruition.

67.    Program Specialists also provide timely emergency support. They provide urgent guidance and technical assistance for child health and safety incidents and disaster relief.

68.    Finally, Program Specialists assist with approvals related to an agency's facilities, like fixing a leaking roof. At any given time, there are typically over 1,000 open facilities requests across the country.

69.    Many Head Start programs are in almost constant contact with their Program Specialist in regional offices. For example, the Office of Region 10—covering Alaska, Idaho, Oregon, and Washington—conducted bi-weekly meetings with Head Start agencies in Washington, in addition to any contact as necessary. Similarly, prior to the current administration, the Wisconsin HSA similarly convened monthly calls between its members and OHS regional leadership.

**II.    Congress directed HHS to administer the Head Start program in a manner that accounts for and effectively serves the wide range of children and families across the country.**

70.    The Head Start Act requires Head Start agencies to meet the "diverse needs of the population served." 42 U.S.C. § 9836(d)(2)(L); *see also* 45 C.F.R. § 1302.11(b).

71.    Since its founding in 1965, Head Start has successfully served children from a wide range of backgrounds, including children of color, children living in rural areas, children with disabilities, children who are experiencing homelessness, and bilingual children.

72.    Over 75 percent of the children that Head Start serves are from families of color, including Latine, Black, and Indigenous families. In 2023 and 2024, 37 percent of participants

SECOND AMENDED COMPLAINT - 21
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

were non-white Hispanic or Latine, 28 percent were Black, 5 percent were multiracial, 3 percent were American Indian or Alaska Natives, 2 percent were Asian, and 1 percent were Native Hawaiian or Pacific Islander.[10]

73.    About 30 percent of Head Start participants live in rural communities. In these areas, recruitment of staff and provision of wraparound services for education and health agencies is particularly challenging because of lower population density, transportation, and resources.[11] The ability of Head Start agencies to successfully provide services in rural areas is particularly important because in these areas (known as "childcare deserts"[12]), Head Start agencies are often one of extremely limited childcare options for parents and caregivers, including many of Plaintiff FFO's members. Abrupt closure of Head Start agencies in many rural communities would mean a significant number of parent and caregivers would lose access to childcare overnight, without other available and/or affordable childcare openings in their communities.

74.    Head Start agencies also must ensure that at least 10 percent of their total enrollment is filled by children with disabilities. 42 U.S.C. § 9835(d)(1). Today, approximately 15 percent of Head Start children have a disability that makes them eligible to receive special education, early intervention, and related services.

75.    About 7.5 percent of Head Start children—over 58,000 children—were experiencing homelessness in 2023 to 2024. These children and their families, including

---

[10] *Office of Head Start – Services Snapshot National All Programs (2023-2024)*, Admin. For Child & Fams., U.S. Dep't of Health & Hum. Servs., at 2, (Mar. 24, 2025), https://headstart.gov/sites/default/files/pdf/service-snapshot-all-2023-2024.pdf.

[11] Dana C. McCoy et al., *Differential Effectiveness of Head Start in Urban and Rural Communities*, 43 J. of Applied Dev. Psych. 29-42 (Mar.-Apr. 2016) https://doi.org/10.1016/j.appdev.2015.12.007; Doris Chertow, *Project Head Start, the Urban and Rural Challenge* No. OEO-4012 (Apr. 1968)), https://files.eric.ed.gov/fulltext/ED022527.pdf.

[12] Rasheed Malik, Katie Hamm, & Maryam Adamu, *Child Care Deserts*, Center For American Progress (Oct. 27, 2028), https://www.americanprogress.org/article/child-care-deserts/.

SECOND AMENDED COMPLAINT - 22
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

members of Parent Plaintiffs, rely on access to Head Start for vital services, including, but not limited to, access to nutritious meals and healthcare services.[13]

76.     Over 25,000 children enrolled in Head Start were in foster care between 2023-2024. Head Start provides vital predictable environments and relationships to trusted teachers and caregivers to children in foster care who often case instability in their living situations.

77.     In 2023 to 2024, 28.3 percent of children enrolled in Head Start were dual language learners. They speak more than 140 languages and are enrolled in 87 percent of Head Start programs.[14]

78.     Congress also directed Head Start agencies to provide services specifically tailored for American Indians, Alaska Natives, and children of migrant and seasonal farmworkers.

79.     In 1965, Head Start created the "American Indian and Alaska Native" ("AIAN") program to provide services for children with American Indian and Alaska Native heritage. AIAN Head Start agencies may prioritize enrollment of tribal members and their families. 42 U.S.C. § 9840(d); 45 C.F.R. § 1302.14(a)(2).

80.     In 1969, Congress created the Migrant and Seasonal Worker Head Start ("MSHS") to provide services for the children of migrant and seasonal farmworkers. Children are eligible to enroll in MSHS agencies if at least one family member's income comes primarily from agricultural work. 42 U.S.C. § 9832(17); 45 C.F.R. § 1302.12(f).

---

[13] *Office of Head Start – Services Snapshot National All Programs (2023-2024)*, Admin. For Child & Fams., U.S. Dep't of Health & Hum. Servs., at 2-4, (Mar. 24, 2025), https://headstart.gov/sites/default/files/pdf/service-snapshot-all-2023-2024.pdf.
[14] *Office of Head Start – Services Snapshot National All Programs (2023-2024)*, Admin. For Child & Fams., U.S. Dep't of Health & Hum. Servs., at 3, (Mar. 24, 2025), https://headstart.gov/sites/default/files/pdf/service-snapshot-all-2023-2024.pdf.

SECOND AMENDED COMPLAINT - 23
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

81.     Both the MSHS and AIAN Head Start agencies provide tailored services for program participants, including language preservation services, culturally integrated learning plans, and professional staff development. *See, e.g.*, 45 C.F.R. §§ 1302.30, 1302.36, 1302.90.

82.     In 2023 and 2024, MSHS operated in 38 states and served 21,061 children and pregnant people along with their families. Of these participants, more than 11 percent of the children were experiencing homelessness and 11 percent had a disability.[15]

83.     Many MSHS children come from families where parents have limited English proficiency. Approximately 25 percent of MSHS parents do not speak English, and 33 percent of parents reported speaking limited English.

84.     In 2023 to 2024, AIAN Head Start served 17,889 participants. Of these participants, 1,416 (8.1 percent) were experiencing homelessness, and 2,256 (12.9 percent) had a disability.[16]

### A.  Head Start programs must be designed to meet the needs of the local community.

85.     Because of the broad range and diversity of needs of Head Start families, each agency must take into account the unique backgrounds and cultures of their participants in the design of their curriculum and activities, as well as their staff training, outreach, and recruitment process. Head Start agencies are directed to provide linguistically and culturally appropriate services, inclusive services for children with disabilities, and services to children experiencing homelessness. In order to fulfill its mandate, Head Start agencies are further directed to consider diversity in staff development and community outreach.

---

[15] Erin Bumgarner et al., *Select Findings from the Migrant and Seasonal Head Start Study 2017: Cultural Items and Language Use (CILU) Checklist*, Admin. for Child. & Fams. (Jan. 2020), https://acf.gov/sites/default/files/documents/opre/mshs_cilu_brief_jan_2020.pdf; *Services Snapshot Migrant and Seasonal Head Start (MSHS) All Programs (2023-2024)* Off. Of Head Start, https://headstart.gov/sites/default/files/pdf/service-snapshot-mshs-2023-2024.pdf, (last visited Apr. 18, 2025).
[16] *Services Snapshot American Indian and Alaska Native (AIAN) All Programs (2023-2024)*, Off. Of Head Start, https://headstart.gov/sites/default/files/pdf/service-snapshot-aian-2023-2024.pdf (last visited Apr. 18, 2025).

SECOND AMENDED COMPLAINT - 24
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

86.     When determining services, Head Start agencies must conduct "community wide assessments" to identify "populations most in need of services including prevalent social or economic factors, challenges, and barriers experienced by families and children." 45 C.F.R. § 1302.11(b); *see also id.* § 1302.14.

87.     Assessments must collect relevant demographic data regarding eligible participants' race and ethnicity, the number of "[c]hildren with disabilities, including types of disabilities and relevant services and resources provided," and eligible participants' spoken languages. *Id.* § 1302.11(b). Assessments must also consider "changes related to children and families experiencing homelessness" and "how the program addresses equity, accessibility, and inclusiveness in its provision of service." *Id.* A program must use this data to "inform ongoing program improvement efforts" and "to promote enrolling the children most in need of program services." *Id.* § 1302.14.

88.     Head Start regulations include "Performance Standards" which require that agencies "ensure equitable, inclusive, and accessible service[s]" that reflect the "needs and diversity of the community." *Id.* § 1302.11. The "Performance Standards are the foundation on which programs design and deliver comprehensive, high-quality individualized services to support the school readiness." Head Start Performance Standards, 81 Fed. Reg. 61294, 61296 (Sept. 6, 2016).

89.     The Performance Standards integrate the *Head Start Early Learning Outcomes Framework: Ages Birth to Five* (the "Framework"). *See* 45 C.F.R. §§ 1302.30–32, 1302.30–35, 1302.91–92, which were developed based on comprehensive research on effective early learning outcomes.[17] One of the "guiding principles" of the Framework is that "every child

---

[17] *Interactive Head Start Early Learning Outcomes Framework: Ages Birth to Five*, Off. of Head Start, https://headstart.gov/interactive-head-start-early-learning-outcomes-framework-ages-birth-five (last visited Apr. 28, 2025).

SECOND AMENDED COMPLAINT - 25
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

has diverse strengths rooted in their family's culture, background, language, and beliefs. Responsive and respectful learning environments welcome children from diverse cultural and linguistic backgrounds. Effective teaching practices and learning experiences build on the unique backgrounds and prior experiences of each child[18] The Framework elements are "[i]nclusive [and] [r]elevant for children from diverse linguistic, economic, and cultural backgrounds and for children with disabilities." *Id.* at 6.

90.     In accordance with the Performance Standards, agencies have developed unique curricula, schedules, projects, and activities to meet the needs of the local communities.

91.     For example, to address the needs of parent farmworkers who work long hours in the fields, MSHS offers full-day care from 6 a.m. to 6 p.m. from October through April. MSHS agencies also offer multilingual education through dual language classrooms to aid in literacy for their mostly Spanish-speaking students.

92.     Members of Wisconsin HSA support the needs of Wisconsin's American Indian populations through Tribal Head Start programs, including cultural ceremonies and trainings such as historical trauma training, Ojibwe language and culture preservation programs, and dedicated Ojibwe immersion classrooms.

93.     Members of Wisconsin HSA also focus on the needs of the significant number of immigrant and refugee children and families in the state and provide family services to support their needs. The predominant immigrant groups that Wisconsin HSA members serve are from Hispanic and Latin populations. The services they provide include interpretation services during conferences, home visits, and parent engagement events; translated books and literacy take-home materials in multiple languages to strengthen the connection between

---

[18] *Head Start Early Learning Outcomes Framework: Ages Birth to Five*, Off. of Head Start, 3 (2015) https://headstart.gov/sites/default/files/pdf/elof-ohs-framework.pdf.

SECOND AMENDED COMPLAINT - 26
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

home and school, and to support early language development in both English and the child's home language; and referral to legal resources.

94.    In Washington, members of Washington HSA have consistently performed community assessments to determine the needs of their community. They tailor outreach and services to the results of the assessments.

95.    In Illinois, members of Illinois HSA also serve significant populations of immigrant, refugee, and other limited English proficient families throughout the state, based on the information gathered through their community assessments. They do so by prioritizing dual language services in the classroom; providing written recruitment materials in multiple languages to ensure all eligible families are aware of the services available; offering simultaneous translation services during parent meetings to support engagement; and providing referral resources for immigration matters.

96.    In Pennsylvania, the majority of the children and families served by the Pennsylvania HSA members are people of color. Around 25 percent of children served by Pennsylvania HSA members speak a language other than English. Moreover, they serve a significant number of children in rural areas, where access to quality childcare facilities is particularly scarce.

### B.  Agencies must provide linguistically and culturally appropriate services.

97.    Head Start agencies must provide "linguistically and culturally appropriate" services that foster children's learning and development. 42 U.S.C. § 9836a(a)(2). For example, Head Start agencies must implement policies and practices that support the unique learning needs of children with limited English proficiency and dual language learners. *See e.g.*, 45 C.F.R. §§ 1302.30, 1302.90.

SECOND AMENDED COMPLAINT - 27
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

98.     For children who are dual language learners, the Performance Standards require the use of "teaching practices to "create learning environments that support children's diversity and use proven strategies that promote home language(s) and English acquisition." *See* Framework. at 4. The Framework, when used "in combination with teachers' knowledge and understanding of each child's cultural background ensures that children's unique ways of learning are recognized." *Id.* at 8. Meeting the "unique needs of children and families of bilingual and multicultural backgrounds" has long been a core tenant of the Performance Standards.[19]

99.     Linguistic and cultural competency is especially important for MSHS agencies, which incorporate multilingual education in their dual language classrooms. In order to provide competent instruction, teachers read to children in both English and Spanish and engage in activities that include serving traditional cultural foods at mealtime or using multicultural dolls and puppets and culturally specific toys or instruments.[20]

100.    Head Start regulations further provide that agencies serving American Indian and Alaska Native children may provide "language preservation" services that include the "full immersion" in tribal language. 45 C.F.R. § 1302.36.

101.    Many agencies, particularly those serving large immigrant communities, have tailored services to meet cultural and linguistic needs. Accordingly, Head Start services are especially critical to Parent Plaintiffs, who have many members that are bilingual, multilingual, and/or have limited English proficiency.

---

[19] Head Start Bureau, Administration for Children & Families, U.S. Dep't of Health and Hum. Serv., *Celebrating Cultural and Linguistic Diversity in Head Start* (April 2000), https://acf.gov/sitesdefault/files/documents/opre/celebr ating.pdf.
[20] Erin Bumgarner et al., *Select Findings from the Migrant and Seasonal Head Start Study 2017: Cultural Items and Language Use (CILU) Checklist*, Admin. For Child. & Fams. (Jan. 2020) https://acf.gov/sites/default/files/documents/opre/mshs_cilu_brief_jan_2020.pdf

SECOND AMENDED COMPLAINT - 28                          A.C.L.U. OF WASHINGTON
2:25-CV-00781-RSM                                      PO BOX 2728 SEATTLE, WA 98111-2728
                                                       (206) 624-2184

102.   Wisconsin HSA members serve both American Indian and immigrant and refugee populations. The most predominant immigrant populations are those from Spanish-speaking countries, while the most predominant refugee populations are those from Afghanistan. In line with their statutory and regulatory obligations, Wisconsin HSA members have developed tailored programs and services for these populations, including for children and parents. For example, members offer both on-site parenting classes and translated materials for limited English proficient parents, and also refer parents to off-site programs that specialize in adult literacy and other in-language public benefits services.

103.   Wisconsin HSA agencies also aim to hire culturally and linguistically competent staff. In Wisconsin, the most prevalent need is for bilingual Spanish-speaking teachers and staff, and those with understanding of tribal cultures, customs and languages of the 11 federally recognized American Indian nations and tribal communities in the state. To ensure cultural competence, Wisconsin HSA Members also require all staff to be trained to build understanding, reduce unconscious bias, and strengthen inclusive classroom practices, including through trainings on Head Start approved Multi-Cultural principles and the Parent Family Community Engagement ("PFCE") framework. These trainings occur both at the onboarding stage and at regular intervals throughout each school year, and are also tailored to specific staff positions.

104.   In Washington, of the thousands of children served by Washington HSA members, over 76 percent are children of color; nearly 42 percent speak a primary language other than English at home; and over half are dual language learners. Consistent with their statutory and regulatory obligations, Washington HSA members aim to hire, train, and develop staff who are both culturally and linguistically competent. The wide range of diversity within populations served by Washington HSA members requires as wide of a range of resources to provide culturally and linguistically appropriate services. For example, a Washington HSA

member provides services to families who speak 46 different languages. These families require intensive language support ranging from individualized learning plans to hiring interpreters to speak with parents.

105. In Illinois, roughly 28,000 children are currently enrolled in Head Start. Of those, 14.3 percent are children with disabilities; 3.8 percent are children in foster care; and 7.9 percent are children experiencing homelessness. Nearly two-thirds are children of color, with 41 percent identifying as Black and 36 percent identifying as Hispanic. They live in communities ranging from Chicago, the third largest city in the country, to rural farming areas. To meet these widely and richly diverse needs, Illinois HSA members offer an equally wide array of services, including initiatives focusing on school-readiness for Black boys (which has recently been discontinued); English language learning and job placement resources for immigrant parents; on-site health clinics and food pantries; and regular staff training to reduce bias and improve equitable access to all Head Start services.

106. In Pennsylvania, because 25 percent of the children served by Pennsylvania HSA members speak a language other than English at home, they strive to effectively provide linguistically and culturally appropriate service. For example, Pennsylvania HSA members recruit staff who speak the languages of the children and families served, provide language learning courses for families, provide program materials in both English and the children's home language, and train staff to ensure they are able to be responsive and inclusive to the language and culture of the people they serve.

**C. Agencies do not and cannot deny enrollment based on immigration status.**

107. The Head Start Act does not restrict eligibility based on immigration status, and federal government agencies have never restricted eligibility based on immigration status since Congress created Head Start in 1965.

SECOND AMENDED COMPLAINT - 30
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1        108.   The Head Start Act governs "Participation in Head Start programs" by directing

2  that "[t]he Secretary shall by regulation prescribe eligibility for the participation of persons in

3  Head Start programs." The Act further specifies the types of eligibility criteria the Secretary

4  shall prescribe through regulation. 42 U.S.C. § 9840(a)(1). These statutorily-required "criteria

5  for eligibility" provide that the following children "shall" be eligible for Head Start": (i)

6  children whose families' incomes are below the poverty line, and children whose "families

7  are eligible or, in the absence of child care, would potentially be eligible for public assistance"

8  and (ii) homeless children. *Id.* § 9840(a)(1)(B)(i).(ii).  Further, the statute specifies that under

9  certain conditions, additional children that do not meet that criteria are eligible. *Id.* §

10  9840(a)(1)(B)(iii); *id.* § 9840(d). Immigration status is not included as part of the statutorily

11  mandated "criteria for eligibility" for children or their families.

12        109.   In 2024, Congress amended the eligibility criteria for Migrant or Seasonal Head

13  Start and for Head Start programs operated by Indian tribes to eliminate the requirement that

14  they comply with the income eligibility criteria of the Head Start Act. *See* Further

15  Consolidated Appropriations Act, 2024, §§ 238-239. Migrant or Seasonal Head Start

16  programs may enroll any children "who have at least one family member whose income

17  comes primarily from agricultural employment." *Id.* § 239. Head Start programs operated by

18  Indian tribes may enroll any children who have a family or household member who "is a

19  member of an Indian tribe." *Id.* § 238. Again, immigration status is not included as part of the

20  amended criteria for these Head Start programs.

21        110.   The regulation entitled, "Determining, verifying, and documenting eligibility,"

22  45 C.F.R. § 1302.12, implements the requirements of the Head Start Act. Subsection (c)

23  enumerates the "eligibility requirements" and does not include immigration status.

SECOND AMENDED COMPLAINT - 31
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**D. Agencies must provide inclusive and accessible services for children with disabilities.**

111.   The Head Start Act and implementing regulations require agencies to meet the needs of children with disabilities. Agencies must reserve at least 10 percent of a program's enrollment for children with disabilities. 42 U.S.C. § 9835(d)(1); 45 C.F.R. § 1302.14(b). Head Start agencies must ensure that a child with a "disability or chronic health condition or its severity" has equal access to program's services as other children. 45 C.F.R. § 1302.14(a)(5).

112.   Outside of enrollment alone, Head Start agencies must create inclusive and accessible classrooms for children with disabilities. Agencies must provide individualized assessments, resources, and services (including accessible transportation) for children with disabilities. *Id*. §§ 1302.61, 1303.75(a). In particular, "[t]he equipment, materials and supplies [that agencies use] must include any necessary accommodations and the space must be accessible to children with disabilities. Programs must change materials intentionally and periodically to support children's interests, development, and learning." *Id*. § 1302.31(d).

113.   Head Start agencies must work with local agencies to ensure children with Individualized Education Plans ("IEPs") are supported.

114.   For students with mental health disabilities, agencies must use a multi-disciplinary approach that promotes "mental health, social and emotional well-being," provide ongoing mental health consultation, and build community partnerships to facilitate additional mental health resources. *Id.* §§ 1302.45(a)–(b), 1302.46.

