1

2

3

4

5

6

The Honorable Ricardo S. Martinez

7

8

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

9

10

11

12

13

14

15

16

17

WASHINGTON STATE ASSOCIATION OF
HEAD START AND EARLY CHILDHOOD
ASSISTANCE AND EDUCATION
PROGRAM, et. al.,

                Plaintiffs,

      v.

ROBERT F. KENNEDY, JR., in his official
capacity as Secretary of Health and Human
Services; et. al.,

                Defendants.

Case No. 2:25-cv-00781-RSM

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED
COMPLAINT

Noted for consideration:
October 3, 2025

## INTRODUCTION

18

19

20

21

22

23

24

       Plaintiffs—six non-profit agencies representing Head Start programs and their families—challenge HHS's actions to implement the President's DEI, Workforce, and PRWORA Executive Orders, which they predict *may* disrupt Head Start funding and programs. They challenge: (1) HHS's Reductions in Force and restructuring, specifically regarding the Administration for Children and Families (ACH) and the Office of Head Start (OHS); (2) HHS's letter to Head Start grant recipients informing them that OHS will not approve the use of federal funding for

expenditures that promote or take part in DEI initiatives (DEI Letter), and HHS's revision to its Grants Policy Statement (which has now been rescinded) to include a Civil Rights Assurance and certification that recipients will not operate programs that promote DEI, DEIA, or discrimination equity ideology in violation of Federal anti-discrimination laws (DEIA Certification); and (3) HHS's Notice revising its interpretation of the term "Federal public benefit" and identifying programs, including Head Start, that provide Federal public benefits and are, therefore, subject to PRWORA's identity verification requirements (PRWORA Notice). The underlying facts are well known to this Court.

This Court lacks jurisdiction to review each of Plaintiffs' claims in this pre-enforcement stage, where no actual harms have occurred over the six months since HHS has taken the challenged actions, and where Plaintiffs' speculation about what *may* happen in the future does not constitute imminent or substantial injury. This Court also lacks jurisdiction to adjudicate Plaintiffs' challenges to HHS's employment decisions under the Civil Service Reform Act (CSRA). Even if the Court had jurisdiction, Plaintiffs fail to state a claim under the Administrative Procedures Act (APA), or for a constitutional or ultra vires challenge to the agency actions.

## LEGAL STANDARDS

Subject matter jurisdiction is a threshold issue that goes to the court's power to hear the case. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 94-95 (1998). It is assumed that the district court lacks subject matter jurisdiction and the party asserting the claim bears the burden of establishing that subject matter jurisdiction exists. *In re Dynamic Random Access Memory Antitrust Litig.*, 546 F.3d 981, 984 (9th Cir. 2008) (*citing Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994)). When a party makes a factual attack on the district court's subject matter jurisdiction, the court "need not presume the truthfulness of the plaintiffs' allegations." *White v. Lee*, 227 F.3d 1214, 1242 (9th Cir. 2000). Instead, the district court can look beyond "the

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 2

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    face of the pleadings, [and] review any evidence, such as affidavits and testimony, to resolve

2    factual disputes concerning the existence of jurisdiction." *McCarthy v. United States*, 850 F.2d

3    558, 560 (9th Cir. 1988).

4        A motion to dismiss for failure to state a claim should be granted if, after reviewing the

5    complaint in the light most favorable to the plaintiff, he can prove no set of facts in support of the

6    claims that would entitle him to relief. Fed. R. Civ. P. 12(b)(6). The complaint must give "fair

7    notice of what the […] claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*,

8    550 U.S. 544, 555 (2007). While detailed factual allegations are not generally required, the facts

9    alleged must state a claim for relief that is plausible on its face and "must be enough to raise a right

10   to relief above the speculative level […]." *Id.* at 555, 570-572.

11                                   **ARGUMENT**

12   **I.      Plaintiffs' Challenges to the DEIA Certification are Moot.**

13       The Grants Policy Statement, which contained the DEIA Certification Plaintiffs seek to

14   challenge here, was revised in July 2025 and the DEIA Certification has been removed. Dkts. 95,

15   98. As such, Plaintiffs' claims challenging the DEIA Certification are moot. "Article III of the

16   United States Constitution limits federal court jurisdiction to 'actual, ongoing cases or

17   controversies.'" *Wolfson v. Brammer*, 616 F.3d 1045, 1053 (9th Cir. 2010) (quoting *Lewis v. Cont'l*

18   *Bank Corp.*, 494 U.S. 472, 477 (1990)). The "case or controversy" clause requires, among other

19   things, that a plaintiff have standing, that the plaintiff's claims be ripe for adjudication, and that

20   the plaintiff's claims not be moot. *See DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 335 (2006).

21   Because the DEIA Certification no longer exists, Plaintiffs' claims are moot and the Court lacks

22   jurisdiction over any challenges to it.

23   //

24   //

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 3

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

## II.        Plaintiffs Lack Standing and their Claims are not Ripe for Review.

Article III's "case or controversy" requirement obligates federal courts to determine, as a preliminary matter, whether plaintiffs have standing to bring suit. *Lance v. Coffman*, 549 U.S. 437, 439 (2007). A plaintiff establishes standing by showing: (1) that it suffered an injury in fact, meaning a concrete and particularized harm that is actual or imminent, rather than hypothetical; (2) a causal connection between the injury and the challenged conduct that is fairly traceable to the defendant's actions; and (3) a non-speculative likelihood that the injury will be redressed by a decision in the plaintiff's favor. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992).

Here, Plaintiffs have not shown that the DEI Letter/DEIA Certification, RIFs and restructuring, or PRWORA Notice threaten to cause them actual harm. At most, they allege a fear of what might happen down the line—an apprehension about the future. Plaintiffs hypothesize about harms that may befall them if their members do, or do not, comply with the DEI Letter/DEIA Certification, or if HHS is unable to provide a particular service or function because of its RIFs and restructuring, or if enrollment numbers drop because of the PRWORA Notice. Plaintiffs rely on predictions but cite no proof that these alleged harms have or will materialize or are imminent.

To be clear, Plaintiffs and their members have not suffered a single grant termination or program closure due to the challenged actions. Notably, the DEI Letter/DEIA Certification were issued in March 2025, the RIFs and restructuring were announced in March 2025, and the PRWORA Notice was issued in July 2025. Dkt. 38, Exs. 5, 8-9; Dkt. 88, Ex. B. Despite filing hundreds of pages of declarations over the course of preliminary proceedings, Plaintiffs cannot cite a single grant termination, loss of funding, or program closure directly caused by the challenged agency actions. Thus, Plaintiff have suffered no actual harm. Their alleged harms are merely anticipated or predicted harms that have not yet materialized.

