1
2
3
4
5
6

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

7
8
9
10
11
12
13

| | |
|---|---|
| WASHINGTON STATE ASSOCIATION OF HEAD START AND EARLY CHILDHOOD ASSISTANCE AND EDUCATION PROGRAM, *et al.*,<br><br>                   Plaintiffs,<br><br>          v.<br><br>ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, *et al.*,<br><br>                   Defendants. | Case No. C25-781-RSM<br><br>ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION |

14
15

## I.      INTRODUCTION

16      This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction, Dkt.

17  #79.  The Court held oral argument on August 5 and September 9, 2025.  Having heard said

18  arguments and reviewed the briefs, attached declarations, and remainder of the docket, the Court

19  will GRANT Plaintiff's Motion for the following reasons.

20

## II.      BACKGROUND

21

### A. PRWORA

22      In 1996, Congress passed the Personal Responsibility and Work Opportunity Act

23  ("PRWORA").  Pub. L. No. 104-193, 110 Stat. 2105 (1996).  PRWORA limits eligibility for

24  "federal public benefits" to certain "qualified aliens" or immigrants.  8 U.S.C. §§ 1611(a)-(c).

"Federal public benefits" are defined as:

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and
>
> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c)(1). "Qualified" immigrants include lawful permanent residents, refugees, asylees, and a few others. *Id*. at § 1641. All non-citizens who do not fall under this definition, including Special Immigrant Juveniles, U visa holders, and student visa holders, are "unqualified." To uphold this qualification status, PRWORA mandates verification of citizenship status for individuals applying for federal public benefits. *See* 8 U.S.C. § 1642 Sec. 432. "Nonprofit charitable organizations," however, are not required to verify eligibility, even if providing a federal public benefit. *Id*. at § 1642(d).

**B. 1998 HHS Interpretation**

Within two years of PRWORA's enactment, the Department of Health and Human Services ("HHS") issued an interpretation of "federal public benefit." Specifically, this interpretation explained that:

> Although the litany of categories in 401(c)(1)(B) is broad, it is not comprehensive and clearly excludes certain categories from the definition. For example, by explicitly identifying "postsecondary education" the statute excludes non-postsecondary education programs, such as Head Start and elementary and secondary education.

PRWORA: Interpretation of "Federal Public Benefit," 63 Fed. Reg. 41658 (Aug. 4, 1998). This interpretation also concluded that certain services or assistance, particularly those providing in-kind services at the community level, may also be exempt from verification requirements. *Id*. at 41660.

**C.  Executive Orders**

After declaring a national emergency at the Southern Border his first day in office, on February 19, 2025, President Trump issued an Executive Order titled "Ending Taxpayer Subsidization of Open Borders."  E.O. 14218.  This Order states that "[t]he plain text of federal law, including . . . (PRWORA), generally prohibits illegal aliens from obtaining most taxpayer-funded benefits."  *Id*. at Sec. 1.  Claiming to "uphold the rule of law, defend against the waste of hard-earned taxpayer resources, and protect benefits for American citizens in need," all executive agencies were ordered to:

  i.  identify all federally funded programs administered by the agency that currently permit illegal aliens to obtain any cash or non-cash public benefit, and, consistent with applicable law, take all appropriate actions to align such programs with the purposes of this order and the requirements of applicable Federal law, including the PRWORA;

  ii.  ensure, consistent with applicable law, that Federal payments to States and localities do not, by design or effect, facilitate the subsidization or promotion of illegal immigration, or abet so-called "sanctuary" policies that seek to shield illegal aliens from deportation; and

  iii.  enhance eligibility verification systems, to the maximum extent possible, to ensure that taxpayer-funded benefits exclude any ineligible alien who entered the United States illegally or is otherwise unlawfully present in the United States.

*Id*. at Sec. 2.

**D.  July 2025 HHS Directive**

On July 14, 2025, HHS issued a Directive, effective immediately, that reinterprets PWORA's "federal public benefit" to include an updated and expanded list of programs that provide these benefits, including Head Start, thereby requiring Head Start agencies and providers to verify citizenship and no longer offer services to "non-qualified" immigrants.  90 Fed. Reg. 31232 (July 14, 2025).  The Directive contends that the 1998 HHS interpretation erred by reading PRWORA as only applying to programs with eligibility criteria, instead reasoning that

PRWORA's "eligibility unit[s]" only limit the statute to programs with "discrete end-recipients." *Id*. at 31234-35.  The Directive further interprets "Federal public benefits" to include non-postsecondary education benefits, like Head Start, because these benefits are "similar" to "welfare." *Id*. at 31235-37.  The Directive states that its new list is "not exhaustive," and that HHS may find "additional programs" in a later guidance "to be Federal public benefits." *Id*. at 31237.  The Directive does not specify if eligibility is based on the status of the child, parents, guardians, or other family or household members.  The Directive instructs entities to "pay heed to the clear expressions of national policy" but includes no other guidance.  *Id*.

Though HHS' Regulatory Impact Analysis and the Directive estimate millions of dollars in costs to agencies and providers attempting to meet verifying requirements, as well as hundreds of thousands of children losing access to Head Start programs, HHS reasoned that the Directive needed to be implemented immediately, without a notice and comment period:

> Although HHS is soliciting public comment on this interpretation, it is necessary to apply this interpretation to HHS programs immediately, prior to receipt and consideration of any comments.  Any delay would be contrary to the public interest and fail to address the ongoing emergency at the Southern Border of the United States.

> During the prior administration, the numbers of illegal aliens who entered the United States reached dangerous levels, threatened the safety and wellbeing of the American people, and strained Federal and State resources.  On January 20, 2025, President Trump declared a national emergency at the Southern Border of the United States.

