1
2
3
4
5                      UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF WASHINGTON
6                              AT SEATTLE

7

8 | WASHINGTON STATE ASSOCIATION OF | Case No. C25-781-RSM |
HEAD START AND EARLY CHILDHOOD
9 | ASSISTANCE AND EDUCATION | ORDER GRANTING PLAINTIFFS' |
PROGRAM, *et al.*, | MOTION FOR PRELIMINARY |
INJUNCTION
10                      Petitioner,

11         v.

12 | ROBERT F. KENNEDY, JR., in his official |
capacity as Secretary of Health and Human
12 | Services, *et al.*, |

13                      Respondents.

14

15                      **I.      INTRODUCTION**

16      This matter comes before the Court on Plaintiffs' Motion for Preliminary Injunction, Dkt.

17 #37.   The Court held oral argument on August 5, 2025.   *See* Dkt. #94.   Having heard said

18 argument and reviewed the briefs, attached declarations, and remainder of the docket, the Court

19 will grant Plaintiffs' Motion for the following reasons.

20                      **II.      BACKGROUND**

21      Many of the facts in this case were established in the Court's prior preliminary injunction

22 Order, Dkt. #120.   Unless otherwise noted, the Court incorporates those facts in this Motion

23 below.

24

## A. Executive Orders

At the start of 2025, President Trump issued several Executive Orders ("E.O.") articulating aims to shrink executive agencies and curb funding for diversity, equity, inclusion, and accessibility ("DEIA") initiatives.

E.O. 14151, "Ending Radical and Wasteful Government DEI Programs and Preferences," orders the termination of "all discriminatory programs, including illegal DEI and DEIA mandates, policies, programs, and activities in the Federal Government, under whatever name they appear," including all "equity" related action plans, actions, initiatives, programs, or contracts and all DEI or DEIA employee, contractor, or grantee performance requirements. 90 Fed. Reg. 8339, Sec. 2 (Jan. 20, 2025); Dkt. #59 at 2.

E.O. 14173, "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," seeks to uphold anti-discrimination and civil rights laws by ending "[i]llegal DEI and DEIA policies" that "undermine our national unity" and "traditional American values[;]" requires all grant awards recipients to agree to compliance of applicable Federal anti-discrimination laws and to not operate any programs promoting DEI that violate applicable Federal anti-discrimination laws; and orders "heads of all agencies" to "take all appropriate action" and "further inform" the President's administration on "measure to encourage the private sector to end illegal discrimination and preferences, including DEI." 90 Fed. Reg. 8633, Sec. 1, Sec. 3(b)-(c), Sec. 4 (Jan. 21, 2025); Dkt. #59 at 2.

E.O. 14210, "Implementing the President's 'Department of Government Efficiency' Workplace Optimization Initiative," instructs the Office of Management and Budget ("OMB") to reduce the size of the federal workforce, including through "large-scale reductions in force" or "RIFs." 90 Fed. Reg. 9669, Sec. 3(c) (Feb. 11, 2025); Dkt. #59 at 3.

### B.  Actions to Implement Executive Orders

Following these E.O.'s, numerous agency actions unfolded to implement the executive "DEIA Ban" and RIFs.  On March 14, 2025, the Administration for Children and Families ("ACF"), issued the following letter:

> Dear Head Start recipients,
>
> The Office of Head Start will not approve the use of federal funding for any training and technical assistance (TTA) or other program expenditures that promote or take part in diversity, equity, and inclusion (DEI) initiatives.  This includes expenditures for services provided by contractors or vendors.
>
> With your next application submission, Head Start grant recipients should carefully review their annual funding application, including the budget and budget justification narrative, TTA plans, program goals, and any other supplemental materials to ensure they are in accordance with this change.
>
> Please direct any questions regarding this guidance to your regional office.

Off. of Admin. for Child. and Fams., "Federal Funding Restrictions for Diversity, Equity, and Inclusion Initiatives," (Mar. 14, 2025) ("March 14 DEI Letter").

On March 27, 2025, the Department of Health and Human Services ("HHS") issued a directive, titled "HHS Announces Transformation to Make America Healthy Again," to announce multiple structural changes through mass layoffs and office closures.  Dkt. #38, Calvo-Friedman Decl., Exs. 8 and 9.  This included a RIF of approximately a quarter of HHS' staff (over 10,000 full-time employees), consolidating twenty-eight divisions into fifteen, cutting regional offices in half, and creating a new division, "the Administration for a Healthy America." *Id*.  These cuts included much of Head Start's staff, divisions, and offices.

On April 1, 2025, HHS closed half of its regional offices, leaving Head Start agencies in twenty-three states with no program staff, and laid off additional OHS staff at remaining regional offices.  *Id*.  So far, HHS has "purged 60 percent of OHS staff[.]"  Dkts. #37 at 15; #49, Garvin

Decl., at ¶ 21.  In a public statement, Secretary Kennedy acknowledged that many of these lay-offs and eliminations could be mistakes.  Dkt. #38, Calvo-Friedman Decl., Ex. 11.

On April 10, 2025, in a memorandum on fiscal year 2026, OMB acknowledged executive plans to de-fund Head Start:

> The Budget does not fund Head Start.  HHS/ACF should work with OMB to ensure to the extent allowable FY 2025 funds are made available to close out the program.  This elimination is consistent with the Administration's goals of returning education to the States and increasing parental choice.  The Federal government should not be in the business of mandating curriculum, locations, and performance standards for any form of education.

*Id*. at Ex. 12 at 47.

