**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 25-1189

NATIONAL ASSOCIATION OF DIVERSITY OFFICERS IN HIGHER
EDUCATION; AMERICAN ASSOCIATION OF UNIVERSITY PROFESSORS;
MAYOR AND CITY COUNCIL OF BALTIMORE, MARYLAND,

Plaintiffs - Appellees,

v.

DONALD J. TRUMP; DOROTHY FINK; DEPARTMENT OF HEALTH AND
HUMAN SERVICES; DEPARTMENT OF EDUCATION; DENISE CARTER;
DEPARTMENT OF LABOR; VINCENT MICONEI; DEPARTMENT OF
INTERIOR; DOUG BURGUM; DEPARTMENT OF COMMERCE; JEREMY
PELTER; DEPARTMENT OF AGRICULTURE; GARY WASHINGTON;
DEPARTMENT OF ENERGY; INGRID KOLB; DEPARTMENT OF
TRANSPORTATION; SEAN DUFFY; DEPARTMENT OF JUSTICE; JAMES
MCHENRY; NATIONAL SCIENCE FOUNDATION; SETHURAMAN
PANCHANATHAN; OFFICE OF MANAGEMENT AND BUDGET; MATTHEW
VAETH,

Defendants - Appellants.

------------------------------------

AMERICAN CENTER FOR LAW AND JUSTICE,

Amicus Supporting Appellants.

ILLINOIS; CALIFORNIA; MASSACHUSETTS; COLORADO; CONNECTICUT;
DELAWARE; HAWAII; MAINE; MARYLAND; MICHIGAN; MINNESOTA;
NEVADA; NEW JERSEY; NEW YORK; OREGON; RHODE ISLAND;
VERMONT; WASHINGTON; PRIVATE EMPLOYERS WITH DIVERSITY,
EQUITY, AND INCLUSION PROGRAMS, AND ORGANIZATIONS THAT
SUPPORT THEM; ACLU OF MARYLAND; PUBLIC JUSTICE CENTER;
UNION OF CONCERNED SCIENTISTS,

Amici Supporting Appellees.

————————

Appeal from the United States District Court for the District of Maryland, at Baltimore. Adam B. Abelson, District Judge.  (1:25−cv−00333−ABA)

————————

Argued:  September 11, 2025                    Decided:  February 6, 2026

————————

Before DIAZ, Chief Judge, and HARRIS and RUSHING, Circuit Judges.

————————

Vacated and remanded by published opinion.  Chief Judge Diaz wrote the opinion, in which Judge Harris joined and Judge Rushing joined except as to Part III.C.  Judge Diaz wrote a concurring opinion. Judge Rushing wrote a concurring opinion.

————————

**ARGUED:**   Jacob Moshe Roth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellants.  Aleshadye Getachew, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., for Appellees.  **ON BRIEF:**  Brett A. Shumate, Assistant Attorney General, Eric D. McArthur, Deputy Assistant Attorney General, Mark R. Freeman, Daniel Tenny, Jack Starcher, Catherine Padhi, Civil Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C.; Kelly O. Hayes, United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greenbelt, Maryland, for Appellants.    Niyati Shah, Noah Baron, Alizeh Ahmad, ASIAN AMERICANS ADVANCING JUSTICE, Washington, D.C.; Cynthia Liao, J. Sterling Moore, Audrey Wiggins, Brooke Menschel, Skye Perryman, DEMOCRACY FORWARD FOUNDATION, Washington, D.C., for Appellees.  Jay Alan Sekulow, Jordan Sekulow, Stuart J. Roth, Benjamin P. Sisney, Matthew R. Clark, Nathan J. Moelker, Liam R. Harrell, AMERICAN CENTER FOR LAW & JUSTICE, Washington, D.C., for Amicus American Center for Law and Justice.  Kwame Raoul, Attorney General, Jane Elinor Notz, Solicitor General, Sarah A. Hunger, Deputy Solicitor General, Samantha Sherman, Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF ILLINOIS, Chicago, Illinois, for Amicus State of Illinois.  Rob Bonta, Attorney General, James Richardson, Deputy Attorney General, William H. Downer, Supervising Deputy Attorney General, Michael L. Newman, Senior Assistant Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CALIFORNIA, Los Angeles, California, for Amicus State of California. Andrea Joy Campbell, Attorney General, David Ureña, Assistant Attorney General, Elizabeth Matos, Chief, Civil Rights Division, OFFICE OF THE ATTORNEY GENERAL OF MASSACHUSETTS, Boston, Massachusetts, for Amicus Commonwealth of Massachusetts.  Philip J. Weiser, Attorney General, OFFICE OF THE ATTORNEY