115.   In addition to the Head Start Act, Section 504 of the Rehabilitation Act also requires that agencies provide individualized services and supports, to the maximum extent possible, to meet the needs of children with disabilities. 29 U.S.C. § 794.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

116.    Wisconsin HSA members tailor classrooms to the needs of their students with disabilities, and their respective IEPs, including purchasing materials (*e.g.*, special sensory toys) and creating visuals, and physically modifying facilities for accessibility and safety (*e.g.*, for autistic children). Some have "collaborative classrooms" with a mix of children who are identified as having a disability and those who are not, and each such classroom has both a regular education teacher and special education teacher. Others hire contract staff to address specialized needs, including teachers trained in teaching deaf and hard of hearing students. Many also do home visits and provide other resources to support parents to care for their disabled children at home. Wisconsin HSA members also provide training to special education and other teachers to ensure they understand how to carry out IEPs, including through the Head Start-approved Pyramid Model and Creative Curriculum.

117.    Nearly 14 percent of the children served by Washington HSA members are on IEPs. Washington HSA provides professional development specifically geared towards providing inclusive learning for children with disabilities. Some Washington HSA members provide inclusive learning classrooms in which children on IEPs learn alongside their peers.

118.    Illinois HSA members have fully inclusive classrooms and provide individualized services to children with disabilities in partnership with families and local education agencies. They utilize a strength-based approach to identify and support developmental needs early, and work with specialists to develop and implement IEPs or Individualized Family Service Plans ("IFSPs"). Classrooms are designed to be accessible and supportive environments where all children can participate and thrive.

119.    Pennsylvania HSA members place trained specialists in classrooms to assist both children and agency staff with supporting children with disabilities. Members rely on strong relationships formed with local early intervention programs that refer children with

SECOND AMENDED COMPLAINT - 33
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

disabilities to member agencies that can provide care and learning environments tailored to their needs.

120.    Many of Parent Plaintiffs' members have children with disabilities who have relied or currently rely on Head Start's disability-related supports and services. Such supports are critical to ensuring that their members' children and families obtain and establish the supports they need, particularly prior to entering the school system.

### E. Agencies must provide services to children experiencing homelessness and children in foster care.

121.    All Head Start agencies—Head Start, Early Head Start, AIAN Head Start, and MSHS—must prioritize families experiencing homelessness and children in foster care. The Head Start Act and Performance Standards require agencies to assess the needs of children experiencing homelessness and children in foster care and provide adequate services to address those needs.

122.    Children experiencing homelessness and children in foster care are automatically eligible for Head Start programs. 42 U.S.C. § 9840(a); 45 C.F.R. § 1302.12. Though enrollment is not guaranteed, agencies must prioritize their admission. Agencies may also temporarily reserve up to 3 percent of their funded enrollment slots for children experiencing homelessness and children in foster care. 45 C.F.R. § 1302.15(c).

123.    Once a child experiencing homelessness or a child in foster care enrolls in a Head Start program, the agency must make efforts to maintain the child's enrollment regardless of whether the family or child moves to a different service area. *See e.g.*, *id*. § 1302.15(b)(3), 1302.16(c). Agencies are also required to support children as they transition to Head Start agencies in other locations. *Id*. §1302.72(a).

124.    Head Start agencies must coordinate with local agencies designated under the McKinney-Vento Homeless Assistance Act, 42 U.S.C. § 11301 *et seq.*, to develop and

SECOND AMENDED COMPLAINT - 34
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

implement family outreach agencies, create plans to ensure the continuity of services and effective transitions, and provide ongoing channels of communication between Head Start staff and local educational agencies' liaisons for children experiencing homelessness. 42 U.S.C. § 9837a(a); 45 C.F.R. § 1302.53(a)(2).

125.   With respect to training and technical assistance ("TTA") funds, the Head Start Act instructs the HHS Secretary "to the maximum extent practicable" assist Head Start agencies in improving their outreach and quality of services to children and families experiencing homelessness. 42 U.S.C. § 9843(a)(3)(B). For example, Early Head Start agencies specifically, may use TTA funds to "creat[e] special training and technical assistance initiatives targeted to serving high-risk populations, such as children in the child welfare system and homeless children." 42 U.S.C. § 9840A(g)(2)(A).

126.   Head Start agencies meet these requirements through a variety of means. For example, Wisconsin HSA members recruit for enrollment in homeless shelters, and one member has developed relationships with local landlords to attempt to help transition families to more stable housing.

127.   Washington HSA members also conduct focused recruiting for children and families experiencing homelessness. Washington HSA members that provide services to children experiencing homelessness use an intensive case management model to provide holistic social services for the child and their family, including housing assistance, counseling, and employment support.

128.   Illinois HSA members ensure that children experiencing homelessness are enrolled without delay, and without requiring onerous documentation. They provide transportation services to ensure consistent attendance, as well as access to any clothing, hygiene supplies, and food as needed. Family advocates work with children and their families to connect them with housing resources, mental health support, and other social services.

SECOND AMENDED COMPLAINT - 35
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

129.   Pennsylvania HSA members create strong relationships with community organizations that provide shelter and homeless care, and connect with children and families in need through those organizations. Members also provide transportation support for families to give them the opportunity to commute to Head Start programs that fit their needs even if they live in a different service area.

130.   Children and their families experiencing homelessness and housing insecurity, including members of Parent Plaintiffs, rely greatly on access to Head Start for all of these vital services, including to ensure continued access to critical health and counseling services, referrals, regular healthy and nutritious meals, and other supports.

### F.  Agencies must consider diversity in development of staff.

131.   To ensure that communities are adequately served, Head Start agencies must consider diversity and inclusion in recruitment, professional development, and technical training.

132.   The Head Start Act requires HHS to develop and implement recruitment policies that encourage "professionals from diverse backgrounds to become Head Start teachers." 42 U.S.C. § 9843(c). Recruitment should "reflect the communities in which Head Start children live." *Id*. Further, the Act requires agencies to provide their staff "professional development" which includes training "to provide instruction and appropriate support services to children of diverse backgrounds." 42 U.S.C. § 9832(21). Head Start teachers must spend at least 15 hours per year on professional development. *Id*.

133.   Head Start regulations require agencies to "ensure staff and program consultants or contractors are familiar with the ethnic backgrounds and heritages of families in the program and are able to serve and effectively communicate, either directly or through interpretation and translation, with children who are dual language learners and to the extent feasible, with families with limited English proficiency." 45 C.F.R. § 1302.90(d)(1). If a

SECOND AMENDED COMPLAINT - 36
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1    majority of children in a class or home-based program speak the same language, at least one

2    class staff member or home visitor must speak such language. 45 C.F.R. § 1302.90(d)(2).

3         134.    To that end, teachers must receive training to serve children in a

4    "developmentally, culturally, and linguistically appropriate manner." 42 U.S.C. § 9843(d)(2).

5    This includes training on "specific methods to best address the needs of children who are

6    limited English proficient" and "how to best address the language and literacy needs of

7    children with disabilities, including training on how to work with specialists in language

8    development." *Id.*

9         135.    Finally, Head Start regulations require agencies to provide specific training for

10   staff who work with children with disabilities and dual language learners. *See, e.g.*, 45 C.F.R.

11   § 1302.92. The Secretary must provide funding to support "training and technical assistance"

12   for Head Start staff "working with children and families, including children and families who

13   are limited English proficient and children with disabilities and their families." 42 U.S.C. §

14   9843.

15        136.    Families served by Washington HSA members represent a wide variety of

16   cultural backgrounds. To reach these families, Washington HSA members conduct specific

17   outreach and recruitment to their communities. Moreover, in order for these families to feel

18   comfortable in the program, Washington HSA members strive to respect their social norms,

19   or the family will not be able to fully access the services that are offered and may refuse to

20   return to the program. Washington HSA members also recruit staff specifically to address

21   multi-lingual needs as well as needs for culturally competent staff to provide appropriate

22   services.

23        137.    Illinois HSA members adhere to Program Standards of Conduct, which require

24   staff, consultants, contractors, and volunteers to respect and promote the unique identity of

25   each child and family, without stereotyping on any basis, including gender, race, ethnicity,

26

27   SECOND AMENDED COMPLAINT - 37          A.C.L.U. OF WASHINGTON
     2:25-CV-00781-RSM                      PO BOX 2728 SEATTLE, WA 98111-2728
                                            (206) 624-2184

culture, religion, disability, sexual orientation, or family composition. Illinois HSA members recruit staff who are members and representative of the local communities served, and ongoing professional development emphasizes cultural competence, anti-bias education, and understanding implicit bias so that staff can best serve the children in their classrooms.

138.    Pennsylvania HSA members tailor their programs to the children and families they serve, including through recruiting staff who speak the languages of those children and families, providing language learning courses for families, and providing program materials in both English and the children's home language. They also place trained specialists in classrooms to assist both children and agency staff with supporting children with disabilities, and invest resources into forming relationships with community organizations that provide shelter and homeless care, and connecting with children and families in need through those organizations.

139.    Wisconsin HSA members are committed to serving and being responsive to the changing and developing needs of Wisconsin's children and families, including based on the needs identified in our members' annual Head Start mandated community assessments. They tailor their services to the significant number of migrant, immigrant and refugee children and families, and provide a variety of services to support their needs. They recruit bilingual Spanish-speaking teachers and staff, and those with understanding of tribal cultures, customs and languages of the 11 federally recognized American Indian nations and tribal communities in the state.

**G. Agencies must conduct outreach to diverse families in the community and involve parents in the design and implementation of their programs.**

140.    Agencies must also actively recruit Head Start participants from all parts of the community, including traditionally underserved populations. Agencies must "create

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

welcoming program environments that incorporate the unique cultural, ethnic, and linguistic backgrounds of families in the program and community." 45 C.F.R. § 1302.50. They must also "[c]onduct family engagement services in the family's preferred language, or through an interpreter, to the extent possible, and ensure families have the opportunity to share personal information in an environment in which they feel safe" 45 C.F.R. § 1302.50.

141.    The Head Start Act requires agencies to involve families and community members in a variety of ways, including, but not limited to, providing for "regular and direct participation of parents and community residents" in program implementation, seeking "involvement of parents, community residents, and local business in the design and implementation of the program," and establishing effective procedures to "facilitate and seek the involvement of parents of participating children" and to afford parents the opportunity to participate in program development and overall conduct. 42 U.S.C. §§ 9837(b)(1)-(3).

142.    The Act specifically requires participation of parents in the leadership of Head Start programs. Agencies must establish and maintain a governing body with members that "reflect the community to be served and include parents of children who are currently, or were formerly, enrolled in Head Start programs." 42 U.S.C. §§ 9837(c)(1)(A)-(B). The governing body plays an active role in the administration and oversight of Head Start policies, including "establishing procedures and criteria for recruitment, selection, and enrollment of children," "reviewing all applications for funding and amendments to applications for funding" programs, and otherwise setting and monitoring policies and practices for Head Start agencies. *Id.* § 9837(c)(1)(E).

143.    Moreover, each Head Start agency must have a policy council, which "shall be elected by the parents of children who are currently enrolled in the Head Start program of the Head Start agency." *Id.* § 9837(c)(2). The Head Start Act requires the policy council to be composed of "parents of children who are currently enrolled" in the Head Start program and

SECOND AMENDED COMPLAINT - 39
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

"members at large of the community served by the Head Start agency." *Id.* § 9837(c)(2)(B). The policy council is responsible for making decisions about a range of topics, including, but not limited to, "policies to ensure that the Head Start agency is responsive to community and parent needs," program recruitment, selection, and enrollment priorities, program personnel policies and decisions, and funding applications. *Id.* § 9837(c)(2)(D).

144. The Act further requires Head Start agencies to offer parents of participating children a variety of services and programs, including, but not limited to, family literacy services, parenting skills training, substance abuse counseling, family needs assessments and consultations "in a manner and language that such parents can understand," and referrals to available assistance. 42 U.S.C. §§ 9837(4)-(5).

145. The Head Start Act also imposes specific requirements to address the needs of parents. Head Start agencies, for example, must provide "parents of limited English proficient children outreach and information, in an understandable format and, to the extent practicable, in a language that the parents can understand." 42 U.S.C. § 9837(11). The Head Start Act also mandates that Head Start agencies establish effective procedures for "timely referrals" to state and local agency services and "necessary early intervening services" for children with disabilities. 42 U.S.C. §§ 9837(14)-(15). Through these mandates, Congress made clear that parents of participating children are the central stakeholders and partners in the design, implementation, and governance of Head Start programs.

146. Agencies must additionally "extend outreach to fathers" and "target[] increased male participation in the conduct of the program" 42 U.S.C. § 9836(d)(2)(J)(vii).

147. In Washington, some Washington HSA members conduct regular "father engagement nights" that provide family activities for fathers to engage in with their children for positive relationship building, such as carnival games or sports activities. Washington HSA

SECOND AMENDED COMPLAINT - 40
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

members also organize "father affinity groups" that provide Head Start fathers with supportive community amongst their peers.

148.    In Pennsylvania, Pennsylvania HSA members organize programs aimed at strengthening father and child bonds, such creating community gardening spaces where fathers and children can plant crops and watch them grow. Members also increase male participation in Head Start by expanding events and activities to include father figures in addition to biological fathers.

149.    Illinois HSA members collaborate closely with families to understand their unique needs, values, and goals. They solicit parent input in program planning, policy-making, and continuous improvement efforts, ensuring that services are aligned with the real needs of the community. They host multicultural events and invite families to share their customs, languages, and experiences with the children and staff, and they provide books, literacy materials, and family communications in multiple languages reflective of enrolled families, including simultaneous translation services at parent meetings to help break down barriers to full family engagement for limited English speakers.

150.    Wisconsin HSA members also support their diverse families through community engagement, resources and referral. In 2024, Wisconsin HSA members served over 14,000 families, including families with two parents, single fathers, pregnant people, foster parents, and grandparents.  They offer services including English as a second language training; education on fetal development, prenatal/postpartum healthcare, and benefits of breastfeeding; help enrolling in education or job training programs; assistance to families with incarcerated individuals; parenting curriculum; and asset building services

**III.    Head Start's community-based model improves outcomes for children, families, and their communities.**

SECOND AMENDED COMPLAINT - 41
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

151.   Since launching in 1965, Head Start has successfully improved the educational, health, social, and economic outcomes for families and children, particularly Black children and other children of color, children with disabilities, children from dual-language and immigrant families, and children in rural communities, as Congress envisioned.

### A. Educational outcomes

152.   Head Start participation is crucial for preschool-age children. It supports readiness for success in elementary school, particularly through improvement of vocabulary knowledge and receptive language skills. Head Start children experience measurable improvements in social and emotional development; perception, motor, and physical development; self-regulation skills; math, language, and literacy skills; and cognition.[21]

153.   Access to high-quality early education like Head Start has been shown to narrow racial disparities in educational achievement, particularly for Black children.[22]

154.   Dual language learners in Head Start also experience improvements in vocabulary knowledge, letter-word identification, spelling, and receptive language skills.[23] These effects are largest for those who start at the bottom of the skill distribution, including those with limited English proficiency.[24]

155.   Access to Head Start also supports children with disabilities and their families through early interventions and supports aimed at identifying and addressing a child's disability or developmental delay before the child enters school—ensuring that the child is set

---

[21] Nat'l Head Start Ass'n, *The Head Start Advantage: Success in School Readiness*, https://nhsa.org/wp-content/uploads/2021/12/HSA-School-Readiness.pdf (last visited Apr. 28, 2025).

[22] Nadia Nittle, *Study Shows Excellent Preschool Experience Can Narrow Racial Achievement Gap*, The Imprint, July 12, 2020, https://imprintnews.org/education/study-shows-excellent-preschool-experience-can-narrow-racial-achievement-gap/45195.

[23] Nat'l Head Start Ass'n, *The Head Start Advantage: Success in School Readiness*, https://nhsa.org/wp-content/uploads/2021/12/HSA-School-Readiness.pdf (last visited XX).

[24] Marianna Bitler, et al. *Head Start Agencies Have Significant Benefits for Children at the Bottom of the Skill Distribution,* UC Davis Ctr. For Poverty Rsch, no. 1, at 1, https://poverty.ucdavis.edu/sites/main/files/file-attachments/6_01_bitler_head_start_2.pdf?1520454958 (last visited Apr. 28, 2025).

SECOND AMENDED COMPLAINT - 42
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

up to succeed and thrive in the school environment with the appropriate supports and services that they need.[25]

156.    The long-term impacts of Head Start for economically disadvantaged children are significant. Participation in the program substantially reduces—by approximately 33 percent—the gaps in educational outcome, criminalization, and mortality rates between children from families with median incomes and children from families with incomes in the bottom quartile.[26]

157.    Indeed, Head Start participants have stronger educational outcomes compared to non-participant peers. They are 6 percent less likely to develop a learning disability as they get older and 7 percent less likely to repeat a grade. They are 8.5 percent more likely to graduate high school[27]—17 percent higher if the participant's mother did not graduate high school and 10 percent higher for Hispanic participants.[28]

158.    Students who attended Head Start are 15 percent more likely to complete a post-secondary credential. One study reports up to a 39 percent higher likelihood of college completion.[29]

159.    Head Start administrators who have taught grade school notice a distinct difference between children who have been through the Head Start program and those who have been through traditional preschool or no preschool at all. Children who have been

[25] Danielle Ewen & Katherine Beh Neas, *Preparing for Success: How Head Start Helps Children with Disabilities and Their Families*, CLASP, May 6, 2005, at 4, https://files.eric.ed.gov/fulltext/ED491137.pdf.
[26] David Deming, *Early Childhood Intervention and Life-cycle Skill Development: Evidence from Head Start*, 1 Am. Econ. J.: Applied Econ., no. 3, July 2009, at 111, https://pubs.aeaweb.org/doi/pdfplus/10.1257/app.1.3.111.
[27] David Deming, *Early Childhood Intervention and Life-cycle Skill Development: Evidence from Head Start*, 1 Am. Econ. J.: Applied Econ., no. 3, July 2009, at 126, https://pubs.aeaweb.org/doi/pdfplus/10.1257/app.1.3.111.
[28] Lauren Bauer and Diane Schanzenbach, *The Long-Term Impact of the Head Start Program*, The Hamilton Project Brookings Institute (Aug. 2016) https://www.hamiltonproject.org/wp-content/uploads/2023/01/long_term_impact_of_head_start_program.pdf.
[29] Martha Bailey et al., *Prep School for Poor Kids: The Long-Run Impacts of Head Start on Human Capital and Economic Self-Sufficiency*, 12 Am. Econ. Rev., no. 111, Dec. 2021, at 3963, https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20181801.

SECOND AMENDED COMPLAINT - 43
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

through Head Start are more prepared for the academic challenges of elementary school and are also better at emotional regulation and interactions with their peers.

### B. Health outcomes

160.   Head Start agencies have an important impact on ensuring children are up to date on immunizations, have health insurance, and have access to continuous healthcare and dental care through Medicaid or Child Health Insurance Program ("CHIP"). They also provide a variety of health, vision, and development screenings to ensure that children are receiving the medical interventions they need.[30]

161.   Head Start provides healthy and nutritious breakfast, lunch, and snacks for young children, thereby promoting healthy eating and nutrition, and saving parents and caregivers significant time and expense related to purchasing and preparing such meals on their own. Head Start also provides parents and caregivers with critical education, resources, and information about balanced nutrition and healthy eating.

162.   Children enrolled in Early Head Start agencies have significantly fewer child welfare encounters related to sexual or physical abuse between the ages of five and nine compared to those who do not attend.[31] Mortality rates for 5- to 9-year-old children who attended Head Start are 33 to 50 percent lower than the rates for comparable children who were not enrolled in Head Start.[32]

163.   Head Start provides families and children with needed social services, either directly through the program or through referrals. In 2019, about 17 percent of enrolled families received emergency or crisis intervention such as assistance in meeting needs for

---

[30] *Head Start Program Facts: Fiscal year 2023*, Admin. For Child. & Fams., U.S. Dep't of Health & Hum. Servs. (Feb. 27, 2025), https://headstart.gov/program-data/article/head-start-program-facts-fiscal-year-2023.
[31] *Head Start Services*, Off. of Head Start (Feb. 26, 2025), https://acf.gov/ohs/about/head-start.
[32] Jens Ludwig and Douglas L. Miller, *Does Head Start Improve Children's Life Chances? Evidence from a Regression Discontinuity Design*, 122 The Q. J. of Econ., Issue 1, Feb. 2007, at 162, https://doi.org/10.1162/qjec.122.1.159.