Furthermore, there is no basis for assuming that disruption of statutorily mandated

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 4

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

programs will occur, that grant denials will materialize, or that funding will disappear, especially given HHS's stated focus of avoiding disruption of critical services. Dkt. 38, Exs. 8-9. Plaintiffs rely on precisely the sort of "highly attenuated chain of possibilities" that "does not satisfy the requirement that threatened injury must be certainly impending." *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409-10 (2013) (A threatened injury must be certainly impending to constitute injury in fact; allegations of possible future injury are not sufficient); *see also Summers v. Earth Island Inst.*, 555 U.S. 488 (2009) (rejecting standing based on a speculative chain of possibilities); *Whitmore v. Arkansas*, 495 U.S. 149, 157-60 (1990) (same); *United States v. Texas*, 599 U.S. 670, 674, 680 n.3 (2023) (remote and speculative harms are not cognizable injuries-in-fact).

"For a case to be ripe, it must present issues that are 'definite and concrete, not hypothetical or abstract.'" *50 Exch. Terrace LLC v. Mount Vernon Specialty Ins. Co.*, 129 F.4th 1186, 1188 (9th Cir. 2025) (quoting *Bishop Paiute Tribe v. Inyo Cnty.*, 863 F.3d 1144, 1153 (9th Cir. 2017) (citation omitted)). Instead of rushing into court, Plaintiffs must wait "until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to [their] situation in a fashion that harms or threatens to harm [them]." *Nat'l Park Hosp. Ass'n v. Dep't of the Interior*, 538 U.S. 803, 807-08 (2003) (quoting *Lujan*, 497 U.S. at 891). To evaluate ripeness, courts look to (1) "the fitness of the issues for judicial decision" and (2) "the hardship to the parties of withholding court consideration." *National Park*, 538 U.S. at 808.

First, Plaintiffs present the kind of "abstract disagreemen[t] over administrative policies" that are unfit for judicial resolution. *Id.* at 807. Article III courts exist to resolve claims arising from concrete injuries arising in specific factual settings, but Plaintiffs improperly seek preemptive judicial review of HHS's implementation of the President's Executive Orders when there has been no credible threat of enforcement or proof of imminent injury.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

Second, if HHS acts and causes a Plaintiff a concrete injury for which they can seek redress, they can challenge that specific action in the normal course via the HHS Departmental Appeals Board (DAB). Grant terminations follow a robust process where OHS conducts a review, issues a monitoring report, gives grantees an opportunity to correct, conducts a follow up review, and issues a termination notice with an opportunity to appeal. *See* 42 U.S.C. §§ 9836a(c) and (e), 9841(a)(3); 45 C.F.R. § 1304.2; 45 C.F.R. § 1304.5. Furthermore, a Head Start grantee appealing a grant termination to the DAB keeps its funding during the pendency of an appeal. 45 C.F.R. §§ 16.22; 1304.5(c)(2). Thus, denying review at this pre-enforcement stage will not impose any legally cognizable hardship.

### III. The CSRA Precludes Jurisdiction over Plaintiffs' Claims Challenging HHS's Restructuring and RIFs.

The CSRA and the Federal Service Labor-Management Relations Statute (FSL-MRS) together provide a comprehensive "scheme of administrative and judicial review" for resolving both disputes between employees and their federal employers and disputes brought by unions representing those employees. *Am. Fed'n of Gov't Emps., AFL-CIO v. Trump*, 929 F.3d 748, 752 (D.C. Cir. 2019) (*AFGE*) (regarding FSL-MRS); *see also Roth v. United States*, 952 F.2d 611, 615 (1st Cir. 1991) (stating that "Congress intended [the CSRA] to provide an exclusive procedure for challenging federal personnel decisions" (citation omitted)); *Graham v. Ashcroft*, 358 F.3d 931, 933 (D.C. Cir. 2004) (similar).

In the CSRA, Congress made the Merit Systems Protection Board (MSPB) and Federal Labor Relations Authority (FLRA) the exclusive fora in which federal employees, labor unions, and other interested parties may raise challenges to final, non-discrimination-related, adverse employment actions. *See United States v. Fausto*, 484 U.S. 439, 455 (1988). CSRA channeling is

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 6

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1  required even when such disputes involve constitutional claims. *See Elgin v. Dep't of the Treasury*,

2  567 U.S. 1, 10-15 (2012) (citation omitted); *see also, e.g.*, *AFGE*, 929 F.3d at 752.

3      The D.C. Circuit's decision in *AFGE* provides a roadmap for analysis here. In that case,

4  the court applied the "two-step framework set forth in" *Thunder Basin Coal Co. v. Reich*, 510 U.S.

5  200 (1994), to conclude that the union plaintiffs could not challenge in district court three executive

6  orders related to federal employment. *AFGE*, 929 F.3d at 754. Under that framework, district

7  courts lack jurisdiction over suits like this one when the intent for exclusive review in the court of

8  appeals is "(i) fairly discernible in the statutory scheme, and (ii) the litigant's claims are of the type

9  Congress intended to be reviewed within [the] statutory structure." *See id.* at 755 (citations

10  omitted).

11      The framework is satisfied here. As to the first step, the Supreme Court has repeatedly held

12  that the CSRA provides the exclusive means of redressing employment disputes involving federal

13  employees. *See Elgin*, 567 U.S. at 10-15; *Fausto*, 484 U.S. at 455. In other words, Congress

14  intended to make the FSL-MRS and CSRA the exclusive review scheme.

15      As to the second step, beyond restricting judicial review of covered constitutional claims,

16  the CSRA prevents district courts from deciding the merits of APA claims challenging an agency's

17  "systemwide . . . policy interpreting a statute," its "implementation of such a policy in a particular

18  case," *Nyunt v. Chairman, Broad Bd. of Govs.*, 589 F.3d 445, 449 (D.C. Cir. 2009) (quotation

19  marks omitted), or its decision to engage in "a *type* of personnel action the [CSRA] does not cover,"

20  *Mahoney v. Donovan*, 721 F.3d 633, 635-36 (D.C. Cir. 2013) (citation and quotation marks

21  omitted); *but see Axon Ent., Inc. v. FTC*, 598 U.S. 175 (2023).

22      That Plaintiffs have framed their alleged injuries partly in constitutional terms does not

23  allow them to sidestep CSRA's mandatory channeling regime. *Cf. Maryland v. USDA*, 2025 WL

24  1073657, at *1 (4th Cir. April 9, 2025). Were it otherwise, downstream users of government

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 7

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1  services could always go directly to court to raise challenges to agency reductions in force despite

2  Congress's determination that the employees themselves must first pursue relief administratively.

3  Courts have repeatedly rejected these sorts of end runs.

4        In *Elgin*, the Supreme Court held that even if a federal employee was raising constitutional

5  claims, the CSRA imposes an "implied preclusion of district court jurisdiction." 567 U.S. at 12.