> Additional delay to correct the deficiencies of the 1998 Notice would fail to remove incentives to illegal immigration that are exacerbating the invasion at the Southern Border.

90 Fed. Reg. at 31238.  In a public statement, HHS reiterated its goal is to "ensure enrollment in Head Start is reserved for American citizens."  U.S. Dep't of Health & Hum. Servs., "HHS Bans Illegal Aliens from Accessing its Taxpayer Funded Programs" (July 10, 2025).

**E.  Plaintiffs**

Plaintiffs are a collection of non-profit organizations. The Plaintiff Parent Members (Parent Voices Oakland and Family Forward Oregon) are made up of parents and caregivers from the local communities, aiming to organize, educate, and advocate for affordable, accessible, and quality education and childcare. *See* Dkts. #80, ("Doutherd Decl."), at 2 and #85, ("Williams Decl."), at 2-3. The Plaintiff Head Start Association ("HSA") Members (Wisconsin, Pennsylvania, Illinois, and Washington State Head Start Associations) are associations whose members are Head Start and Early Head Start agencies within the designated state. The HSA Members support and strengthen Head Start and Early Head Start programs through community outreach efforts, professional development and trainings for members, and advocacy efforts at the local, state, and federal levels. Dkts. #81, ("Mauer Decl."), at 2; #82, ("McFalls Decl."), at 2; #83, ("Morrison-Frichtl Decl."), at 2; and #84, ("Ryan Decl."), at 4-5.

## F.  Procedural Posture

Plaintiffs filed their Complaint on April 28, 2025. Dkt. #1. On May 16, 2025, Plaintiffs filed a Motion for Preliminary Injunction regarding Defendants' mass layoffs and office closure and anti-diversity, equity, inclusion, and accessibility initiatives. Dkt. #37.

On July 15, 2025, Plaintiffs moved to amend their Complaint to include claims related to the July 14 HHS Immigration Directive, which the Court granted on August 19, 2025. Dkts. #78 and #102.

On July 21, 2025, Plaintiffs filed the instant Motion, initially a Motion for Temporary Restraining Order, requesting a stay of the Directive and that Defendants and their relevant agents be enjoined from implementing and enforcing the Directive. Dkt. #79.

On August 5, 2025, the Court held oral argument on both Motions. Dkt. #94. However, the parties only discussed the May 16 preliminary injunction motion with the Court because Defendants' counsel stated that the Government had already stipulated in a case before the

District of Rhode Island to not enforce HHS' new interpretation until September 10, 2025, with regard to all of Plaintiffs' states except Pennsylvania. *See* D.R.I. Case No. 1:25-cv-00345-MSM-PAS, Dkt. #46. Counsel stipulated that his clients would include Pennsylvania in this delayed enforcement, thus the Court found Plaintiffs' requested relief in its temporary restraining order moot for the duration of a temporary restraining order. *See* Dkt. #95. The Court converted Plaintiffs' Motion to one for a Preliminary Injunction, re-noted it for consideration, and set a hearing date. *Id*.

On September 5, 2025, Defendants filed a Motion to Dismiss Plaintiffs' Second Amended Complaint, which has not been fully briefed and is not noted for the Court's consideration until October 3, 2025. Dkt. #116. On September 9, 2025, the Court held oral argument on the instant Motion. Dkt. #117.

## III. DISCUSSION

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008). A party can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Id*. at 555 U.S. 20. A preliminary injunction may also be appropriate if a movant raises "serious questions going to the merits" and the "balance of hardships . . . tips sharply towards" it, as long as the second and third *Winter* factors are satisfied. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

### A. Likelihood of Success on the Merits

Plaintiffs argue that the Directive violates the APA because it is contrary to law, in excess of statutory authority, arbitrary and capricious, and is procedurally deficient under the APA and

Head Start Act.  Dkts. #79 at 18-31 and #107 at 12-19.

### 1. Procedurally Deficient

Plaintiffs argue that Defendants violated APA and Head Start Act procedural requirements by making the Directive immediately effective without a notice and comment period, failing to consult relevant stakeholders, and failing to assess the impact.  Dkt. #79 at 29. Defendants contend that the Directive is "merely" an interpretive rule, not a final agency action, and even if it is a final agency action, it did not violate the APA or Head Start Act.  Dkt. #87 at 7-8.

"The APA, by its terms, provides a right to judicial review of all 'final agency action for which there is no other adequate remedy in a court[.]"  *Bennett v. Spear*, 520 U.S. 154, 175 (1997) (quoting 5 U.S.C. § 704).  For an agency action to be "final," the action (1) "must mark the consummation of the agency's decisionmaking process" and (2) must be one by which rights or obligations have been determined, or from which legal consequences will flow[.]"  *Id*. at 177-78 (quotations omitted).

Defendants contend that the Directive is not a "final agency action" because it is "an interpretive rule" that "advises the public of the agency's construction of the definition of 'Federal public benefit under PRWORA[.]"  Dkt. #87 at 7.  Because the Directive "merely sets forth HHS's statutory interpretation, notice and comment was not required."  Dkt. #106 at 2.  At oral argument, Defendants' counsel stated that the Government did not even have to issue this Directive and could have moved forward without it.  Defendants contend that "[t]his approach is consistent with HHS's actions in 1998."  Dkt. #87 at 7.

The Court disagrees.  Unlike the 1998 HHS interpretation, the Directive here creates legal obligations for Head Start agencies that did not exist for the last 30 years and alters the legal rights of Parent Plaintiff Members by removing their access to Head Start programs altogether.