On April 16, 2025, HHS amended its Grants Policy Statement, adding a "Civil Rights Assurance" ("DEIA certification") requirement that agencies accepting grant awards must certify that they do not, and will not during the term of their award, operate any programs advancing or promoting "DEI, DEIA, or discriminatory equity ideology in violation of Federal anti-discrimination laws."  *Id*. at Ex. 7.  This certification included a reservation of HHS' right to terminate awards and "claw back all funds" if grant recipients operate any violating programs during their award terms.  Rejecting this certification would mean rejecting a Notice of Award and the federal grant.  For Head Start agencies, this equates to at least 80% of their programming.  *See* 42 U.S.C. § 9835(b).

On May 19, 2025, the Department of Justice ("DOJ") established a Civil Rights Fraud Initiative to coordinate enforcement against DEIA activities and "strongly encourage" private parties to file False Claims Act lawsuits.  Dkt. #103, Second Amended Complaint ("SAC"), at ¶ 11 (citing to official memo).  That same month, HHS reiterated its commitment to "remove DEI" from Head Start in its Fiscal Year 2026 Budget in Brief.  *Id*. at ¶ 12 (citing to Budget in Brief).

In June 2025, ACF submitted its Fiscal Year 2026 budget. *Id*. at ¶ 13 (citing to ACF FY 2026 Justification). While including Head Start funds, ACF anticipated reducing the total funded Head Start slots for children by over forty thousand, as well as thousands of reductions in staff, teachers, and classrooms, since FY 2024. *Id*.

### C. Head Start

Congressionally allocated funds are designated to HHS for distribution – over $12 billion for Fiscal Years 2024 and 2025. Dkt. #37 at 12 (citing to appropriations acts). The Head Start Act requires the Secretary of HHS to allocate funds to Head Start agencies in each state in an amount no less than the funds allocated in the previous fiscal year. 42 U.S.C. § 9835 (2007). Head Start agencies are designated for a five-year period through a "Notice of Award" and receive federal grants to cover at least 80% of approved program costs. 42 U.S.C. §§ 9833, 9835(b). These designations are made based on their ability to deliver a "high-quality and comprehensive Head Start program that meets the education, health, nutritional, and social needs of the children and families it serves, and meets program and financial management requirements and standards." 42 U.S.C. § 9836(c)(1).

During this designated five-year period, each Head Start agency applies annually to renew their grants, referred to as a "continuation grant" or refunding, for "an amount equal to that agency's base grant for the prior fiscal year." Dkt. #37 at 11.

The Head Start Act directs the HHS Secretary to enact "program performance standards by regulation" that are "scientifically based and developmentally appropriate," to assure that "not less than 10 percent" of enrolled children have disabilities, to identify and prioritize "homeless children," and to allocate funding to provide training, technical assistance, monitoring and research to ensure performance standards compliance. *Id*. at 11-12 (providing statutory citations).

Most of these duties are delegated to OHS and performed by staff at Head Start regional offices. *See* 88 Fed. Reg. 32227, 32229 (May 19, 2023). These staff members "designate, fund, support, train, and monitor approximately 1,600 agencies serving 800,000 children and families[.]" Dkt. #37 at 12. Regional offices are mostly staffed by "Program Specialists" who operate as "intermediaries between OHS and agencies and Head Start associations." Dkt. #78, SAC, at ¶ 65. Program Specialists assist with operations throughout an agency's lifetime via constant communication, providing emergency support, assisting with any facility approvals, and providing approvals to allow agencies to withdraw funds to pay rent, payroll, and other financial obligations. *Id*. at ¶¶ 64, 65, 69. These communications are essential due to HHS' Payment Management System allowing federal cash to be drawn for immediate needs on an "as needed basis" only. *Id*. at ¶ 64.

Head Start's administration involves twelve regions, including two specialties located in OHS' central office: (1) the American Indian and Alaska Native Head Start and (2) the Migrant and Seasonal Head Start. *Id*. at ¶ 63. These specialty regions were created to provide tailored services to children with American Indian and Alaska Native heritage and children of migrant and seasonal farmworkers, including language preservation, dual language programs, culturally integrated learning plans, and professional staff development. *Id*. at ¶ 78-84.

Head Start serves diverse groups of children. Over thirty percent of participants are from rural communities. *Id*. at ¶ 73. At least 10 percent of total enrollment at an agency must be filled by children with disabilities. 42 U.S.C. § 9835(d)(1). "In 2023 and 2024, 37 percent of participants were non-white Hispanic or Latine, 28 percent were Black, 5 percent were multiracial, 3 percent were American Indian or Alaska Natives, 2 percent were Asian, and 1 percent were Native Hawaiian or Pacific Islander. *Id*. at ¶ 72. In 2023-24, over 7% of participant

children experienced homelessness, over 25% were in foster care, and 28.3% were dual language learners (with over 140 languages across 87% of programs). *Id*. at ¶¶ 75-77.

Head Start agencies must conduct "community wide assessments" to identify "populations most in need of services including prevalent social or economic factors, challenges, and barriers experienced by families and children." 45 C.F.R. § 1302.11(b).  Assessments collect data on race, ethnicity, the number of children with disabilities and types, spoken languages, and living situations. Dkt. #78, SAC, ¶ 87.  Head Start "Performance Standards" require that agencies "ensure equitable, inclusive, and accessible service[s]" reflecting the "needs and diversity of the community." *Id*. at ¶ 88.  For example, agencies under the Migrant and Seasonal Head Start Region offer full-day care, 6am to 6pm, October through April, to address the needs of parent farmworkers in the fields.  Agencies must provide linguistic services for dual language learners, such as reading to children in English and Spanish or tribal languages, and hire based on this knowledge.  Agencies must provide inclusive and accessible classrooms, equipment, materials, and mental health consultations for children with disabilities. *Id*. at ¶¶ 111-15.