GENERAL OF COLORADO, Denver, Colorado, for Amicus State of Colorado. Kathleen Jennings, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF DELAWARE, Wilmington, Delaware, for Amicus State of Delaware. Aaron M. Frey, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MAINE, Augusta, Maine, for Amicus State of Maine. William Tong, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF CONNECTICUT, Hartford, Connecticut, for Amicus State of Connecticut. Anne E. Lopez, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF HAWAI'I, Honolulu, Hawai'I, for Amicus State of Hawai'i. Anthony G. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MARYLAND, Baltimore, Maryland, for Amicus State of Maryland. Dana Nessel, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MICHIGAN, Lansing, Michigan, for Amicus State of Michigan. Aaron D. Ford, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEVADA, Carson City, Nevada, for Amicus State of Nevada. Letitia James, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW YORK, New York, New York, for Amicus State of New York. Peter F. Neronha, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF RHODE ISLAND, Providence, Rhode Island, for Amicus State of Rhode Island. Nicholas W. Brown, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF WASHINGTON, Olympia, Washington, for Amicus State of Washington. Keith Ellison, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF MINNESOTA, St. Paul, Minnesota, for Amicus State of Minnesota. Matthew J. Platkin, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF NEW JERSEY, Trenton, New Jersey, for Amicus State of New Jersey. Dan Rayfield, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF OREGON, Salem, Oregon, for Amicus State of Oregon. Charity R. Clark, Attorney General, OFFICE OF THE ATTORNEY GENERAL OF VERMONT, Montpelier, Vermont, for Amicus State of Vermont. Michael R. Abrams, Deborah A. Jeon, Sonia Kumar, Zoe M. Ginsberg, AMERICAN CIVIL LIBERTIES UNION OF MARYLAND FOUNDATION, Baltimore, Maryland, for Amici ACLU of Maryland, Public Justice Center, and Union of Concerned Scientists. Victoria Slade, Ambika Kumar, Seattle, Washington, Stacey Sprenkel, San Francisco, California, Amanda Goméz, New York, New York, Adam Sieff, DAVIS WRIGHT TREMAINE LLP, Los Angeles, California, for Amici Private Employers with Diversity, Equity, and Inclusion Programs and Organizations that Support Them.

_____

DIAZ, Chief Judge:

In the first days of his second term, President Donald J. Trump issued two Executive Orders that directed executive agencies to end "diversity, equity, and inclusion" ("DEI") programs within federal grant and contract processes.  *See* Exec. Order No. 14,151, 90 Fed. Reg. 8339 (Jan 20, 2025); Exec. Order No. 14,173, 90 Fed. Reg. 8633 (Jan. 21, 2025). Plaintiffs—the Mayor and City Council of Baltimore; the American Association of University Professors; and the National Association of Diversity Officers in Higher Education[1]—sued and sought to preliminarily enjoin three of the Orders' provisions on First and Fifth Amendment grounds.

The district court entered a preliminary injunction, but we stayed it pending appeal. We now vacate the district court's injunction and remand.

## I.

## A.

Consistent with his campaign promises, newly inaugurated President Trump acted swiftly to eliminate DEI programming and funding in the federal government and private sectors.  Two Executive Orders he issued sought to do just that.

The first, entitled "Ending Radical and Wasteful Government DEI Programs and Preferencing," contains what plaintiffs call the "Termination Provision."  That provision directs all agencies, departments, and commissions to:

---

[1] Plaintiff Restaurant Opportunities Center dismissed its claim in district court.

terminate, to the maximum extent allowed by law, all DEI, DEIA, and "environmental justice" offices and positions (including but not limited to "Chief Diversity Officer" positions); all "equity action plans," "equity" actions, initiatives, or programs, "equity-related" grants or contracts; and all DEI or DEIA performance requirements for employees, contractors, or grantees.

Exec. Order No. 14,151 § 2(b)(i).

The second, entitled "Ending Illegal Discrimination and Restoring Merit-Based Opportunity," contains what plaintiffs call the "Certification Provision" and the "Enforcement Threat Provision."[2] The Certification Provision instructs "[t]he head of each agency [to] include in every contract or grant award:"

(A) A term requiring the contractual counterparty or grant recipient to agree that its compliance in all respects with all applicable Federal anti-discrimination laws is material to the government's payment decisions for purposes of section 3729(b)(4) of title 31, United States Code; and

(B) A term requiring such counterparty or recipient to certify that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws.

Exec. Order No. 14,173 § 3(b)(iv). Section 3729 of title 31 refers to the False Claims Act, which carries a civil penalty for knowingly making false statements. 31 U.S.C. § 3729(a).

The Enforcement Threat Provision tasked the "heads of all agencies, with the assistance of the Attorney General" to prepare a report, within 120 days of the Order, identifying "[a] plan of specific steps or measures to deter DEI programs or principles (whether specifically denominated 'DEI' or otherwise) that constitute illegal discrimination or preferences." Exec. Order No. 14,173 §§ 4(b)(iii).

---

[2] Defendants call this the "Report Provision."

B.

Implementation of the Orders soon followed.  The Departments of Labor, Health and Human Services, and Education instructed grantees to cease DEI activities and terminated DEI-related grants.  Similarly, the National Endowment for the Arts required grant applicants to certify that they "comply with all applicable Executive Orders while the award is being administered."  Supplemental Appendix ["S.A."] 82.

The Federal Communications Commission cited the Orders (along with the Communications Act and FCC regulations) in announcing that it was investigating Comcast NBCUniversal because the media conglomerate may have been "promoting invidious forms of DEI."  S.A. 69–71.  The Commission also noted that it had "already taken action to end its own promotion of DEI."  S.A. 70.  And the Department of Justice issued internal memoranda requiring its components to prepare reports about terminating grants or contracts related to DEI with "recommendations for enforcing federal civil-rights laws."  *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 767 F. Supp. 3d 243, 263 (D. Md. 2025).

As relevant here, the Department of Health and Human Services directed Baltimore—a Centers for Disease Control and Prevention grant recipient—to "immediately terminate" all activities "promoting 'diversity, equity, and inclusion . . . that are supported with funds from [Baltimore's] award'" given the Orders.  S.A. 5.  AmeriCorps likewise instructed Baltimore to certify that its awards "compl[y] with all administration Executive Orders" and don't "include any activities that promote DEI activities."  S.A. 65 ¶ 11.