SECOND AMENDED COMPLAINT - 44
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

food, clothing, or shelter.[33]

164.    As adults, Head Start graduates continue to have improved health outcomes. For example, former Head Start participants are 17 percent less likely to smoke than individuals who attended other forms of preschool. The savings from these reduced health costs are substantial.[34]

165.    In Wisconsin, Wisconsin HSA members achieve these outcomes through intentional programming that offers access to physical health, mental health, and other services to all families and children. They often do so by partnering with other local organizations that specialize in health and wellness services for underserved communities, including Black children and families who make up a significant percentage of their enrollees. Also, members who operate Tribal Head Start programs offer trainings on teaching students who suffer effects of Fetal Alcohol Syndrome and parental drug use, to help mitigate their effects on children's long term health outcomes.

166.    Washington HSA members connect families to much needed services including services that address food insecurity, housing insecurity, chemical dependency, mental health, and financial literacy. Children served by Washington HSA members also receive medical check-ups, dental check-ups, and also brush their teeth at school.

167.    Illinois HSA members provide access to routine immunizations, dental, medical, and mental health services, and screening for nutritional and developmental concerns. They also facilitate essential continuity of services for children and families facing housing, food, transportation, or employment instability.

---

[33] *Biennial Report to Congress FY 2019 The Status of Children in the Head Start Program*, Admin. For Child. & Fams. at 31, https://acf.gov/sites/default/files/documents/ohs/ohs-2019-biennial-report-to-congress.pdf (last visited Apr. 28, 2025).
[34] Kathryn H. Anderson et al., *Investing in Health: The Long-Term Impact of Head Start on Smoking*, 42 Econ. Inquiry, Issue 3, June 17, 2010, at 19, https://citeseerx.ist.psu.edu/document?repid=rep1&type=pdf&doi=7724834477ea264e0dce646ad425e8ba89e15e1f.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

168.    Pennsylvania HSA members provide emergency and crisis intervention services to meet children and family immediate needs for food, clothing, or shelter. They provide education on preventative medical and oral health, education on nutrition, mental health services, and substance misuse prevention and treatment services. These services all improve the health outcomes of the children and families served by member agencies.

## C. Economic outcomes

169.    Head Start helps break the cycle of intergenerational poverty. Head Start decreases the likelihood of adult poverty by 23 percent and use of public assistance by 27 percent.[35] A study in 2007 found that former Head Start participants' annual wages to be approximately $1,500 higher per year compared to non-participants.

170.    As Nobel Prize-winning economist James J. Heckman wrote "High-quality early childhood programs, especially those like Head Start" deliver an economic return on investment of "[m]ore than 13 percent annually for disadvantaged children, outpacing the stock market."[36]

171.    Of the approximately 723,000 families served during the 2022 to 2023 enrollment year, 48,000 were experiencing homelessness. Of those families, 23 percent found housing during the program year through the support of Head Start housing assistance.

172.    Head Start also provides vital childcare services that enable parents and caregivers to participate in the workforce, attend school and vocational training, attend medical and wellness appointments, and more. Head Start agencies operate with part-time or full-time program options, which provide parents with flexibility in child drop-off and pick-

---

[35] Martha Bailey et al., *Prep School for Poor Kids: The Long-Run Impacts of Head Start on Human Capital and Economic Self-Sufficiency*, 12 Am. Econ. Rev., no. 111, Dec. 2021, at 3963, https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20181801.

[36] James J. Heckman and Alison W. Baulos, *Trump is right about the Department of Education but wrong about Head Start*, The Hill (Apr. 26, 2025), https://thehill.com/opinion/education/5267799-head-start-education-reform/.

SECOND AMENDED COMPLAINT - 46
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

up. As a result of Head Start, over half a million parents are able to work, attend school, or participate in job training agencies while their child is at Head Start.[37]

173. Additionally, Head Start offers important professional development opportunities for families of participants. In 2023 to 2024, 83,614 Head Start family members (11.4 percent) received job training, and adult education, such as general equivalency diploma (GED) agencies and college selection.

174. In Wisconsin, where some Wisconsin HSA members operate within a school district, the correlating school district provides GED classes in English and Spanish, ESL classes and reimburses staff for college credits. Other Wisconsin HSA members provide GED and English courses, or connect parents to local colleges that offer courses in business training and other job skills, which they can attend free of charge.

175. Pennsylvania HSA members provide housing assistance in the form of subsides, utilities assistance, and home repairs to ensure children are set up for success in the classroom by having safe homes. Members also provide families with asset building services, such as financial education courses, debt counseling, and assistance in enrolling in job education or job training programs.

176. Illinois HSA members facilitate the continuity of services beyond the classroom for children and families, including for those facing housing, food, transportation, or employment instability. Low-wage working parents in Illinois, especially working mothers, rely on Head Start for reliable childcare service– and so do their employers. For example, in Illinois, as in several other states, the National Farmworker Jobs Program partners with Head Start providers to identify employment needs in the community and provide career services and training to parents who are migrant and seasonal farmworkers.

---

[37] *National 2024 Head Start and Early Head Start Profile*, Nat. Head Start Ass'n, https://nhsa.org/wp-content/uploads/2024/01/National.pdf (last visited Apr. 28, 2025).

SECOND AMENDED COMPLAINT - 47
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

177.    In Washington, its Head Start Association members adhere to the belief that parents are a child's first teacher and, as such, their teachers and caregivers work with parents as co-equals in their child's education. They provide services starting from the time when a mother is pregnant, and throughout a child's preschool age from 0-5 years old. Their services in this area include helping families find housing, helping parents set and meet goals to go to school or work, providing financial literacy education, and working with parents on nutrition and behavioral health so they can help their kids at home.

178.    Head Start is essential to ensuring access to employment and educational opportunities for women, who bear a disproportionate share of childcare responsibilities.[38] Black women and women of color, in particular, face higher levels of difficulty finding childcare than their white counterparts, often due to cost and childcare deserts.[39]

179.    Without access to Head Start, many women would not be able to earn a living, pursue educations or vocational training, or pursue other opportunities outside of their caregiving responsibilities.

180.    Head Start participation contributed to reduced poverty rates among women by 31 percent.[40] Indeed, enrollment in Head Start services increases full-time employment among Black mothers by 10 to 20 percent.[41]

---

[38] Julia Haines, *Gender Reveals: Data Shows Disparities in Child Care Roles*, U.S. News, May 11, 2023, https://www.usnews.com/news/health-news/articles/2023-05-11/gender-reveals-data-shows-disparities-in-child-care-roles#google_vignette.
[39] Leila Schochet, *The Child Care Crisis Is Keeping Women Out of the Workforce*, Ctr. For Am. Progress, Mar. 28, 2019, https://www.americanprogress.org/article/child-care-crisis-keeping-women-workforce/.
[40] Martha Bailey et al., *Prep School for Poor Kids: The Long-Run Impacts of Head Start on Human Capital and Economic Self-Sufficiency*, 12 Am. Econ. Rev., no. 111, Dec. 2021, at 3965, https://pubs.aeaweb.org/doi/pdfplus/10.1257/aer.20181801.
[41] Catherine Yeh and Geoffrey Wodtke, *The Effects of Head Start on Low Income Mothers*, Am. Socio. Ass'n, Vol. 9 (2023) at 10, https://journals.sagepub.com/doi/pdf/10.1177/23780231231192392.

SECOND AMENDED COMPLAINT - 48
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

181.    Access to Head Start further improves women's health outcomes. Without Head Start, many women would face significant barriers to attending medical and other health appointments and treatment due to lack of childcare.

182.    Women who attended Head Start as children or while pregnant are 10 percent less likely to be in poor health. Of pregnant women who participated in Head Start, approximately 86 percent received important prenatal education on fetal development.

183.    Employers also depend on Head Start to provide reliable service to their workers. In Illinois, Missouri, and Wisconsin, the National Farmworker Jobs Program partners with Head Start providers to identify employment needs in the community and provide career services and training to parents who are migrant and seasonal farmworkers.[42]

184.    MSHS, in particular, is essential to farms that employ migrant farmworkers, who are a critical part of the country's food supply chain. According to a national study, farmworkers in fields and orchards generated $375 billion in revenue in 2015, comprising 42 percent of the national agricultural economy.[43]

185.    Finally, Head Start agencies are themselves often one of the largest employers in communities. In total, Head Start agencies employ a quarter of a million people.[44] Parents of current or former Head Start children made up 23 percent of Head Start staff.[45] In Indiana, for example, Head Start is the 78th largest employer in the state.[46] In Wisconsin, Head Start employes over 4,400 people. Illinois Head Start agencies employ over 8,700 residents.

---

[42] *National Farmworker Jobs Program*, United Migrant Opportunity Servs., https://www.umos.org/how-we-help/workforce-development/national-farmworker-jobs/ (last visited Apr. 28, 2025).

[43] *Migrant and Seasonal Head Start Works*, Nat'l Migrant and Seasonal Head Start Ass'n (Apr. 2018), https://nmshsa.org/sites/default/files/2021-12/Final-White-Paper-2018-4.pdf.

[44] *Head Start Program Facts: Fiscal Year 2023*, Nat'l. Head Start Ass'n., (Feb. 27, 2025), https://headstart.gov/program-data/article/head-start-program-facts-fiscal-year-2023

[45] *Id.*

[46] Moriah Balingit, *Mass Layoffs Rattle Head Start Leaders Already on Edge Over Funding Problems,* Associated Press (April 2, 2025, 11:59 AM), https://apnews.com/article/head-start-office-closures-hhs-trump-00b1a6b33ef918cb66e59b7ffb07ac13.

SECOND AMENDED COMPLAINT - 49
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Moreover, Head Start employees are mostly women, and predominantly women of color—who, therefore, would be disproportionately impacted by the elimination of Head Start employment opportunities.[47]

186.  Head Start agencies also mobilize parent involvement in their communities. Over 542,000 adults volunteer in local Head Start agencies—more than 400,000 are parents of children in Head Start.

187.  Head Start's unique Congressional mandate to tailor services to the particular needs of the community allows agencies to maximize participation and enrollment, thereby improving families' educational, health, and economic outcomes and bolstering local economies.

**IV.    Defendants' actions conflict with the legal requirements established by Congress to maintain Head Start programming across the country.**

188.  Despite the vital role of Head Start in nearly every community, Defendants are wreaking havoc on Head Start agencies and the families that they serve. In the past two months, Defendants have started to dismantle the program piece by piece, resulting in what Head Start agency directors across the country describe as "chaos" that impedes their ability to effectively continue running their programs.

189.  On March 14, 2025, Defendants informed agencies that the OHS would not approve the use of federal funding "for any training and technical assistance (TTA) or other program expenditures that promote or take part in diversity, equity, and inclusion (DEI) initiatives." This sweeping and vague Ban threatens core Head Start activities mandated by Congress.

---

[47] Emily Tate Sullivan, *'We're Sounding the Alarm Bells': Head Start Report Underscores Workforce Crisis*, EdSurge, May 18, 2022, https://www.edsurge.com/news/2022-05-18-we-re-sounding-the-alarm-bells-head-start-report-underscores-workforce-crisis.

SECOND AMENDED COMPLAINT - 50
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

190.    On March 27, 2025, HHS issued a directive to remake the Department's programs through mass layoffs and restructuring, which would cut approximately a quarter of HHS's staff.  HHS described the restructuring as an "overhaul" that would supposedly make the Department "more responsive and efficient."

191.    On April 1, 2025, HHS closed half of its regional offices and laid off those staff, leaving Head Start agencies in 23 states without necessary support. Since then, Head Start agencies across the country have experienced problems in their abilities to access federal grant funds already allocated to them, uncertainty about whether such funds are being permanently withheld, and delays in notices about receipt of federal funding going forward.

192.    On or about April 3, 2025, Secretary Kennedy acknowledged that HHS did not perform a detailed "line by line" review of the responsibilities of each fired employee before the layoffs.  He also acknowledged multiple times in the days following the layoffs that about 20 percent of the layoffs could be "mistakes" and that those employees would have to be reinstated.[48]

193.    On or about April 10, 2025, OMB issued a memorandum about the 2026 HHS discretionary budget, which anticipated the elimination of Head Start in its entirety. The memorandum directed HHS to work with OMB "to ensure to the extent allowable FY 2025 funds are made available to *close out the program*. This elimination is consistent with the Administration's goals of returning education to the States and increasing parental choice. The Federal government should not be in the business of mandating curriculum, locations and performance standards for any form of education." Between January 20, 2025 and April 16, 2025, HHS has disbursed nearly $1 billion less in spending for Head Start compared to the

[48] Cheyenne Haslett, *RFK Jr. Announces HHS reinstating some programs, employees cut by mistake,* ABC News (April 3, 2025, 4:11 PM), https://abcnews.go.com/Politics/rfk-jr-announces-hhs-reinstating-programs-employees-cut/story?id=120463293.

SECOND AMENDED COMPLAINT - 51
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

same period in the previous year.[49]

194.    On April 16, 2025, HHS imposed a new requirement for agencies to certify that "they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." Agencies that run afoul of this directive are subject to clawback of grant funds and liability for misrepresentation under the False Claims Act, which imposes a civil penalty of treble damages and carries the potential of criminal liability. *See* 31 U.S.C. § 3729. On April 25, 2025, news sources reported that documents related to the President's budget described Head Start as having a "radical" curriculum and should be eliminated due to its diversity, equity, and inclusion programming.[50]

195.    On May 2, 2025, public reporting revealed Defendants' plan to terminate dozens of research projects intended to improve the operations of Head Start programs, such as how to retain more educators. Head Start is an evidence-based program. Terminating the research, which supports its continual improvement, reflects Defendants decision to disinvest in the program.[51]

196.    Defendants' actions disrupt—and are designed to disrupt—the ability of Head Start agencies to provide quality service to children and parents. They are part and parcel of Defendants' unlawful policy of winding down the Head Start program without Congressional approval.

---

[49] *NEW: Trump Admin Withholding Nearly $1 Billion in Funding for Head Start—Crunching Centers Nationwide and Forcing Devastating Closures*, U.S. Senate Comm. On Appropriations (Apr. 16, 2025), https://www.appropriations.senate.gov/news/minority/new-trump-admin-withholding-nearly-1-billion-in-funding-for-head-startcrunching-centers-nationwide-and-forcing-devastating-closures.

[50] Alan Rappeport & Tony Romm, *Trump Budget to Take Ax to 'Radical' Safety Net Programs*, N.Y. Times (Apr. 25, 2025), https://www.nytimes.com/2025/04/25/us/politics/trump-budget-cuts.html.

[51] Ryan J. Foley, *Email mistake reveals secret plans to end research on Head Start and other child safety net programs*, AP News (May 2, 2025), https://apnews.com/article/children-head-start-research-cuts-trump-hhs-ecfa2b140990057eb412e476dc875ffa.

SECOND AMENDED COMPLAINT - 52
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**A. Contrary to Congressional mandate, Defendants are implementing a policy to dismantle the Head Start program.**

197. Defendants have created extraordinary uncertainty in states across the country about whether Head Start agencies will be able to continue operations. The mass purge of program staff and resulting gap in communication and transparency are a sharp departure from past HHS practice on which agencies have long relied.

198. Uncertainty about the agencies' funding has already led to the closure of one Head Start program and will imminently lead to closure, suspension, or reduction in service of others. The systemic termination of Head Start services for children across the country runs counter to Congress's directive for Head Start to continue operating at levels consistent with previous years.

i. HHS carries out unauthorized mass office closures and layoffs.

199. On April 1, 2025, HHS abruptly shuttered half of its regional Head Start offices, including those serving communities in 23 states. HHS closed offices in Region 1 serving Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island and Vermont; Region 2 serving New Jersey, New York, Puerto Rico and the U.S. Virgin Islands; Region 5 serving Illinois, Indiana, Michigan, Minnesota, Ohio, and Wisconsin; Region 9 serving Arizona, California, Hawaii, Nevada, American Samoa, Federated States of Micronesia, Guam, Marshall Islands, Republic of Palau, and Commonwealth of the Northern Mariana Islands; and Region 10 serving Alaska, Idaho, Oregon, and Washington.

200. Upon information and belief, HHS carried out the layoffs pursuant the Government-Wide Guidance from OMB which, as described in the April 10 OMB Memo, directs agencies to implement their "Agency RIF and Reorganization Plans" consistent with Fiscal Year 2026 Budget "funding levels and policy." ("Agencies should…position the agency

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

to implement the President's Budget"). In other words, the mass office closures and layoffs are part of the implementation of policy to terminate the Head Start program.

201.    HHS provided no further communications about how the program would continue. Head Start agencies were given no instructions on where to turn for guidance in place of their previously assigned Program Specialist for routine questions about grants or sign-off on equipment expenditures, much less complex questions about compliance in the changed executive landscape and future program certifications for funding purposes.

202.    The mass office closures and layoffs significantly reduce the capacity of OHS staff and interfere with their ability to fulfill the Department's statutory obligation to monitor and provide guidance and support to agencies. Prior to the termination of nearly 100 regional and quasi-regional employees, regional Head Start offices were already understaffed—with many employees working overtime, and regional offices struggling with staff turnover due to demanding workloads. Defendants' mass office closures and layoffs aggravated these already-present issues of understaffing, overworking, and insufficient resources to a degree that effectively expect the remaining regional Head Start programs to perform the impossible.

203.    As a result of mass office closures and layoffs, OHS is unable to effectively 1) ensure that agencies understand and have the guidance that they need to comply Performance Standards; 2) monitor agencies for compliance with the Performance Standards, including ensuring that health and safety requirements are met; and 3) provide other guidance and information necessary for agencies' day-to-day operations, including, crucially, administering grants and providing information about the status of funding.

204.    Equally important as the number of terminated employees is the *type* of terminated employees, many of whom were Program Specialists. While agencies requiring emergency assistance could previously call their Program Specialist for immediate support, they must now submit any concerns to the Head Start Enterprise System portal, where an

urgent request is pushed into a repository of all Head Start related questions—alongside routine budget and grant management questions. This process causes a delay and level of uncertainty that is likely to obstruct the flow of information and resources an agency needs during an emergency.

205.    The mass closures and layoffs are illegal. Congress has not authorized HHS to withhold, withdraw, or terminate funds allocated to Head Start, including funds to operate regional offices and employ personnel necessary to running the program at current capacity.

ii.    Unlawful office closures cause and compound the chaos of extreme delays in funding and access to PMS.

206.    The lack of communication and information about funding has been existential for Head Start agencies. As described *supra* Section I.B, agencies work closely with OHS staff during both the grant continuation and designation renewal process. This partnership enables agencies to have access to the information and assurances that they need in order to keep their doors open.

207.    Many agencies, including those that are members of Plaintiffs' Head Start Associations and those that serve Parent Plaintiffs, expect to communicate consistently with their Program Specialists about the status of their funding and designation. Typically, existing Head Start agencies are on notice about the funds they will be receiving for their annual award several weeks before their renewal date.

208.    But in the past few weeks, agencies experienced unprecedented uncertainty and confusion before receiving funding at the final hour. The lack of communication and transparency from OHS about funding has forced programs to make difficult choices about whether, and at what capacity, to remain open.

209.    At the beginning of April, several members of Washington HSA were expecting approval for grants funding their programs from April 2025 to October 2025. When one

member, Inspire Development Centers in Sunnyside, Washington, did not receive the approval or any information about the status of the approval, it had no choice but to shut down its Head Start programs. Without a Program Specialist to contact, Inspire was unable to confirm that it would be able to cover payroll and other essential expenditures that it continued to incur. No one at OHS in Washington, D.C., was able to provide Inspire with this information. Inspire's closure resulted in immediate layoffs for more than 70 staff and termination of services for more than 400 children in central Washington.

210.   Another agency in Washington also received no information in April about the status of its funds and did not know whom to contact at HS in place of their Program Specialist. When the agency emailed the Head Start Enterprise Portal, it received no response.

211.   Although these agencies eventually received their notices of award between April 18 and April 25, 2025, they had received no updates from OHS staff prior to that time.

212.   In Pennsylvania, an agency with a June 1, 2025 continuation grant was forced to announce staff layoffs. Normally, the agency would have known it would receive requisite funding because it would have received updates from OHS staff well in advance. Only after receiving belated notice, was the agency able to know it could remain open and rescind the layoff notifications.

213.   Similarly, in Illinois, one agency with a May 1, 2025 continuation grant was left waiting until April 25, 2025 to learn whether it would be approved. Even after it received a Notice of Award, the agency could not get confirmation on when funds would be available, until the funds disbursed on May 1. Had the funds been delayed any further, the program would have been forced to lay off staff and send children home.