6  Similarly, in *AFGE*, numerous federal unions asserted broad constitutional and statutory

7  challenges to a set of three Executive Orders. *See* 929 F.3d at 752. The D.C. Circuit held that the

8  FLRA provided the exclusive avenue through which unions could bring their claims. *See id*. at

9  754-61 (citing *Thunder Basin*, 510 U.S. at 212-16). In short, because "district courts do not have

10  concurrent jurisdiction over matters within the exclusive purview of the FLRA," this Court should

11  reject Plaintiffs' effort to disrupt Congress's review scheme and to seek premature, improper

12  review before this Court. *Am. Fed'n of Gov't Emps., AFL-CIO v. Loy*, 367 F.3d 932, 935 (D.C. Cir.

13  2004) (citing *Karahalios v. Nat'l Fed'n of Fed. Emps.*, 489 U.S. 527, 533 (1989)).

14        This limitation is not only doctrinally mandated; it also makes common sense because

15  Plaintiffs are not members of the class benefited by Congress's comprehensive statutory structure.

16  It would be odd if strangers to the federal-employment relationship—such as Plaintiffs here—

17  could raise claims in this Court that the affected federal employees cannot themselves raise. The

18  "exclusion" of Plaintiffs "from the provisions establishing administrative and judicial review for

19  personnel action" of the type challenged here "prevents [Plaintiffs] from seeking review" under

20  other provisions. *Fausto*, 484 U.S. at 455. When a comprehensive scheme of the sort at issue here

21  permits review at the behest of some types of plaintiffs but not others, it implicitly precludes review

22  by plaintiffs who are not authorized to bring claims. *See Block v. Cmty. Nutrition Inst.*, 467 U.S.

23  340, 347-48 (1984); *Fausto*, 484 U.S. at 448 (applying *Block* to conclude that certain employees

24  who lacked CSRA appeal rights "should not be able to demand judicial review for the type of

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 8

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1  personnel action covered by that chapter"). Congress intentionally foreclosed judicial review for

2  parties other than those specifically authorized to seek relief; therefore, Plaintiffs, who are not

3  employees of HHS, cannot challenge HHS's employment actions.

4      Furthermore, the Supreme Court has stayed decisions of the First and Ninth Circuits

5  relating to Agency reorganization plans and reductions in force. *See Trump v. Am. Fed'n of Gov't*

6  *Emps.*, 606 U.S. __, 2025 WL 1873449 (July 8, 2025) (Mem.) (*AFGE 2*) (granting stay "[b]ecause

7  the Government is likely to succeed on its argument that the Executive Order and Memorandum

8  are lawful."); *McMahon v. New York*, 606 U.S. __, 2025 WL 1922626 (July 14, 2025) (Mem.)

9  (granting stay in matter raising question of "[w]hether the Supreme Court should stay a district

10 court order requiring the government to reinstate Department of Education employees fired as part

11 of a reduction in force."). Such decisions "on the interim legal status of" Executive activities are

12 entitled to great weight: they "will often constitute a form of precedent (*de jure* or *de facto*) that

13 provides guidance throughout the United States during the years-long interim period until a final

14 decision on the merits." *Trump v. CASA, Inc.*, 606 U.S. __, 145 S. Ct. 2540, 2570 (2025)

15 (Kavanaugh, J., concurring); *see also Trump v. Boyle*, 606 U.S. __, 145 S. Ct. 2653, 2654 (2025)

16 ("Although our interim orders are not conclusive as to the merits, they inform how a court should

17 exercise its equitable discretion in like cases.").

18     The *McMahon* and *AFGE 2* stays provide particularly weighty guidance here. Like this

19 case, *McMahon* addressed a RIF at a Cabinet agency; the plaintiffs there alleged, as Plaintiffs do

20 here, that the RIF "made it effectively impossible for the Department to carry out its statutorily

21 mandated functions." *Somerville Pub. Schs. v. McMahon*, 139 F.4th 63, 69 (1st Cir. 2025)

22 (quotation marks omitted). As for *AFGE 2*, although the Court did not opine on the legality of any

23 specific restructuring plan, *see* 145 S. Ct. at 2635, its reasoning and result indicate that the Supreme

24 Court likely would side with the Government on core issues relating to the scope of Executive

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 9

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    authority to reorganize Executive agencies. *See AFGE 2*, 145 S. Ct. at 2635 (granting stay

2    "[b]ecause the Government is likely to succeed on its argument that the Executive Order and

3    Memorandum are lawful").

4            In sum, CSRA's channeling provisions preclude this Court's review of Plaintiffs' claims

5    challenging HHS's RIFs and restructuring. Everything about those claims, and the remedies

6    Plaintiffs seek, derives from the relationship between the federal government and its employees,

7    to which Plaintiffs and their members are strangers. Plaintiffs cannot step into the shoes of those

8    employees and assert claims against HHS that the employees cannot themselves assert in federal

9    district court but instead must pursue before the FLRA or the MSPB.

10           **IV.    Plaintiffs Fail to State an APA Claim.**

11           **A. Plaintiffs Do Not Challenge a Discrete, Final Agency Action.**

12           Plaintiffs have not identified a *discrete final* agency action that is reviewable under the

13   APA. Plaintiffs must plead "an identifiable action or event" and "direct [their] attack against some

14   particular 'agency action' that causes [them] harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871,

15   891 (1990) (*Nat'l Wildlife Fed'n*). That final agency action must be "circumscribed [and] discrete."

16   *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 62 (2004) (*SUWA*). The APA does not provide for

17   "general judicial review of [an agency's] day-to-day operations." *Nat'l Wildlife Fed'n*, 497 U.S. at

18   899. Agency action is final only if the action (1) marks "the consummation of the agency's

19   decisionmaking process" and (2) is "one by which rights or obligations have been determined, or

20   from which legal consequences flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citations

21   omitted).

22           ***RIFs and Restructuring.*** HHS announced its plans for RIFs and restructuring in March

23   2025, but HHS's "decisionmaking process" is ongoing and evolving. The Secretary's March 27

24   Press Release describes "specific contents of the restructuring plan that have been announced so

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 10

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    far." Dkt. 38, Ex. 8. And the accompanying Fact Sheet notes that while "[n]o additional cuts are

2    currently planned" beyond those described in the sheet, HHS "will continue to look for further

3    ways to streamline its operations and agencies." *Id.* at Ex. 9. They describe aspects of what HHS

4    "will" do going forward. *Id.* No one "action" is encompassed by the press release because the

5    restructuring is still being planned and refined. These statements underline the developing nature

6    of HHS's actions - it is an unfolding reorganization plan that remains subject to changes based on

7    circumstances, which is quintessentially non-final. Thus, the actions taken so far are "preliminary"

8    in nature and "not directly reviewable." *See* 5 U.S.C. § 704.  Moreover, a reorganization affecting

9    almost roughly half of HHS's operating divisions is not the kind of "circumscribed [and] discrete"

10   action reviewable under the APA. *SUWA*, 542 U.S. at 62.