Based on the existing record, the Directive carries direct consequences and is more akin to "a final and binding determination" with direct consequences than "a tentative recommendation." *See Bennett* at 178. Unlike the 1998 interpretation, which was "purely advisory and in no way affected the legal rights of the relevant actors," the Directive "at issue here has direct and appreciable legal consequences." *Id.*

Furthermore, Plaintiffs will also likely succeed in showing that the Directive is a legislative rule. Under the APA, a "rule" is "the whole or a part of an agency statement of general or particular applicability and future effect designed to implement, interpret, or prescribe law or policy[.]" 5 U.S.C. § 551(4). Legislative rules are distinctive from interpretative rules in that they "create rights, impose obligations, or effect a change in existing law," while interpretive rules "merely explain, but do not add to, the substantive law that already exists in the form of a statute or legislative rule." *Hemp Indus. Ass'n v. DEA*, 333 F.3d 1082, 1087-88 (9th Cir. 2003). The Directive imposes new obligations on Head Start agencies and strips away rights from immigrant families. The Court finds that Plaintiffs are likely to succeed on their claim that the Directive is a final agency action and legislative rule.

Given the above, Plaintiffs are likely to succeed on their claim that the Directive violates APA procedural requirements. Under the APA, agencies must publish proposed rules and allow the public the opportunity to comment before promulgating substantive rules. 5 U.S.C. § 553. Defendants' contention that this matter does not apply because it relates to grants is broadly overstated. Defendants' argument that the 1998 interpretation was similarly issued is inapposite because, as stated above, that interpretation did not change rights or obligations. And even if the 1998 interpretation was the same, two wrongs don't make a right. Furthermore, Plaintiffs' argument does not hinge on the fact that HHS changed its position but rather that the Directive changes provisions and regulations governing eligibility. Dkt. #107 at 19. Thus, it is likely that

Plaintiffs will succeed on their APA procedural violation claim.

Similarly, Plaintiffs are also likely to succeed on their Head Start Act procedural violation claim. The Act requires that HHS "prescribe eligibility for the participation of persons in Head Start programs" by regulation. 42 U.S.C. § 9840(a)(1)(A). These regulations must be published at least 30 days prior to taking effect. *Id*. at § 9839(d). Prior to any changes, HHS must consult stakeholders, such as experts in early childhood education, assess potential impacts, and determine that "revisions in the standards will not result in the elimination of or any reduction in quality, scope, or types" of services. *Id*. at § 9836a(a)(1)-(2).

Defendants argue that they "did just as required and issues regulations on eligibility" and contend that "nothing in the language requiring HHS to issue regulations prohibits Congress from prescribing other eligibility requirements for the Head Start program through other laws." Dkt. #87 at 8. This argument fails. As Plaintiffs point out, HHS issued the Directive limiting eligibility, not Congress, and "Congress—in the four times that it revisited Head Start eligibility criteria since the passage of PRWORA—chose not do so." Dkt. #107 at 18. Defendants' point at oral argument that Congress meant to include Head Start and PRWORA has been "underenforced" for almost three decades falls flat as well. Since PRWORA's adoption and the 1998 interpretation, Congress has not included any immigration or citizenship requirements for Head Start eligibility, and the Court is uninclined to presume such intention after several decades of inaction. Defendants' admission that this Directive is a "major rule" that "may result in an annual effect on the economy of $100 million or more" further emphasizes Plaintiffs' argument. 90 Fed. Reg. at 31238.

As a last-ditch effort, Defendants attempt to meet a "good cause" exception to the rule by arguing that immediate effect is necessary because "any delay would be contrary to the public interest" and "additional delay to correct the deficiencies of the 1998 Notice would fail to remove

incentives to illegal immigration that are exacerbating the invasions at the Southern Border[.]" 90 Fed. Reg. at 31238.  The Court is floored by this argument.  Nothing on the record provides any means for this Court to infer that access to Head Start "incentivizes" illegal immigration or immediate action requires jumping the guardrails of the above statutes by ignoring the 30-day notice and comment period.  In sum, the Court finds that Plaintiffs are likely to succeed on their APA and Head Start Act procedural violation claims.

## 2.  Contrary to Law and in Excess of Statutory Authority

Plaintiffs argue that the Directive is contrary to law and in excess of Defendants' statutory authority because Defendant's new interpretation conflicts with PRWORA's definition of "federal public benefit," Head Start is not similar to welfare, and because it creates new eligibility criteria inconsistent with the Head Start Act.  Dkts. #79 at 18-19, #107 at 12-15.

First, Plaintiffs argue that both categories under the definition of "federal public benefit" exclude Head Start.  Dkt. #79 at 19.  Under PRWORA, "federal public benefit" includes:

> (A) any grant, contract, loan, professional license, or commercial license provided by an agency of the United States or by appropriated funds of the United States; and

> (B) any retirement, welfare, health, disability, public or assisted housing, postsecondary education, food assistance, unemployment benefit, or any other similar benefit for which payments or assistance are provided to an individual, household, or family eligibility unit by an agency of the United States or by appropriated funds of the United States.