Head Start regulations require agencies to hire staff familiar with the backgrounds, heritages, and language needs of the community and provide required trainings. *See* 45 C.F.R. § 1302.90(d).  Agencies must involve families and community members through participation in, designing and implementation of, and facilitating and seeking program development.  Dkt. #78, SAC, at ¶ 141.  Agencies must have parents in leadership through governing bodies and policy councils elected by children's parents. *Id*. at ¶¶ 142-32.

### D.  Procedural Posture

Plaintiffs filed their Amended Complaint ("FAC") on May 13, 2025. Dkt. #31.  Plaintiffs' FAC alleges constitutional violations of (1) separations of powers, (2) the Spending Clause, (3) Fifth Amendment due process and void for vagueness, and (4) the First Amendment. *Id*.  It also

includes Administrative Procedure Act ("APA") violations of (5) not being in accordance with congressional appropriations, the Head Start Act, and the Rehabilitation Act, (6) being an arbitrary and capricious agency action and abuse of discretion, (7) failing to observe procedure required by law, (8) unlawful withholding an unreasonable delay, and (9) being contrary to constitutional rights. *Id*. Finally, the FAC alleges (10) violations of the Rehabilitation Act of 1973 for discrimination against qualified individuals with disabilities and (11) that Defendants' actions are *ultra vires*. *Id*.

On May 16, 2025, Plaintiffs filed the instant Motion for Preliminary Injunction. Dkt. #37. Plaintiffs request the Court:

(1) enjoin Defendants from implementing or enforcing the March 14 DEI Letter and the HHS Grants Policy Statement DEIA certification or any agency-wide directives to effectuate the "DEIA ban," including by (a) changing Head Start grant conditions or other obligations, (b) requiring any anti-DEIA certification, (c) modifying grant terms, or (d) bringing any False Claims Act enforcement related to the DEIA certification;

(2) enjoin Defendants from implementing any further mass cuts, layoffs, closures, or RIFs; and

(3) postpone the effective dates of the DEIA ban and Head Start layoffs and regional closures. *Id*.

On July 15, 2025, Plaintiffs filed a Motion to Amend the FAC, which includes all of the above eleven claims. Dkt. #78. The Court granted this Motion on August 19, 2025, and Plaintiffs filed the Second Amended Complaint ("SAC") that day. Dkts. #102, #103.

On July 21, 2025, Plaintiffs filed a Motion for Temporary Restraining Order against Defendants' Immigrant Exclusion Directive. Dkt. #79. The Court converted the Motion to one

for a Preliminary Injunction, held oral argument on September 9, 2025, and subsequently granted the Motion.  Dkts. #95, #117, #120.

On August 5, 2025, the Court held oral argument on Plaintiffs' preliminary injunction Motion.  Dkt. #94.  Following the hearing, the Court ordered the parties to submit supplemental briefing addressing the effects of (1) HHS' July 2025 Grants Policy Statement, amending the DEIA certification at issue, (2) the July 29, 2025, memorandum from the Office of the Attorney General on "Guidance for Recipients of Federal Funding Regarding Unlawful Discrimination," and (3) a similar pending case and preliminary injunction issued by a U.S. District of Rhode Island court, Case No. 1:25-cv-00196-MRD-PAS.  Dkt. #95.  The parties filed supplemental briefing on August 15, 2025.  Dkts. #98, #99.

Defendants filed a Motion to Dismiss on September 5, 2025.  Dkt. #116.  On October 2, 2025, the Court granted Defendants' request to stay the case pending the Federal Government shutdown.  Dkt. #128.  On December 5, 2025, Plaintiffs filed a Motion for Leave to File Declaration in Pseudonym, Dkt. #134, and a Motion to Supplement the Record, Dkt. #136, both noted for December 26, 2025.

## III.    DISCUSSION

### A. Standing

Responding to the instant Motion, Defendants first argue that Plaintiffs have not shown a fair chance of establishing standing. Dkt. #59 at 5.  Defendants argue that any alleged harm is only "what might happen down the line" but "cite no proof that these alleged harms will materialize."  *Id*.  Defendants also argue that Plaintiffs have a redressability issue because "[h]alting implementation of the DEI Letter and DEIA Certification will not automatically result in Plaintiffs becoming entitled to grants on the timeline they prefer."  *Id*. at 6.

To establish standing, Plaintiffs must show an injury traceable to Defendants' conduct and that the injury is redressable by the Court. *Lujan v. Defs. Of Wildlife*, 504 U.S. 555, 560-61 (1992) ("*Lujan*"). The injury must be "concrete and particularized" and "actual or imminent," not "conjectural or hypothetical." *Id*. For a preliminary injunction, Plaintiffs "must make a clear showing that [they are] likely to establish each element of standing." *Murthy v. Missouri*, 603 U.S. 43, 58 (2024) (internal quotations omitted). When risk of future harm is asserted, the harm must be "sufficiently imminent and substantial." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 415 (2021). The standing inquiry is "especially rigorous" if it requires the Court decide "whether an action taken by one of the other two branches of Federal Government was unconstitutional." *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 408 (2013). For the reasons given below, the Court finds that Plaintiffs have demonstrated injury and redressability to have standing. *See* Sec. III. D. 2 (Irreparable Harm).

**B. Ripeness**

Defendants argue that Plaintiffs' claims are not "ripe" because they "improperly seek judicial review of an agency's implementation of the President's Executive Orders[.]" Dkt. #59 at 7. Defendants argue that denying review now will not impose any legally cognizable harm, and if a concrete harm happens, Plaintiffs can challenge "that specific action" through the HHS Departmental Appeal Board, which oversees terminations, or the Merit Systems Protection Board, which oversees personnel actions. *Id*. at 8. "Plaintiffs cannot claim . . . that any grant terminations have occurred due to HHS's actions." *Id*.