6

The National Science Foundation refused to approve a travel request for a member of the American Association of University Professors, given uncertainty about whether the member's project regarding gender disparities and diversity in the sciences "aligned with the administration's executive orders."  S.A. 57 ¶ 4.  And a university issued a stop order on another member's National Academy of Sciences-funded project, which focused on equitable service access, after the Academy terminated a different project at the same university, citing the Orders.

Relatedly, an institutional member of the National Association of Diversity Officers in Higher Education cancelled a conference after the Department of Labor rescinded funding for it.  And the Association had to refund registration fees for another conference after attendees canceled because of the Orders.

## C.

Plaintiffs sued, seeking preliminary injunctive relief.  They argued that the Termination and Enforcement Threat Provisions facially violated the Fifth Amendment and that the Certification and Enforcement Threat Provisions facially violated the First Amendment.

The district court found the provisions likely unconstitutional and granted a nationwide injunction, which it later clarified "applie[d] to and b[ound] [d]efendants other than the President, as well as all other federal executive branch agencies, departments, and commissions, and their heads, officers, agents, and subdivisions."  *Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, 769 F. Supp. 3d 465, 467 (D. Md. 2025).  While the district court enjoined defendants from bringing enforcement or termination actions under

7

the provisions, it didn't bar the Attorney General from preparing the report prescribed under the Enforcement Threat Provision.

Defendants then appealed and moved for a stay of the preliminary injunction, which we granted. Soon after, plaintiffs moved to vacate the injunction so that they could amend their complaint. But the district court denied the motion because it "remain[ed] of the view that [p]laintiffs have shown a strong likelihood of success on the merits of their [constitutional] claims." *Nat'l Ass'n of Diversity Officers in Higher Ed. v. Trump*, 781 F. Supp. 3d 380, 385–86 (D. Md. 2025).

As explained below, we vacate the preliminary injunction.

## II.

"We review a district court's grant or denial of a preliminary injunction for abuse of discretion." *Salomon & Ludwin, LLC v. Winters*, 150 F.4th 268, 274 (4th Cir. 2025). While we don't "reweigh evidence the district court considered, a clear error in factual findings or a mistake of law merits reversal." *Id.*

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). "To justify [injunctive relief], a plaintiff must establish that 1) they are likely to succeed on the merits; 2) they are likely to suffer irreparable harm absent preliminary relief; 3) the balance of the equities favors relief; and 4) the relief is in the public interest." *Leaders of a Beautiful Struggle v. Balt. Police Dep't*, 2 F.4th 330, 339 (4th Cir. 2021). Plaintiffs bear the burden on each factor, and "[d]enying

a preliminary injunction only takes the rejection of a single factor." *Jensen v. Md. Cannabis Admin.*, 151 F.4th 169, 174 (4th Cir. 2025).

But first, plaintiffs must show that we have jurisdiction to hear their case; in other words, that they have Article III standing to bring their claims and that the claims are ripe. We start our analysis there.

III.

The district court concluded that plaintiffs had standing for each of their claims. We review that determination de novo, *see South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir. 2019), and disagree as to the Enforcement Threat Provision.[3]

A.

"Article III's standing requirement centers on whether the party invoking jurisdiction had the requisite stake in the outcome when the suit was filed." *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (citation modified). "Standing also tends to assure that the legal questions presented to the court will be resolved, not in the rarified atmosphere of a debating society, but in a concrete factual context conducive to a realistic

---

[3] In doing so, we join a trio of district courts that have evaluated nearly identical claims in the same procedural posture. *See, e.g.*, *Nat'l Urban League v. Trump*, 783 F. Supp. 3d 61 (D.D.C. 2025) (finding Article III jurisdiction over Termination and Certification Provision claims but not over Enforcement Threat Provision claim); *Chi. Women in Trades v. Trump*, 773 F. Supp. 3d 592 (N.D. Ill. 2025) (same); *S.F. AIDS Found. v. Trump*, 786 F. Supp. 3d 1184 (N.D. Cal. 2025) (same).

appreciation of the consequences of judicial action." *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 379 (2024) (citation modified).

To establish Article III standing, a plaintiff, whether an organization or an individual, must show: "(i) that [they] suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "An organization may have standing to sue on its own behalf for injuries it sustains as a result of a defendant's actions" or on behalf of its members. *Republican Nat'l Comm. v. N.C. State Bd. of Elections*, 120 F.4th 390, 395 (4th Cir. 2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 n.19 (1982)).

We may "somewhat relax[]" the injury-in-fact requirement "in First Amendment cases given that even the *risk* of punishment could chill speech." *Haines*, 2 F.4th at 310 (citation modified). In those cases, "the injury-in-fact element is commonly satisfied by a sufficient showing of self-censorship, which occurs when a claimant is chilled from exercising his right to free expression." *Id.* (citation modified). Still, the claimant must show that the chilling effect is "objectively reasonable" and that the challenged "action would be likely to deter a person of ordinary firmness from the exercise of First Amendment rights." *Id.* (citation modified).

B.

We hold that plaintiffs lack standing to challenge the Enforcement Threat Provision.

To begin, as defendants explained at oral argument, agency heads and the Attorney General prepared the required report and submitted it to the President in June. So it's unclear how an injunction could redress any plausible harm stemming from a report issued months ago. Indeed, the Administration's preparation of the report may have mooted plaintiffs' challenge to the Enforcement Threat Provision. *See, e.g.*, *Trump v. Int'l Refugee Assistance*, 583 U.S. 912 (2017) (mem.) (finding challenge to Executive Order "no longer present[ed] a live case or controversy" after the 90-day suspension period described in the Order expired (citation modified)).

But because we evaluate plaintiffs' standing as of the time they filed their complaint (before the report was issued), *see Wild Va. v. Council on Env't Quality*, 56 F.4th 281, 293 (4th Cir. 2022), we'll assume that we could redress such harm.