214.   In Wisconsin, in addition to the disruptions associated with last minute grant approvals experienced by two Wisconsin HSA members, the closure of their regional office and termination of its staff has significantly disrupted access to training and technical

SECOND AMENDED COMPLAINT - 56
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

assistance (TTA). Wisconsin HSA members have not received any information from OHS explaining how TTA will work in the new organizational structure. Without consistent and predictable access to regional TTA specialists, they have been left to self-navigate complex guidance and standards, which puts them at risk of inadvertent non-compliance.

215.    These last-minute funding approvals – preceded by no HHS communication – have caused enormous panic and confusion. The radio silence and extremely delayed grant awards has already, and will continue to, result in the disruption of services for children and families.

216.    For example, upon information and belief, Head Start staff in Oregon— including a childcare provider member of Plaintiff FFO—have been forced to take five unpaid days off, and were instructed that they will not receive 10 percent of their wages for the next month and a half due to funding concerns.

217.    As of the time of this filing, several agencies with continuation grant renewal deadlines of June 1, 2025 have yet to receive updates or confirmation about their funding.

218.    Agencies have further been subject to substantial delays in accessing funding that they have already been awarded. President Trump's February 26, 2025 Executive Order, "Implementing the President's 'Department of Government Efficiency' Cost Efficiency Initiative" ("February 26 DOGE Order.") Exec. Order No. 14,222, 90 Fed. Reg. 11095 (Feb. 29, 2025) directs the Secretary to conduct a comprehensive review of all existing contracts and grants and to terminate or modify the grants.

219.    On April 7, 2025, using the e-mail address "defendthespend@hhs.gov," DOGE began responding to Head Start providers request to draw down their money through the "Payment Management Services" ("PMS") for routine requests e.g. "payroll." PMS is a centralized payment system that processed nearly 500,000 transactions and more than $850 billion in payments last year. Previous justifications, such as "salaries" or "payroll" were

SECOND AMENDED COMPLAINT - 57
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

deemed insufficient and required additional clarification, including "what the award is for, what the funds will be used for, and why it is necessary." The webform has the heading "Department of Government Efficiency" and cites to Exec. Order No. 14,158, Establishing and Implementing the President's "Department of Government Efficiency", 90 Fed. Reg. 8441 (Jan. 20, 2025), the February 26 DOGE Order[52]

220.    Seeing this surprise requirement from an unknown e-mail address, Head Start agencies immediately reached out to contacts in HHS to find out if it was a spam e-mail. HHS responded: "Please report the email as a phishing email, do not click the link and do not respond. If you have any other questions, your correct liaison accountant is . . . ." Several hours later, programs were then contacted verbally by OHS and told that, in fact, it was *not* a phishing e-mail and programs must respond in order to draw down their money. Some providers have also received notification that their drawdown request was "escalate[d]" to the "Tier 2 department" with no explanation as to what this meant.

221.    Requests for drawdowns from the PMS system usually take approximately 24-hours, but of late, agencies have been unable to access funds for much longer. Because Head Start programs are subject to PMS's Three-Day Rule to spend funds,[53] these delays mean that agencies may be unable to make payroll and have to close their classrooms or reduce services.

222.    Under HHS regulations, the withholding of allowable payments is permitted only under specific circumstances, otherwise "payments for allowable costs by non–Federal entities must not be withheld at any time during the period of performance." 45 C.F.R. § 75.305(b)(6). HHS has not notified Plaintiffs' members that an enumerated condition applies such that HHS could withhold payments.

---

[52] Tony Romm, *Trump Grants HHS and NIH Funds to Address Backlog*, WASH. POST (Apr. 17, 2025), https://www.washingtonpost.com/politics/2025/04/17/doge-trump-grants-hhs-nih-backlog/.
[53] *Funding Request Formula*, Payment Management System, U.S. Dep't of Health and Hum. Servs., https://pms.psc.gov/grant-recipients/funding-request-formula.html (last visited Apr. 28, 2025).

SECOND AMENDED COMPLAINT - 58
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

223.   The new impediments to PMS drawdowns are adding to the operational challenges of operating a Head Start program. For example, they have caused agencies in Washington to be late in payroll payments to staff.

224.   As with concerns with grant renewal, agencies had nowhere to raise these issues outside the centralized OHS email. Agencies received no information about the status of their PMS requests or when they would be able to withdraw money to pay bills.

225.   Not only is it much more difficult to be able to communicate with OHS staff—even when that communication happens, the information provided is limited and vague.

226.   In the weeks since the layoffs, many agencies in Washington who attempted to contact OHS about their anticipated Notice of Awards, received no assistance. Instead, they were told that OHS is still working to assign tasks following the regional office closures, and that "at this time I do not have an answer for you about how the recent changes in the Region will affect grant application processing and approval timelines."

227.   Similarly, in Illinois, agencies that attempted to confirm the status of their Notice of Awards received no response until just days before their funding was due to expire – and then, only when a notification was posted in their online portal, without any direct communication from an OHS representative.

228.   On May 1, 2025, OHS convened a public information session about the Office's organizational structure and forward-looking plan. In that meeting, Defendant Tala Hooban, the Acting Director of  OHS, acknowledged that there were "major holes" in the Office's workload that needed to be addressed.

229.   HHS has provided no assurance or confirmation that no further cuts to staffing would be made in the coming weeks and months.

SECOND AMENDED COMPLAINT - 59
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

iii.   Defendants systematically delay decision-making on designation
        renewals.

230.   Defendants have further impermissibly delayed decision-making on renewal of designation status, in particular for agencies that are currently in the Designated Renewal System ("DRS"). As discussed *supra* Section I.A., agencies are placed in DRS if HHS identifies concerns about the agency's performance over the course of their five-year designation. Instead of being entitled to automatic renewal of their designations at the end of their five-year cycle, they must compete with other agencies for their designation.

231.   HHS must decide well in advance of the end of the designation cycle whether it is terminating the designation status of an agency in DRS. Current regulations require HHS to give notice "at least 12 months before the expiration date of a Head Start agency's current grant." 45 C.F.R. § 1304.15(c).

232.   Typically, agencies in DRS receive notice of HHS's decision as to whether it will retain its designation months in advance of the end of the five-year cycle. The vast majority of agencies in DRS retain their designation status.

233.   Adequate notice of HHS's decision is critical so that agencies can prepare for the transition of services, including giving notice to staff and families of that agency's potential closure. Currently approximately 80 programs, including members of Plaintiff Head Start Associations and agencies that serve Parent Plaintiffs, are in DRS and many have designation cycles that end on June 30, 2025.

234.   Defendants have systematically delayed providing notice to these programs about their designation renewals. To date, none of these programs have received a decision on their designation status.

SECOND AMENDED COMPLAINT - 60
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

235.    If the agencies do not receive notice of their designation status imminently, they will have to consider laying off staff and refusing enrollment to children for the upcoming school year.

236.    Defendants have additionally delayed decision-making on renewal of designations for agencies that are not in DRS. As of the time of this filing, several members of Plaintiff Head Start Associations have yet to receive confirmation that their designation status will be renewed, even though renewal is required under the Head Start Act. 42 U.S.C. § 9836(c)(7)(a). Several of these agencies have a renewal deadline of June 1, 2025 and several, a deadline of July 1, 2025.

237.    One program in Santa Clara county that serves 900 preschoolers and 300 infants and toddlers already notified its staff members that its program will have to close entirely on July 1, 2025 if they do not receive the notice of renewal by that date.

**B.  HHS's unlawful ban on diversity, equity, inclusion, and accessibility sows confusion, compromises the quality of Head Start programming, and is inconsistent with the Head Start Act and the Rehabilitation Act.**

238.    In addition to starving agencies of much needed resources, HHS is also targeting the content and scope of services that Head Start programs offer. Starting on day one, the President began targeting diversity, equity, inclusion, and accessibility programs across the federal government with two executive orders issued on January 20 and 21, 2025. On March 14, HHS issued guidance implementing the January 21 and 20 Anti-DEI Executive Orders, banning "diversity," "equity" and "inclusion" across the agency, including in the Head Start program. The March 14 DEI Letter and the April 16 DEIA Certification contradict the Congressional directives and are impermissibly and incomprehensibly vague. The bans allow HHS to weaponize its monitoring function to enforce "compliance" with ambiguous and

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

undefined terms, ultimately pressuring Head Start programs to depart from the mandate set for them by Congress to avoid punishment.

239.   As with the mass office closures, the March 14 DEI Letter and April 16 DEIA Certification caused confusion and panic. The directives force agencies to guess which of their practices, from training to curriculum to hiring, are proscribed. Members of Plaintiff Head Start Associations do not understand what the Ban or Certification means. Regardless of what agencies do, they cannot be sure that they are complying with the Ban or Certification and are subject to arbitrary and unpredictable enforcement that carry existential consequences.

240.   Furthermore, the March 14 DEI Letter and April 16 DEIA Certification contravene the explicit legislative obligation of Head Start agencies to provide services that meet the "diverse needs" of the communities and requires the agencies to abandon their statutory obligations.

i.   OMB funding freeze implementing Anti-DEI, Gender Ideology, and Anti-Immigration Executive Orders.

241.   On Inauguration Day, January 20, 2025, President Trump issued an Executive Order targeting DEI initiatives, entitled "Ending Radical and Wasteful Government DEI Agencies and Preferencing" ("January 20 Anti-DEI Order"). Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025). The Order directed each federal agency to "terminate, to the maximum extent allowed by law, . . . "equity" actions, initiatives, or agencies, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or agencies." *Id*.

242.   The January 20 Anti-DEI Order does not define "DEI," "DEIA," "diversity," "equity," or "inclusion."

243.   On January 21, 2025, President Trump issued a second executive order targeting DEI agencies, entitled "Ending Illegal Discrimination and Restoring Merit-Based

SECOND AMENDED COMPLAINT - 62
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Opportunity" ("January 21 Anti-DEI Order"). Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025). Section 3(b)(iv) of the January 21 Anti-DEI Order requires federal contractors and agencies to certify that they do not operate "illegal" DEI agencies and that the certification is "material" under the False Claims Act. *Id*. The January 21 Anti-DEI Order again fails to define "DEI," "DEIA," "diversity," "equity," or "inclusion." It only purports that ""diversity, equity, and inclusion," "DEI," "diversity, equity, inclusion, and accessibility," or "DEIA" policies are "illegal," "dangerous," and "immoral" and can violate federal civil rights laws." *Id*.

244.    On January 20, 2025, President Trump also issued an Executive Order titled "Defending Women from Gender Ideology Extremism and Restoring Biological Truth to the Federal Government" ("Gender Ideology EO"), directing that "federal funds shall not be used to promote gender ideology." Exec. Order No. 14,168., 90 Fed. Reg. 8615 (Jan. 30, 2025), §2(f). The Order defines "gender ideology" as a "false claim" that "replaces the biological category of sex with an ever-shifting concept of self-assessed gender identity," and that "includes the idea that there is a vast spectrum of genders that are disconnected from one's sex." *Id.* at §2(g).

245.    On January 27, 2025, OMB issued a memorandum requiring all "Federal agencies to identify and review all Federal financial assistance agencies and supporting activities consistent with the President's policies and requirements." Off. Of Mgmt. & Budget, Exec. Off. Of the President, OMB Memo. No. 25-13, Temporary Pause of Agency Grant, Loan, and Other Financial Assistance Programs (2025), implementing the Anti-DEI, Gender Ideology, and Anti-Immigration Orders. The memorandum instructed all federal agencies to temporarily suspend "all activities related to obligation or disbursement of all Federal financial assistance, and other relevant agency activities that may be implicated by the executive orders, including, but not limited to . . . DEI." *Id*.

SECOND AMENDED COMPLAINT - 63
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

246.   In the hours after OMB issued the funding freeze memorandum, Head Start agencies from across the nation scrambled to determine whether, and to what extent, the funding freeze impacted them. HHS provided no guidance or clarity, and Head Start agencies struggled to get into contact with government officials.[54]

247.   The following day, numerous Head Start officials reported that they could no longer access their PMS accounts. *Id.* Because of the Three-Day Rule, several agencies made the difficult decision to shut down. Parents were forced to try to find alternative childcare—and those with no alternative could not go to work and lost wages critical to supporting their families.[55] Several agencies temporarily laid off staff and contemplated permanent closure.[56]

248.   On January 29, 2025, OMB rescinded the funding freeze memorandum after the freeze was enjoined by multiple federal courts. Off. Of Mgmt. & Budget, Exec. Off. Of the President, OMB Memo. No. 25-14, Recession of M-25-13 (2025). Despite the rescission, Head Start agencies struggled to get access to frozen funds. A week later, at least 45 agencies serving nearly 20,000 children in 23 states, Washington D.C., and Puerto Rico were still locked out of their funding.[57]

   ii.   The March 14 DEI Letter and the April 16 DEIA Certification.

249.   On March 14, 2025, Acting Assistant Secretary Gradison issued guidance (the "March 14 DEI Letter") informing all Head Start agencies that the Office for Head Start "will not approve the use of federal funding for any training and technical assistance (TTA) or other

---

[54] *See e.g.,* Moraiah Balingit, *Head Start And Medicaid Providers Hit Glitches as Trump Freezes Federal Money*, ASSOCIATED PRESS (Jan. 28, 2025 8:10 PM), https://apnews.com/article/head-start-medicaid-federal-funding-4fe440e35df70c7ede8ce8e0409cb581.

[55] Moriah Balingit, *Mass layoffs rattle Head Start leaders already on edge over funding problems*, ASSOCIATED PRESS (Apr. 2, 2025 11:59 AM), https://apnews.com/article/head-start-office-closures-hhs-trump-00b1a6b33ef918cb66e59b7ffb07ac13.

[56] *See e.g.,* Casey Peeks, *Head Start funding freeze: The panic was the point*, WISC. EXAMINER (Feb. 7, 2025, 5:00 AM), https://wisconsinexaminer.com/2025/02/07/head-start-funding-freeze-the-panic-was-the-point/.

[57] *Nearly 20,000 Children and Families Impacted by Delay in Accessing Federal Funds*, Nat'l Head Start Ass'n., (Feb. 4, 2025), https://nhsa.org/press_release/nearly-20000-children-and-families-impacted-by-delay-in-accessing-federal-funds/.

SECOND AMENDED COMPLAINT - 64
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

program expenditures that promote or take part in diversity, equity, and inclusion (DEI) initiatives."

250. The Letter purports to be "consistent with the nondiscrimination provisions in Sec. 654 of the Head Start Act." Section 654 provides that the HHS Secretary "shall not provide financial assistance for any program, project or activity under this subchapter unless the grant or contract . . . provides that no person with responsibilities in the operation thereof" will discriminate on the basis of "race, creed, color, national origin, sex, political affiliation, or beliefs" or based on a disability. 42 U.S.C. § 9849.

251. Further, the Ban instructs agencies to "carefully review their annual funding application, including the budget and budget justification narrative, TTA plans, program goals, and any other supplemental materials to ensure they are in accordance with this guidance."

252. The Ban does not define "DEI," "diversity," "equity," or "inclusion." Nor does it explain what it means to "promote."

253. On March 21, 2025, ACF issued a press release announcing the new policy change. ACF stated that the March 14 DEI Letter "amplif[ies] President Trump's executive order on removing diversity, equity and inclusion (DEI) initiatives."

254. On April 16, 2025, HHS amended its Grants Policy Statement to add a provision titled "Grant award certification." The provision provides that "by accepting [HHS's] grant award, recipients are certifying that . . . they do not, and will not during the term of this financial assistance award, operate any programs that advance or promote DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws." The April 16 DEIA Certification also states that "HHS reserves the right to terminate financial assistance awards and claw back all funds if the recipients, during the term of this award, operate any

SECOND AMENDED COMPLAINT - 65
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

program in violation of Federal anti-discriminatory laws."[58] The Policy Statement further cautions that "recipients must comply with all applicable Federal anti-discrimination laws material to the government's payment decisions for purposes of [the False Claims Act]."

255.    The April 16 DEIA Certification does not define "DEI," "DEIA, or "discriminatory equity ideology."

256.    Members of Plaintiff Head Start Associations that received new notices of grant awards after April 16, 2015 are now subject to these requirements.

*a. The March 14 DEI Letter and April 16 DEIA Certification are unlawfully vague.*

257.    The key terms in March 14 DEI Letter and the April 16 DEIA Certification – "diversity" "equity," "inclusion," and "accessibility" and "discriminatory equity ideology"– are unclear and undefined, broad in scope, and turn heavily on subjective judgement.

258.    The March 14 DEI Letter purports that the ban on diversity, equity, and inclusion is "consistent" with the non-discrimination provision in the Head Start Act, but does not explain whether and why all activities relating to "diversity, equity, and inclusion" are considered unlawful under the Act. Unlike the January 21 Anti-DEI Order and the April 16 DEIA Certification, the March 14 DEI Letter does not limit the prohibition to diversity, equity, and inclusion initiatives that are purportedly "illegal."

259.    Indeed, agencies have been given conflicting information by HHS about what is covered by the March 14 DEI Letter on "diversity, equity, and inclusion initiatives." For example, while Wisconsin HSA members were generally not provided guidance on how to amend their grant applications to remove references to "DEI" from their grant applications,

---

[58] *HHS Grants Policy Statement*, DEP'T. OF HEALTH AND HUM. SERV'S., at 18, (Apr. 16, 2025), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-april-2025.pdf (reflecting HHS policies based on 45 C.F.R. part 75 and 2 C.F.R. part 200).

SECOND AMENDED COMPLAINT - 66
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

at least one member received a list of words from their Program Specialist containing words President Trump "is making disappear." The agency expressed the impossibility of being able to remove all of the listed words while still maintaining the content of their mandated programming, so they removed only a handful of the listed words. Their application has yet to be approved, and they remain in fear that that they will have to do additional edits and changes that may affect the substance of their programming or be punished for not having their grant renewed.

260.    In Wisconsin, after the March 14 DEI Letter was issued, several Wisconsin HSA members were instructed by their Program Specialists to review their refunding applications to ensure they comply with the March 14 DEI Letter. However, no specific instruction was provided on how to do so, such that members scrambled to obtain outside direction and advice, and struggled to amend language in their applications that did not undermine the substance of the core programs they believe they are mandated to continue to provide, e.g. for dual language and American Indian students and families.

261.    In Washington, Washington HSA members were also generally not provided guidance on how to comply with the March 14 DEI Letter, and the information that members received from their respective Program Specialists was inconsistent. For example, one Washington HSA member was told by their Program Specialist to remove all references to "DEI" and related words from their grant application, but to continue using terms found in the Head Start Act, such as "disability." However, other members were advised by their Program Specialist to change the use of "disability" in their grant application to "developmental concern" in order to comply with the March 14 DEI Letter. One Washington HSA member was told by their Program Specialist that they could continue conducting "DEI" trainings if they used funds other than those from Head Start. Other members were advised by their Program Specialist that they could not conduct "DEI" related activities using other

funding sources if the equipment used for those activities, such as computers and phones, was

purchased with Head Start funds. Some Washington HSA members have had no contact with

their Program Specialist since the closure of the OHS Region 10 Office, and thus have no

guidance on how to comply with the March 14 DEI Letter.

262.    Illinois HSA members received conflicting responses when they requested

guidance about how to comply with the March 14 DEI Letter. Some members were told that

their Program Specialists could not discuss it. Some members were advised to delete words

like "diversity," "equity," "inclusion," and "accessibility" from their renewal applications but

to otherwise leave the substance of the programs the same. And other members were

instructed to remove entire sections of their applications–such as an anti-bias training, and a

program goal aimed at addressing the marginalization of underrepresented groups in the

workplace – and resubmit them.

263.    Pennsylvania HSA members have likewise experienced mass confusion about

the scope and meaning of the March 14 DEI Letter, with conflicting guidance given by

Program Specialists. Some members were told by Program Specialists to remove the word

"inclusion" from grant applications, while others were told using it and similar words found

in the Performance Standards was permissible.

264.    Other agencies have not been given any further guidance about how to interpret

these terms. Compounding the confusion, on April 1, 2025, all the Program Specialists in the

states where Plaintiffs operate were fired and Plaintiffs have not been able to receive any

updated interpretation of the March 14 DEI Letter.

265.    The April 16 DEIA Certification appears, in several respects, even broader in

scope and more serious in consequence. Unlike the March 14 DEI Letter, the April 16 DEIA

Certification explicitly bans activities that "advance or promote" "accessibility." The

Certification also imposes the additional threats that, if an agency is engaged in "illegal

DEIA" or "discriminatory equity ideology" activities, HHS can claw back already disbursed grant funds and the agency may be subject investigation and liability under the False Claims Act, which includes the potential of treble damages and the criminal prosecution.