11       ***DEI/DEIA.*** The DEI communications are not a final agency action because no rights or

12   obligations have been determined or legal consequences flow directly from them. The DEI Letter

13   merely identifies HHS' funding priorities under the Head Start Act. Dkt. 38, Ex. 5. Whereas the

14   DEIA Certification emphasized the anti-discrimination requirements that all HHS grant recipients

15   are already required to follow by having the recipient sign a certification. *Id.* at Ex. 7. Thus, the

16   DEI communications are not a final agency action subject to review under the APA.

17       ***PRWORA Notice.*** The Notice is not a final agency action. Rather, it is an interpretive rule

18   that simply "reflects" HHS's interpretation of PRWORA and does not "modif[y] or add[] to a legal

19   norm based on the agency's own authority." *Syncor Intern. Corp. v. Shalala*, 127 F.3d 90, 94-95

20   (D.C. Cir. 1997). The Notice sets forth HHS's understanding of PRWORA's purpose and plain

21   text and explains why HHS's statutory interpretation closely aligns with PRWORA's provisions.

22   HHS Notice at 31,232.

23       Agencies' "interpretative rules or statements of policy generally do not qualify" as final

24   agency action "because they are not finally determinative of the issues or rights to which they are

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 11

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

addressed." *Am. Tort Reform Ass'n v. Occupational Safety & Health Admin.*, 738 F.3d 387, 395 (D.C. Cir. 2013) (cleaned up). A non-binding interpretive rule is not a "final agency action" suitable for review because "'standing alone, it is lifeless and can fix no obligation nor impose any liability on the plaintiff.'" *Borg-Warner Protective Servs. Corp. v. EEOC*, 245 F.3d 831, 836 (D.C. Cir. 2001) (quoting *Georator Corp. v. EEOC*, 592 F.2d 765, 767 (4th Cir. 1979)). Thus, the Notice is not a final agency action reviewable under the APA.

### B. There is No Agency Action Unlawfully Withheld.

Plaintiffs have not identified a mandatory duty unlawfully withheld that this Court can compel under 5 U.S.C. § 706(1). "The only agency action that can be compelled under the APA is action legally required." *SUWA*, 542 U.S. at 63. Plaintiffs do not identify any "specific, unequivocal command" to which HHS is subject such that the Court could "order[] . . . a precise, definite act." *Id.* at 63 (citations omitted). Plaintiffs' allegations of *delays* in receiving decisions on their applications for renewal and annual funding are insufficient to state a claim because there is no statutorily required timeline for making designation and funding decisions for Head Start grants.

### C. HHS's Actions Are Not Arbitrary and Capricious.

"Judicial review under [the arbitrary and capricious] standard is deferential, and a court may not substitute its own policy judgment for that of the agency." *FCC v. Prometheus Radio Proj.*, 592 U.S. 414, 423 (2021). Thus, this Court must review only to ensure "that the agency has acted within a zone of reasonableness[.]" *Id.* at 423; *cf. Lincoln v. Vigil*, 508 U.S. 182, 192 (1993). HHS's actions satisfy this deferential review.

***RIFs and Restructuring.*** The focus of HHS's RIFs and restructuring is reduction of wasteful spending, increased efficiency, and increased responsiveness to the needs of the American people. HHS's reorganization plans aim to create a new Administration for a Healthy

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 12

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    America to coordinate chronic care and disease prevention programs and harmonize health

2    resources to low-income Americans more efficiently; appoint a new Assistant Secretary for

3    Enforcement to combat waste, fraud, and abuse in federal health programs; and consolidate ten

4    regional offices into five. Dkt. 38, Exs. 8-9. These changes will reduce redundancy and allow HHS

5    to perform its core functions more efficiently. *Id.*

6         Most importantly, HHS intends to accomplish its goals "without impacting critical

7    services" and statutorily mandated programs. *Id.* Although ACF and OHS were impacted, critical

8    functions including health and safety monitoring, centralized communication between OHS and

9    grantees, grant funding, and application processing have continued. Plaintiffs may disagree with

10   HHS's analysis, but they are not entitled to judicial relief "dictating to the agency the methods[]

11   [and] procedures" it uses to complete its statutory obligations. *Vt. Yankee Nuclear Power Corp. v.*

12   *Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978) (citation omitted). Thus, HHS has acted

13   reasonably in creating its reorganization plans.

14        ***DEI/DEIA.*** The Letter merely identifies funding priorities and does not purport to

15   terminate Head Start grant awards. And the DEIA Certification (which is now rescinded), reserved

16   the right to terminate financial assistance for violations of Federal anti-discrimination laws, but

17   that has always been true. Head Start grantees are subject to relevant Federal anti-discrimination

18   laws. 45 C.F.R. § 1303.3; 42 U.S.C. § 9849. Thus, HHS acted reasonably in issuing this guidance.

19        ***PRWORA Notice.*** The Notice properly interprets the term "Federal public benefit" and

20   guides grantees of Federal public benefit programs to verify that benefit recipients are of a

21   qualifying immigration status. Congress enacted PRWORA to limit who could receive federal

22   public benefits, and the Notice is consistent with the statute's plain language, despite that this

23   language comes with practical costs. It is not arbitrary or capricious, however, for an agency to

24   decline to adopt an incorrect reading of a statute merely because the correct reading of the text

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 13

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1   comes with practical costs; rather, if the agency reasonably concludes that Congress already made

2   that judgment by using the words that it did, it is entitled to follow Congress's lead. *See Rust v.*

3   *Sullivan*, 500 U.S. 173, 187 (1991); *Bostock v. Clayton Cnty.*, 590 U.S. 644, 666 (2020). At the

4   very least, the choice between fidelity to the best interpretation of statutory text and practical

5   consequences involves the sort of "value-laden decisionmaking and the weighing of

6   incommensurables" entrusted to federal agencies. *Dep't of Com. v. New York*, 588 U.S. 752, 776-

7   77 (2019). Thus, HHS acted reasonably in formulating its reinterpretation of PRWORA. Further,

8   the Notice includes an extensive discussion and explanation of the agency's revision of its prior

9   interpretation of PRWORA. HHS Notice at 31,233-36.