8 U.S.C. § 1611(c)(1)(A)-(B).

The parties disagree on whether Head Start qualifies under subsection (B).[1]  Plaintiffs argue that, by explicitly excluding post-secondary education, Congress did not intend to exclude

---

[1] "The Directive does not argue that Head Start is a 'federal public benefit under subsection (A), *id*. [8 U.S.C.] § 1611(c)(1)(A), nor could they.  Head Start [g]rants are provided to agencies, 42 U.S.C. § 9833, and thus not to any 'alien who is not a qualified alien.'  8 U.S.C. § 1611(a)."  Dkt. #79 at 19 n. 32.  Though Defendants point out in their Supplemental Briefing that the Directive interprets subsection (A) to apply to all HHS grants, Defendants provide no case law or further argument to this conclusory point.  See Dkt. #106.

non-post-secondary education programs like Head Start. Dkt. #79 at 19. "The doctrine of *expressio unius est exclusio alterius* [the expression of one is the exclusion of another] as applied to statutory interpretation creates a presumption that when a statute designates certain persons, things, or manners of operation, all omissions should be understood as exclusions." *Id.* (quoting *Silvers v. Sony Pictures Ent., Inc.*, 402 F.3d 881, 885 (9th Cir. 2005)).

Defendants do not disagree that Head Start is not a post-secondary education program. *See* 90 Fed. Reg. at 31236 ("It is true that an HHS program that deals with non-postsecondary education (such as Head Start) would not fall under the statutory term 'post-secondary education . . . benefit.'"). Instead, Defendants contend that Head Start is excluded as a "similar benefit" to a welfare benefit, thus it is excluded under the catch-all provision. Dkt. #87 at 8. Looking to PRWORA's preamble and that ACF "defines 'welfare' specifically in the context of services that help children[,]" Defendants argue for a "broad reading of 'welfare' and any 'similar benefit[.]'" *Id.*; Dkt. #106 at 10.

At oral argument, Defendants' counsel called Plaintiff's post-secondary education argument a "red herring," contending that pre-school is a thing before school and therefore not education, and that Congress intended all education to be excluded to the maximum extent. Defendants' counsel also argued that the doctrine of *expressio unius est exclusio alterius* works in Defendants' favor because the residual clause and the "dozen" or so excluded categories are "broad" and extensive.

Plaintiffs argue that Defendants' use of "similar" and "welfare" is a violation of "the rule against surplusage 'by ascribing to one word [here 'welfare…or other similar benefit'] a meaning so broad' that it assumes the same meaning as another statutory term,' (here 'health' and 'food assistance')." Dkt. #107 at 13 (citing *Ysleta Del Sur Pueblo v. Texas*, 596 U.S. 685, 698 (2022)). Plaintiffs also argue that this interpretation renders the exclusion of non-postsecondary education

"'superfluous, void, or insignificant,' given that elementary and secondary education programs also provide health, nutritional, and social services." *Id*. (citing *TRW Inc. v. Andrews*, 534 U.S. 19, 31 (2001)).

Because "Head Start is an anti-poverty program" with many varying services, Defendants seem to cherry pick certain Head Start program aims over others and argue for an endless definition to welfare that is neither found in the statute nor supported elsewhere. If anything, Congress' use of "welfare" throughout PRWORA refutes Defendants' sweeping non-definition by consistently using "welfare" to refer to cash payments to low-income families. *See gen*. PRWORA, Pub. L. 104-193 (1996). "Other similar benefits" to welfare including education renders post-secondary education useless in the statute. Providing services such as healthcare, nutrition, and other social services does not make Head Start non-educational but, as the Head Start Act states, "promote[s] the school readiness of low-income children by enhancing their cognitive, social, and emotional development" with these additional services. 42 U.S.C. § 9831. Just as grade schools across the country provide meals and health services while being considered educational, non-federal public benefits, so too is Head Start. *See* 8 U.S.C. § 1615 (students are not ineligible for free lunch or breakfast programs based on immigration or citizenship status). Furthermore, Head Start funds do not provide payments or benefits "to an individual, household, or family eligibility unit," further supporting Plaintiffs' stance that Congress excluded Head Start from the definition of "federal public benefit." Dkt. #79 at 22 (citing Congressional Congress Report, H.R. Rep. No. 104-725, at 380 (July 30, 1996)).

Finally, Plaintiffs argue that the Directive creates conflict between PRWORA and the Head Start Act by establishing new eligibility criteria. Dkt. #79 at 25. "These two statutes have been read harmoniously for the last 27 years, during which time Congress amended the Head Start Act's provision on 'criteria for eligibility' several times, and never added immigration

status." *Id*. By introducing immigration status, the Directive makes Head Start Act requirements

that certain children "shall" be eligible (such as those experiencing homelessness or members of

tribes) regardless of immigration status. *Id*. Defendants contend that "the PRWORA eligibility

prohibitions exist 'notwithstanding any other provision of law.'" Dkt. #87 at 10 (quoting 8

U.S.C. § 1611). Because of this "notwithstanding clause," Defendants contend the Head Start

Act providing that certain children shall be eligible "does not manifest an intention to repeal the

PRWORA requirements on eligibility based on immigration status." *Id*. Plaintiffs rebut this

argument by proposing that Defendants attempt to "invalidate the Head Start Act's later in time

and more specific eligibility criteria" with the earlier, less specific PRWORA provision. Dkt.

#107 at 14.

Again, the Court finds no reason to infer a different intention from Congressional action

over the last 3 decades. Congress has operated with the 1998 HHS interpretation for years and

has not included immigration status as criterion but instead widened eligibility to remove

enrollment barriers. As both parties argue, acts both later in time and more specific "should

control our construction of the [earlier] statute." Dkts. #87 at 11 and #107 at 15 (quoting *Food

& Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 143 (2000)). Given all of

the above, the Court finds that Plaintiffs are likely to succeed on these claims.

### 3.  Arbitrary and Capricious

Lastly, Plaintiffs argue that the Directive is arbitrary and capricious because Defendants

rely on improper facts and "conclusory assertions" and failed to consider reliance interests. Dkts.