Article III requires Plaintiffs' claims be "ripe" for adjudication. Ripeness is a "jurisdictional prerequisite" in the Ninth Circuit. *Thomas v. Anchorage Equal Rights Comm'n*, 220 F.3d 1134, 1139 (9th Cir. 2000). Ripeness includes constitutional and prudential components.

"The constitutional component of ripeness overlaps with the 'injury in fact' analysis for Article III standing, and therefore the inquiry is largely the same: whether the issues presented are definite and concrete, not hypothetical and abstract." *Ass'n of Irritate Residents v. U.S. Env't Prot. Agency*, 10 F.4th 937, 944 (9th Cir. 2021). Looking at injuries below (*see* Sec. III.D.2 (Irreparable Harm)), the Court finds that Plaintiffs' claims are constitutionally "ripe."

For prudential ripeness, the Court must assess "the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration." *Wolfson v. Brammer*, 616 F.3d 1045, 10158, 1060 (9th Cir. 2010). "A claim is fit for decision if the issues raised are primarily legal, do not require further factual development, and the challenged action is final*." US West Commc'ns v. MFS Intelenet, Inc.*, 193 F.3d 1112, 1118 (9th Cir. 1999). For hardship, "a litigant must show that withholding review would result in direct and immediate hardship." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1126 (9th Cir. 2009). Courts "consider whether the regulation requires an immediate and significant change in plaintiffs' conduct of their affairs with serious penalties attached to noncompliance" in evaluating hardship. *Id*. Here, prudential ripeness weighs in Plaintiffs' favor as well because, as demonstrated below (*see* Sec. III.D.2), they have alleged sufficient, immediate, and ongoing harm from Defendants' directives that threaten enforcement consequences. *See Washington v. U.S. Dep't of Transportation*, 2025 WL 1742893, at *16 (W.D. Wash. June 24, 2025). Accordingly, the Court finds that Plaintiffs' claims are prudentially "ripe."

### C. Jurisdiction

Defendants also argue that Plaintiffs fail to show a fair chance of establishing jurisdiction because (1) Congress "intentionally foreclosed judicial review" of these types of claims by these types of plaintiffs through the Civil Service Reform Act ("CSRA"), and (2) Plaintiffs have failed to identify a final agency action under the APA. Dkt. #59 at 9, 11.

### 1. CSRA

To determine if claims "are the type Congress intended to be reviewed within this statutory structure[,]" the Court must analyze (1) whether the claims are "wholly collateral to a statute's review provisions," (2) whether the issues are "outside the agency's expertise," and (3) whether a "finding of preclusion could foreclose all meaningful judicial review." *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 212-13 (1994). "When the answer to all three questions is yes, 'we presume that Congress does not intend to limit jurisdiction.'" *Axon Enter., Inc. v. Fed. Trade Comm'n*, 598 U.S. 175, 186 (2023) (quoting *Free Enter. Fund v. Public Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010)).

The Ninth Circuit recently considered a similar argument in *Am. Fed'n of Gov't Emps. v. Trump*, 139 F.4th 1020 (9th Cir. 2025). There, the plaintiffs ("a collection of unions, non-profit organizations, and local governments") brought *ultra vires* and APA claims against the executive branch's RIFs at issue in this case. *Id.* at 1028-29. Though the Government argued that the claims must be administratively channeled under the CSRA, the Ninth Circuit held that "ultra vires and APA claims plainly fall outside the scope of the CSRA's review provisions" because "[n]either [administrative review] body has the authority to address the type of constitutional and statutory claims raised by Plaintiffs." *Id.* at 1030-31.

Similarly, in *New York v. Kennedy*, a District of Rhode Island court also analyzed constitutional and APA claims brought by the plaintiff states against the mass cuts and layoffs at issue here. There, the court also held that the CSRA does not deprive the court of jurisdiction because the APA and constitutional claims fall outside of the CSRA's provisions, the "agency adjudications are generally ill suited to address structural constitutional challenges[,]" and the claims are not based "on why or how employees were fired" but "on the March 27 Communiqué's effect on HHS's ability to perform the duties it was Congressionally created to carry out." 2025

WL 1803260, at *9 (D.R.I. July 1, 2025).

The Court agrees with the Ninth Circuit and District of Rhode Island courts. Plaintiffs' claims challenge the DEIA ban's and mass layoffs' effects on the statutory duties of HHS, OHS, and the Head Start agencies. "[T]he MSPB and FLRA lack the relevant expertise, as well as the jurisdiction, to decide" these claims, "the Government here does not pretend that [Plaintiffs'] constitutional [and statutory] claims are . . . intertwined with or embedded in matters on which the [MSPB or FLRA] are expert[,]" and "channeling Plaintiffs' claims would preclude meaningful judicial review . . . where, as here, entire offices and functions are being eliminated from federal agencies." *Am. Fed'n of Gov't Emps.*, 139 F.4th at 1032. "This Court sees little to no value in requiring [Plaintiffs] to bring individual claims . . . to MSPB or FLRA . . . . In this scenario, even successful Plaintiffs would return to an empty agency with no infrastructure to support a resumption of their work." *New York v. Kennedy*, 2025 WL 1803260, at *9 (cleaned up). The Court is far better equipped to address these issues.

### 2. Final Agency Action

The APA allows a court to review the "procedure and substance" of a final agency action. 5 U.S.C. § 704. To determine a final agency action, a court must determine that a plaintiff is targeting "its attack against some particular agency action that causes it harm . . . [not] seeking wholesale improvement of an administrative program by court decree, rather than in the offices of the agency or the halls of congress, where programmatic improvements are normally made." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("*Nat'l Wildlife Fed'n*"). An agency action being "final" hinges on (1) the action marking the "consummation of the agency's decision making process," meaning its has "rendered its last word on the matter[,]" and (2) the action determines rights or obligations or creates legal consequences. *Bennett v. Spear*, 520 U.S. 154, 177, 178 (1997).