Even so, plaintiffs haven't sufficiently alleged an injury-in-fact. They claim that they fear retribution by defendants and that they'll be forced to restrict "their speech and conduct in support of diversity, equity, and inclusion" or face penalties. Appellees' Br. at 21. But these allegations overstate the Enforcement Threat Provision's text.

First, "[e]verything [about that provision] is intra-governmental: the President has directed the Attorney General to spearhead a report that will further inform and advise him." *Nat'l Urban League*, 783 F. Supp. 3d at 80 (citation modified). Though the report might graze the private sector, the provision itself "focus[es] on internal government agency processes and programs and reporting to the President from his subordinates." *Chi. Women in Trades*, 773 F. Supp. 3d at 601. None of the plaintiffs, "of course, [are] an

agency within the executive branch of government," so "it is difficult to see how [they] can be in imminent danger of an injury based on a provision that simply requires a cabinet official to issue a report at a future date." *Id.*

Second, any injury "rest[s] 'on a highly attenuated chain of possibilities' that 'does not satisfy the requirement that threatened injury must be certainly impending.'" *Nat'l Urban League*, 783 F. Supp. 3d at 80 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410 (2013)).  The Enforcement Threat Provision would harm plaintiffs only if:

> (1) the Attorney General includes in her report a plan or strategy of cutting funds for organizations that engage in DEI, even though the [P]rovision does not mention funding; (2) the President adopts that aspect of the *proposed* strategic enforcement plan; (3) the plan, however finalized, includes [p]laintiffs (or at least one of them) within the scope of the funding-cut strategy; and (4) some government actor enforces that part of the approved plan and slashes funding.

*Id.* (citation modified).

"Such multi-tiered speculation is inconsistent with Article III standing." *Id.* (citation modified).[4]  So we lack jurisdiction to hear plaintiffs' constitutional claims related to the Enforcement Threat Provision.[5]

---

[4] This speculation also creates a ripeness problem.  "A case is fit for judicial decision," or ripe, "when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).  Put differently, we'll dismiss a claim "as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Id.* (citation modified).  Though we vacate the injunction of the Enforcement Threat Provision for lack of standing, we could likely do the same on ripeness grounds.

[5] The district court didn't enjoin defendants from preparing the report; it barred only enforcement of the same.  But the text of the Enforcement Threat Provision has no enforcement mechanism, so we don't see how that carve out supports plaintiffs' standing.

12

C.

The Termination and Certification Provisions' jurisdictional allegations are altogether different. For those provisions, plaintiffs plausibly allege that they "will lose access to money—a classic pocketbook injury sufficient to give them standing." *Id.* (citation modified).

For the Termination Provision, plaintiffs allege that they, or their members, had grants cancelled on account of the Executive Orders that would have funded equity-related work and travel. The Department of Health and Human Services likewise demanded that Baltimore "immediately terminate" all activities "promoting 'diversity, equity, and inclusion'" supported by its federal grant money. S.A. 5. Plaintiffs also identified other awards "at risk of termination" due to "the anti-equity Termination Provision." Appellees' Br. at 24.

For the Certification Provision, plaintiffs allege that they "may have to abandon [their] lawful efforts and speech related to diversity, equity, inclusion, and accessibility, or else lose federal funds." Appellants' Br. at 19. In fact, "based on their previous and planned activit[ies] as federal grantees," plaintiffs "are likely . . . to face the forced choice that the [Provision] presents: change their programming to enable them to make the certification; make the certification without changes and risk a false certification; or give up federal funds and contracts." *Nat'l Urban League*, 783 F. Supp. 3d at 85 (citation modified).

The injury posed by such a "lose-lose-lose choice" "is real." *Id.* Add to this that the Certification Provision mandates that "each agency head '*shall*' include the

13

certification in '*every*' contract or grant award," and the threatened injury becomes both likely and imminent. Appellees' Br. at 19 (quoting Exec. Order 14,173 § 3(iv)(B)) (emphasis added).

Recall too, that plaintiffs must certify under the additional threat of False Claims Act enforcement. A "person of ordinary firmness faced with this situation would steer clear of any speech or activities arguably promoting [DEI]" both to avoid losing his or her federal funding and to avoid federal enforcement. *Id.* (citation modified). At the very least, plaintiffs "are forced to do something they otherwise would not need to do"—affirmatively certify that their DEI programming complies with federal antidiscrimination laws. *Nat'l Urban League*, 783 F. Supp. 3d at 85.[6]

Defendants concede (as they must) that "plaintiffs experience some direct effects from the Certification Provision." Appellants' Br. at 36. We're satisfied that those effects—and the chilled speech accompanying them—constitute an injury-in-fact, particularly under a relaxed First Amendment standard. *See Haines*, 2 F.4th at 310 (crediting plaintiff's "self-censorship" allegations as sufficient "for an injury-in-fact to lie" (citation modified)).

And for both provisions, plaintiffs have shown that their injuries are fairly traceable to defendants. "[T]he Termination and Certification Provisions are part of executive orders

---

[6] This likely satisfies the causation element as well. *See All. for Hippocratic Med.*, 602 U.S. at 382 ("Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements.").

signed by the President that, by their terms, require implementation by . . . federal agencies." *Chi. Women in Trades*, 773 F. Supp. 3d at 603; *see also supra* note 6.

Defendants have asked at least one plaintiff to certify and placed others in fear of losing funding if they don't.  Plaintiffs wouldn't have to affirmatively certify but for the provision.  Nor would they fear repercussions for certifying (or not) but for the provision. *See Haines*, 2 F.4th at 311 (crediting causation allegations where plaintiffs would have published materials "*but for*" prepublication regimes at issue).