266. Currently, Members of Plaintiff Head Start Associations do not know whether use of the following educational methods, services, and tools are permitted under the March 14 DEI Letter and/or April 16 DEIA Certification, such as:

    a. Interpretation and translation services and devices in the classroom;

    b. Including different types of family structures, including single parents or LGBTQIA+ families in lessons, recruitment, or any learning materials;

    c. Nutrition services that meet the needs of children with disabilities and those with special cultural or religious dietary needs;

    d. Specialized staff who work specifically with children with disabilities;

    e. Purchasing books, music, or toys which reflect the identities of their students; or

    f. Partnering with a Spanish immersion classroom at a local school

267. Because of this uncertainty, and the extreme consequences of noncompliance, agencies cannot know how to conform their behavior to comply with the March 14 DEI Letter and are thus subject to arbitrary and subjective enforcement.

> *b. The March 14 DEI Letter and April 16 DEIA Certification conflict with the requirements of the Head Start Act and the Rehabilitation Act.*

268. The March 14 DEI Letter and April 16 DEIA Certification also contravene the requirements that Congress set for the Head Start program.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

269. As described *supra* Section II, under the Head Start Act and Performance Standards, agencies must meet the "diverse needs" of the communities they serve, including by offering "culturally and linguistically appropriate" services.

270. State laws that govern members of Plaintiff Head Start Associations supported in part by state funds mandate similar requirements.[59]

271. In order to fulfill these obligations, agencies must consider the diversity of the local population at each step – in the design their classrooms, curricula, and activities; the recruitment, professional development, and training of their staff; the outreach to parents and family members; and the selection of participants. *See supra* Section II.

272. Any of these activities may be considered a proscribed "diversity initiative" under the March 14 DEI Letter or and April 16 DEIA Certification. For example, a Program Specialist instructed an Illinois agency to remove "non-English speaker" as a selection criteria for participants, yet ensuring access to such participants is how the program complies with its obligation to "welcome children from diverse cultural and linguistic backgrounds" and to offer "limited English proficient children" "culturally and linguistically appropriate instructional services."

273. Agencies' ability to reach community members of different social and cultural backgrounds depends on their ability to recruit and retain a diverse classroom and staff.

---

[59] For example, under Washington state law, agencies under that state-funded programs must consider racial diversity and equity in providing services. *See, e.g.,* RCW 43.216.567(2) (requiring programs to consider racial diversity and equity in providing services); Washington Administrative Code (WAC) 110-300-0160 (Head Start programs must "provide culturally and racially diverse learning opportunities," including "curriculum, activities, and materials that represent all children, families, and staff...and do not reinforce stereotypes"). Similarly, Illinois-funded programs must "establish weighted eligibility criteria that prioritize children considered most at risk of academic failure, including children with IEPs, children experiencing homelessness, youth in the custody of the Department of Children and Family Services, children with family income 50 percent below the federal poverty level, children whose parent or caregiver speaks a language other than English, and children whose screening indicates delays in development." 325 ILCS 3/15-30; 105 ILCS 5/2-3.71; 23 Ill. Adm. Code 235.20, 235.30, 235.50.

SECOND AMENDED COMPLAINT - 70
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

274.    Likewise, agencies must meet the needs of children with disabilities and enroll in students with disabilities in their classrooms. By taking steps to make the classroom inclusive, by making sure it is physically accessible and provides "individualized assessments, resources, and services (including accessible transportation) for children with disabilities," agencies ensure compliance with the Head Start Act and Section 504.

275.    But the March 14 DEI Letter's ban on "inclusion initiatives" and the April 16 DEIA Certification's ban on activities that advance "accessibility" threaten agencies' efforts to maintain accessible classrooms. For example, the Washington HSA Tribal Head Start members who serve American Indian communities work with students who are struggling with physical and developmental disabilities, including children with muscular disorders and children diagnosed with varying degrees of autism. They both work with local school districts as well as develop their own interventions to meet these children's needs, including purchasing equipment and providing staff training to handle a variety of behaviors in the classroom. Under the Ban and the Certification, these members do not know whether they are permitted to continue these activities.

276.    Furthermore, without being able to use the words like "diversity," "equity," "inclusion," and "accessibility," agencies may not be able to effectively communicate to community members from different ethnic and cultural backgrounds and family members of children with disabilities that Head Start services are designed to meet their needs.

277.    The March 14 DEI Letter and the April 16 DEIA Certification create, in effect, a gag order that interferes with agencies' ability to maintain necessary enrollment.

278.    For example, Plaintiff Head Start Associations' members regularly use language about accessibility and inclusion to recruit disabled children and ensure parents that their children will receive appropriate adaptive materials. The March 14 DEI Letter and the April 16 DEIA Certification compel agencies to remove resources for children with

SECOND AMENDED COMPLAINT - 71
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

disabilities and otherwise marginalized children from websites and recruitment materials. Plaintiff Head Start Associations' members are situated in states where many families who qualify for Head Start do not speak English. Agencies therefore develop recruitment materials in other languages to express their desire to engage and build trust with immigrant and dual-language families. Several members of Plaintiff Head Start Associations feel they have no choice but to remove and limit the languages in their recruitment materials in order to comply with the March 14 DEI Letter and the April 16 DEIA Certification.

279. In Wisconsin, Wisconsin HSA members serve upward of 70 percent communities of color – including significant numbers of Latine, African American, American Indian and refugee populations—and they have tailored their programs to meet the unique needs of these populations consistent with Performance Standards. It is inconceivable to members how Wisconsin HSA how they can continue these programs without running afoul of March 14 DEI Letter and April 16 DEIA Certification, and if they stop the programs, they will lose enrollment. While many have followed the guidance of their Program Specialists to amend the descriptions of their programs in their renewal applications to eliminate banned terminology, they have been provided no assurances that this is sufficient to maintain their funding.

280. Finally, to the extent that Defendants are interpreting the Head Start Act's nondiscrimination provision to prohibit activities described *supra* Section II, such as recruiting participants or staff from immigrant communities or communities of color, this is an impermissible interpretation of the provision. To the contrary, HHS has consistently mandated that agencies take steps to enhance diversity among their staff and participant families, improve equitable outcomes for children of underprivileged backgrounds, and foster inclusion in and outside of the classroom for children with disabilities. The March 14 DEI

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Letter and the April 16 DEIA Certification thus unlawfully depart from longstanding and established agency interpretations without reason or notice.

281.   Ultimately, agencies are caught in an impossible bind: they can either cease activities that may be considered related to "diversity, equity, and inclusion" and risk noncompliance with their longstanding statutory and regulatory obligations, including the Performance Standards, or they can continue those activities and risk noncompliance with the March 14 DEI Letter and the April 16 DEIA Certification.

282.   In both cases, agencies risk losing their designation as a Head Start provider and shutting their doors to the communities that they have long served.

*c. The March 14 DEI Letter and the April 16 DEIA Certification*
*unlawfully suppress speech*

283.   Furthermore, the March 14 DEI Letter and the April 16 DEIA Certification and their implementation create widespread chilling effects beyond activities that are supported by federal funding due to their extreme and coercive consequences. Notably, the April 16 DEIA Certification does not limit the ban on DEIA activities to those that are federally funded—instead it applies to "any programs" operated "during the term" of the "financial assistance award."

284.   In an exercise of reasonable caution, members of Plaintiff Head Start Associations started to self-censor and abandoned all activities – including those that are not federally funded – that may be construed as related to diversity, equity, or inclusion. Indeed, the January 21 Anti-DEI EO, which the March 14 DEI Letter implements, does not limit the proscription on "DEIA" solely to federally funded activities.

285.   The April 16 DEIA Certification makes plain what members of Plaintiff Head Start Associations have reasonably feared—that they will be subject to adverse government action for their speech perceived to "advance or promote" "diversity," "equity," "inclusion,"

SECOND AMENDED COMPLAINT - 73
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

1    "accessibility," or "discriminatory equity ideology," even when that speech is outside of the

2    contours of the federal grants—and without any way of knowing what is prohibited by those

3    vague and subjective terms. Defendants are unconstitutionally leveraging federal funds as a

4    tool to suppress protected speech with which it disagrees.

5        286.  The threatened adverse government action is extremely coercive. First, it

6    imposes existential consequences on Head Start agencies—termination of financial assistance

7    awards without which Head Start classrooms will be forced to close their doors permanently.

8    Terminated programs not only lose federal funds that cover at least 80 percent of the approved

9    costs of the agency's Head Start program, 42 U.S.C. § 9835(b)., but they also lose the

10   opportunity to compete in for funding in future funding cycles. 45 C.F.R. § 1304.13. Second,

11   it threatens to "claw back funds" previously distributed from organizations that use all of those

12   funds to provide services to children from low-income families. Third, it threatens agencies

13   that their certification will be deemed false and thus subject them to potential civil and

14   criminal liability under the False Claims Act if any of the agency's programs are deemed to

15   conflict with the April 16 DEIA Certification.

16       287.  Head Start agencies include school districts, nonprofit and for-profit groups,

17   faith-based institutions, tribal councils, and other types of organizations, and of which engage

18   in many programs outside of their Head Start programs, including state funded early

19   childhood education programs, financial education, job training, housing assistance, legal

20   assistance, community events, staff professional development and training, to name a few.

21   The predictable result of the April 16 DEIA Certification is that agencies will be censored to

22   simply stop speaking on anything remotely related to what the government might consider as

23   promoting "diversity," "equity," "inclusion," or "accessibility," in any of their programs.

24

25

26

27   SECOND AMENDED COMPLAINT - 74
     2:25-CV-00781-RSM

     A.C.L.U. OF WASHINGTON
     PO BOX 2728 SEATTLE, WA 98111-2728
     (206) 624-2184

## V.    HHS Issuance of New Directive to Exclude Immigrants from Head Start.

288.    On January 20, 2025, President Trump issued an executive order targeting immigration, entitled "Protecting the American People Against Invasion" ("January 20 Anti-Immigration Order"). Exec. Order No. 14,159, 90 Fed. Reg. 8443 (Jan. 29, 2025). On February 19, 2025, President Trump issued another executive order targeting immigration, entitled "Ending Taxpayer Subsidization of Open Borders" ("February 19 Anti-Immigration Order"). Exec. Order No. 14,218, 90 Fed. Reg. 10581 (Feb. 25, 2025). Section 2(a) of the February 19 Anti-Immigration Order directs all federal agencies to "identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such agencies with the purposes of this order and the requirements of applicable Federal law, including the PRWORA [Personal Responsibility and Work Opportunity Reconciliation Act of 1996]." *Id.*

289.    On March 10, 2025, ACF published a letter stating that it "is reviewing the public benefit programs we administer to ensure alignment with the President's Executive Order." Andrew Gradison (Acting Assistance Secretary), *EO 14218 – Letter to State, Local, Tribal Partners*, ACF (Mar. 10, 2025), https://acf.gov/policy-guidance/eo-14218.

290.    PRWORA was enacted in 1996, and Title IV of PRWORA limits eligibility for certain "federal public benefits" to specified immigrants referred to as "qualified" immigrants. 8 U.S.C. § 1611(a). Qualified immigrants include lawful permanent residents, refugees, asylees and certain other enumerated immigrants admitted into the county for humanitarian reasons. 8 U.S.C. § 1641.

291.    "Federal public benefit" is defined by PRWORA. 8 U.S.C. § 1611(c).

292.    In the thirty years since Congress enacted PRWORA, Head Start has never been considered a "federal public benefit" under PRWORA. 8 U.S.C. § 1611(c).

SECOND AMENDED COMPLAINT - 75
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

293.    Contemporaneous HHS agency interpretations of PRWORA confirm that Head Start is not a "federal public benefit" under that statute. *See* U.S. Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA): Interpretation of "Federal Public Benefit," 63 Fed. Reg. 41658 (Aug. 4, 1998) (explaining that the definition of "federal public benefit" "is not comprehensive and clearly excludes certain categories from the definition. For example, by explicitly identifying 'postsecondary education' the statute excludes non-postsecondary education programs, such as Head Start and elementary and secondary education."); U.S. Dep't of Health & Hum. Servs., Admin. for Child. & Fams., Office of Child Care, *Clarification of Interpretation of "Federal Public Benefit" Regarding CCDF Services* (Nov. 25, 1998), https://acf.gov/occ/policy-guidance/clarification-interpretation-federal-public-benefit-regarding-ccdf-services  ("Head Start and Early Head Start have been determined not to provide 'Federal public benefits' because non-postsecondary education benefits were expressly omitted from the statutory definition in title IV of PRWORA.").

294.    On July 14, 2025, HHS issued the Immigrant Exclusion Directive, purporting to reinterpret the phrase "federal public benefit" in PPRWORA in order to exclude "non-qualified" immigrants from Head Start for the first time in the program's decades-long history.

295.    The July 14 Immigrant Exclusion Directive contradicts HHS's longstanding interpretation since 1998 stating that Head Start is not a "federal public benefit" that requires the exclusion of "non-qualified aliens." *See* U.S. Dep't of Health and Human Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA): Interpretation of "Federal Public Benefit," 63 Fed. Reg. 41658 (Aug. 4, 1998).

296.    Whereas HHS had previously explained that PRWORA's explicit inclusion of "postsecondary education" in the list of "federal public benefits" means that the statute excluded non-postsecondary education programs, such as Head Start, the July 14 Immigrant Exclusion Directive, declares Head Start a "similar benefit" to "welfare," such that it falls

SECOND AMENDED COMPLAINT - 76
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

within PWORA's definition of "federal public benefit" and requires the exclusion of "non-qualified" immigrants.

297.    The July 14 Immigrant Exclusion Directive does not specify whether the immigration status of the child, the parents and/or guardians, or family and/or household members is relevant for purposes of eligibility.

298.    While the Immigrant Exclusion Directive purports to make no change to the exemption for nonprofit charitable organizations from screening applicants for immigration status, the Directive also extensively references President Trump's January 20 and February 19 Anti-Immigration Orders, and states that it is "the policy of this country that persons' access to public benefits should turn on those persons' immigration status." The Directive instructs entities, which include HSA Plaintiffs' members, to "pay heed to the clear expressions of national policy," with no explanation of the nature or extent of this obligation, how entities are expected to follow or implement the policy, or the consequences of failing to follow it. HHS's Regulatory Impact Analysis also describes "full compliance with the notice" as one in which immigration status relating to every child enrolled in Head Start is verified such that no child excluded under the new definition of "federal benefit program" is enrolled, and refers to immigration status for both children and parents. *See* AHRQ-2025-2002 at 7–8, 14.

299.    The July 14 Immigrant Exclusion Directive acknowledges that it will have a significant economic impact and is subject to the requirements of Executive Orders 12866 and 13563, which direct administrative agencies "to assess all benefits and costs of available regulatory alternatives and, when regulation is necessary, to select regulatory approaches that maximize net benefits." 90 Fed. Reg. at 31238.  But the Directive and the corollary Regulatory Impact Analysis fail entirely to quantify or consider the costs on children, families, and communities of losing access to Head Start.

SECOND AMENDED COMPLAINT - 77
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

300.   In promulgating the July 14 Immigrant Exclusion Directive and applying the reinterpretation immediately, HHS bypassed the 30-day notice and comment period required by the Administrative Procedure Act, and the Head Start Act, 42 U.S.C. § 9839(d). HHS also ignored its statutory obligation to consult with "experts" in enumerated fields, "persons with experience in the operation of Head Start programs," "Indian tribes," and the "National Indian Head Start Directors Association," and entirely failed to engage in the analysis of the statutorily enumerated topics, required when "developing any modifications to the standards." *Id.* § 9836a(a)(2).

## VI.   Defendants' actions have caused, are causing, and will continue to cause irreparable harm to Plaintiffs.

301.   The mass office closures and layoffs, the March 14 DEI Letter, the April 16 DEIA Certification, and the July 14 Immigrant Exclusion Directive cause substantial and irreparable harm to Plaintiffs.

### A.   Defendants' actions will imminently result in reduction, suspension, or termination of Head Start programs across the country.

302.   As discussed *supra* Section IV.A, the complete lack of information, communication, and transparency from OHS staff coupled with the delays in decision-making, particularly on issuance of grants, as a result of the April 1, 2025 office closures and layoffs have had devastating effects on agencies and families. One of Plaintiff Washington HSA's members already suspended services due to the confusion and uncertainty. If OHS does not maintain adequate levels of staffing, more agencies will soon also suspend or reduce services.

303.   Termination or non-renewal of designation for agencies entitled to renewal will likewise result in the termination, suspension, or reduction of services for children.

SECOND AMENDED COMPLAINT - 78
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

304.    Furthermore, given the vagueness of the March 14 DEI Letter and the April 16 DEIA Certification, agencies, including Plaintiffs' members, are uncertain about which educational agencies and tools they can implement for multilingual or disabled students, how to target recruitment efforts for children and families, hiring and training practices for their staff, which community partners they can maintain relationships with, and what demographic data they can collect and evaluate. This uncertainty immediately impacts agencies' ability to comply with the Head Start Act's Performance Standards, the Head Start Act, and Section 504, which, in turn, creates an existential threat to their status as Head Start providers. Agencies that are forced to make these changes risk compromising the quality of services that they are able to provide to children of diverse backgrounds.

305.    To the extent that agencies are no longer able to meet the same needs of the children they serve, they are at risk of disenrollment, and, as a result, closure. Indeed, agencies that do not meet enrollment targets risk receiving deficiency findings that jeopardizes their designation status.

306.    Agencies that do not change their programs in response to the March 14 DEI Letter and the April 16 DEIA Certification, however, also risk existential consequences, including investigation, a finding of deficiency, and threatened loss of their Head Start designation and funding, clawback of funding, and criminal and civil liability under the False Claims Act.

307.    Consistent with the explicitly-stated purpose of HHS, the July 14, 2025 Immigrant Exclusion Directive will immediately cause a decline in attendance and enrollment in Head Start programs.

308.    Prior to the July 14 Immigrant Exclusion Directive, HSA Plaintiffs and their members have never screened participants based on immigration status, allowing staff to build the community trust necessary for Head Start recruitment and retention.

SECOND AMENDED COMPLAINT - 79
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

309.   Similarly, Parent Plaintiffs have long relied on Head Start's policy not to screen based on immigration status when educating their members about their early education options and advising them that Head Start programs do not determine eligibility based on immigration status.

310.   The July 14 Immigrant Exclusion Directive now effectively requires non-exempt Head Start agencies to verify applicants' immigration status and to deny applicants who are not "qualified" immigrants. This Directive also will result in the immediate loss of access to Head Start programs of those who are not deemed "qualified" immigrants. The Directive will also cause broader chilling in Head Start participation due to ambiguity of whether the status of the caregiver, child, or household members will be used to determine eligibility as well as confusion and fear over how the Directive will apply and the consequences of noncompliance. HSA plaintiffs' members will lose enrollment as a consequence of the chilling effects.

311.   The Immigrant Exclusion Directive forces HSA Plaintiffs to abruptly change course in program implementation and divert limited resources away from core operational activities toward screening based on immigration status. The Directive itself estimates "annual costs of $21 million in the opportunity cost of time spent by individuals seeking benefits to document eligibility and time spent by individuals reviewing program eligibility, and additional transition costs for the Head Start program associated with revising standard operating procedures." The Regulatory Impact Analysis estimates the costs of verification for Head Start agencies to be more than $17 million. AHRQ-2025-0002 at 14.

312.   The Immigrant Exclusion Directive also may force many of Parent Plaintiffs' members to lose access to Head Start programs due to ineligibility based on immigration status and, in turn, lose access to critical early education at a time when such disruption will impose significant and long-term hardships for young children and their development.

SECOND AMENDED COMPLAINT - 80
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

313.   In addition, many of Parent Plaintiffs' members who are immigrants and/or who have children and family members who are immigrants will be chilled from attending and participating in Head Start as a result of the Immigrant Exclusion Directive and fear of negative repercussions if their children remain enrolled in Head Start.

314.   The Directive will cause Parent Plaintiffs' members to lose access to childcare, forcing them to miss work, lose their jobs, drop out of school and training programs, and otherwise jeopardize their ability to care for themselves and their families—inflicting significant economic, social, and health costs at the individual, family, and community levels.

315.   The Immigrant Exclusion Directive will force Parent Plaintiffs to divert limited staff and resources from their already-existing core operational activities toward new rapid response efforts to address questions and concerns regarding the Directive, to provide information and guidance regarding the Directive, and to help members navigate the impacts of the Directive.

316.   Sudden drops in attendance and enrollment in Head Start programs also will have severe financial and programmatic consequences for HSA Plaintiffs and their members, such as loss of funding, layoffs, and even program closures.