10          **D. HHS Was Not Required to Engage in Rule Making.**

11          "Under the APA, a federal administrative agency is required to follow prescribed notice-

12   and-comment procedures before promulgating substantive rules." *Colwell v. Dep't of Health &*

13   *Human Servs.*, 558 F.3d 1112, 1124 (9th Cir. 2009); *see* 5 U.S.C. § 553. None of the challenged

14   agency actions here are substantive rules.

15          ***DEI/DEIA***. The DEI Letter is more akin to a program instruction or information

16   memorandum, not a rule that must be published in the Federal Register. The OHS regularly

17   publishes guidance documents on its website, often called Program Instructions or Information

18   Memorandum, that the grant recipient community relies on to help run their program. These are

19   not considered rules nor are they published in the Federal Register. Similarly, the DEIA

20   Certification was an agency-wide policy document, not a rule or regulation.

21          While Section 644(d) of the Head Start Act requires HHS to publish all rules, regulations

22   and application forms in the Federal Register 30 days prior to their effective date, Section 644(d)

23   only applies to a specific sub-set of rules or regulations related to administrative requirements in

24   subsections (a) and (f) of Section 644. It does not apply to program instructions, information

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 14

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    memorandum, or to a departmental policy document, which the challenged agency actions here

2    are.

3        ***PRWORA Notice.*** The PRWORA Notice is an interpretive rule, and the procedural

4    requirements for rulemaking under the APA do not apply to "interpretative rules." 5 U.S.C.

5    § 553(b)(A). Interpretive rules "do not have the force and effect of law," and "do not require notice

6    and comment." *Shalala v. Guernsey Mem'l Hosp.*, 514 U.S. 87, 99 (1995); *Perez v. Mortg. Bankers

7    Ass'n*, 575 U.S. 92, 97 (2015). The fact that the previous HHS Notice interpreting PRWORA was

8    longstanding (since 1998) does not alter the procedural requirements, as no additional

9    requirements are necessary to amend an interpretive rule. *See Perez*, 575 U.S. at 103 (rejecting the

10    argument that the rule having been a definitive prior interpretation requires additional procedures.).

11    And in any event, the previous Notice was likewise issued without notice and comment and

12    Plaintiffs do not suggest that notice was procedurally invalid.

13        A change in HHS's interpretation of PRWORA does not transform this interpretive rule

14    into a legislative rule requiring notice and comment rulemaking. A rule is not legislative merely

15    because the agency has changed its interpretation of a statute. *Orengo Caraballo v. Reich*, 11 F.3d

16    186, 196 (D.C. Cir. 1993). Here, the Notice merely sets forth HHS's construction of the statute

17    and, therefore, lacks the force of law. *See, e.g., Christensen v. Harris Cnty.*, 529 U.S. 576, 587

18    (2000). HHS was free to change or withdraw its prior interpretations without engaging in notice

19    and comment rulemaking, and the agency's decision to solicit public comment despite not being

20    required to do so does not change this analysis.

21        **E. HHS's Actions are in Accordance with Law and Within Statutory Authority.**

22        Courts can hold unlawful and set aside agency action that is found to be "not in accordance

23    with law" and "in excess of statutory . . . authority." 5 U.S.C. § 706(2). Plaintiffs' argument suffers

24    from a fundamental flaw: the Executive Orders that the challenged agency actions are based on

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 15

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    explicitly direct the agencies to implement the Orders consistent with applicable law. EO 14,151

2    § 4(b); EO 14,173 § 8(b); EO 14210 §§ 3(b)(1); 3(c); 5(b); Memorandum §§ II; IV(2). Notably,

3    this past month, the Supreme Court stayed an injunction with respect to an Executive Order

4    regarding government restructuring, which included a similar limited-by-law qualifier. *Trump v.*

5    *Am. Fed'n of Gov't Emps.*, 2025 WL 1873449 (U.S. July 8, 2025). Writing separately, Justice

6    Sotomayor stated that although "the President cannot restructure federal agencies in a manner

7    inconsistent with congressional mandates," a stay of the injunction was warranted because "the

8    relevant Executive Order directs agencies to plan reorganizations and reductions in force

9    'consistent with applicable law.'" *Id.* at *1 (Sotomayor, concurring). Plaintiffs have failed to show

10    that the steps HHS has taken to implement these Orders violates, or will imminently violate, a

11    specific statutory requirement.

12        ***RIFs and Restructuring.*** Plaintiffs entirely fail to allege what statutory provisions HHS

13    has violated with its RIFs and restructuring.  A bald statement that those actions will "hinder"

14    Head Start is insufficient. Dkt. 103, pg. 96, ¶ 386.  Nor is there any indication that HHS has not

15    provided services required by statute. For example, Plaintiffs say that HHS cannot "effectively"

16    conduct Head Start monitoring required under 42 U.S.C. § 9836a(c), *id.* at ¶ 203, but never say

17    that HHS has stopped monitoring altogether. Plaintiffs also never allege that Program Specialists

18    are required by statute. *Contra id.* at ¶ 204. Similarly, Plaintiffs never allege that anyone has not

19    received allegedly required funding, despite delays. *See id.* at ¶¶ 206-29. That some services may

20    be provided by a different division or unit after the reorganization or on a different timeline than

21    before does not mean services will cease being provided.

22        ***DEI/DEIA.*** The fact that funding decisions will be guided by the Administration's funding

23    and enforcement priorities does not mean that Head Start grants will not be awarded consistent

24    with law.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 16

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1     ***PRWORA.*** HHS's Notice interpreting PRWORA is consistent with Congressional intent

2     and a plain reading of the statute. PRWORA's definition of "Federal public benefit" includes "any

3     grant, contract, loan, professional license, or commercial license provided by an agency of the

4     United States or by appropriated funds of the United States." 8 U.S.C. § 1611(c)(1)(A). The Notice

5     interprets subsection (A) as applying to all HHS "grants," including financial awards to individuals

6     and block grants to States and localities. HHS Notice at 31,233. Under subsection (B), "Federal

7     public benefit" further includes "any retirement, welfare, health, disability, public or assisted

8     housing, postsecondary education, food assistance, unemployment benefit, or any other similar

9     benefit for which payments or assistance are provided to an individual, household, or family

10    eligibility unit by an agency of the United States or by appropriated funds of the United States."

11    8 U.S.C. § 1611(c)(1)(B). HHS applies the canon of *ejusdem generis* to reasonably interpret

12    subsection (B)'s "any other similar benefit" catch-all provision "in line with plain meaning: any

13    other benefit that is 'alike in substance or essentials' to or that 'has characteristics in common'

14    with 'retirement, welfare, health, disability, public or assisted housing, postsecondary education,

15    food assistance, or unemployment benefits.'" *Id*. at 31,236 (quoting 8 U.S.C. § 1611(c)(1)(B))

16    (alterations adopted).