#79 at 26, #107 at 15. Defendants failed to consider the Directive's abrupt changes to program

implementation, the disruption of access, the significant economic and social impacts, enrollment

and attendance drops, and the lack of guidance on how to comply. Dkt. #79 at 26-28. Defendants

contend that they met Supreme Court and Ninth Circuit standards with their changed position

because they provided a "reasoned explanation" that "display[ed] awareness" of the change, showed the change was permissible under the APA, believed the change was better, and provided "good reasons" for the change.  Dkt. #87 at 11.

Defendants also argue that they need not consider reliance interests because "reliance interests are less relevant in matters of statutory interpretation."  Dkt. #106 at 12.  Citing to *Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024), Defendants argue that "PRWORA means what it means; its best reading cannot have changed simply because the government previously interpreted it wrongly, even if people rely on its error."  *Id*.

Plaintiffs rely on *U.S. Dep't of Homeland Sec. v. Regents of the Univ. of Cali.*, 591 U.S. 1 (2020), to refute Defendants' reliance argument.  There, the Supreme Court determined that the Government was required to consider reliance costs to avoid an arbitrary and capricious finding when rescinding a program, even though the Attorney General determined that a program (in that case, DACA) was illegal.  *Regents* at 33.  Defendants argue that *Regents* is inapplicable here because "DACA recipients had no statute to rely on, as the Executive's discretion was the only source of their status" versus "[h]ere, Congress enacted PRWORA to limit who could receive federal public benefits, and the [Directive] is consistent with the statutory language."  Dkt. #106 at 12.

While *Loper Bright Enters*. concerns a court's ability to "exercise their independent judgment in deciding whether an agency has acted within its statutory authority[,]" 603 U.S. at 400, the Supreme Court clearly set out in *Regents* that failing to consider reliance interests when rescinding a program based on illegality is arbitrary and capricious.  591 U.S. at 33.  As Defendants contend, Plaintiffs here do rely on statutes—the consistent interpretation of PRWORA and the Head Start Act for three decades.  Defendants' Directive is the only argument that appears to be inconsistent with statutory language, Congressional action, and all precedent.

Plaintiffs have likely shown that Defendants' Directive is not permissible under the statute and have not provided good reasons for the change in policy. Defendants are "entitled to follow Congress's lead" rather than creating confusion through supposed necessary, inconsistent changes. Dkt. #106 at 12.

The extensive reliance interests Plaintiffs proffer lean in favor of Plaintiffs' claims. *See* Dkt. #79 at 26-29. Defendants' own assertions that the Directive "may result in an annual effect on the economy of $100 million or more" and "[f]or the Head Start program, a primary estimate of $374 million in annual effects[,]" as well "a full range of estimated expenditure effects between $184 million and $1,881 million," support Plaintiffs' arguments. 90 Fed. Reg. at 31238-39. Accordingly, the Court finds that Plaintiffs will likely succeed on this claim.

### B.  Irreparable Harm

Plaintiffs list a number of harms to both Plaintiff Agency Members and Parent Members, all of which Plaintiffs argue "flow from the Directive being in effect, regardless of whether the agency enforces it." Dkt. #107 at 8.

First, Plaintiffs argue that the Directive harms "non-qualified" immigrant children and families. *Id*. By HHS' own estimates, the Directive "overnight canceled the Head Start eligibility of more than 500,000 children" and "that approximately 115,000 children currently enrolled in Head Start will be disenrolled." *Id*. Plaintiffs contend that this harm continues because, even without enforcement, families are deterred from enrolling. Facing "life-altering immigration consequences" if found in violation of the law, these families are effectively chilled from enrolling, "especially in the context of the current administration's aggressive immigration enforcement actions[.]" *Id*.

Second, Plaintiffs argue that the Directive harms "qualified" immigrant children and families by deterring them from enrolling. Dkt. #107 at 9. Plaintiffs allege confusion on whether

eligibility is based on the status of the child, parents, guardians, or other household members because the Directive does not clearly state which applies. *Id*. This ambiguity is "compounded" by Defendants' public statements that "Head Start is reserved for American citizens from now on." *Id*. at 10. Again, "fear of immigration consequences creates a powerful deterrent effect, leading families to avoid public benefits even when they are eligible." *Id*. This is "exacerbated" by the lack of guidance on how to comply "while simultaneously stating compliance is required 'immediately' and 'all entities…should pay heed to the clear expressions of national policy[.]'" *Id*. (quoting 90 Fed. Reg. at 31237-38). As a result, Plaintiffs state that many of Plaintiffs' non-profit members have already begun screening status "using birth certificates as a proxy—an approach that will exclude and irreparably harm even 'qualified' immigrants." *Id*. Plaintiffs point to past studies on similar policy changes and their chilling effects. *Id*. at 10-11. This confusion, coupled with already confusing and complex immigration law, leads many qualified immigrants to believe they are ineligible, and they lack the resources to obtain accurate legal information. *Id*. at 11. Furthermore, Plaintiffs argue that requiring citizenship/immigration documentation to enroll deters all families, "including where all members are U.S. citizens," because "many families facing homelessness, domestic violence, poverty, or those with foster children or living in foster care" struggle to maintain or access documentation "due to unstable living conditions." *Id*. at 11-12. At oral argument, Plaintiffs' counsel specifically spoke to how many of their members assist enrolling families in accessing documentation needed prior to this Directive.