Defendants contend that Plaintiffs seek "comprehensive judicial review of HHS's initial and preliminary actions to begin implementing the President's Executive Orders," and the challenged actions and statements are "an unfolding reorganization plan that remains subject to changes based on circumstances, which is quintessentially non-final." Dkt. #59 at 12. Defendants argue that the DEIA ban is also not a final agency action because "[i]t merely emphasizes to grant recipients that they must comply with the anti-discrimination provision of the Head Start Act" and federal law. *Id*. at 12. Plaintiffs argue that the DEIA ban is a final agency action because it requires immediate compliance with legal consequences and "is already impeding agencies' abilities to serve these children." Dkt. #65 at 17-18. They argue the RIFs are also final actions because they have had immediate and direct effects on Plaintiffs, and the fact that HHS' "reorganization" may change "is irrelevant to whether actions Defendants have already taken are final and subject to APA review." *Id*. at 20.

The Court agrees with Plaintiffs. Defendants do not claim that the RIFs or DEIA ban are "of a merely tentative or interlocutory nature" (*Bennett*, 520 U.S. at 178) but that they are "not final" because "HHS's 'decisionmaking process' is ongoing and evolving" and the ban "merely emphasizes" already existing legal requirements. Dkt. #59 at 11-12. As Plaintiffs note, several courts have already found these exact RIFs to be final agency actions, and the Court finds their reasoning persuasive. Dkt. #65 at 20 (citing cases); *Am. Fed'n of Gov't Emps.*, 139 F.4th at 1038-39. As the court in *New York v. Kennedy* so eloquently reasoned on the HHS March 27 directive:

> It is this action that ushered in sweeping terminations and administrative leaves that essentially eviscerated many of the public health programs on which the States rely. Contrary to the Defendants' assertions, the record does not indicate that the States are seeking "wholesale improvement" of any program . . . . Remarkably, the Defendants fail to explain why a communication that foists mass terminations and is implemented to effectively discontinue sub-agencies would not constitute a "discrete" agency action.

ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION - 14

. . .

The Communiqué amounted to an announcement, not a suggestion, of the Defendants' plans to implement an absolute reorganization. The RIF notices further underscored HHS's intentions to fulfill the plans announced in the Communiqué. Such an immediate and sweeping termination of critical staff and the closure of division and offices surely marks the culmination of the Agency's decision to implement the Communiqué. The mere fact that additional cuts may be implemented does not prevent this Court from reviewing the actions already taken. The Defendants do not proclaim an intention to reverse all the mass terminations in the absence of judicial intervention, nor do they suggest they will reinstate closed programs or offices or resuscitate transferred programs.

. . .

[C]lear legal consequences resulted from the issuance of the Communiqué. The States are unable to access previously available funds, guidance, research, screenings, compliance oversight, data, and importantly, the expertise and guidance on which they have long relied. HHS's decision to dismiss employees and shut down entire programs and offices further demonstrate self-evident legal consequences . . . . Such an announcement, along with the swift actions taken by the Defendants to execute the plans of the Communiqué clearly marked the "consummation of the agency's decision making process" which triggered legal consequences.

2025 WL 1803260, at *12-13.

Similarly, the Court finds that the DEIA ban, consisting of the March 14 DEI Letter and the DEIA certification requirement, is a final agency action. This was a formal directive with immediate, new obligations (no "DEIA" programs) and consequences (no grant approval and subject to "clawing back" of funds and False Claims Act violations) with little to no guidance on compliance. As Plaintiffs state, Defendants' contention that this "merely emphasizes" existing anti-discrimination requirements is "a contention belied by the record and common sense." Dkt. #65 at 17. Furthermore, it is unclear to this Court that HHS' subsequent amendments to the Grants Policy Statement has any effect on Head Start agencies who accepted grants prior to the amendment, changes the intent or meaning behind certifying compliance, or Defendants' efforts to execute the DEIA ban. Plaintiffs are not seeking "programmatic change" but challenging discrete agency action to ban DEIA programming by Head Start providers.

In short, the Court finds that the above actions constitute final agency actions that are

judicially reviewable under the APA.

**D.  Preliminary Injunction**

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008).  A party can obtain a preliminary injunction by showing that (1) it is likely to succeed on the merits, (2) it is likely to suffer irreparable harm in the absence of preliminary relief, (3) the balance of equities tips in its favor, and (4) an injunction is in the public interest. *Id*. at 555 U.S. 20.  A preliminary injunction may also be appropriate if a movant raises "serious questions going to the merits" and the "balance of hardships . . . tips sharply towards" it, as long as the second and third *Winter* factors are satisfied.  *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1134-35 (9th Cir. 2011).

**1.  Likelihood of Success on the Merits**

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts." *Franklin v. Massachusetts*, 505 U.S. 7811, 796 (1992).  The APA requires federal agencies to "engage in reasoned decisionmaking." *National Urban League v. Ross*, 977 F.3d 770, 779 (9th Cir. 2020).  Reviewing courts must:

(1) compel agency action unlawfully withheld or unreasonably delayed; and

(2) hold unlawful and set aside agency action, findings, and conclusions found to be—

(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;

(B) contrary to constitutional right, power, privilege, or immunity;

(C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or]

(D) without observance of procedure required by law[.]