The Termination Provision, meanwhile, increases "the likelihood that [p]laintiffs will lose access to money because [it] direct[s] agencies to stop providing the federal funds." *Nat'l Urban League*, 783 F. Supp. 3d at 84.  Without the Termination Provision (at least on this record), plaintiffs wouldn't have lost—or be under threat of losing—their federal funding.

Plaintiffs' alleged injuries from the Certification and Termination Provisions are also redressable by a favorable judicial decision.[7]  "[C]ausation and redressability[] are often flip sides of the same coin" in that "[i]f a defendant's action causes an injury, enjoining the action or awarding damages for the action will typically redress that injury." *All. for Hippocratic Med.*, 602 U.S. at 380–81 (citation modified).  An injunction would absolve plaintiffs from having to make their "lose-lose-lose choice" and would prevent defendants from terminating funding based on those Provisions.

---

[7] The Termination Provision directed agencies to terminate equity-related contracts within 60 days.  That deadline has come and gone, but defendants neither argue nor represent that they have stopped enforcing the provision.  So the claim isn't moot.

D.

Plaintiffs' challenges to the Termination and Certification Provisions are also constitutionally ripe. "While standing involves the question of *who* may sue, ripeness involves *when* they may sue." *Wild Va.*, 56 F.4th at 293 (citation modified). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Doe*, 713 F.3d at 758.

"Much like standing, ripeness requirements are also relaxed in First Amendment cases." *Cooksey v. Futrell*, 721 F.3d 226, 240 (4th Cir. 2013). Still, the doctrine is meant to "prevent the courts . . . from entangling themselves in abstract disagreements over administrative policies, and . . . to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Wild Va.*, 56 F.4th at 295.

Defendants argue that neither the termination of plaintiffs' contracts nor the chilling of their "First Amendment activity" "provides a basis for judicial review now." Appellant's Br. at 14. That's because plaintiffs may challenge any terminated contract "in the context of [that] particular contract termination" and any "hypothetical future terminations of contracts, . . . is speculative." *Id.* Defendants also assert that any chilling effect "result[s] from a governmental policy that does not regulate, constrain, or compel any action" by plaintiffs. *Id.* at 16.

Neither argument persuades. The Certification and Termination Provisions contain "straightforward directive[s]" "pointedly tell[ing] agencies to terminate grants and contracts in specified circumstances," or mandating that "agencies . . . include two terms

16

requiring certification in every contract or grant." *Nat'l Urban League*, 783 F. Supp. 3d at 86.

And plaintiffs allege multiple "examples of agencies acting consistently with those directives by terminating or suspending grants," or by requiring that plaintiffs certify that their DEI programming doesn't violate antidiscrimination laws. *Id.* So "[d]efendants are the ones speculating by suggesting that the agencies will disregard these clear mandates when implementing the [P]rovisions." *Id.*

Defendants have repeatedly (and rightly) invoked the Executive Orders' plain text in this facial challenge. But that text reveals that agencies have little discretion when it comes to enforcement.[8]

Because plaintiffs have standing to challenge the Termination and Certification Provisions, we turn to the merits.

IV.

At the outset, we stress that plaintiffs bring facial challenges to the Termination and Certification Provisions. "Facial invalidation is, manifestly, strong medicine that has been employed by [courts] sparingly and only as a last resort." *Nat'l Endowment for the Arts v. Finley*, 524 U.S. 569, 580 (1998) (citation modified). Here, plaintiffs' "claim is that the

---

[8] "[W]hether [d]efendants will apply the provisions in ways affecting [p]laintiffs and whether they will do so unlawfully are distinct [questions]." *Nat'l Urban League*, 783 F. Supp. 3d at 86; *see also Whitmore v. Arkansas*, 495 U.S. 149, 155 (1990) ("Our threshold inquiry into standing in no way depends on the merits of the [plaintiffs'] contention that particular conduct is illegal." (citation modified)).

[provisions] are unconstitutional not as applied to [plaintiffs'] own conduct, but rather, *on their face*, as they apply to the population generally." *Haines*, 2 F.4th at 313. But such claims "are disfavored because they run contrary to the fundamental principle of judicial restraint that courts should neither anticipate a question of constitutional law in advance of the necessity of deciding it nor formulate a rule of constitutional law broader than is required by the precise facts to which it is to be applied." *Id.* (citation modified).

Typically, a facial challenge requires a showing "that the [provision] is unconstitutional in all of its applications, or that [it] lacks any plainly legitimate sweep." *Id.* (citation modified). In the First Amendment context though, a facial challenge may proceed "if a substantial number of [the provision's] applications are unconstitutional, judged in relation to [its] plainly legitimate sweep." *United States v. Stevens*, 559 U.S. 460, 473 (2010) (citation modified). Plaintiffs "must demonstrate a substantial risk that application of the provision will lead to the suppression of speech." *Finley*, 524 U.S. at 580.

### A.

We start with plaintiffs' Fifth Amendment challenge to the Termination Provision.

The Fifth Amendment guarantees that "[n]o person shall . . . be deprived of life, liberty, or property without the due process of law." U.S. Const. amend. V. Because "clarity in regulation is essential to the protections provided by the Due Process Clause," *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012), "an enactment is void for vagueness if its prohibitions are not clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). The vagueness inquiry asks whether a regulation "provide[s] a

person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *Fox Television*, 567 U.S. at 253 (citation modified).

In sum, due process demands fair notice and prohibits arbitrary enforcement. On this record, the Termination Provision satisfies both.