317.   Head Start agencies who have less than full enrollment are at risk of having their grant funding reduced. 42 U.S.C. § 9836a(h) ("Reduction of grants and redistribution of funds in cases of underenrollment."); *see id.* § 9837 ("Each Head Start agency shall enroll 100 percent of its funded enrollment."); ACF, Program Instruction: Full Enrollment Initiative (June 5, 2018), https://headstart.gov/sites/default/files/pi/downloads/acf-pi-hs-18-04.pdf.

318.   In recent weeks, the OHS has stepped up enforcement of its full enrollment initiative.

319.   Defendants' Immigrant Exclusion Directive further burdens HSA Plaintiffs and their members by forcing them to expend limited staff and financial resources toward

complying with the Directive, at the cost of their core training, technical assistance, and programmatic work and services.

320.    This Directive will undermine the ability of agencies to form trust with families, serve the most vulnerable in their community, and meet the Head Start Act's goals.

**B.    Loss of access to affordable childcare will have catastrophic and cascading impacts.**

321.    Suspension or termination of Head Start services have harmed and will continue to significantly harm parents and families of children participating in Head Start—including Parent Plaintiffs' parent and caregiver members—by depriving them of critical education, benefits, and services, jeopardizing their access to affordable childcare services, and causing hardship and distress as result of disruption of such benefits and services.

322.    Children and families who rely on Head Start, including Parent Plaintiffs' members, have lost and will continue to lose access to education, services, and benefits on which they rely for health, safety, and physical and mental well-being. Such services and benefits include access to health and developmental screenings, physical and mental health services, and healthy and nutritious meals for children. Disruption of services and benefits would disproportionately harm children and families from underserved and marginalized populations, including Black children and other children of color, children with disabilities, children experiencing homelessness, and children with limited English proficiency.

323.    Indeed, many parent and caregiver members, including Parent Plaintiffs' members, rely on Head Start supports for their children with disabilities, such as speech, occupational, and physical therapy. Without Head Start, their children will be deprived of these necessary services at a critical time in their early childhood development, resulting in immediate and lasting harms to their ability to survive and thrive in educational environments and beyond. Moreover, members who rely on Head Start have lost or will lose access to

affordable childcare services—which, in many instances, would mean that they no longer have access to childcare at all.

324.    The average cost of childcare for young children in the U.S. is almost $10,000 per year.[60] More than half of the U.S. population live in areas with an insufficient supply of licensed childcare providers—otherwise known as a "childcare desert."[61] This is especially true in many rural communities, which would have no licensed childcare centers without Head Start services.[62]

325.    Loss of access to childcare services would result in a cascade of negative impacts for Parent Plaintiffs' parent and caregiver members who rely on Head Start, including forcing family members to involuntarily quit their jobs, to work fewer hours and/or shifts, and, in turn, experience significant financial stress and hardship due to decreased income.[63] These consequences will disproportionately impact women, and especially Black women and other women of color.[64]

326.    Moreover, disruptions to childcare access—and the stressors and pressure caused by such disruptions—would result in significant negative outcomes to the physical and

---

[60] *This is how much child care costs in 2025*, Care.com (Jan. 29, 2025), https://www.care.com/c/how-much-does-child-care-cost/.
[61] Casey Peeks & Allie Schneider, *5 Things to Know About Head Start*, Ctr. For Am. Progress (Apr. 16, 2025), https://www.americanprogress.org/article/5-things-to-know-about-head-start/#:~:text=If%20Head%20Start%20is%20eliminated,care%20and%20early%20learning%20opportunities.; *see also* Rasheed Malik, Katie Hamm, & Leila Schochet, *America's Child Care Deserts in 2018*, Ctr. For Am. Progress (Dec. 6, 2018), https://www.americanprogress.org/article/americas-child-care-deserts-2018/.
[62] Rasheed Malik & Leila Schochet, *A Compass for Families: Head Start in Rural America*, Ctr. For Am. Progress (Apr. 10, 2018), https://www.americanprogress.org/article/a-compass-for-families/.
[63] Katie Romas, *How Inaccessible Childcare Affects Families and Early Childhood Educators*, Univ. Of Mich. Sch. Of Pub. Health (Mar. 7, 2025), https://sph.umich.edu/pursuit/2025posts/how-inaccessible-childcare-affects-families-and-early-childhood-educators.html#:~:text=For%20some%20families%2C%20insufficient%20access,of%20improper%20care%20and%20burnout; Massimiliano Tani et al., *Working Parents, Financial Insecurity, and Child-Care: Mental Health in the Time of COVID-19*, Inst. Of Lab. Econ., (Aug. 2020), IZA DP No. 13588, https://docs.iza.org/dp13588.pdf.
[64] *Id.*; *see also* Massimiliano Tani et al., *Working Parents, Financial Insecurity, and Child-Care: Mental Health in the Time of COVID-19*, Inst. Of Lab. Econ., (Aug. 2020), IZA DP No. 13588, https://docs.iza.org/dp13588.pdf.

---

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

mental health and well-being of Parent Plaintiffs' members and their families who rely on Head Start. Insufficient access to quality childcare services has been shown to result in negative health and developmental outcomes for children, impairment to child-parent bonding and the development of positive family relationships, and even mental and physical illness for caregivers.[65]

327.    The families that rely on Head Start agencies would thus be left without access to critical Head Start services and benefits or affordable childcare, which, in many instances, would mean that they no longer have access to childcare at all.

328.    In Oregon—where Plaintiff FFO's members live, Head Start provides high-quality early childhood education and services to over 12,000 children between the ages of 0 and 5 years old. Because nearly every county in Oregon qualifies as a childcare desert,[66] Defendants' actions will result in the complete loss of early education, childcare, healthcare, and other services for many of FFO's parent and caregiver members and their families.

329.    Similarly, Defendants' actions will result in the loss of affordable early education services to over 620 children in Oakland alone, leaving many of Plaintiff PVO's parent and caregiver members without any access to early education, childcare, healthcare, and other services. In the past four years, the costs of childcare in the Bay Area have increased by 40 percent—and in San Francisco and Marin counties, childcare costs have increased by more than 50 percent.[67]

---

[65] *Id.*; Katie Romas, *How Inaccessible Childcare Affects Families and Early Childhood Educators*, Univ. Of Mich. Sch. Of Pub. Health (Mar. 7, 2025), https://sph.umich.edu/pursuit/2025posts/how-inaccessible-childcare-affects-families-and-early-childhood-educators.html#:~:text=For%20some%20families%2C%20insufficient%20access,of%20improper%20care%20and%20burnout;

[66] Natalie Pate, *How to solve Oregon's child care crunch*, OPB, Feb. 1, 2024, https://www.opb.org/article/2024/02/01/oregon-child-care-affordability-access/.

[67] GQLSHARE, *You think Bay Area housing is expensive? Child care costs are rising, too*, SiliconValley.com, Apr. 13, 2025, https://www.siliconvalley.com/2019/02/03/you-think-bay-area-housing-is-expensive-childcare-costs-are-rising-too/; *see also* Lauren Martinez, *Bay Area parents, leaders and lawmakers discuss affordable*

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

330.   In addition to the harms on their members, Parent Plaintiffs will also suffer significant harms as a result of Defendants' actions. Because of Defendants actions dismantling access to Head Start—on which its members rely for childcare services, Parent Plaintiffs will suffer frustration of its mission to obtain accessible, affordable, and high-quality childcare for parents and caregivers.

331.   Defendants' actions also will impose significant barriers to fulfilling and carrying out Parent Plaintiffs' core business activities due to the disruption and elimination of childcare access. Such activities include, but are not limited to, convening and organizing parent and caregiver members to attend membership meetings, leadership trainings, care summits, direct actions, and other events and programming. Without access to affordable childcare through Head Start, Parent Plaintiffs' members would be unable to attend or participate in organizational programs—effectively barring Parent Plaintiffs from building collective power and coalition among their parent and caregiver members.

332.   Moreover, as a result of Defendants' actions, Parent Plaintiffs will be forced to divert limited resources away from their planned activities—*e.g.*, events and programming to organize, support, and empower their membership—toward covering costs that are not only unplanned but also unrelated to their core activities.

333.   For example, because Defendants' actions will deprive its members of access to childcare, Plaintiff FFO will be required to pay for childcare services—likely at higher rates due to the lack of availability of affordable childcare in Oregon—to encourage and enable its members to attend and participate in their events and programs. Such increased costs and expenses will interfere with and otherwise limit Plaintiff FFO's ability to dedicate limited resources to its planned activities, such as its care summits, meetings, leadership trainings,

---

*'child care crisis'*, abc7 News, Sept. 10, 2023, https://abc7news.com/child-care-affordable-ro-khanna-crisis/13756847/.

and statewide parent cohorts.

334.    Moreover, Defendants' actions have resulted and/or will result in loss of wages and jobs for Head Start teachers, staff, and childcare providers, including Parent Plaintiffs' childcare provider members. Such loss of income and employment will lead to further negative harms, including, but not limited to, inability to pay housing and utility costs or to purchase groceries, housing insecurity, financial hardship, and significant emotional distress.

## CAUSES OF ACTION

## FIRST CLAIM FOR RELIEF

### Violation of Separation of Powers

335.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

336.    The mass OHS office closures and layoffs, the policy of delay on designation decisions, the March 14 DEI Letter, and the April 16 DEIA Certification violate the constitutional separation of powers in that they constitute executive branch actions that infringe upon—and flatly contradict—the mandates of the Head Start Act.

337.    Article I of the United States Constitution vests exclusively in Congress the federal spending power. U.S. Const. art. I § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

338.    Pursuant to this authority, Congress established the Head Start Act, which: (1) expressly allocates federal funds to various Head Start programs, including directing that each state and each agency be allotted an amount equal to their base grants for the prior fiscal year, MSHS and AIAN, each fiscal year; and (2) requires Head Start agencies to provide various services *by* diverse individuals *to* diverse individuals. *See, e.g.*, 42 U.S.C. § 9835; 42 U.S.C. § 9836(d), (f); 42 U.S.C. § 9843(c) (explicitly requiring the program to "recruit and train professionals from diverse backgrounds" to serve and deploy resources to "children with

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

diverse backgrounds."); *see also* Improving Head Start for School Readiness Act, Pub. L. No. 110-134, 121 Stat. 1363 (2007); 42 U.S.C. § 9832(21).   Improving Head Start for School Readiness Act, Pub. L. No. 110-134, 121 Stat. 1363 (2007); 42 U.S.C. § 9832(21).

339.   Congress appropriated $12,271,820,000 for carrying out and "making payments under" the Head Start Act for the FY 2024–2025 year. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024); Making Further Continuing Appropriations and Other Extensions for the Fiscal Year Ending September 30, 2025, and for Other Purposes, Pub. L. No. 119-4, 139 Stat. 9 (2025) (extending funding through September 30, 2025).

340.   These funds were appropriated to make payments under the Head Start Act, including for Early Head Start–Child Care Partnerships. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024). The Act also named (1) cost of living increases; (2) quality improvements to Head Start programs operated by an Indian Head Start agency; (3) the Tribal Colleges and Universities Head Start Partnership Program; and (4) supplemental funding otherwise available for research, evaluation, and Federal administrative costs. *Id.*

341.   A House Report further clarified that the appropriated funding was to assist in funding "competitive grants to States to improve existing early childhood programs" in line with Head Start's mission to "promote school readiness of children under 5 from low income families through preschool services[.]" *See* H.R. Rep. No. 118-585, at 165 (2025).

342.   Congress' funding requirements and service mandates are currently being thwarted by the Improper Executive Actions.

343.   HHS has disbursed nearly $1 billion less in spending for Head Start compared to the same period in the previous year.

SECOND AMENDED COMPLAINT - 87
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

344.    The March 14 DEI Letter and the April 16 DEIA Certification directly conflict with both the Head Start Act and Congress' Further Consolidated Appropriations Act—which explicitly allocate federal moneys to Head Start to "recruit and train professionals from diverse backgrounds" to serve and deploy resources to "children with diverse backgrounds." 42 U.S.C. § 9843(c), (g)(1)(C); *see also* 42 U.S.C. § 9843(h)(2)(G); 42 U.S.C. § 9832(21). Enforcement of the March 14 DEI Letter and the April 16 DEIA Certification purport to permit the Executive Branch to supersede unambiguous congressional mandates and, too, violates the separation of powers doctrine.

345.    The March 14 DEI Letter and April 16 DEIA Certification further contradict numerous congressional mandates in the Head Start Act as they relate to providing language-based curricula to non-English native speakers. For example, the March 14 DEI Letter and April 16 DEIA Certification would frustrate the Head Start Act's requirement that Head Start use funds, when available, "to address the challenges of children from immigrant, refugee, and asylee families, . . . limited English proficient children, children of migrant or seasonal farmworker families, and children from families in crisis," and to provide "services for families in whose homes English is not the language customarily spoken" 42 U.S.C. §§ 9835(a)(5)(B)(i), (g)(1)(C)(v).

346.    The mass layoffs and office closures nationwide and policy of delay on designation decisions contradict the Head Start Act and Congress' Further Consolidated Appropriations Act. These closures hinder Head Start's ability to perform the tasks Congress directed when appropriating Head Start's FY 2024 and FY 2025 funds: to assist in funding "competitive grants to States to improve existing early childhood programs" in line with Head Start's mission to "promote school readiness of children under 5 from low income families through preschool services[.]" *See* Departments of Labor, Health and Human Services, and Related Agencies Appropriations Bill, 2025, H.R. Rep. No. 118-585, at 165 (2025).

347.   Congress has not authorized the Executive Branch to withhold, withdraw, or terminate federal moneys from Head Start as a whole or its local Head Start agencies, on the basis that the funds are used to "advance" or "promote" "diversity," "equity," "inclusion," or "accessibility" or "equity ideology."

348.   On the contrary, Congress has authorized the federal moneies and service directives given to Head Start, MSHS, and AIAN through the Head Start Act and the Further Consolidated Appropriations Act of 2024. The Executive Branch does not have the power to unilaterally veto federal statutes and block congressionally-authorized and appropriated funding or other mandates.

349.   "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effect its own policy goals." *City of San Francisco v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). When "Congress [does] not authorize withholding of funds, the Executive Order violates the constitutional principle of the Separation of Powers." *Id.*

350.   Accordingly, the challenged improper agency actions are unconstitutional because they contradict Congress' authority to dictate how federal dollars are spent.

351.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## SECOND CLAIM FOR RELIEF

### Violation of Spending Clause

352.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

353.   Congress has the exclusive authority under the Spending Clause and the Appropriations Clause to establish and fund federal programs and to direct payment of federal funds to the states for purposes defined by Congress.

SECOND AMENDED COMPLAINT - 89
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

354.    The Appropriations Clause of the Constitution provides that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law." U.S. Const. art. I, § 9, cl. 7. Accordingly, the Clause "gives Congress control over the public fisc . . . ." *Consumer Fin. Prot. Bureau v. Cmty. Fin. Servs. Ass'n of Am.*, 601 U.S. 416, 420 (2024).

355.    The Spending Clause of the Constitution provides: "Congress shall have Power To lay and collect Taxes, Duties, Imposts and Excises, to pay the Debts and provide for the common Defence and general Welfare of the United States; but all Duties, Imposts and Excises shall be uniform throughout the United States." U.S. Const. art. I, § 8, cl. 1. The Spending Clause vests the power of the purse exclusively in Congress.

356.    The Executive Branch does not have constitutional authority to override or disregard Congress's appropriations. *See In re Aiken Cnty.,* 725 F.3d 255, 260-61 (D.C. Cir. 2013).

357.    The Constitution does not permit the President or his subordinate executive branch officials to exercise the spending power and condition grant awards on requiring a compliance condition.

358.    Congress has authorized and appropriated funds of which Head Start is a recipient. HHS does not have unilateral authority to refuse to spend those funds, including on the basis that the funds are "programs" or "activities" that are used to "promote" or "take part in" 'diversity, equity, and inclusion initiatives' or to "advance" "DEI, DEIA, or discriminatory equity ideology"

359.    Neither can HHS direct mass terminations of Head Start employees that are integral to the success of the program and whose salaries were already appropriated and accounted for within this fiscal year.

360.    Accordingly, the challenged improper agency actions are unconstitutional.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

361.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

### THIRD CLAIM FOR RELIEF

### Violation of Fifth Amendment – Due Process, Void for Vagueness

362.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

363.   The Due Process Clause of the Fifth Amendment prohibits laws that are unconstitutionally vague."[C]larity in regulation is essential to the protections provided by the Due Process Clause of the Fifth Amendment." *F.C.C. v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012).

364.   The Fifth Amendment prohibits vagueness as "an essential of due process, required by both ordinary notions of fair play and settled rules of law." *Sessions v. Dimaya*, 584 U.S. 148, 155 (2018) (citation omitted). The prohibition on vagueness guarantees that ordinary people have fair notice of the conduct proscribed, and guards against arbitrary and discriminatory enforcement. *Id.* A regulation is "void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972).

365.   Where vague regulation abuts upon First Amendment freedoms or imposes severe consequences, including penalties that "that strip persons of their professional licenses and livelihoods," the most exacting vagueness review applies. *Dimaya,* 584 U.S. at 184 (Gorsuch, J., concurring); *see also Hynes v. Mayor of Oradell*, 425 U.S. 610, 620 (1976). But even where a more stringent test for vagueness does not apply, "[v]ague laws in any area suffer a constitutional infirmity." *Ashton v. Kentucky*, 384 U.S. 195, 200 (1966).

366.   The March 14 DEI Letter and April 16 DEIA Certification are impermissibly vague and thus violate the Fifth Amendment due process rights of Plaintiffs Head Start Associations.." The prohibitions in the March 14 DEI Letter and the April 16 DEIA

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Certification are unclear and undefined, broad in scope, and turn on subjective judgement. These undefined terms are susceptible of multiple and wide-ranging meanings. By making clear that the Head Start grant recipients annual funding application is conditional on compliance with these directives, and subject to termination, clawback, and additional civil and criminal liability under the False Claims Act, 31 U.S.C. § 3729, Defendants threaten Plaintiff Head Start Associations' members with an existential threat to their existence. As illustrated by the difficulties facing Plaintiffs described above, the March 14 Letter fails to provide adequate notice about what speech and programming regarding diversity, equity, or inclusion is prohibited.

367.   Because Plaintiffs' members are also subject to compliance with state licensing laws for Early Childhood Credentialing which require diversity and inclusivity practices, the March 14 Letter also exposes Plaintiffs to professional consequences of losing the state funding and licensing required for serving their communities if they wish to remain comply in compliance with federal requirements.

368.   The vagueness of the prohibitions in the March 14 DEI Letter and April 16 DEIA Certification invites arbitrary and selective enforcement by Defendants because it impermissibly delegates basic policy matters or "resolution on an ad hoc and subjective basis." *Grayned*, 408 U.S. at 108–09.

369.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## FOURTH CLAIM FOR RELIEF

### Violation of the First Amendment

370.   Plaintiffs incorporate the above paragraphs as if fully set forth therein.

371.   Plaintiff state Head Start Associations and their member agencies are private entities which engage in constitutionally protected expression relating to diversity, equity, and

SECOND AMENDED COMPLAINT - 92
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

inclusion in their educational and community programming. Plaintiffs reasonably fear HHS's implementation of the January 20 and 21 anti-DEI Executive orders, the March 14 DEI Letter's prohibition on "promot[ing]" "diversity, equity, and inclusion (DEI) initiatives," and the April 16 DEIA Certification's bans on "DEIA" and "discriminatory equity ideology," apply to all of their initiatives, programs, and activities, including those outside of the contours of the federal grants. Together, these directives send the clear message to agencies that any programing that could be viewed as promoting "diversity," "equity," "inclusion," or "accessibility" is bad and disfavored by the government, whether or not it violates antidiscrimination laws, and whether or not it is within the contours of the federal program.

372. The government may not leverage funding to regulate speech outside the contours of the federal program itself. *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214 (2013).

373. Head Start agencies are constantly monitored by Defendants, most receiving monthly contact about compliance. They understand that they are under constant scrutiny, and being out of compliance could lead to an official "deficiency" or loss to "designation" status. The loss of designated status as Head Start agencies poses an existential threat to any Head Start program. Not only does termination mean an agency loses its current funding, any agency that has been terminated for cause or been denied refunding is then excluded from competing for the next five years. 45 C.F.R. § 1304.13. The April 16 DEIA Certification threatens agencies with additional penalties including a clawback of grant funds and civil and criminal liability for misrepresentation under the False Claims Act. 31 U.S.C. § 3729, in the event that a funding recipient engages in impermissible "DEIA." Defendants' "conduct . . . viewed in context, could be reasonably understood to convey a threat of adverse government action in order to punish or suppress the plaintiff's speech." *NRA v. Vullo*, 602 U.S. 175, 190–91 (2024).