17    Head Start is an anti-poverty program that provides for school readiness, provides low-

18    income children and their families with "health, educational, nutritional, social, and other services,

19    that are determined based on family needs assessments, to be necessary," and "may serve as child

20    care for parents of young children." 42 U.S.C. §§ 9831(2), 9833. HHS interprets that Head Start

21    is a "Federal public benefit" because these benefits are "'similar' to 'welfare' benefits." HHS

22    Notice at 31,236. While the term "welfare" is not defined in PRWORA, it can be given a fair

23    reading in its plain meaning and agency usage. The broad sweep of "welfare" described in

24    PRWORA's preamble, 8 U.S.C. § 1601, supports a broad reading of "welfare" and any "similar

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 17

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

benefit," as do other laws enacted around the same time such as the Welfare Indicators Act of 1994 (Pub. L. 103-432).

ACF also defines "welfare" specifically in the context of services that help children: "Child welfare is a continuum of services designed to ensure that children are safe and that families have the necessary support to care for their children successfully."[1] Head Start is, at minimum, a program that provides means-tested assistance to families and individuals similar to programs under part A of title IV of the Social Security Act, the food stamp program under the Food Stamp Act of 1977, and the Supplemental Security Income program under title XVI of the Social Security Act. HHS Notice at 31,236.

## V.    Plaintiffs Have Failed to State a Claim Under Separation-of-Powers or Spending Clause Principles.

Congress often chooses to appropriate funds without attempting to control the manner of their use and, absent explicit statutory direction, funding decisions are generally committed to the agency's discretion by law. *See* 5 U.S.C. § 701(a)(2). Here, the appropriations bills provide no standards "against which to judge the agency's exercise of discretion" in making the many choices an agency must make concerning how to spend those funds. *See Heckler v. Chaney*, 470 U.S. 821, 830 (1985). HHS's decisions about how best to spend appropriated funds "requires 'a complicated balancing of a number of factors which are peculiarly within its expertise,'" and the "agency is far better equipped than the courts to deal with the many variables involved in the proper ordering of its priorities." *Id.* at 193 (quoting *Heckler*, 470 U.S. at 831-32).

***RIFs and Restructuring.*** Plaintiffs allege that the RIFs and restructuring violates the separation of powers and the Spending Clause because they "contradict" recent appropriations

---

[1] *See* Administration for Children and Families, *Child Welfare*, available at https://acf.gov/acf_issues/child_welfare.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 18

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1  statutes. Dkt. 103, pg. 88, ¶¶ 346, 359. But HHS has never said that it will not spend appropriated

2  funds on statutorily required programs or withhold funds. *Contra id.* at ¶ 347. Plaintiffs' allegation

3  that required Head Start activities are "hinder[ed]" is not an allegation that HHS will not expend

4  funds. *Id.* at ¶ 346. And saving taxpayer money by consolidating functions and reducing personnel

5  redundancy is not inherently inconsistent with spending appropriated funds.

6      ***DEI/DEIA.*** The DEI communications reflect that the government is making an *allocation*

7  choice about *what* the funding should be spent on. Such allocation choices are routinely made

8  without explicit congressional approval. *Lincoln v. Vigil*, 508 U.S. 182, 192 (1993) ("the allocation

9  of funds from a lump-sum appropriation is another administrative decision traditionally regarded

10 as committed to agency discretion.").

11     The allocation choice reflected in the DEI Letter is not at odds with the Head Start Act,

12 and it does not prevent Head Start agencies from serving and recruiting from diverse populations,

13 offering services to children with diverse backgrounds, or meeting the diverse needs of the

14 population served.

15     The DEI Letter does not conflict with the Head Start appropriation. The Further

16 Consolidated Appropriations Act appropriates funds in a general manner, "for making payments

17 under the Head Start Act" and then specifies four areas where a specific and relatively small

18 amount of funds should be spent. *See* The Further Consolidated Appropriations Act, 2024, Pub. L.

19 No. 118-47, 138 Stat. 460 (2024). The appropriation does not explicitly allocate federal money to

20 Head Start to recruit and train professionals from diverse backgrounds or to serve and deploy

21 resources to children with diverse backgrounds. HHS continues to use its appropriation for making

22 payments under the Head Start Act and operates the program in accordance with the Head Start

23 Act. It has not terminated or clawed back any funding. HHS has not refused to spend appropriated

24 funds on statutorily mandated programs.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 19

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    Moreover, the DEIA Certification merely served to ensure that the recipients comply with

2    their *existing* obligations under anti-discrimination laws. While some courts have reasoned that

3    "*new* conditions on federal funds" may implicate separation of powers, *see Cnty. of Santa Clara*

4    *v. Trump*, 250 F. Supp. 3d 497, 516 (N.D. Cal. 2017) (emphasis added), no such concern arises

5    when the Executive merely reinforces preexisting legal obligations. The requirement that federal

6    funding recipients follow the law is not new. *See Guardians Ass'n v. Civ. Serv. Comm'n of City of*

7    *N.Y.*, 463 U.S. 582, 629-30 & n.22 (1983) (Marshall, J., dissenting) (citing regulations from

8    various agencies). For decades, federal agencies have required recipients to certify their

9    compliance with federal laws, including antidiscrimination laws. *Id.* The DEIA Certification

10   required recipients to certify that they are honoring their preexisting obligation to follow the law

11   with respect to DEI programs in particular. That limitation merely renders it narrower than routine

12   compliance-with-law certifications, which Plaintiffs do not argue violate separation of powers.

13        ***PRWORA Notice.*** The Notice does not impose new funding conditions on grantees.

14   Rather, the Notice describes funding conditions that were unambiguously outlined by Congress in

15   PRWORA at the time of the statute's enactment and ascertainable at the time that Plaintiffs

16   accepted federal funds. PRWORA unambiguously states that only "qualified alien[s]" are eligible

17   for benefits that fall within the statute's definition of "Federal public benefit." *See* 8 U.S.C.

18   § 1611(c) (defining "Federal public benefit"), § 1641 (defining "qualified alien"). Because, as

19   outlined above, Head Start provides a Federal public benefit as defined in § 1611(c), the text of

20   the statute itself provides Plaintiffs "fair notice" that the listed programs are limited to American

21   citizens and qualified aliens, and subject to identity verification requirements.

22   **VI.    Plaintiffs Have Failed to State a Fifth Amendment Claim.**

23        The Due Process Clause requires that laws "give the person of ordinary intelligence a

24   reasonable opportunity to know what is prohibited, so that he may act accordingly" and "provide

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 20

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

explicit standards for those who apply them." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Plaintiffs challenge the DEI Letter/DEIA Certification as violative of the Fifth Amendment. Dkt. 103, pgs. 91-92.