Defendants dispute Plaintiffs' use of the word "immigrant" rather than "qualified alien," argue that this alleged harm is "misleading and exaggerates any alleged harm," that enrolled children are grandfathered into the program, and that "it is blatantly false to say that Head Start will no longer accept immigrants." Dkt. #87 at 14. Defendants contend that Plaintiffs' asserted

"chilling effect" is not imminent or irreparable, is based on two studies "almost half a decade old" and "over two decades' old[,]" and is "entirely speculative and is not supported by the accompanying declarations." *Id*.

Third, Plaintiffs argue that the Directive harms Head Start agencies because declining enrollment puts agencies at risk of closure and funding loss. Dkt. #107 at 12.  Lack of guidance on compliance puts even agencies exempt from verification at risk of closure and risks civil and criminal liability under the False Claims Act for Plaintiff Agency Members. Dkt. #79 at 17.  This potential risk to funding is further complicated by having to "divert resources to developing and implementing new policies and procedures for screening and verifying immigration status, as well as providing relevant training to all personnel[,]" resulting in further financial hardship that forces reduction in services or closures.  *Id*. at 18.  As Plaintiffs' counsel described at oral argument, even the loss of two students could result in an entire classroom's or program's closure because funding depends on each student.

Defendants contend that the alleged funding loss from under enrollment is not imminent because this process "would take, at a minimum, 16 months plus additional time if a program decides to appeal."  Dkt. #87 at 14.  Defendants contend that loss of enrollment is "entirely speculative" because "Plaintiffs offer no statistics or calculations to support these predictions[.]" Dkt. #106 at 13.  Defendants argue that the Directive "does not detail enforcement procedures or non-compliance consequences[,]" thus Plaintiffs' claims of threatened civil or criminal liability are merely "predictions."  *Id*. (quoting *Trump v. New York*, 592 U.S. 125, 133 (2020)). Furthermore, Plaintiffs' assertions of injury due to resource diversion and training costs to implement the Directive are unlikely because the Directive "does not mandate program-specific verification methods" and any costs are estimated by HHS to be "about 0.1% of the average annual expenditures per enrollee.  HHS Notice at 31,238."  *Id*.

While the Court believes that Plaintiffs effectively showed irreparable harm in prior declarations, Plaintiffs' most recent declarations show that Plaintiffs' asserted harms are not merely speculative. A small Wisconsin HSA member reports that at least 4 families withdrew from Head Start since the Directive. *See* Dkt. #109, Mauer Decl. Another Pennsylvania HSA member reports a 50% decrease in enrollment of Spanish-speaking families. *See* Dkt. #110, McFalls Decl. At least two non-profit Pennsylvania members have begun attempting to collect immigration information even though they are allegedly exempt under PRWORA. *See* Dkt. #111, Morrison-Frichtl Decl. Several Pennsylvania programs have confirmed significant under enrollment compared to previous years and a decrease in waitlists. *Id*. One Pennsylvania program serving parents on student visa at a university campus faces complete closure due to the Directive, while another program reported that continued decreased enrollment will likely force the closure of an entire classroom. *Id*. Here in Washington, individual HSA Members have reported: (1) an estimated 22 families have unenrolled since the Directive, equal to 10% of its enrollment; (2). 20% of Hispanic families have refused home-based services or expressed reluctance out of fear of providing home addresses; (3) enrollment of only 82% as of August 26, compared to 95% or more in previous years, and could face penalties as early as September 30, 2025; (4) at least 3 families directly contacting the Declarant to express doubts of continued enrollment; (5) that "at least 20 families" in one program expressed fear of continuing to send their children, with 15 of these families (nearly 20% of total enrollment) discontinuing attendance; and (6) at least two members losing enrolled families because they left the United States altogether. *See* Dkt. #112, Ryan Decl. Including these specific harms, all of the declarations detail confusion on how to comply with the Directive, how to verify immigration status, who status is based on, whether non-profits are exempt, difficulties in recruiting and families obtaining proper documentation, and the families' overall fear that reporting

immigration status will result in a choice between family safety and a child's education.

While actual loss of funding from under enrollment might be down the road, families losing access to Head Start due to the Directive's unclear guidance and chilling effects appears anything but speculative and exists even prior to enforcement. As Plaintiffs enumerate, this chilling effect results in the immediate harm of childhood education loss, disability support, dual-language instruction, and stable learning environments, leading to long-term harms in development. It also results in parents losing childcare, risking missed work, unemployment, forced dropouts, and inability to pay life expenses and support families. Given that many state and federal laws require children's school attendance, constant attendance monitoring, and threaten truancy and court action for chronic absenteeism, the Court finds Plaintiffs' enumerated harms to be extremely likely and irreparable. Defendant HHS' estimate that changing systems will cost over $100 million is no small amount, and Defendants' contentions that legal liability is speculative because the Directive lacks enforcement procedures or consequences is less than assuring. The threatened loss of federal funding and risk of Plaintiffs' Members having "to imminently undertake the extensive efforts associated with compliance to avoid consequences . . . is sufficient to ground a finding of imminent, irreparable harm." *California v. Trump*, No. 25-cv-10810-DJC, 2025 WL 1667949, at *17-18 (D. Mass. June 13, 2025); *see also City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1236 (9th Cir. 2018) (finding harm where "if their [plaintiffs'] interpretation of the Executive Order is correct, they will be forced to either change their policies or suffer serious consequences"); *Louisiana v. Biden*, 55 F.4th 1017, 1033-35 (5th Cir. 2022) (affirming irreparable harm finding based on states diverting resources to comply with an invalid regulation). All of the above, coupled with the nationwide Head Start mass layoffs and closures, create a bleak picture for Plaintiffs. Overall, Plaintiffs have provided numerous examples from which this Court can find imminent, irreparable harm stemming from Defendants'

Directive.