5 U.S.C. § 706(1) and (2)(A)-(D).

Plaintiffs bring all of the above APA claims against Defendants.  *See* Dkt. #31 at ¶¶ 341-385.  The Court analyzes Plaintiff's arbitrary and capricious claim below.[1]

### a.  Arbitrary and Capricious

Regarding the mass cuts or "RIFs," Plaintiffs argue that Defendants' actions are arbitrary and capricious because (1) "they have failed to consider important aspects of the problem created by mass cuts," Dkt. #37 at 26 (quotations omitted), (2) "the sudden mass cuts have significant costs and burdens that Defendants have failed to acknowledge or consider[,]" *id*. at 27, and (3) "Defendants have failed to meet their obligation to assess reliance interests."  *Id*.

On the DEIA ban, Plaintiffs first argue that it "abandons decades of policy" that required Plaintiff agencies to "address issues of cultural relevance and diversity" and "serve children with disabilities in inclusive settings[.]"  Dkt. #37 at 24-25.  Second, they argue that Defendants have failed "to consider how the DEIA Ban's vague prohibitions conflict with the Head Start Act, implementing regulations, and state and local laws have weakened" Plaintiffs' agency members' abilities "to effectively run their programs[,]" thus failing to consider reliance interests.  *Id*. at 25.

Defendants contend that their actions were within "the zone of reasonableness," and "Plaintiffs' dissatisfaction with the degree of analysis does not support their APA claim."  Dkt. #59 at 13-14.  Defendants contend that "Plaintiffs overlook the cost-saving value of actions like consolidating redundant departments" and "overstate the alleged harms[.]"  *Id*. at 14.

"Reasoned decisionmaking" is "the touchstone of arbitrary and capricious review under

---

[1] "The Court need only find that plaintiff is likely to succeed on one of his claims for the likelihood-of-success factor to weigh in favor of a preliminary injunction."  *City of Seattle v. Trump*, 2025 WL 3041905, at *9 n. 14 (W.D. Wash. Oct. 31, 2025) (cleaned up) (quoting *Am. Fed'n of State, Cnty. and Mun. Emps., ALF-CIO v. Soc. Sec. Admin.*, 778 F. Supp. 3d 685, 759 (D. Md. 2025)).

the APA[.]" *Altera Corp. & Subsidiaries v. Comm'r*, 926 F.3d 1061, 1080 (9th Cir. 2019) (quotations omitted). "[A]n agency's action can only survive arbitrary or capricious review where it has articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *All. for the Wild Rockies*, 68 F.4th at 493 (cleaned up). A district court "must not 'rubber-stamp' . . . administrative decisions that [it] deem[s] inconsistent with a statutory mandate or that frustrate the congressional policy underlying a statute." *Ocean Advocs. v. U.S. Army Corps of Eng'rs*, 402 F.3d 846, 859 (9th Cir. 2005) (cleaned up, quotations omitted). "An agency may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books. And of course the agency must show that there are good reasons for the policy[.]" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009) (citation omitted). Under this "change-in position doctrine," federal "[a]gencies are free to change their existing policies as long as they provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interest." *FDA v. Wages & White Lion Invs., L.L.C.*, 604 U.S. 542, 568 (2025) (cleaned up, quotations omitted).

Considering the mass cuts, the *New York v. Kennedy* court considered the same "cost-benefit" argument by the Government and found it unpersuasive:

> Instead of undertaking an intentional and thoughtful process for weighing the benefits and drawback of implementing the sweeping policy change, the Defendants hastily restructured the sub-agencies and issued RIF notices. The Defendants have failed to demonstrate how the workforce terminations and restructurings made the sub-agencies more efficient, saved taxpayer dollars, or aligned with HHS's priorit[ies] . . . . In fact, the record is completely devoid of any evidence that the Defendants have performed any research on the repercussions of issuing and executing the plans announced in the Communique. Without a modicum of evidence to the contrary, the record shows that the Defendants did not consider the substantial harms and reliance interests of the states and the devastating consequences that would be felt by the populations served by these critical public health programs."

789 F. Supp. 3d at 204. Other courts have come to similar conclusions on Defendants' DEIA

ban as well:

> Defendants counter that there "is nothing arbitrary or capricious about requiring federal grantees to comply with federal antidiscrimination laws or to certify that they are doing so." However, as this Court has already determined, the DEI Order does not simply require that grant recipients comply with federal antidiscrimination laws; rather, the Order is meant to advance the Trump Administration's own interpretation of "discrimination" through the threat of the loss of federal funding and/or FCA investigations and penalties.

*City of Seattle v. Trump*, 2025 WL 3041905, at *9 (W.D. Wash. Oct. 31, 2025) (internal quotations omitted).

This Court agrees with the above courts. Beyond Defendants' bold assertion that the mass cuts are cost efficient, Defendants have provided no rational basis for these actions and have shown no consideration for how these cuts and confusing policy changes have frustrated or made it impossible for Plaintiffs to function as they are statutorily required. Accordingly, the Court concludes that Plaintiffs are likely to succeed on the merits of their arbitrary and capricious APA claim.

**(3) Irreparable Harm**

Plaintiffs must establish a likelihood of irreparable harm absent preliminary relief. *Winter*, 555 U.S. at 20. Irreparable harm "is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages." *Ariz. Dream Act. Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014). A showing of "ongoing harms to their organizational missions" established this likelihood. *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013). Where these organizations rely on federal funding, "total loss of federal funding would be catastrophic, and the [plaintiffs'] need for certainty renders damages inadequate." *City & Cnty. of S.F. v Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). "[O]nce relevant funds have been obligated . . . [a]ny transfer, re-allocation, or re-obligation of these funds would be an irreparable loss." *Climate United Fund v. Citibank*, N.A. 775 F. Supp. 3d 335, 349 (D.D.C. 2025).