The Termination Provision calls for federal actors to terminate (among other things) "'equity-related' grants or contracts." Exec. Order 14,151 § 2(b)(i). Plaintiffs argue that the provision never defines "equity-related," so there isn't "any guidance as to which grants or contracts must be terminated." Appellees' Br. at 37. Thus, "agencies are free to terminate grants and contracts as they please, even based on protected speech." *Id.*

But therein lies plaintiffs' dilemma. The Termination Provision, on its face, doesn't ask anything of them, nor does it regulate private conduct. Instead, it instructs the President's subordinates to act, and then only "to the maximum extent allowed by law." Exec. Order 14,151 § 2(b)(i). The Provision, at this stage at least, is nothing more than "an outward-facing" policy directive from the President to his agents. *See Chi. Women in Trades*, 778 F. Supp. 3d at 989 ("Any concerns of vagueness regarding exactly what authority an agency may have to terminate a grant are internal considerations for the agency itself.").

The President may determine his policy priorities and instruct his agents to make funding decisions based on them. *See generally* 2 C.F.R. § 200.340(a)(4) (2025). President Trump has decided that equity isn't a priority in his administration and so has directed his subordinates to terminate funding that supports equity-related projects to the

maximum extent allowed by law.[9]  Whether that's sound policy or not isn't our call.  We ask only whether the policy is unconstitutionally vague for funding recipients.

The Supreme Court's decision in *National Endowment for the Arts v. Finley* provides the answer.  There, the Court rejected a facial vagueness challenge to certain standards in the National Foundation on the Arts and Humanities Act.  *Finley*, 524 U.S. at 572–73.  Those standards directed the National Endowment for the Arts' chairperson "to ensure that 'artistic excellence and artistic merit are the criteria by which [grant] applications are judged, taking into consideration general standards of decency and respect for the diverse beliefs and values of the American public.'"  *Id.* at 572 (citation modified).

The Court acknowledged that "[t]he terms of the provision are undeniably opaque, and if they appeared in a criminal statute or regulatory scheme, they could raise substantial vagueness concerns."  *Id.* at 588.  But it explained that, in the funding context, "when the Government is acting as patron rather than as sovereign, the consequences of imprecision are not constitutionally severe."  *Id.* at 589.  "To accept [the] respondents' vagueness argument," continued the Court, "would be to call into question the constitutionality" of

---

[9] The Termination Provision "directs the termination of grants, subject to applicable legal limits, based *only on the nature of the grant-funded activity itself*."  *Nat'l Ass'n of Diversity Officers*, No. 25-1189, Dkt. No. 29, at 7 (4th Cir. Mar. 14, 2025) (Harris, J., concurring) (emphasis added).  In practical terms (which defendants confirmed at oral argument), the Provision isn't meant to affect non federally funded initiatives: for example, if an employee of the organization includes their pronouns in their email signature.  Doing otherwise would implicate the First Amendment.  *See Agency for Int'l Dev. v. All. for Open Soc'y Int'l, Inc.*, 570 U.S. 205, 214–15 (2013) (explaining that the government can't "seek to leverage funding to regulate speech outside the contours of the federal program itself").

other government funding programs and awards based on "subjective criteria such as 'excellence.'" *Id.* (quoting 2 U.S.C. § 802).

Try as they might, Plaintiffs can't wriggle out from under *Finley*'s weight. They argue that the decision "did not foreclose all claims of unconstitutional vagueness for already-awarded grants, especially when the danger of coercion and suppression is clear." Appellees' Br. at 37. While that may be true, it doesn't help them.

Importantly, *Finley* addressed Congress's guidance to an independent agency about its funding decisions. But here, we're reviewing the President's directive to his subordinates about how they should allocate federal funding based on the President's priorities. If the Supreme Court didn't find vagueness concerns in the former, we're hard-pressed to see how we could for the latter. *See Nat'l Urban League*, 783 F. Supp. 3d 94 ("Because [p]laintiffs are not those to whom the provisions are directed, the fair notice aspect of the vagueness doctrine is a poor fit." (citation modified)).

We're also guided by *Finley*'s refrain that courts should afford greater latitude for vagueness in funding decisions than they would "in a criminal statute or regulatory scheme." 524 U.S. at 588; *see also Chi. Women in Trades*, 778 F. Supp. 3d at 987 ("Vague funding criteria certainly influences speech, but the consequence of grant termination or denial is significantly less severe than criminal or regulatory sanction, so it is likely that less speech will be stifled."). And while that latitude isn't boundless, it bars a facial challenge here.

Plaintiffs direct us to instances in which (in their view) agencies have enforced the Termination Provision in an "arbitrary and discriminatory" manner. Appellees' Br. at 37.

21

But if government actors have terminated grants or contracts "without regard to their legality," Reply Br. at 6, then plaintiffs can sue *those* actors for terminating *those* contracts. The Provision's plain text doesn't terminate any contracts, nor does it directly regulate non-governmental conduct, so by relying on this enforcement evidence, plaintiffs blur the line between a facial and as-applied challenge.

In short, plaintiffs are unlikely to succeed on their facial challenge to the Termination Provision. So the district court erred in preliminarily enjoining it.

B.

We next turn to the plaintiffs' First Amendment challenge to the Certification Provision.

The First Amendment precludes the government from "abridging the freedom of speech." *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015) (quoting U.S. Const. amend. I). So generally, "the government may not regulate speech based on its substantive content or the message it conveys." *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995).