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

374.    To avoid the threatened adverse government actions, Plaintiffs and their members will foreseeably suppress expressions and support of any programming, pedagogy, trainings, professional development, that could be construed as promoting diversity, equity, or inclusion, including outside of the contours of the federal program. Because the March 14 DEI Letter and April 16 DEIA Certification prohibitions are undefined and subjective, Plaintiffs reasonably fear that any statement they make that could be construed as promoting diversity, equity, or inclusion by the government puts them at risk of losing designation, federal funding, and exposing them to additional penalties.

375.    Moreover, The March 14 DEI Letter and April 16 DEIA Certification attempt textbook viewpoint discrimination because they single out messages and perspectives that the government does not like—those that "promote . . . diversity, equity, and inclusion"— for adverse treatment. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (Content based regulations "target speech based on its communicative content."); *Rosenberger v. Rector & Visitors of Univ. of Virginia*, 515 U.S. 819, 829 (1995) ("Viewpoint discrimination is thus an egregious form of content discrimination. The government must abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 396 (1992) (First Amendment forbids government from imposing a content limitation to single out and display hostility towards particular content).

376.    Plaintiff state Head Start Associations and their member agencies are impermissibly chilled in their constitutionally protected speech based on its viewpoint, specifically the viewpoint that recognizing and celebrating the diversity of their students and communities, improving equity for all students no matter of socio-economic background, and promoting the inclusion and accessibility of all children and families, including children with disabilities, is *not* "immoral."

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

377.   The March 14 DEI Letter and April 16 DEIA Certification therefore violate the First Amendment facially and as applied to Head Start Association Plaintiffs.

378.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**FIFTH CLAIM FOR RELIEF**

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) – Not in Accordance with Congressional Appropriations, the Head Start Act, and the Rehabilitation Act**

379.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

380.   The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

381.   When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265(1954). A federal agency "is obliged to abide by the regulations it promulgates," including its own internal operating procedures. This is especially true [w]here a prescribed procedure is intended to protect the interests of a party before the agency." *Backcountry Against Dumps v. Fed. Aviation Admin.*, 77 F.4th 1260, 1267 (9th Cir. 2023) (citation omitted). An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures.

382.   The mass OHS office closures and layoffs, the March 14 DEI Letter, and the April 16 DEIA Certification constitute final agency actions subject to judicial review. They mark the "consummation" of the agency's decision-making process, set forth the agency's conclusions that agencies are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997)

(quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

383.    Congress appropriated $12,271,820,000 under the Head Start Act for the FY 2024-2025 year. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024); Making Further Continuing Appropriations and Other Extensions for the Fiscal Year Ending September 30, 2025, and for Other Purposes, Pub. L. No. 119-4, 139 Stat. 9 (2025) (extending funding through September 30, 2025).

384.    These funds were appropriated to make payments under the Head Start Act, including for Early Head Start–Child Care Partnerships. *See* Further Consolidated Appropriations Act, 2024, Pub. L. No. 118-47, 138 Stat. 460 (2024). The Act also named (1) cost of living increases; (2) quality improvements to Head Start programs operated by the Indian Head Start agency and tribal universities; (3) the Tribal Colleges and Universities Head Start Partnership Program; and (4) supplemental funding otherwise available for research, evaluation, and Federal administrative costs. *Id.*

385.    The mass office closures and layoffs are contrary to Congress's directive to continuing operation the Head Start program at current capacity.

386.    The mass office closures and layoffs hinder Head Start's ability to perform the tasks Congress directed when appropriating Head Start's FY 2024 and FY 2025 funds: to assist in funding "competitive grants to States to improve existing early childhood programs" in line with Head Start's mission to "promote school readiness of children under 5 from low income families through preschool services[.]" *See* H.R. Rep. No. 118-585, at 165 (2025).

387.    The March 14 DEI Letter and April 16 DEIA Certification conflict with the Head Start Act, 42 U.S.C. § 9831 *et seq.*, its implementing regulations, and longstanding guidance, as described *supra* Section II, including through the following:

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

a.  First, they conflict with the statutory requirement Head Start agencies meet the diverse needs of the populations they serve, that they use systems to increase participation of underserved populations, and that the education and services they provide to both children and families are both culturally and linguistically appropriate, and incorporate the unique cultural, ethnic, and linguistic backgrounds of families and community.

b.  Second, by prohibiting program expenditures that promote inclusion and accessibility the March 14 DEI Letter and April 16 DEIA Certification conflict with the obligation of all Head Start agencies that at least ten percent of the children they enroll must be children with disabilities, to effectively communicate with prospective and enrolled families, and that Head Start agencies must meet the needs of those children with disabilities and their families.

c.  Third, the March 14 DEI Letter and April 16 DEIA Certification conflict with the obligation of Head Start agencies to conduct "community assessments" that "ensure equitable inclusive and accessible service delivery that reflects the needs and diversity of the community." 45 C.F.R § 1302.11(b)(1).

d.  Fourth, the March 14 DEI Letter and April 16 DEIA Certification conflict with the requirements that Head Start agencies provide training, technical assistance, and professional development that enables teachers and staff to effectively provide instruction and services to children and families of diverse backgrounds, including those with limited English proficiency and children with disabilities.

388.  By prohibiting promoting "inclusion" and "accessibility" the March 14 DEI Letter and April 16 DEIA Certification conflict with Section 504 of the Rehabilitation Act,

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

which provides that no individual with a disability "shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency[.]" 29 U.S.C. § 794(a).

389.    As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## SIXTH CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) -- Agency Action That Is Arbitrary and Capricious and an Abuse of Discretion

390.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

391.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

392.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co*., 463 U.S. 29, 43 (1983). That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com*. v. *New York*, 588 U.S. 752, 785 (2019).

393.    The mass office closures and layoffs constitute a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets

SECOND AMENDED COMPLAINT - 98
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

forth the agency's conclusions that agencies are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Rederiaktiebolaget Transatlantic*, 400 U.S. at 71).

394.   Defendants' actions are arbitrary and capricious because Defendants failed to take into consideration the impact that terminating "diversity, equity, and inclusion initiatives" or activities related to "accessibility" would have on Head Start agencies ability to meet the requirements of the Head Start Act, its implementing regulations, state and local requirements, as well as the needs of the diverse children and families they serve.

395.   Defendants' actions are arbitrary and capricious because the March 14 DEI Letter and April 16 DEIA Certification are inconsistent with one another.

396.   Defendants' actions are arbitrary and capricious because Defendants failed to take into consideration the impact that mass office closures and layoffs and policy of delay on designation decisions would have.

397.   Defendants' actions are arbitrary and capricious because they rely on factors Congress did not intend the agency to consider, and disregard material facts and evidence.

398.   The Defendants actions are arbitrary and capricious because they are vague, arbitrary, and unsupported by the evidence.

399.   The Defendants actions is arbitrary and capricious because they do not adequately quantify or consider the harms that will result.

400.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

## SEVENTH CLAIM FOR RELIEF

**Violation of Administrative Procedure Act, 5 U.S.C. § 706()(D) – Failure to Observe**

**Procedure Required by Law**

401.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

402.   The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "without observance of procedure required by law. . . ." 5 U.S.C. § 706(2)(D).

403.   The March 14 DEI Letter and April 16 DEIA Certification constitute final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process, sets forth the agency's conclusions that agencies are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

404.   The Head Start Act provides the procedure required by law for the Secretary to make modifications to the Performance Standards, and proscribes that such modifications must made by "regulation." § 9836a(a). The guidance significantly alters the performance standards without adopting a regulation.

405.   In addition to modifying the performance standards by action other than regulation, the agency violated statutorily required procedure that before "any modifications to standards" the Secretary must "consult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs," 42 U.S.C. § 9836a(a)(2)(A), and must "consult with Indian tribes, including Alaska Natives, experts in Indian, including Alaska Native, early childhood education and

SECOND AMENDED COMPLAINT - 100
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

development, linguists, and the National Indian Head Start Directors Association." 42 U.S.C. § 9836a(a)(2)(D).

406. Moreover, the Head Start Act enumerates ten topic that the Secretary "shall…take into consideration" in developing any modifications to the Performance Standards. The March 14 Letter and April 16 DEIA Certification unlawfully modify the Performance Standards without taking the enumerated topics into consideration.

407. Because the requirements in the March 14 DEI Letter and April 16 DEIA Certification constitute a "rule," HHS was required by the Head Start Act to "[a]t least 30 days prior to [its] effective date," publish it in the "the Federal Register and shall be sent to each grantee with the notification that each such grantee has the right to submit comments pertaining thereto to the Secretary prior to the final adoption thereof."

408. Although the requirements March 14 DEI Letter and April 16 DEIA Certification modify the performance standards without enacting a regulation, they nonetheless are a "rule" that "effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Priv.y Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 34–40 (D.C. Cir. 2005)). The March 14 DEI Letter and April 16 DEIA Certification impose new legal obligations on Plaintiffs and appear on their faces to be binding. "It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

409. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

SECOND AMENDED COMPLAINT - 101
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**EIGHTH CLAIM FOR RELIEF**

**Violation of Administrative Procedure Act, 5 U.S.C. §706(1)—Unlawful Withholding and/or Unreasonable Delay of Agency Action**

410.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

411.    The APA also authorizes a court to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. §706(1). Relief is warranted under this provision where an agency completely fails to take, or unreasonably delays in taking, "a discrete agency action that it is required to take." *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis omitted).

412.    The Head Start Act provides that Defendants "shall" designate a current Head Start agency "as a Head Start agency for the period of 5 years," 42 U.S.C. 9836(b)(7)(i), unless "the responsible HHS official determines that one or more" of seven enumerated conditions existed during the current five-year designation period. 45 C.F.R. § 1304.11. To make this determination "ACF will review the relevant data to determine if one or more of the conditions under § 1304.11 were met by the Head Start agency during the current project period." 45 C.F.R. § 1304.15(b). Only if "ACF determines that one or more data elements described in the conditions in section § 1304.11 is not available due to an emergency described" in the regulation may ACF "make a designation renewal determination based on the data elements that are available." 45 C.F.R. § 1304.17(a). ACF "will" give notice to grant recipients on Designation Renewal System status "at least 12 months before the expiration date of a Head Start agency's current grant. 45 C.F.R. § 1304.15(c).[68] If a previously designated Head Start

---

[68] "Will" has the same meaning as the word "shall." As a "technical fix[]" that does "not alter the substance of the provision," in 2020, HHS "remove[d] the word 'shall' and replace[d] it with the word 'will.'" Head Start Designation Renewal System, 85 Fed. Reg. 53189-01.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

agency does not qualify for designation renewal, the Secretary must either designate a new agency or an interim agency to fill the gap in services. 42 U.S.C. 9836(d), (f).

413.    Additionally, the Head Stat Act requires the Secretary of HHS "shall prescribe" "procedures to assure that financial assistance under this subchapter shall not be suspended, except in emergency situations, unless the recipient agency has been given reasonable notice and opportunity to show cause why such action should not be taken." 42 U.S.C. 9841(a). Pursuant to that statutory command, regulations require that before termination or denial or refunding the "responsible HHS official will notify the grant recipient" and "must notify the grant recipient no later than 30 days after ACF receives the annual application for refunding." 45 C.F.R. § 1304.5(b).

414.    Additionally, HHS regulations on "payment" of grants specify that "payments for allowable costs . . . must not be withheld at any time during the period of performance" unless certain circumstances delineated in the applicable regulation applies. 45 C.F.R. § 75.305(b)(6). Moreover, HHS may only impose "additional specific award conditions," HHS must first "notify the applicant" as to "why the additional requirements are being imposed," under four enumerated circumstances, and if it does so, HHS must provide notification of "the nature of action needed to remove the additional requirement," and the "method for requesting reconsidering of the additional requirements imposed." 45 C.F.R. § 75.207.

415.    Plaintiffs' members include agencies whose current period of 5 years expires in the coming days, weeks, and month, have applied for designation renewal, have not met one of the seven enumerated conditions during the current project period that mean an "agency will be required to compete for its next five years of funding," 45 C.F.R. § 1304.11, but have not been designat[ed] "as a Head Start agency for the period of 5 years," 42 U.S.C. 9836(b)(7)(i).

SECOND AMENDED COMPLAINT - 103
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

416.   Plaintiffs' members include agencies whose current annual funding period end shortly, have submitted their annual application for refunding more than 30 days ago, and have not received notification regarding its application. 45 C.F.R. § 1304.5(b). Failure to provide a notification of award for annual refunding has the effect of a "den[ying] of refunding." *Id.*

417.   Plaintiffs' members include agencies who have had "payments for allowable costs . . . withheld . . . during the period of performance," and have had additional requirements imposed without justification or notification in violation of 45 C.F.R. §§ 75.305(b)(6); 75.207. The above-described delays constitute unlawful withholding and/or unreasonable delay of agency action within the meaning of §706(1).

418.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

### NINTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Contrary to Constitutional Right**

419.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

420.   A reviewing court must "hold unlawful and set aside agency action" that is "contrary to constitutional right, power, privilege, or immunity." 5 U.S.C. § 706(2)(B).

421.   The mass OHS office closures and layoffs, the policy of delay on designation decisions, the March 14 DEI Letter, and the April 16 DEIA Certification constitutes a final agency action subject to judicial review. These marks the "consummation" of the agency's decision making process, sets forth the agency's conclusions that agencies are acting unlawfully, and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Rederiaktiebolaget Transatlantic*, 400 U.S. at 71).

SECOND AMENDED COMPLAINT - 104
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

422.   For the reasons described above and incorporated here, Defendants' actions are contrary to constitutional right, and the Court must hold them unlawful and set them aside.

423.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## TENTH CLAIM FOR RELIEF

**Violation of Section 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794**

424.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

425.   Section 504 of the Rehabilitation Act provides in pertinent part that "no otherwise qualified individual with a disability in the United States . . . shall, solely by reason of his or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any . . . program or activity conducted by any Executive agency . . . ." 29 U.S.C. § 794(a).

426.   Plaintiffs have members that have or serve children who have been diagnosed with ADHD, intellectual disabilities, and learning disabilities, among other disabilities. These children have physical or mental impairments that substantially limit a number of major life activities, including thinking, learning, and communicating. As such, children that plaintiffs serve are qualified individuals with a disability within the meaning of Section 504.

427.   Defendant HHS is an "Executive agency" within the meaning of 29 U.S.C. § 794(a); 5 U.S.C. § 105 ("Executive agency" means an Executive department); 5 U.S.C. § 101 (The Executive departments are: . . . The Department of Health and Human Services.").

428.   The administration of the Head Start program by Defendants is a federally conducted program or activity subject to Section 504 of the Rehabilitation Act. Moreover, when Defendants are operating in their capacity as a provider of funding to recipients of Federal assistance, Defendants' actions fall with the "narrow category of § 504(a) violations

SECOND AMENDED COMPLAINT - 105
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

committed by federal funding agencies acting as such—that is, by 'Federal provider[s].'" *Lane v. Pena*, 518 U.S. 187, 193 (1996) (quoting 29 U.S.C. § 794(a)(2)).

429.   By making the denial of "inclusion" a condition of Head Start agencies federal funding, HHS, through OHS, is acting in its capacity as a "Federal provider" and sovereign immunity is waived. 29 U.S.C. § 794a.

430.   The regulations implementing Section 504 prohibit HHS from:

a.   Providing a qualified individual with handicaps with an aid, benefit, or service that is not as effective in affording equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement as that provided to others. 45 C.F.R. § 85.21(b)(1)(iii); and

b.   Providing different or separate aid, benefits, or services to individuals with handicaps or to any class of individuals with disabilities than is provided to others, where such action is not necessary to provide qualified individuals with disabilities with aid, benefits, or services that are as effective as those provided to others. *Id.* § 85.21(b)(1)(iv); and

c.   Failing to "administer programs and activities in the most integrated setting appropriate to the needs of qualified individuals" with disabilities. *Id.* § 85.21(d); and

d.   Affording qualified individuals with disabilities an opportunity to participate in or benefit from the aid, benefit, or service that is not equal to that afforded to others. *Id.* § 85.21(b)(1)(ii); and

e.   Utilizing criteria or methods of administration the purpose or effect of which would—(i) Subject qualified individuals with disabilities to discrimination on the basis of disability; [and] (ii) Defeat or substantially impair

SECOND AMENDED COMPLAINT - 106
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

accomplishment of the objectives of a program or activity with respect to individuals with disabilities. *Id.* § 85.21(3).

431.    The March 14 Letter and the April 16 DEIA Certification discriminate on their face and in their application against children with disabilities by prohibiting their educational providers from "promot[ing] . . . inclusion" or "accessibility." "Inclusion in early childhood programs," including Head Start, has been defined by HHS for over a decade as referring to "including children with disabilities in early childhood programs together with their peers without disabilities." HHS & U.S. DOE, Policy Statement on Inclusion of Children with Disabilities in Early Childhood Programs at 3 (Sept. 14, 2015);[69] HHS & DOE, Policy Statement on Inclusion of Children with Disabilities in Early Childhood Programs at 6 (updated 2023) (similar).[70] By forbidding initiatives, including program modifications and training, necessary to provide children with disabilities early childhood programs, services, and experiences alongside their non-disabled peers, the March 14 Letter and April 16 DEIA Certification deny disabled children access to HHS services in the most integrated setting that are not separate from those provided to non-disabled children. This policy also singles out children with disabilities for discriminatory treatment. *See Bay Area Addiction Rsch. & Treatment, Inc. v. City of Antioch*, 179 F.3d 725 (9th Cir. 1999) (ordinance that prohibited the operation of methadone clinics within 500 feet of residential areas "facially discriminates on the basis of appellants' disability").

432.    The above-described acts and omissions have caused, are causing, and imminently threaten to cause direct, concrete, and irreparable harm to Plaintiffs.

---

[69] U.S. Dep't of Educ. & U.S. Dep't of Health and Hum. Servs., *Policy Statement on Expulsion and Suspension Practices in Early Childhood Settings*, https://www.ed.gov/sites/ed/files/policy/speced/guid/earlylearning/joint-statement-full-text.pdf, (last visited Apr. 28, 2025).

[70] U.S. Dep't of Health and Hum. Servs., Admin. & Child. and Fams., *Policy Statement on Inclusion of Children with Disabilities in Early Childhood Programs*, https://acf.gov/sites/default/files/documents/ecd/policy-statement-on-inclusion.pdf, (last visited Apr. 28, 2025).

SECOND AMENDED COMPLAINT - 107
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

## ELEVENTH CLAIM FOR RELIEF

### Ultra Vires

433.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

434.    Defendants cannot take any action that exceeds the scope of their constitutional and/or statutory authority.

435.    Federal courts possess the power in equity to grant injunctive relief "with respect to violations of federal law by federal officials." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326–27. Equitable relief is available against federal officials who act "beyond th[e] limitations" imposed by federal statute. *Larson v. Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689 (1949).

436.    Defendants' actions are ultra vires because they are beyond the scope of their constitutional and statutory authority, and the Court must hold them unlawful and set them aside.

## TWELFTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A) - Contrary to Law and in Excess of Statutory Authority

*(against Defendants U.S. Department of Health and Human Services and Robert F. Kennedy, Jr. based on the July 14 Immigrant Exclusion Directive)*

437.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

438.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law." 5 U.S.C. § 706(2)(A).

439.    When a federal agency has promulgated "[r]egulations with the force and effect of law," those regulations "supplement the bare bones" of federal statutes. *United States ex*

SECOND AMENDED COMPLAINT - 108
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

*rel. Accardi v. Shaughnessy*, 347 U.S. 260, 265 (1954). A federal agency "is obliged to abide by the regulations it promulgates," including its own internal operating procedures. This is especially true "[w]here a prescribed procedure is intended to protect the interests of a party before the agency." *Backcountry Against Dumps v. Fed. Aviation Admin.*, 77 F.4th 1260, 1267 (9th Cir. 2023) (quoting *Sameena Inc. v. U.S. Air Force*, 147 F.3d 1148, 1153 (9ᵗʰ Cir. 1998)). An agency's action may be set aside pursuant to the APA if the action violates the agency's own procedures.

440.    The July 14 Immigrant Exclusion Directive constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decision-making process and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Bos. Marine Terminal Ass'n. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

441.    The July 14 Immigrant Exclusion Directive conflicts with PRWORA, the Head Start Act and other federal law.

442.    Title IV of PRWORA limits eligibility for certain "federal public benefits" to specified immigrants referred to as "qualified" immigrants. 8 U.S.C. § 1611(a). Qualified immigrants include lawful permanent residents, refugees, asylees and certain enumerated other immigrants admitted into the county for humanitarian reasons. 8 U.S.C. § 1641.