First and foremost, Plaintiffs do not have a constitutionally protected property interest in Head Start grants. The Supreme Court has identified a narrow set of government benefits—so-called "new property"—that are protected under the Due Process Clause. *See Perry v. Sindermann,* 408 U.S. 593 (1972) (tenured teaching position); *Goldberg v. Kelly,* 397 U.S. 254 (1970) (welfare benefits); *see also Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564 (1972) (collecting cases). But the protections afforded to this narrow set have not been extended to "'ordinary' or 'routine' government contracts." *Gizzo v. Ben-Habib*, 44 F. Supp. 3d 374, 385 (S.D.N.Y. 2014); *see also Redondo-Borges v. U.S. Dep't of Hous. & Urb. Dev.*, 421 F.3d 1, 10 (1st Cir. 2005); *New Vision Photography Program, Inc. v. District of Columbia*, 54 F. Supp. 3d 12, 29 (D.D.C. 2014); *Nat'l Urb. League v. Trump (NUL)*, 2025 WL 1275613, at *17 (D.D.C. May 2, 2025). Indeed, no entity is entitled to a Head Start grant. *See Ohio Head Start Ass'n, Inc. v. U.S. Dep't of Health & Hum. Servs.*, 873 F. Supp. 2d 335 (D.D.C. 2012), *aff'd*, 510 F. App'x 1 (D.C. Cir. 2013).

Because Plaintiffs have failed to allege sufficient facts needed to establish a constitutionally protected property right in a Head Start grant, their challenge to the DEI Letter should be dismissed outright. *See Vera Inst. of Just. v. U.S. Dep't of Just.*, 2025 WL 1865160, at *16 (D.D.C. July 7, 2025) (dismissing the Fifth Amendment claim because there is "no property interest in a grant termination case").

Besides, even on the merits, Plaintiffs' Fifth Amendment challenge to the DEI Letter fails. Although the Letter may not contain the specificity Plaintiffs would like, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 21

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

constitutionally severe." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998); *see also Meriwether v. Hartop*, 992 F.3d 492, 518 (6th Cir. 2021) ("There is substantially more room for imprecision in regulations bearing only civil, or employment, consequences, than would be tolerated in a criminal code." (citation omitted)); *NUL*, 2025 WL 1275613, at *19 (Indeed, "when the Government is acting as patron rather than as sovereign," the effects "of imprecision are not constitutionally severe." (citation omitted); *Chicago Women in Trades v. Trump (CWIT)*, 2025 WL 1114466, at *14 (N.D. Ill. Apr. 14, 2025) (Because the Termination Provision of EO 14,151 "simply involves the government engaging in funding, as opposed to regulating, the vagueness concerns fall away as well").

Plaintiffs' Fifth Amendment challenge to the DEIA Certification is similarly futile. While the vagueness doctrine demands scrutiny of statutes and regulations that identify a *new* conduct for punishment, the DEIA Certification does no such thing. *See Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump (Diversity Officers)*, No. 25-1189, ECF No. 29 at 7 (4th Cir. Mar. 14, 2025) (finding that the Certification Provision from EO 14,173 applies only to conduct that violates *existing* federal anti-discrimination law).

The DEIA Certification, which is now rescinded, did not penalize any new conduct; it merely prioritized the enforcement of existing antidiscrimination laws, which Plaintiffs do not challenge as unconstitutionally vague. Thus, Plaintiffs have no legitimate concern that they will not be given a "reasonable opportunity to know what is prohibited." *Grayned*, 408 U.S. at 108; *see also NUL*, 2025 WL 1275613, at *20 (rejecting plaintiff's Fifth Amendment challenge to a similar certification requirement) *San Francisco A.I.D.S. Found. v. Trump*, 2025 WL 1621636, at *23 (N.D. Cal. June 9, 2025) ("[T]he limiting qualifier implicating only DEI programs that 'violate any applicable Federal anti-discrimination law' is sufficiently defined because it incorporates by reference the body of existing federal law.")

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 22

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    Even if the Court were inclined to demand more specificity than the DEIA Certification

2  provided, finding a due process violation now would be premature in this pre-enforcement posture

3  where courts must not "assume that the [government] will take no further steps to minimize the

4  dangers of arbitrary enforcement." *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S.

5  489, 504 (1982). To the contrary, courts must consider the possibility that, prior to enforcement,

6  the government "will sufficiently narrow potentially vague or arbitrary interpretations of the

7  [directives]." *Id.* Indeed, the government has already done so. *See* Dkt. 88, Ex. A (March 19, 2025

8  DOJ and EEOC Guidance).

9    **VII. Plaintiffs Have Failed to State a First Amendment Claim.**

10    The First Amendment prohibits the enactment of laws "abridging the freedom of speech."

11  U.S. Const. amend. I. Under the Free Speech Clause, the government "has no power to restrict

12  expression because of its message, its ideas, its subject matter, or its content." *Police Dep't of*

13  *Chicago v. Mosley*, 408 U.S. 92, 95 (1972). Plaintiffs challenge the DEI Letter/DEIA Certification

14  as violative of the First Amendment. Dkt. 103, pgs. 92-95.

15    The DEI Letter simply identifies funding priorities. The government does not run afoul of

16  the First Amendment by making subject-driven funding decisions. Indeed, other courts have

17  already rejected First Amendment challenges in similar contexts. *See Diversity Officers*, No. 25-

18  1189, ECF No. 29, at 7 (Harris, J., concurring); *NUL*, 2025 WL 1275613, at *19; *CWIT*, 2025 WL

19  1114466, at *11-14.

20    It is well established that government spending is not subject to traditional First-

21  Amendment scrutiny. The Supreme Court has long been clear that First Amendment concerns are

22  far less pronounced when the government acts as patron to subsidize speech, as opposed to when

23  it acts as sovereign to regulate it. "The Government can, without violating the Constitution,

24  selectively fund a program to encourage certain activities it believes to be in the public interest . .

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 23

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

. In so doing, the Government has not discriminated based on viewpoint; it has merely chosen to fund one activity to the exclusion of the other." *Rust v. Sullivan*, 500 U.S. 173, 193 (1991). Thus, "[a]s a general matter, if a party objects to a condition on the receipt of federal funding, its recourse is to decline the funds. This remains true when the objection is that a condition may affect the recipient's exercise of its First Amendment rights." *Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.* (*AID*), 570 U.S. 205, 214 (2013) (collecting cases).