### C.  Balance of Equities and Public Interest

In weighing the balance of equities and the public interest, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  Courts "explore the [parties'] relative harms" and "the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991).  These factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

Plaintiffs argue that the balance of equities and public interest "heavily favor" Plaintiffs because Defendants will not suffer any "from Head Start continuing under the rules that have been in effect for nearly three decades." Dkt. #79 at 31.  An injunction serves the public interest by ensuring legal compliance, continuing children's education, and preventing harm because "[o]ur society as a whole suffers when we neglect the poor, the hungry, the disabled, or when we deprive them of their rights or privileges." *Id*. (quoting *Lopez v. Heckler*, 713, F.2d 1432, 1437 (9th Cir. 1983)).  Furthermore, "when a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated." *Id*. (quoting *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021)) (punctuation omitted).

Defendants contend that "[t]hese factors tilt decisively against" an injunction because it "would disrupt HHS's efforts to comply with the Executive Order" and "hamstring HHS and force it to operate as if a new administration was never elected[,]" depriving HHS of flexibility in executing broad statutory mandates, compelling discretionary work that "may not be consistent with Administration priorities[,]" and disrupt compliance with the PRWORA Executive Order and correct interpretation of "PRWORA's plaint text[.]" Dkts. #87 at 15, #106 at 14.  "In sum,"

Defendants contend that an injunction "would inflict severe constitutional harms on the Executive branch" and "effectively disable HHS, as well as the President himself, from implementing the President's priorities[,]" thus frustrating "the public interest in having the Executive Branch effectuate the President's policy priorities through lawful direction."  Dkts. #87 at 16, #106 at 14.

The Court finds that these factors weigh in Plaintiffs' favor.  "Defendants do not have a legitimate interest in ensuring that funds are spent pursuant to conditions that were likely imposed in violation of the APA and/or the Constitution."  *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-814, 2025 WL 2322763, at *17 (W.D. Wash. Aug. 12, 2025) (citing *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding no legitimate government interest in violating federal law)); *see League of Women Voters of United States v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (finding "no public interest in the perpetuation of unlawful agency action").  A "strong public interest [exists] that the laws enacted by their representatives are not imperiled by executive fiat[,]" and public interest is not "'disserved by an injunction that brings clarity to all parties and to citizens dependent on public services."  *Washington v. Trump*, 767 F. Supp. 3d 1239, 1280 (W.D. Wash. 2025) (internal citations omitted).  "Indeed, if the Court were to adopt Defendants' argument that an injunction should not issue because the relief Plaintiffs request would effectively disable the President and federal agencies from effectuating the President's agenda . . . then 'no act of the executive branch asserted to be inconsistent with a legislative enactment could be the subject of a preliminary injunction.  That cannot be so.'"  *Id*. (docket citations omitted) (quoting *Doe #1 v. Trump*, 957 F.3d 1050, 1059 (9th Cir. 2020)).  Defendants face little to no harm in maintaining the status quo, and the public interest tilts in favor of keeping children in school, fed and cared for, with their families able to attend work, provide, and participate in society.  Accordingly, the Court finds that the balance of equities and public interest

weighs in Plaintiffs' favor.

**D. Bond and Stay**

Defendants argue that Plaintiffs should post a bond "commensurate with the scope of any injunction issued" that "consider[s] that the relief Plaintiffs request will hinder HHS's ability to process funding requests and reorganize HHS in a manner consistent with the President's policies." Dkt. #87 at 16. Defendants also request a stay of any injunction pending appeal or for at least seven days to seek appeal. *Id.* at 17.

Plaintiffs request that the Court "exercise its discretion to waive or set a nominal bond." Dkt. #79 at 32. In their Supplemental Briefing, Plaintiffs argue that the Court should waive the bond because Defendants have failed to show any of the above "because the result would be a continuation of the status quo since the program's creation in 1965." Dkt. #107 at 21 n.41. Plaintiffs argue that Defendants' stay request is "procedurally improper" and "fails considering Plaintiffs' showing of likelihood of success on the merits, irreparable harms, and that the balance of the equities and the public interest weigh in their favor." *Id.*

"A stay is not a matter of right, even if irreparable injury might otherwise result" and "is instead an exercise of judicial discretion, and the propriety of its issue is dependent upon the circumstances of the particular case." *Nken*, 556 U.S. at 433 (internal quotations omitted). "The party requesting a stay bears the burden of showing that the circumstances justify an exercise of that discretion." *Id.* at 433-34. The party must show and the court considers four factors: (1) the stay applicant's "strong showing" of success on the merits; (2) the applicant's irreparable injury without a stay; (3) if a stay will "substantially injure" other interested parties; and (4) "where the public interest lies." *Id.* at 434. "It is generally logically inconsistent for a court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites." *Turner*, 2025 WL 2322763, at *17 (quoting *Maryland*

*v. Dep't of Agriculture*, JKB-25-0748, 2025 WL 800216, at *26 (D. Md. Mar. 13, 2025)).

This Court has found before that similar stay requests were "procedurally improper under Federal Rule of Civil Procedure 7 and Local Civil Rule 7" because "'requests for affirmative relief must be made in a motion, not in a response[.]'" *Washington v. Trump*, 768 F. Supp. 3d at 1282 (quoting *Sergeant v. Bank of Am., N.A.*, No. C17-5232-BHS, 2018 WL 1427345, at *1 n.2 (W.D. Wash. Mar. 22, 2018)). However, even if procedurally proper, Defendants do not meet the above standard for a stay, as all four stay factors weigh in Plaintiffs' favor, not Defendants'.