Defendants contend that Plaintiffs' alleged "anticipated harms are not sufficiently concrete or imminent" and, even if injury existed, "these injuries are readily measurable in monetary terms[.]" Dkt. #59 at 30. Defendants further argue that the requested belief "sweeps far beyond what might arguably be necessary" and that Plaintiffs' argument is "diminished here by the length of time since they learned of HHS's implementation of the Executive Orders[.]" *Id*. at 31.

Defendants' assertion that Plaintiffs' alleged harms are not concrete or imminent is unsupported by the record. Plaintiffs face a "Hobson's choice" between a penalty or no funding and meeting their statutory diversity requirements and no clarity on how to comply. *See* Dkt. #37 at 28-29. The mass cuts exacerbate these problems and more, as Plaintiffs' direct lines to any clarification and guidance from program directors and other Head Start oversight are non-existent or muddled by office closures and layoffs, resulting in program closures and instability. *Id*. at 30 (citing exhibits). Whether from closure or fear of offering services allegedly in violation of existing law, children risk losing access to health services, meals, screenings, and disabilities support. *Id*. (citing exhibits).

Defendants' arguments, appearing baseless before, are further contradicted by Plaintiffs' most recent supplemental briefings. *See* Dkts. #135, #137. For example, one Head Start agency director in Wisconsin states that her agency's grant application was returned and ordered to remove certain words from the application, including "racism," "race," "racial," "marginalized," "institutional," "historically," "bias," "equity," "equitable," "diversity," "diverse," "belonging," "inclusion," "inclusivity," "gender," "chestfeeding," "pregnant people," and "LGBTQIA 25+." Dkt. #135 at ¶ 10. She was also provided a "much lengthier list" of 197 other terms to exclude from applications, including "advocate," "accessible," "at risk," "barrier," "BIPOC," "Black," "cultural competence," "disability," "ethnicity," "equal opportunity," "equality," "expression,"

"female," "gender," "Hispanic minority," "immigrants," "indigenous community," "inclusive," "LatinX," "mental health," "multicultural," "Native American," "socioeconomic, "tribal," "underserved," and "women." *Id.* at ¶ 12. Given that this is a requirement for grant re-applications, and 45 C.F.R. § 1302.11(b)(2) "requires that the community assessment include the following demographic data: race and ethnicity; children with disabilities[,]" as well as services like mental health services for children with disabilities, the agency director does not know how to submit a grant application without violating the Government's prohibitions and limiting her ability to comply with reporting requirements, putting her and other agencies "in an impossible situation." *Id.* at ¶¶ 13-20.

Similarly, a program director for Washington Head Start Agencies' American Indian and Alaska Native member programs was instructed in November to "(1) 'Remove the Eligibility and Selection Criteria document from [their] application package'; (2) Revise [their] Training and Technical Assistance (T/TA) Plan to remove all Diversity and Inclusion-related training activities'; and (3) 'Resubmit the corrected application once the revisions [we]re complete." Dkt. #137 at ¶ 9 (quoting exhibit). Given that the program is located on a reservation, approximately 70% of children enrolled are tribal members, these Plaintiff agency members do not know how to comply with these requirements and their purpose to support and provide for their indigenous community. *Id.* at ¶¶ 10-16. Furthermore, the program specifically requested professional development on working with children with autism to support more than 10% of enrolled children, but they were forced to remove these plans along with the other "prohibited" terms from applications as "a condition of grant renewal." *Id.* at ¶¶ 17-22.

The Court finds that Plaintiffs' alleged harms are not "readily measurable" and that "Plaintiffs have 'laid out scores of examples of obligated funding and the harm that withholding such funding has caused[,]'" as well as the harm from conflicting instructions related to DEIA.

*Oregon Council for Humans. v. United States DOGE Serv.*, 794 F. Supp. 3d 840, 892 (D. Or. 2025) (quoting *New York v. Trump*, 769 F. Supp. 3d 119, 142 (D.R.I. 2025)); *see also City of Seattle*, 2025 WL 3041905, at *11 ("Adequate financial compensation simpl[y] does not exist for the destabilization of immediate and future budgets, termination of multi-year transportation projects, upheaval of low-to-moderate income individuals and families, loss of access to health care services to vulnerable populations, and the risk to public safety.").  Accordingly, the Court finds that Plaintiffs have sufficiently alleged irreparable harms from the OHS mass cuts and layoffs and the DEIA ban to satisfy the *Winters* requirements.

**(4) Balance of Equities and Public Interest**

In weighing the balance of equities and the public interest, "courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) (citation omitted).  Courts "explore the [parties'] relative harms" and "the interests of the public at large." *Barnes v. E-Sys., Inc. Grp. Hosp. Med. & Surgical Ins. Plan*, 501 U.S. 1301, 1305 (1991).  These factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009).

The Court finds that these factors weigh in Plaintiffs' favor.  Defendants contend these factors favor the Government because an injunction "would disrupt HHS's efforts to comply with the Executive Orders" and "hamstring HHS and force it to operate as if a new administration was never elected[,]" thus depriving HHS of flexibility in executing broad statutory mandates and compelling discretionary work that "may not be consistent with Administration priorities[.]" Dkts. #59 at 31-32.  But "Defendants do not have a legitimate interest in ensuring that funds are spent pursuant to conditions that were likely imposed in violation of the APA and/or the Constitution." *Martin Luther King, Jr. Cnty. v. Turner*, No. 2:25-cv-814, 2025 WL 2322763, at

*17 (W.D. Wash. Aug. 12, 2025); *see also City of Seattle*, 2025 WL 3041905, at *11; *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013); *Washington v. Dep't of Transportation*, 792 F. Supp. 3d 1147, 1192-93 (W.D. Wash. 2025). As this Court has stated before, a "strong public interest [exists] that the laws enacted by their representatives are not imperiled by executive fiat[,]" and public interest is not "'disserved by an injunction that brings clarity to all parties and to citizens dependent on public services." *Washington v. Trump*, 767 F. Supp. 3d 1239, 1280 (W.D. Wash. 2025) (internal citations omitted). Accordingly, the Court finds that the balance of equities and public interest weigh in Plaintiffs' favor.

### (5) Bond and Stay

Defendants request that the Court require Plaintiffs to post a bond and stay the requested relief. Dkt. #59 at 33. The Court will deny these requests. Defendants have not met the standard for a stay. *See, e.g., Maryland v. Dep't of Agriculture*, 770 F. Supp. 3d 779, 820 (D. Md. 2025) ("It is generally logically inconsistent for the court to issue a TRO or preliminary injunction and then stay that order, as the findings on which those decisions are premised are almost perfect opposites."). Furthermore, "[d]espite the seemingly mandatory language, Rule 65(c) invests the district court with discretion as to the amount of security required, if any." *Johnson v. Couturier*, 572 F.3d 1067, 1086 (9th Cir. 2009) (internal citations omitted). Under Ninth Circuit precedent, a district court may waive a bond "when it concludes that there is no realistic likelihood of harm to the defendant from enjoining his or her conduct." *Id*. Having determined that Defendants face little to no likelihood of harm or suffering costs as a result of this injunction, the Court will not require Plaintiffs to post a security bond.

### E. Motion to Supplement

As mentioned above, Plaintiffs have filed a Motion to Supplement the Record to include recent accounts by Plaintiff Head Start members regarding the DEIA ban. *See* Dkt. #136.

Defendants do not oppose the Motion, deny the supplement's relevant, or allege bad faith by the Plaintiffs, but Defendants do oppose the Motion, alleging unfair prejudice, if not given the opportunity "to respond to the new factual allegations and legal arguments[.]" Dkt. #139 at 2. Defendants request thirty days to respond. *Id.* Plaintiffs oppose this request because "supplementing the record with Defendants' own words and instructions, which were thus known to the Defendants," is not unfairly prejudicial, "the supplemental evidence is narrow and . . . presents no new legal arguments[,]" and that Defendants could have included opposing arguments in their Response "but chose not to." Dkt. #140 at 2-3.

The Court agrees with Plaintiffs. Defendants' cited case, *Shijiazhuang Hongray Grp. v. World Trading 23 Inc.*, is inapposite. There, the plaintiffs wanted to include new evidence the defendants failed to produce that was essential to opposing the defendants' summary judgment motion and required further discovery, while here, the new evidence simply illustrates continued harm from Defendants' DEIA-related orders consistent with Plaintiffs' earlier alleged harms. Case No. 5:21-cv-00972-FWS-KK, 2023 WL 6370924, at *3 (C.D. Cal. Aug. 14, 2023). Accordingly, the Court will grant Plaintiffs' Motion.

## IV.    CONCLUSION

Having reviewed the instant Motion and remainder of the record, the Court hereby finds and ORDERS:

(1) Plaintiffs' Motion for Leave to File Declaration in Pseudonym, Dkt. #134, is GRANTED.

(2) Plaintiffs' Motion to Supplement the Record, Dkt. #136, are GRANTED.

(3) Plaintiffs' Motion for Preliminary Injunction, Dkt. #37, is GRANTED, as follows:

Defendants and all their respective officers, agents, servants, employees, contractors, representatives, and attorneys, and any person in active concert or participation with them who receives actual notice of this Order are hereby ENJOINED from enforcing and/or implementing any portion of the DEI Letter of

DEIA Certification, all agency-wide directive implementing or effectuating the DEIA ban, and any changes made pursuant to the DEIA ban, or otherwise similar actions that enforce or implement Executive Orders No. 14,151, 90 Fed. Reg. 8339 (Jan. 29, 2025) or No. 14,173, 90 Fed. Reg. 8633 (Jan. 31, 2025) against any Head Start agencies, program providers, student or family participants, or other similar persons or entities, including by:

1.  Pausing, freezing, impeding, blocking, canceling, terminating, delaying, withholding, or conditioning any grants or obligations to Head Start agencies for any reasons other than those specifically enumerated by the Head Start Act or its implementing regulations;

2.  Requiring any Head Start agency to make "certifications" or other representations pursuant to the DEIA Certification or other similar requirement;

3.  Modifying, or requiring Head Start agencies to modify, the terms of any federal grants to comply with the DEIA ban, or adding/ or requiring Head Start agencies to add any terms to forthcoming grants predicated on the DEIA ban or similar language;

4.  Bringing any False Claims Act or other enforcement action pursuant to the DEIA Certification; or

5.  Any actions to further implement the mass cuts, layoff, and officer closures undertaken in accordance with the above Executive Orders, the March 27, 2025 Directive, and/or the April 3, 2025 e-mail or otherwise, including but not limited to: execution of any existing reduction in force notices, including final separation of employees, issuance of any further existing reduction in force notices, and/or placement of employees on administrative leave.

(4) The effective dates of Defendants' DEIA ban and the OHS mass layoffs and regional office closures are postponed.  5 U.S.C. § 705.

(5) Defendants' counsel shall provide written notice of this Order within 72 hours of entry to all Defendants and their officers, agents, servants, employees, contractors, representatives, and any other persons who are in active concert or participation with them, and to all Head Start agencies.  Defendants shall file a copy of the notice on the docket at the same time, as well as a Status Report documenting the actions they have taken to comply with this Order.

(6) This Preliminary Injunction shall remain in effect pending further orders from this Court.

(7) Plaintiffs are not required to post a security bond under Fed. R. Civ. P. 65(c).

DATED this 6th day of January, 2026.

RICARDO S. MARTINEZ
UNITED STATES DISTRICT JUDGE