But this case arises in the funding context. There, as we've explained, the government "has wide latitude to set spending priorities" and "to ch[oose] to fund one activity to the exclusion of the other." *Finley*, 524 U.S. at 588 (citation modified). But again, the latitude isn't limitless. *See id.* at 587 ("[E]ven in the provision of subsidies, the Government may not aim at the suppression of dangerous ideas." (citation modified)).

We begin (as required) with the Provision's "text, which must be construed consistently with the [Executive] Order's object and policy." *City & Cnty. of San*

22

*Francisco v. Trump*, 897 F.3d 1225, 1238 (9th Cir. 2018) (citation modified); *see also HIAS, Inc. v. Trump*, 985 F.3d 309, 319 (4th Cir. 2021).

The Certification Provision requires that agencies include in "every contract or grant award" a term (A) certifying the grant recipient's "compliance in all respects with all applicable Federal anti-discrimination laws," subject to False Claims Act liability, and (B) certifying "that it does not operate any programs promoting DEI that violate any applicable Federal anti-discrimination laws." Exec. Order 14,173 § 3(b)(iv).

Defendants say that the Provision's mandate is simple: it merely "requires recipients to certify their compliance with existing legal obligations under the 'applicable' federal civil rights laws." Reply Br. at 24–25.

Plaintiffs respond that the Certification Provision violates the First Amendment because it "discriminates between viewpoints" and "is both fatally overinclusive and underinclusive." Appellees' Br. at 30. They say that it targets programs promoting DEI but not those opposing it and doesn't "seek to punish other violations of 'Federal anti-discrimination law[s]' in the same way." *Id.* at 31. They point to record evidence of internal agency memoranda and other agency communications that they claim show that defendants are targeting DEI-related activity beyond what's already prohibited by federal antidiscrimination laws.

To be sure, the Certification Provision (unlike the other challenged provisions) burdens actors outside Executive-Branch purview and requires certification as to "any programs," not just federally funded ones. Exec. Order 14,173 § 3(b). That gives us some pause, but not enough.

23

To start, to make out a First Amendment claim, "[p]laintiffs must show that the certification requirement impermissibly restricts their ability to engage in *protected speech*." *Nat'l Urban League*, 783 F. Supp. 3d at 102.  But the Provision requires only that plaintiffs certify compliance with federal antidiscrimination laws, which the First Amendment doesn't confer a right to violate.[10] *See S.F. AIDS Found.*, 786 F. Supp. 3d at 1222 ("[W]hile the First Amendment may protect speech that advocates for violation of law, it does not protect activities that directly violate antidiscrimination law.").  Put another way, plaintiffs have no protectable speech interest in operating, and "no constitutional right to operate[,] DEI programs that violate federal antidiscrimination law." *Nat'l Urban League*, 783 F. Supp. 3d at 102.

Indeed, existing federal law already demands such compliance, and plaintiffs have not challenged existing law as viewpoint-discriminatory or as over or underinclusive.  Plaintiffs suggest that defendants view all DEI programs as illegal under existing antidiscrimination law.  Perhaps, but the Certification Provision doesn't say that.

What plaintiffs are really asking us to do is read subtext into the Provision's text.  And what they're really challenging is how the Administration and its agency actors interpret antidiscrimination law in relation to plaintiffs' DEI programming.  Neither is fertile ground for a facial attack against the Certification Provision.

---

[10] The certification requirement also seemingly aligns with the Executive Order's purpose: to enforce "[l]ongstanding Federal civil-rights laws [that] protect individual Americans from discrimination based on race, color, religion, sex, or national origin." Exec. Order 14,173 § 1.

Instead, we're bound by the text.  If the President, his subordinates, or another grantor misinterprets federal antidiscrimination law, plaintiffs "can challenge that interpretation in a specific enforcement action." *Id.* at 103.  But we can't conclude today that a "substantial number of the [Certification Provision's] applications" will be unconstitutional.  *Stevens*, 559 U.S. at 473 (citation modified).

Thus, plaintiffs are unlikely to succeed on their challenge to the Certification Provision.  The district court erred in holding otherwise.

## V.

Facial invalidation again "is, manifestly, strong medicine." *Finley*, 524 U.S. at 580 (citation modified).  Here, it proved too strong.  We therefore vacate the district court's order granting plaintiffs' motion for a preliminary injunction, and remand for further proceedings.

*VACATED AND REMANDED*

DIAZ, Chief Judge, concurring:

We're presented today with a facial challenge to two Executive Orders concerning certain DEI programming, not the legality or termination of any particular DEI program. That makes all the difference.

Defendants represented at oral argument that there is "absolutely" DEI activity that falls comfortably within the confines of the law. I hope that's true. But the evidence cited by plaintiffs, their amici, and the district court suggests a more sinister story: important programs terminated by keyword; valuable grants gutted in the dark; worthy efforts to uplift and empower denigrated in social media posts.[*]

Cognizant of my oath, I've framed the limited question before us and answered it. And I've (reluctantly) left others for tomorrow.

---

[*] The Administration's obsession over so called "woke" DEI programs appears to know no bounds. This past December, Secretary of State Marco Rubio—who also serves as Acting National Security Advisor and Acting Archivist of the United States—somehow found time to rail against the Calibri typeface previously approved for State Department use by his predecessor. I kid you not.

Secretary Rubio's predecessor made the change to Calibri (a sans serif font) to help improve accessibility for those with dyslexia or other visual impairments. So why did Secretary Rubio decree otherwise? Primarily, for the entirely defensible reasons that (1) his preferred choice (Times New Roman 14, a classic serif font) presents a more professional and formal typography for diplomatic correspondence, and (2) use of the Calibri font had (at least in the State Department's experience) not meaningfully improved reader accessibility.

Had the Secretary left it there, I would applaud him, particularly since our court favors his font choice. But leave it there, he couldn't. Instead, the Secretary lashed out at his predecessor for imposing yet another "illegal, immoral, radical [and] wasteful [diversity initiative]" before ordering Calibri's demise. *See, e.g.*, Michael Crowley and Hamed Aleaziz, *At State Dept., a Typeface Falls Victim in the War Against Woke*, N.Y. Times (Dec. 9, 2025) [https://perma.cc/C3UA-P8TN]. Sigh.

For those disappointed by the outcome, I say this: Follow the law.  Continue your critical work.  Keep the faith.  And depend on the Constitution, which remains a beacon amid the tumult.

RUSHING, Circuit Judge, concurring in part and concurring in the judgment:

I join all but Part III.C of the majority opinion. I agree that Plaintiffs have standing to challenge the Termination Provision for the reasons given in Part III.C. I also agree that Plaintiffs likely have standing to challenge the Certification Provision, but not for all the reasons given by the majority.

The majority asserts a handful of bases for Plaintiffs' standing to challenge the Certification Provision: losing "access to money"; a chill on Plaintiffs' "lawful efforts and speech related to" DEI; one Plaintiff actually being asked to certify; and, "[a]t the very least," the requirement that Plaintiffs "do something they otherwise would not need to do." Maj. Op. 13–15 (internal quotation marks omitted). Only the last of these options "likely" supports standing here. *Murthy v. Missouri*, 144 S. Ct. 1972, 1986 (2024) (internal quotation marks omitted).

Plaintiffs' claim that the prospect of certification chills their lawful DEI-related activities and expression (or may cause them to lose money because of those activities) is not "'objectively reasonable.'" *Edgar v. Haines*, 2 F.4th 298, 310 (4th Cir. 2021) (quoting *Benham v. City of Charlotte*, 635 F.3d 129, 135 (4th Cir. 2011)). The Certification Provision targets "programs promoting DEI *that violate any applicable Federal anti-discrimination laws*." Exec. Order No. 14,173, § 3(b)(iv)(B), 90 Fed. Reg. 8633 (Jan. 21, 2025) (emphasis added). Plaintiffs provide no evidence to support their fear that the Government will apply that provision to burden their lawful speech or expressive conduct. *See*, *e.g.*, *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 164 (2014) (finding "the threat of future enforcement" of a law "substantial" where there was "a history of past

enforcement"). Nor is this one of those cases in which a plaintiff's allegation of chill is objectively reasonable because "the line between speech unconditionally guaranteed" (here, speech that does not violate antidiscrimination laws) "and speech which may be legitimately regulated, suppressed, or punished" (here, speech that does violate antidiscrimination laws) "is finely drawn." *Speiser v. Randall*, 357 U.S. 513, 525 (1958); *see also Babbit v. United Farm Workers Nat'l Union*, 442 U.S. 289, 301 (1979). To claim that the existence of the Certification Provision objectively chills lawful speech or expressive conduct would be tantamount to claiming that the existence of federal antidiscrimination laws objectively chills lawful speech or expressive conduct. But tellingly, not even Plaintiffs go that far. *Cf. Nat'l Urb. League v. Trump*, 783 F. Supp. 3d 61, 103 (D.D.C. 2025) ("Plaintiffs cite no case—and the Court has found none—suggesting that the fear of liability for violating federal antidiscrimination law supports a chilling-effect claim under the First Amendment."). Given the Certification Provision's text and the lack of other evidence (such as past enforcement), Plaintiffs' fear that the Government may one day use the Certification Provision to cut their funding based on speech or conduct that does not violate federal antidiscrimination laws is pure speculation.

The majority also finds standing in part based on one Plaintiff being asked to make a certification. But the best read of Plaintiffs' evidence on this point is that the certification in question reflects enforcement of the Termination Provision, not the Certification Provision. AmeriCorps told the City of Baltimore to "[c]ertify that *[its] awards*, using proscribed language, compl[y] with all administration Executive Orders and do[] not *include* any activities that promote DEI activities." S.A. 65 (internal quotation marks

29

omitted and emphases added). Given AmeriCorps's focus on whether the "*awards . . . include*" any DEI activities, it is apparent that AmeriCorps was ensuring that it was not funding DEI. S.A. 65. Indeed, Plaintiffs' own declaration tells us that is exactly what AmeriCorps's certification demand was meant to do. *See* S.A. 64 ("According to AmeriCorps, the flagged language [in several grants] raised questions about whether Baltimore's program is *using Federal funds* to promote or provide services out of compliance of the recent Executive Orders." (internal quotation marks omitted and emphasis added)). The certification demand thus reflects enforcement of the Termination Provision (which prohibits funding DEI with federal funds), not the Certification Provision (which requires funding recipients to certify that they operate no DEI programs, federally funded or not, that violate federal antidiscrimination laws). *Compare* Exec. Order No. 14,151, § 2(b)(i), 90 Fed. Reg. 8339 (Jan 20, 2025) (Termination Provision), *with* Exec. Order No. 14,173, § 3(b)(iv)(B) (Certification Provision). It goes without saying that Plaintiffs cannot rely on enforcement of the Termination Provision to establish standing to challenge the Certification Provision.

All that said, it is true that "[g]overnment regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements. So in those cases, standing is usually easy to establish." *FDA v. All. for Hippocratic Med.*, 144 S. Ct. 1540, 1556 (2024). Plaintiffs have plausibly alleged that the Certification Provision will one day require them to certify, an action they otherwise would not take. At this stage, that likely suffices.