443.    The Directive declares that Head Start is a "federal public benefit" under PRWORA.

444.    Head Start does not fall within PRWORA's definition of "federal public benefit." 8 U.S.C. § 1611(c).

445.    By creating a new eligibility requirement based on immigration status, the Immigrant Exclusion Directive undermines agencies' ability to comply with the Head Start Act.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

446.   The Head Start Act imposes no eligibility restriction based on immigration status.

447.   The Head Start Act governs "Participation in Head Start programs" by directing that "[t]he Secretary shall by regulation prescribe eligibility for the participation of persons in Head Start programs" and specifies criteria for what "such regulation shall provide." 42 U.S.C. § 9840(a)(1). The statutorily required "criteria for eligibility" includes that the following children "shall" be eligible for Head Start: (i) children whose families' incomes are below the poverty line, and children whose "families are eligible or, in the absence of child care, would potentially be eligible for public assistance," and (ii) homeless children. *Id.* § 9840(a)(1)(B)(i)(ii). Further, the statute specifies that under certain conditions, additional children that do not meet that criteria are eligible. 42 U.S.C. § 9840(a)(1)(B)(iii); 42 U.S.C. § 9840(d). Immigration status is not included as part of the statutorily mandated "criteria for eligibility."

448.   In 2024, Congress amended the eligibility criteria for Migrant or Seasonal Head Start and for Head Start programs operated by Indian tribes to eliminate the requirement that they comply with the income eligibility criteria of the Head Start Act. *See* Further Consolidated Appropriations Act, 2024, §§ 238-239. Migrant or seasonal Head Start programs may enroll any children "who have at least one family member whose income comes primarily from agricultural employment." *Id.* § 239. Head Start programs operated by Indian tribes may enroll any children who have a family or household member who "is a member of an Indian tribe." *Id.* § 238. The 2024 eligibility criteria include no restriction based on immigration status.

449.   A regulation entitled "Determining, verifying, and documenting eligibility," 45 C.F.R. § 1302.12, implements the requirements of the Head Start Act. Subsection (c) enumerates the "Eligibility requirements." Immigration status is not included.

SECOND AMENDED COMPLAINT - 110
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

450.    Additionally, Because Defendants' Immigrant Exclusion Directive violates the Constitution, *see infra*, and thus the Administrative Procedure Act, the Directive is "not in accordance with law." 5 U.S.C. §§ 706(2)(A), (B).

451.    Because the Immigrant Exclusion Directive is contrary to law, Defendants have acted in excess of their statutory authority in violation of 5 U.S.C. § 706(2)(C). Therefore, the Immigrant Exclusion Directive must be "set aside." *Id.* § 706(2).

### THIRTEENTH CLAIM FOR RELIEF

**Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(A) -- Agency Action That Is Arbitrary and Capricious and an Abuse of Discretion**

(*against Defendants U.S. Department of Health and Human Services and Robert F. Kennedy, Jr. based on the July 14 Immigrant Exclusion Directive*)

452.    Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

453.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be arbitrary, capricious, [or] an abuse of discretion." 5 U.S.C. § 706(2)(A).

454.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). That "reasoned explanation requirement of administrative law . . . is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public." *Dep't of Com.* v. *New York*, 588 U.S. 752, 785 (2019).

SECOND AMENDED COMPLAINT - 111
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

455.   The July 14 Immigrant Exclusion Directive constitutes a final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process and proscribes new substantive obligations "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Rederiaktiebolaget Transatlantic*, 400 U.S. at 71).

456.   Defendants' action is arbitrary and capricious because Defendants failed to consider important factors and aspects of the problem, including, but not limited to, the impact that the July 14 Immigrant Exclusion Directive would have on Head Start agencies' ability to meet the requirements of the Head Start Act, its implementing regulations, state and local requirements, as well as the needs of the diverse communities, children, and families they serve.

457.   Defendants' actions are arbitrary and capricious because Defendants failed to "assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 33 (2020).

458.   Defendants' actions are arbitrary and capricious because they relied on factors Congress did not intend the agency to consider, disregarded material facts and evidence, and offered an explanation for its decision that runs counter to the evidence before the agency. Defendants' actions are also arbitrary and capricious because they are vague, and unsupported by the evidence.

459.   Defendants' actions are arbitrary and capricious because Defendants failed to take into consideration the significant costs and burdens that their actions would have on children, families, and communities impacted by the Immigrant Exclusion Directive.

460.   Defendants' actions are arbitrary and capricious because they do not adequately consider or quantify the harms that will result.

SECOND AMENDED COMPLAINT - 112
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

461.   Defendants have failed to consider or even acknowledge the significant costs and burdens that the Immigrant Exclusion Directive will impose on Plaintiffs and their members. *See Mingo Logan Coal Co. v. Env't Prot. Agency*, 829 F.3d 710, 732 (D.C. Cir. 2016) (Kavanaugh, J., dissenting) ("As a general rule, the costs of an agency's action are a relevant factor that the agency must consider before deciding whether to act."); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017).

462.   Despite the Immigrant Exclusion Directive's harmful impacts, Defendants have failed to consider any of these "important aspect[s] of the problem" caused by the Immigrant Exclusion Directive, *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, or to weigh these significant reliance interests against competing policy concerns, *Regents of the Univ. of Cal.*, 591 U.S. at 33.

463.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## FOURTEENTH CLAIM FOR RELIEF

### Violation of Administrative Procedure Act, 5 U.S.C. § 706(2)(D) – Failure to Observe Procedure Required by Law

(*against Defendants U.S. Department of Health and Human Services and Robert F. Kennedy, Jr. based on the July 14 Immigrant Exclusion Directive*)

464.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

465.   The APA provides that courts "shall . . . hold unlawful and set aside" agency action that is "without observance of procedure required by law . . . ." 5 U.S.C. § 706(2)(D).

466.   The July 14 Immigrant Exclusion Directive constitutes final agency action subject to judicial review. It marks the "consummation" of the agency's decisionmaking process and proscribes new substantive obligations "from which 'legal consequences will

flow.'" *Bennett v. Spear*, 520 U.S. 154, 178 (1997) (quoting *Port of Boston Marine Terminal Assn. v. Rederiaktiebolaget Transatlantic*, 400 U.S. 62, 71 (1970)).

467.    The Head Start Act directs that "[t]he Secretary shall by regulation prescribe eligibility for the participation of persons in Head Start programs assisted under this subchapter" and enumerates certain requirements for the "Criteria for eligibility," 42 U.S.C. § 9840(a)(1)(A). The Immigrant Exclusion Directive changes the criteria for eligibility but failed to do so "by regulation" as required by the Head Start Act.

468.    Although the Immigrant Exclusion Directive modifies the eligibility criteria without enacting a regulation, it nonetheless is a "rule" that "effects 'a substantive regulatory change' to the statutory or regulatory regime." *Elec. Priv. Info. Ctr. v. U.S. Dep't of Homeland Sec.*, 653 F.3d 1, 6–7 (D.C. Cir. 2011) (quoting *U.S. Telecom Ass'n v. F.C.C.*, 400 F.3d 29, 34–40 (D.C. Cir. 2005)). The Immigrant Exclusion Directive imposes new legal obligations on Plaintiffs that appear on their faces to be binding. "It commands, it requires, it orders, it dictates." *Appalachian Power Co. v. E.P.A.*, 208 F.3d 1015, 1023 (D.C. Cir. 2000).

469.    Defendants do not meet the "good cause" exception, 5 U.S.C. 553(b)(4)(B), which is to be "narrowly construed and only reluctantly countenanced." *East Bay Sanctuary Covenant v. Trump*, 909 F.3d 1219, 1253 (9th Cir. 2018) (quotation marks and internal citation omitted). "[N]otice and public procedure" are not "impracticable, unnecessary, or contrary to the public interest." 5 U.S.C. 553(b)(4)(B).

470.    The Head Start Act also requires that "[a]t least 30 days prior to their effective date, all rules, regulations, and application forms shall be published in the Federal Register and shall be sent to each grantee with the notification that each such grantee has the right to submit comments pertaining thereto to the Secretary prior to the final adoption thereof. 42 U.S.C. § 9839(d). The Defendants violated this 30 day notice and comment requirement by applying the Directive immediately, thus failing to observe the procedure required by law. 5

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

U.S.C. § 706(2)(D). In addition, the Secretary did not follow the procedures set forth in the Head Start Act that are required prior to "any" modifications to the "program performance standards." 42 U.S.C. §§ 9836a(a)(1), (2). There is no good-cause or any other exception to these statutory requirements. Under the statute, the Secretary must:

a. "[C]onsult with experts in the fields of child development, early childhood education, child health care, family services (including linguistically and culturally appropriate services to non-English speaking children and their families), administration, and financial management, and with persons with experience in the operation of Head Start programs." *Id.* § 9836a(a)(2)(A)

b. "]T]ake into consideration" ten enumerated topics in developing program performance standards. *Id.* § 9836a(a)(2)(B).

c. "[E]nsure that any such revisions in the standards will not result in the elimination of or any reduction in quality, scope, or types of health, educational, parental involvement, nutritional, social, or other services required to be provided under such standards as in effect on December 12, 2007." *Id.* § 9836a(a)(2)(C).

d. "[C]onsult with Indian tribes, including Alaska Natives, experts in Indian, including Alaska Native, early childhood education and development, linguists, and the National Indian Head Start Directors Association . . . ." *Id.* § 9836a(a)(2)(D).

471. The Immigrant Exclusion Directive entirely fails to even acknowledge the statutory requirement to consult with "experts" in enumerated fields, with "persons with experience in the operation of Head Start programs," with "Indian tribes," and with the "National Indian Head Start Directors Association," and the Directive entirely fails to engage in the analysis of the statutorily enumerated topics in §§ 9836a(a)(2)(B), (C).

SECOND AMENDED COMPLAINT - 115
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

472.   Defendants failed to observe the procedural requirements of Executive Order 12866, which requires administrative agencies issuing economically significant rules to "assess both the costs and the benefits of the intended regulation and . . . adopt a regulation only upon a reasoned determination that the benefits of the intended regulation justify its costs." Sec. 1(b)(6). Defendants' Regulatory Impact Analysis excludes completely the range of costs on children and families that must now forgo participation in Head Start and similar programs; it is not a "reasoned determination" of regulatory impact.

473.   As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

## FIFTEENTH CLAIM FOR RELIEF

### Violation of Separation of Powers and the Spending Clause

(*against Defendants U.S. Department of Health and Human Services and Robert F. Kennedy, Jr. based on the July 14 Immigrant Exclusion Directive*)

474.   Plaintiffs reallege and incorporate by reference all prior and subsequent paragraphs.

475.   The July 14 Immigrant Exclusion Directive violates the constitutional separation of powers in that it constitutes an executive branch action that infringes upon the mandates of the Head Start Act.

476.   Article I of the United States Constitution vests exclusively in Congress the federal spending power. U.S. Const. art. I § 8, cl. 1; *see also South Dakota v. Dole*, 483 U.S. 203, 206 (1987).

477.   Pursuant to this authority, Congress established the Head Start Act, which (1) expressly allocates federal funds to various Head Start programs, MSHS, and AIAN; and (2) governs "Participation in Head Start programs" by directing that the "criteria for eligibility" include that the following children "shall" be eligible for Head Start: (i) children whose

SECOND AMENDED COMPLAINT - 116
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

families' incomes are below the poverty line, and children whose "families are eligible or, in the absence of child care, would potentially be eligible for public assistance," and (ii) homeless children. 42 U.S.C. § 9835; 42 U.S.C. § 9840(a)(1)(B)(i)–(ii). Migrant or seasonal Head Start programs may enroll any children "who have at least one family member whose income comes primarily from agricultural employment . . . " Further Consolidated Appropriations Act, 2024 § 239. Head Start programs operated by Indian tribes may enroll any children who have a family or household member who "is a member of an Indian tribe." *Id.* § 238. Immigration status is not included as part of the statutorily mandated "criteria for eligibility."

478.    The July 14 Immigrant Exclusion Directive imposes an additional condition on Head Start agencies that Congress did not include in the Head Start Act, as amended by the Improving Head Start for School Readiness Act of 2007 and the Further Consolidated Appropriations Act, 2024, and which Congress did not delegate to Defendants to include.

479.    By making children whose "families' incomes are below the poverty line," "families [that] are eligible or, in the absence of child care, would potentially be eligible for public assistance," "homeless children," children "who have at least one family member whose income comes primarily from agricultural employment," and children who have a family or household member who "is a member of an Indian tribe," ineligible for Head Start based on immigration status, Defendants impose a funding condition in pursuit of the Executive's policy agenda that Congress has not authorized. That violates the separation of powers and the Spending Clause, which "exclusively grants the power of the purse to Congress, not the President" or the executive branch. *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018) (citing U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause)).

480. Accordingly, the challenged improper agency actions are unconstitutional because they contradict Congress' authority to dictate how federal dollars are spent.

481. Additionally, the July 14 Immigrant Exclusion Directive further violates the Spending Clause because it conditions the receipt of federal funds on conditions that are ambiguous. *See e.g., Cnty. of Santa Clara v. Trump*, 250 F. Supp. 3d 497, 532 (N.D. Cal. 2017).

482. As a result of Defendants' unlawful conduct, Plaintiffs have suffered and will continue to suffer irreparable harm.

**REQUEST FOR RELIEF**

Plaintiffs respectfully request that this Court:

a. Declare the dismantling of Head Start, the March 14 DEI Letter, the April 16 DEIA Certification, and the July 14 Immigrant Exclusion Directive unconstitutional and unlawful;

b. Vacate and set aside any and all actions to dismantle Head Start, including the unauthorized mass office closures and layoff, delays in designation and refunding of agencies, delays in drawdown of already allocated funds from PMS, the March 14 DEI Letter, the April 16 DEIA Certification, the July 14 Immigrant Exclusion Directive, and Defendants' other actions to implement the dismantling, pursuant to 5 U.S.C. § 706(2), and declare that these actions are arbitrary and capricious, an abuse of discretion, not in accordance with law, contrary to constitutional right, in excess of statutory jurisdiction, and without observance of procedure required by law;

c. Enter an order pursuant to 5 U.S.C. §706(1), and a preliminary and permanent injunction, compelling defendants to undertake the designation and refunding of eligible Head Start agencies;

SECOND AMENDED COMPLAINT - 118
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

d. Postpone the effective date of any actions by Defendants to dismantle Head Start, including any action to freeze or terminate the disbursement of appropriated Head Start funds, pursuant to 5 U.S.C. § 705;

e. Preliminarily and permanently enjoin Defendants taking any action to dismantle Head Start, including enjoining them from implementing or giving effect to the unauthorized mass office closures and layoff, delays in designation and refunding of agencies, unexplained delays in drawdown of already allocated funds from PMS, the March 14 DEI Letter, the April 16 DEIA Certification, or the July 14 Immigrant Exclusion Directive;

f. Preliminarily and permanently enjoin Defendants from taking actions to pause, freeze, impede, block, cancel, or terminate any grant to Head Start programs.

g. Preliminarily and permanently enjoin Defendants from proceeding with the unauthorized mass office closures and layoff, take no steps to further implement or give effect to unauthorized mass office closures and layoff including those made pursuant to the "Reduction-in-Force and Reorganization Plan," and order Defendants to either reinstate federal employees whose employment was terminated or otherwise eliminated, and/or hire staff sufficient to fulfill OHS responsibilities.

h. Preliminarily and permanently enjoin Defendants from enforcing and/or implementing the March 14 DEI Letter and April 16 DEIA Certification, all agency-wide directives implementing or effectuating the March 14 DEI Letter or April 16 DEIA Certification, and any changes made pursuant to those directives.

i. Preliminarily and permanently enjoin Defendants from any other actions that enforce or implement Section 2 of the January 20 anti-DEI Executive Order, Exec. Order No. 14151, 90 Fed. Reg. 8339, to "terminate" Head Start agencies grants as "DEI," "DEIA," or "equity-related."

SECOND AMENDED COMPLAINT - 119
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

j.  Preliminarily and permanently enjoin Defendants from enforcing and/or implementing the July 14 Immigrant Exclusion Directive, all agency-wide directives implementing or effectuating the July 14 Immigrant Exclusion Directive, and any changes made pursuant to those directives, as they relate to Head Start agencies.

k.  Preliminarily and permanently enjoin Defendants from any other actions that enforce or implement the January 20 Anti-Immigrant Executive Order or the February 19 Anti-Immigrant Executive Order, as they relate to the Head Start program.

l.  Order Defendants to file a status report within 48 hours of the entry of a preliminary injunction or 5 U.S.C. § 705 stay, and at regular intervals thereafter, confirming compliance with the order;

m.  Preliminarily and permanently mandate that Defendants provide notice of this injunction to all Head Start grant recipients;

n.  Enjoin Defendants from imposing any negative consequences on Head Start agencies for noncompliance with the terms of their respective grants if such noncompliance is due directly or indirectly to any aspect of Defendants' dismantling of Head Start;

o.  Award attorney's fees, costs, and expenses in accordance with law, including the Equal Access to Justice Act, 28 U.S.C. § 2412; and grant such other and further relief as the Court may deem appropriate.

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

**JURY DEMAND**

Plaintiffs demand a jury trial of all issues so triable under Rule 38 of the Federal Rules of Civil Procedure.

| | |
|---|---|
| Dated: July 15, 2025 | Respectfully submitted,<br>By: ___/s/___ La Rond Baker<br>La Rond Baker (WSBA No. 43610)<br>Brent Low (WSBA No. 61795) |
| Ming-Qi Chu (pro hac vice)<br>Jennesa Calvo-Friedman (pro hac vice)<br>Linda S. Morris* (pro hac vice)<br>*admitted in State of Maryland<br>Sania Chandrani<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>125 Broad Street, 18th Floor<br>New York, NY 10004<br>Tel: (212) 549-2500<br>mchu@aclu.org | David Montes (WSBA No. 45205)<br>AMERICAN CIVIL LIBERTIES<br>    UNION OF WASHINGTON<br>P.O. BOX 2728<br>Seattle, Washington 98111-2728<br>Tel: (206) 624-2184<br>baker@aclu-wa.org |
| Michelle Fraling (pro hac vice)<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>915 15th Street NW, 6th Floor<br>Washington DC, 20005<br>Tel: (917) 710-3245<br>michelle.fraling@aclu.org | Kevin M. Fee (pro hac vice)<br>Allison Siebeneck (pro hac vice)<br>ROGER BALDWIN FOUNDATION OF<br>    ACLU, INC.<br>150 N. Michigan Ave, Suite 600<br>Chicago, IL 60601<br>Tel: (312) 201-9740<br>kfee@aclu-il.org |
| Laboni A. Hoq (pro hac vice)<br>HOQ LAW APC<br>AMERICAN CIVIL LIBERTIES<br>    UNION FOUNDATION<br>    (Cooperating Attorney)<br>P.O. Box 753<br>South Pasadena, CA 91030<br>Tel: (213) 977-9004<br>laboni@hoqlaw.com | Lindsay Nako (pro hac vice)<br>Lori Rifkin (pro hac vice)<br>Fawn Rajbhandari-Korr (pro hac vice)<br>Meredith Dixon (pro hac vice)<br>Megan Flynn (pro hac vice)<br>IMPACT FUND<br>2080 Addison Street, Suite 5<br>Berkeley, CA 94704<br>Tel: (510) 845-3473<br>lrifkin@impactfund.org |
| S. Starling Marshall (pro hac vice forthcoming)<br>CROWELL & MORING LLP | Edward T. Waters (pro hac vice forthcoming)<br>FELDESMAN LEIFER LLP<br>1129 20th Street NW, 4th Floor<br>Washington, DC 20036 |

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184

Two Manhattan West
375 Ninth Avenue
New York, NY 10001
Tel: (212)223-4000
SMarshall@crowell.com

Skye Mathieson (pro hac vice
forthcoming)
Lucy Hendrix (pro hac vice
forthcoming)
Emily P. Golchini (pro hac vice
forthcoming)
CROWELL & MORING LLP
1001 Pennsylvania Ave NW
Washington, DC 20004
Tel: (202)624-2500
SMatheison@crowell.com

Tel: (202) 466-8960
ewaters@feldesman.com

SECOND AMENDED COMPLAINT - 122
2:25-CV-00781-RSM

A.C.L.U. OF WASHINGTON
PO BOX 2728 SEATTLE, WA 98111-2728
(206) 624-2184