No First Amendment concern exists even though, "as a practical matter, [government-funding recipients] may conform their speech to what they believe to be the . . . decisionmaking criteria in order to acquire funding." *Nat'l. Endowment for the Arts v. Finley*, 524 U.S. 569, 589 (1998). At bottom, when the government acts "as patron," it does not infringe on constitutionally protected speech even when it articulates funding standards with "imprecision." *Id.*; *see also id.* at 599 (Scalia, J., concurring) ("Insofar as it bears upon First Amendment concerns, the vagueness doctrine addresses the problems that arise from government *regulation* of expressive conduct . . . not government grant programs."); *see also CWIT*, 2025 WL 1114466, at *11-14 (the Termination Provision in EO 14151 reflects a funding decision not an impermissible attempt to regulate speech); *NUL*, 2025 WL 1275613, at *21-22 (the DEI Provisions do not on their face restrict speech outside the scope of the federal funds or contract and do not run afoul of the First Amendment).

Plaintiffs' First Amendment challenge to the DEIA Certification is similarly meritless. Plaintiffs have no First Amendment right to violate federal antidiscrimination laws in the first place. The DEIA Certification merely required grant recipients/applicants to certify their compliance with existing legal obligations under the "applicable" federal civil rights laws. Dkt. 38, Ex. 7. As such, the DEIA Certification was "distinctly limited scope." *Diversity Officers*, No. 25-1189, ECF No. 29, at 7.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 24

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

As explained earlier, requiring certification that these existing legal obligations are being honored is not novel. It has been true for decades that "[e]very application for Federal financial assistance must, 'as a *condition* to its approval and the extension of any Federal financial assistance,' contain assurances that the program will comply with Title VI *and* with all requirements imposed pursuant to the executive regulations issued under Title VI." *Guardians Ass'n*, 463 U.S. at 629-30 & n.22 (Marshall, J., dissenting). These "assurance[s]" of compliance are "given in consideration of" federal aid, "and the federal government extends assistance in reliance on the assurance of compliance"—but the obligations of Title VI apply regardless of any certification. *Id.* at 630 (citation omitted).

The requirement in the DEIA Certification was no different. At bottom, the DEIA Certification "does not place upon a recipient [any] unanticipated burdens because any recipient must anticipate having to comply with the law." *Id.*

Requiring recipients to sign the DEIA Certification for purposes of the False Claims Act also did not violate the First Amendment. As the D.C. Circuit has explained, the False Claims Act "does not reach an innocent, good-faith mistake about the meaning of an applicable rule," nor "claims made based on reasonable but erroneous interpretations of a defendant's legal obligations." *U.S. ex rel. Purcell v. MWI Corp.*, 807 F.3d 281, 287-88 (D.C. Cir. 2015). That provides ample protection against the sort of unfair liability that may worry Plaintiffs.

The *NUL* decision is instructive. There, the court found that the DEI provisions in the EOs tell agencies what to do with federal funds and contracts and do not reach beyond the scope of the grant or fund at issue. *See NUL*, 2025 WL 1275613, at *21. The directives do not tell agencies to cancel contracts with entities doing equity-related work outside their contracts or to ensure that federal funds do not support grantees promoting gender ideology with non-federal funds. *Id.* In this way, the provisions do not "prohibit[ ] the recipient from engaging in the protected conduct

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 25

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

1    outside the scope of the federally funded program" or contract. *Id.* (quoting *AID*, 570 U.S. at 217

2    (quoting *Rust*, 500 U.S. at 197)). The provisions, in other words, are part of a government effort

3    "to fund one activity to the exclusion of another"—or to contract for certain purposes to the

4    exclusion of others—which does not amount to "discriminat[ion] on the basis of viewpoint." *Rust*,

5    500 U.S. at 193. Thus, the court found that the provisions do not on their face restrict speech

6    outside the scope of the federal funds or contract, they do "not run afoul of the First Amendment."

7    *NUL*, 2025 WL 1275613, at \*22 (*quoting AID*, 570 U.S. at 217); *see also San Francisco A.I.D.S.*

8    *Found.*, 2025 WL 1621636, at \*19 (agreeing with *NUL* and rejecting plaintiffs' First Amendment

9    challenge to a similar certification provision on the grounds that "[t]he Certification Provision

10   does not 'penalize conduct beyond those prohibited by existing antidiscrimination laws'" (citation

11   omitted)).

### VIII. Plaintiffs Have Failed to State a Rehabilitation Act Claim.

13   The Rehabilitation Act of 1973 contains a "broadly-worded prohibition on discrimination"

14   against disabled individuals. *Mark H. v. Lemahieu*, 513 F.3d 922, 930 (9th Cir. 2008); 29 U.S.C.

15   § 794(a). Plaintiffs challenge the DEI Letter/DEIA Certification as violative of the Rehabilitation

16   Act. Dkt. 103, pgs. 105-07. Neither discriminates against children with disabilities. The DEI Letter

17   states that it is consistent with the nondiscrimination provision in the Head Start Act, which

18   includes application of Section 504 of the Rehabilitation Act to all Head Start grants. And the

19   DEIA Certification required compliance with applicable antidiscrimination laws, which for Head

20   Start would include Section 504 of the Rehabilitation Act.

### IX. Plaintiffs Have Failed to State an Ultra Vires Claim.

22   "[S]uits for specific relief against officers of the sovereign" allegedly acting "beyond

23   statutory authority or unconstitutionally" are not barred by sovereign immunity. *Larson v.*

24   *Domestic & Foreign Com. Corp.*, 337 U.S. 682, 689, 693 (1949) (footnote omitted). The exception

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 26

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970

to sovereign immunity is based on the principle that such ultra vires action by a federal officer "is

beyond the officer's powers and is, therefore, not the conduct of the sovereign." *Id.* at 690. Here,

Plaintiffs set forth no ultra vires claim that is conceptually distinct from their Constitutional and

APA claims, all of which the Court lacks jurisdiction and/or they have failed to state a claim for.

## CONCLUSION

WHEREFORE the Court should dismiss Plaintiffs' Second Amended Complaint.

DATED this 5th day of September, 2025.

Respectfully submitted,

TEAL LUTHY MILLER
Acting United States Attorney


*s/ Kristin B. Johnson*
KRISTIN B. JOHNSON, WSBA #28189
Assistant United States Attorney
United States Attorney's Office
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
Telephone No. (206) 553-7970
Fax No. (206) 553-4073
Email: kristin.b.johnson@usdoj.gov

Attorneys for Defendants

I certify that this memorandum contains 8,331 words,
in compliance with the Local Civil Rules.

DEFENDANTS' MOTION TO DISMISS
PLAINTIFFS' SECOND AMENDED COMPLAINT
[2:25-cv-00781-RSM] - 27

**UNITED STATES ATTORNEY**
700 Stewart Street, Suite 5220
Seattle, Washington 98101-1271
206-553-7970