Rule 65(c) states that "[t]he court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). However, "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal citations omitted). Under Ninth Circuit precedent, a district court may waive a bond "when it concludes that there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*. Having determined that Defendants face little to no likelihood of harm or suffering costs as a result of this injunction, the Court will not require Plaintiffs to post a security bond.

**E. Scope**

Plaintiffs request that the injunction immediately postpone and stay the directive implementation and/or enforcement until Plaintiffs' Second Amended Complaint is resolved on the merits and enjoin Defendants and their officers, agents, etc. from implementing or enforcing the Directive. Dkt. #79-1, Proposed Order, at 6-7. Plaintiffs argue that this complete stay and enjoining of the Directive is necessary to provide "complete relief" because "narrowing relief— such as by imposing geographic limitations—would result in inconsistent state-by-state Head

Start eligibility requirements[,] causing further disruptions and harm.  Dkt. #107 at 20.  A Plaintiff HSA Member in Wisconsin operate programs in Wisconsin, Missouri, and Texas, while another Plaintiff HSA Member in Illinois operates in Illinois and Indiana, both to provide services to children of migrant and seasonal workers who frequently cross state lines and "rely on Head Start to support these transitions." *Id.*

Defendants argue that Plaintiffs' requested relief "flouts these well-established principles" that relief be no more burdensome to Defendants than necessary to provide complete relief "and should be significantly narrowed, if awarded at all." Dkt. #87 at 16.  This narrowed injunction "should do no more than necessary to alleviate the irreparable harm to any specific Plaintiff the Court finds to have established such harm." Dkt. #106 at 15.

District courts have "considerable discretion in ordering an appropriate equitable remedy." *City & Cnty. of San Francisco*, 897 F.3d at 1245.  "While the general rule is that injunctions must be limited only to named plaintiffs where there is no class certification, there is no general requirement that an injunction affect only the parties in the suit." *Washington v. Trump*, 768 F. Supp. 3d at 1280 (internal quotations omitted).

Under 5 U.S.C. § 705:

> When an agency finds that justice so requires, it may postpone the effective date of action taken by it, pending judicial review. On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings.

The Ninth Circuit recently held that "postponement has the practical effect of a preliminary injunction because it pauses the implementation of agency action" and "'stays' *Nat'l TPS All. v. Noem*, No. 25-2120, 2025 WL 2487771, at *7 (9th Cir. Aug. 29, 2025) (quoting *Im. Defs. Law Ctr. v. Noem*, 145 F.4th 972, 983 (9th Cir. 2025)).  Therefore, "postponement of

agency action under the APA is governed by the preliminary injunction factors." *Id*. at *9. Accordingly, because the Court determined above that Plaintiffs meet the preliminary injunction factors, Plaintiffs also meet the requirements for a § 705 stay.

Regarding scope, while the general rule is to limit relief to named plaintiffs, the Court finds this impractical here. Plaintiff HSA Members provide Head Start programs that cross state lines, including states that are not parties to this case, and children of migrant and seasonal workers need assurance of access when relocating. Due to mass layoffs and closures, agencies' access to available regional offices could be wide-spread and inconsistent. The Supreme Court in *Trump v. CASA, INC.* limited district courts' ability to issue nationwide or universal injunctions, reasoning that "complete relief" does not equal "universal relief." 606 U.S., 145 S. Ct. 2540, 2558 (2025). However, post-*CASA*, the Ninth Circuit approved such an injunction against the Executive's birthright citizenship order, reasoning that a nationwide injunction was needed to provide complete relief to plaintiff states. *See Washington v. Trump*, 2025 WL 2061447 (9th Cir. July 23, 2025). Anything less would result in patchwork relief for children born in other states with no birthright citizenship who could move to plaintiff states, and limitations would ultimately leave plaintiff states with the burden of citizenship verification to provide federal services. *Id*. Overall, limiting the Directive's reach to include only Plaintiffs or their locations would result in piecemeal, confusing, and incomplete relief. Accordingly, Plaintiffs' request that relief apply to Head Start nationwide is warranted, and the Court will grant this relief.

## IV.    CONCLUSION

Having reviewed the instant Motion, the relevant briefings and attached declarations, and the remainder of the record, the Court hereby finds and ORDERS:

A.    Plaintiffs' Motion for Preliminary Injunction (formerly for Temporary Restraining

Order), Dkt. #79, is GRANTED.

B.  The effective date of implementation and enforcement of the HHS Immigrant Directive, U.S. Dep't of Health & Hum. Servs., Personal Responsibility and Work Opportunity Reconciliation Act of 1996 (PRWORA); Interpretation of "Federal Public Benefit," 90 Fed. Reg. 31232 (July 14, 2025), is STAYED until the Court can resolve Plaintiffs' Second Amended Complaint on the merits.

C.  Defendants and all their respective officers, agents, servants, employees, contractors, representatives, and attorneys, and any person in active concert or participation with them who receives actual notice of this Order (the "Enjoined Parties") are hereby ENJOINED from enforcing or implementing the HHS Immigrant Directive against any Head Start agencies, program providers, student or family participants, or other similar persons or entities.

D.  Defendants' counsel shall provide written notice of this Order to all Defendants and their officers, agents, servants, employees, contractors, representatives, and any other persons who are in active concert or participation with them, and to all Head Start agencies by September 13, 2025.  Defendants shall file a copy of the notice on the docket at the same time.

E.  This preliminary injunction shall remain in effect pending further orders from this Court.

F.  Plaintiffs are not required to post a security bond under Fed. R. Civ. P. 65(c).

DATED this 11th day of September, 2025.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE